UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration )<br>Between )<br> )<br>SMITH COGENERATION (Bangladesh) PVT. LTD., )<br>210 West Park Ave., Suite 810 )<br>Oklahoma City, Oklahoma 73102 )<br> )<br>Petitioners, )<br>and )<br> )<br>BANGLADESH POWER DEVELOPMENT BOARD )<br>and THE GOVERNMENT OF BANGLADESH, represented )<br>by the Ministry of Energy and Mineral Resources )<br> )<br>Respondents. )<br>————————————————————————) | No. _____ |

### PETITION TO CONFIRM A FOREIGN ARBITRAL AWARD

Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("Convention"), 9 U.S.C. § 203 implementing that Convention, and 9 U.S.C. § 207, petitioner Smith Cogeneration (Bangladesh) Pvt. Ltd. ("Petitioner" or "Smith") petitions this Court for an order confirming two related arbitration awards issued by the International Court of Arbitration ("Court of Arbitration") of the International Chamber of Commerce ("ICC") in Case No. 10372/OL/ESR/MS, against the Bangladesh Power Development Board ("Power Board") and the Government of Bangladesh ("GoB") (the Power Board and GoB together, "Respondents"). In support of this Petition, Smith states as follows:

### Jurisdictional Allegations

1.     This Court has jurisdiction over the subject matter of this action pursuant to 9 U.S.C. §§ 201 and 203 and 28 U.S.C. § 1330(a).

2.     The United States is a signatory to the Convention.

3.     The United Kingdom is a signatory to the Convention.

4.    Bangladesh is a signatory to the Convention.

5.    Both Respondents are "foreign states" as defined in 28 U.S. C. § 1603 and are not entitled to immunity from this claim under 28 U.S.C. § 1605(a)(1) and (a)(6) or any applicable international agreement.

6.    Venue is proper in the District for the District of Columbia under the terms of 28 U.S.C. §1391(f)(4).

*Underlying Parties and Arbitration Awards*

7.    Petitioner Smith is a company incorporated under the laws of Bangladesh, and is a subsidiary of Smith Cogeneration of Turks, Inc., a company organized under the laws of the Turks and Caicos Islands and having its principal place of business in Oklahoma City, Oklahoma.

8.    Respondent Bangladesh Power Development Board (the "Power Board") is the Bangladeshi authority responsible for the provision of electric power in Bangladesh.

9.    Respondent Government of Bangladesh ("GoB") is a foreign state also known as the People's Republic of Bangladesh.

10.    On October 14, 1997, Smith and the Power Board entered into a written Power Purchase Agreement for the construction of a barge-mounted power plant in Haripur, Bangladesh (the "PPA"). A true and correct copy of the PPA is attached to this Petition as Exhibit 1.

11.    The Power Board and Smith agreed in Article 18 of the PPA that any dispute or difference of any kind between the parties arising out of the PPA or the breach or termination of the PPA would be submitted to arbitration in London under the rules of ICC and that English law would govern any issue relating to the arbitration provision.

2

They further agreed that the resulting arbitration award would be final and binding and that there could be no appeal to any court.

12.    On October 16, 1997 Smith and the GoB entered into an Implementation Agreement whereby the GoB agreed, among other things, to procure the issuance of all required consents for the "construction, financing, ownership, operation, and maintenance of the Project" undertaken pursuant to the PPA (the "IA"). A true and correct copy of the IA is attached to this Petition as Exhibit 2.

13.    The GoB and Smith agreed in Article 15 of the IA that any dispute or difference of any kind arising out of the IA or the breach or termination of the Implementation Agreement would be submitted to arbitration in London under the rules of the ICC and that English law would govern any issue relating to the arbitration provision. They further agreed that the resulting arbitration award would be final and binding and that there could be no appeal to any court.

14.    The Respondents also agreed that their acts in connection with the PPA and the IA were commercial and not sovereign, and consented to enforcement proceedings regarding an arbitral award in any jurisdiction. *See* PPA at Article 18.6.1 and IA at Article 15.5.1.

15.    In 1999, a dispute arose between Smith and the Respondents, and it was subject to the arbitration provisions of the PPA and IA. The dispute involved the Power Board's termination of the PPA, the failure of the GoB to issue all of the required consents, the termination of the IA, and the Power Board's encashment of a US$1.5 million performance bond guarantee funded by Smith (the "Performance Bank Guarantee").

3

16.     In March 1999, pursuant to the arbitration clauses of the PPA and the IA and the Rules of Arbitration of the ICC, Smith commenced arbitration in London against the Power Board and the GoB.  Despite being notified of the arbitration, the GoB never responded to Smith's request for arbitration, and did not otherwise appear in the arbitration.

17.     Smith appointed Arthur Marriott as an arbitrator, and the Power Board appointed Ajmalul Hossain as an arbitrator.  The two party arbitrators then appointed John Tackaberry as chairman of the arbitral tribunal (the "Tribunal").

18.     The Power Board challenged the jurisdiction of the Tribunal, and the Tribunal considered detailed statements submitted by Smith and the Power Board regarding their respective positions on the issue of jurisdiction.  On September 11, 2000 the Tribunal ruled in a written decision that the Tribunal had jurisdiction to hear the dispute.

19.     The Court of Arbitration notified the parties of the Tribunal's jurisdictional decision and of the schedule of proceedings for the determination on the merits, but the Respondents did not respond or participate in the proceedings on liability. The Tribunal considered written evidence submitted by Smith and held a two day hearing in May 2001, which only Smith attended, despite the fact that Respondents had notice of the proceeding.

20.     On March 15, 2002 the Court of Arbitration provided copies to Smith and the Respondents of a written, binding Award on Liability ("the Award on Liability") holding that the Power Board wrongfully called on the Performance Bank Guarantee.

The Award ordered the Power Board to pay US$1.5 million to Smith Cogeneration within sixty (60) days of the date of the award.

21.     Although Smith requested payment pursuant to the terms of the agreements between the parties and the Award, neither the GoB nor the Power Board paid the Award, and the Award remains unpaid to date.

22.     On September 2, 2002, as confirmed by the Court of Arbitration on October 2, 2002, the Tribunal issued a Third Partial Award on Costs to Date ("Third Partial Award"), a certified copy of which is attached hereto as Exhibit 3.

23.     On May 6 and 7 of 2003, the Tribunal held a hearing in London on the issue of the damages incurred by Smith as a result of the breaches that the Tribunal determined had occurred in the Award on Liability (the "Damages Hearing").

24.     Although the Respondents had notice and an opportunity to participate in the Damages Hearing, they did not.

25.     On November 4, 2003, the Court of Arbitration provided copies to Smith and the Respondents of a written, binding Final Award on Damages and Costs ("Final Award," together with the Third Partial Award, the "Awards").  (A certified copy of the Final Award is attached hereto as Exhibit 4).  The Final Award ordered the Board to pay Smith US$11,561,567 in damages and costs, with interest on the damages portion of the Award.

26.     Although Smith requested payment pursuant to the terms of the Awards and the agreements between the parties (including the GoB guarantee included in the IA), neither the GoB nor the Power Board paid the Awards.

27.    In March 2005, Smith filed a petition with this Court, seeking confirmation of the Liability Award.

28.    On July 12, 2006, Judge Rosemary M. Collyer issued an order confirming the Liability Award, pursuant to the Convention ("July 2006 Confirmation Order"). A copy of the July 2006 Confirmation Order is attached hereto for reference as Exhibit 5.

### This Court's Power to Confirm the Award

29.    Petitioners are entitled to have this Court enter a judgment on the Award for the following reasons:  1) the Court of Arbitration of the ICC issued a final and binding arbitral award in Smith's favor that arose out of a commercial dispute from the legal relationship between Smith and the Respondents; 2) the arbitration took place in London, England under the ICC Rules and English procedural law; and 3) no basis exists under the Convention to refuse recognition and enforcement of the Award.

### Prayer

Petitioner Smith hereby respectfully prays that the Court:

1.    enter an order confirming the Awards;

2.    enter a judgment that conforms to the Awards;

3.    award Petitioner costs and disbursements in this proceeding;

4.    award Petitioner costs and disbursements in enforcing the judgment entered by this Court; and

5.    award Petitioner any and all other relief that the Court deems just and proper.

Respectfully submitted,

Douglas G. Robinson (DC Bar No. 10850)
Donna M. Francescani (DC Bar No. 454433)
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371 7000
(202) 661 9105 (fax)
*Attorneys for Smith Cogeneration*
*(Bangladesh) Pvt. Ltd.*

Dated:  October 24, 2006

*CERTIFICATE OF SERVICE*

I hereby certify that a true and correct copy of the foregoing Petition to Confirm a Foreign Arbitral Award was served via Federal Express, signature required, on October 24, 2006, on all parties as follows:

Bangladesh Power Development Board
Attn:  Mr. Md Iqbal Hossain Khan
Wapda Building
Motijheel C/A
Dhaka 1000
Bangladesh

Government of Bangladesh
The Minister of Energy and Mineral Resources
Bangladesh Secretariat
Building No. 6
Dhaka 1000 Bangladesh

Donna M. Francescani

EXHIBIT 1

*CERTIFICATION*

I, Donna Francescani, hereby certify that this is a true and correct copy of the *Power Purchase Agreement between Bangladesh Power Development Board and Smith Cogeneration (Bangladesh) Pvt. Ltd.,* dated October 14, 1997, for Barge Mounted Power Plant at Haripur, Dist. Narayanganj, Bangladesh.

Donna Francescani

District of Columbia: SS
Subscribed and sworn to before me this 24th day of October, 2006.

Carol A. Friend
Notary Public, D.C.

**Carol A. Friend**
**Notary Public, District of Columbia**
**My Commission Expires 2/28/09**

POWER PURCHASE AGREEMENT

BETWEEN

BANGLADESH POWER DEVELOPMENT BOARD

AND

SMITH COGENERATION (BANGLADESH) PVT. LTD.

DATED OCTOBER 14th, 1997

For

Barge Mounted Power Plant

at

Haripur
Dist. Narayanganj
Bangladesh

**TABLE OF CONTENTS**

| Article | | Page |
|---|---|---|
| 1. | Definitions and Interpretation | 1 |
| 2. | Scope and Duration | 13 |
| 3. | Commencement | 15 |
| 4. | Construction | 16 |
| 5. | Commissioning and Testing | 18 |
| 6. | Operating and Despatch Procedures | 20 |
| 7. | Maintenance and Repair | 23 |
| 8. | Sale and Purchase of Electricity | 25 |
| 9. | Invoicing and Payment | 27 |
| 10. | Metering | 30 |
| 11. | Insurance | 32 |
| 12. | Undertakings and Warranties of the Parties | 33 |
| 13. | Force Majeure | 36 |
| 14. | Termination and Default | 45 |
| 15. | Indemnification and Liability | 50 |
| 16. | Liquidated Damages | 54 |
| 17. | Confidentiality | 59 |
| 18. | Dispute Resolution | 60 |
| 19. | Maintenance of Operating Records | 65 |
| 20. | Miscellaneous Provisions | 66 |
| 21. | Governing Law | 69 |
| 22. | Delivery and Supply of Gas | 70 |

October 14th, 1997

i

NA

**TABLE OF CONTENTS**

Schedule 1:  Facilities to be installed by BPDB and the Company --------------------- 80

Schedule 2:  Maintenance Allowances of the Plant -------------------------------------- 89

Schedule 3:  Procedures ------------------------------------------------------------------- 92

Schedule 4:  Payment ---------------------------------------------------------------------- 100

Schedule 5:  Tariff Schedule -------------------------------------------------------------- 103

Schedule 6:  Program of Works ----------------------------------------------------------- 107

Schedule 7:  Parties addresses and notice details --------------------------------------- 108

Schedule 8:  Insurance --------------------------------------------------------------------- 109

Schedule 9:  Conversion to Combined-Cycle --------------------------------------------- 114

Schedule 10: Description of the Site. ---------------------------------------------------- 115

Schedule 11: Form of Performance Bond. ----------------------------------------------- 116

Schedule 12: Proforma Invoice ----------------------------------------------------------- 118

Schedule 13: Gas Specifications ---------------------------------------------------------- 121

Schedule 14: Letter of Credit------------------------------------------------------------- 122

October 14th, 1997

ii

NA

POWER PURCHASE AGREEMENT
FOR
POWER GENERATION PLANT
AT
HARIPUR, DISTT. NARAYANGANJ

### BANGLADESH

This AGREEMENT is made on October 14th, 1997 (the "Agreement") between Bangladesh Power Development Board, a statutory body  constituted by the Bangladesh Water and Power Development Boards Order, 1972 (P.O.No.59 of 1972), with its head office located in Dhaka, Bangladesh ("BPDB")

And

Smith Cogeneration (Bangladesh) Pvt. Ltd., a company incorporated under the laws of Bangladesh, with its principal office located at 57-A, Road 28, Gulshan, Dhaka 1212 (the "Company")

WHEREAS:

(A)    BPDB has invited offers to construct, build, own, operate and maintain a Barge-Mounted   Power generating plant for the Contracted Capacity under an Independent Power Producers' (IPP) agreement;

(B)    The Company has submitted an offer in response to such invitation;

(C)    Negotiations have been held between BPDB and the Company;

NOW, THEREFORE, in consideration of the promises and mutual consents and covenants set forth herein, it is hereby agreed by and between the Parties as follows:

October 14th, 1997                                iii

# Article 1
## Definitions and Interpretation

1.1    Definitions: Whenever the following terms appear in this Agreement or the schedules hereto, whether in the present, future or past tense, they shall have the meanings stated below unless the context otherwise requires.

"**Additional Measuring Equipment**": means one or more gas chromatographs, one or more gas calorimeters, flow computers, and other appurtenances necessary to accurately measure the BTU (LHV) content of Gas delivered and supplied to the Company under this Agreement.

"**Adjustment Factor**: shall have the meaning assigned to it in Article 22.7.2;

"**Affiliate**": in relation to a Party, a body corporate;

(a)    which is directly or indirectly, controlled by such Party; or
(b)    which directly or indirectly, control such Party; or
(c)    which is directly or indirectly, controlled by a body corporate that also directly or indirectly controls such Party;

"**Agreement**": means this Power Purchase Agreement dated hereof by and between the Company and BPDB, including all Schedules and Annexes hereto, as amended, supplemented, and modified from time to time in writing by the Parties; provided that the Lenders, Contractors, and Investors are not Parties to this Agreement;

"**Annual Scheduled Outage Estimate**":  shall have the meaning assigned to it in Part A of Schedule 2;

"**Authorizations**": any approval, consent, license, permit, authorization or other permission granted by a Governmental Authority, including Consents (as defined in the Implementation Agreement) and the License;

"**Availability**": the ability of the Plant, at a particular instant or over a particular period of time, to deliver electricity to BPDB's System at the Delivery Point and the terms "Available" and "Unavailable" shall be construed accordingly;

"**Back-Up Metering System**": any meters and metering devices installed, owned and maintained by the Company for backup purposes;

"**Bangladesh Bank**": the central bank of Bangladesh established pursuant to Presidential Order No. 127 of 1972, and its successors;

"**BPDB**": means the Bangladesh Power Development Board constituted by the Bangladesh Water and power Development Boards Order, 1972 (P.O. No. 59 of 1972) and its successors and permitted assigns;

"**BPDB's System**": the high voltage transmissions system, operated by BPDB and the distribution system(s), generating plant (other than the Plant) and ancillary electrical plant and equipment connected to such transmission system;

"**Bank Rate**": is the interest rate as announced by the Bangladesh Bank from time to time;

"**Barge Mounted Power Plant**": the barge mounted power plant to be installed by the Company at Haripur, Distt. Narayanganj, Bangladesh;

"**BTU**":    means British Thermal Unit, defined as the quantity of heat required to raise the temperature of one (1) pound of pure water from fifty-eight and one-half degrees Fahrenheit (58.5° F) to fifty-nine and one-half degrees Fahrenheit (59.5° F) at a constant pressure of fourteen and seventy-three hundredths (14.73) psia.

"**Capacity**": the capacity of the Plant expressed in MW to generate and deliver the Net Electrical Output at the Delivery Point, assuming the continued connection and proper operation of the BPDB's System;

"**Capacity Test**": a test of the normal full load Capacity of the Plant carried out in accordance with the requirements of Article 5 and Part D of Schedule 3;

"**Change in Law**": shall mean (a) the adoption, promulgation, change, repeal or modification after the date of this Agreement of any Legal Requirement, including any Change in Tax (b) the imposition upon the Company, its Contractors, the Lenders, or a Fuel Supplier of any material condition in connection with the issuance, renewal, extension, replacement or modification of any Authorization after the date of this Agreement that in either case (i) establishes requirements for the construction, financing, ownership, operation or maintenance of the Plant that are materially more restrictive than the most restrictive requirements in effect as of the Effective Date or (ii) has a material and adverse effect on the Company, the Plant or the return (net of tax) to the Investors of the Company;

"**Change in Tax**": shall mean any change occurring after the date of this Agreement in any Tax or any Indirect Tax or duty whether by way of:

(i)     the failure to receive any incentive, exemption, allowance or holiday provided for in the Implementation Agreement or the same ceasing to remain in full force and effect or not being renewed;

(ii)     a change in the rate, incidence, basis of charge or other provisions applicable to any Tax or Indirect Tax or duty in existence on the

date of this Agreement; or

(iii)   the imposition or assessment of any Tax or Indirect Tax or duty not in existence on the date of this Agreement, or otherwise;

"**Commissioning**": taking all steps necessary to put the Plant into operation including carrying out tests prior to operation as specified in Part A of Schedule 3;

"**Commissioning Date**": the date specified in the Program of Works as the target date for the start of the Commissioning of the Plant or such earlier date as the Company may specify by notice given to BPDB not less than sixty (60) Days before such earlier date subject to BPDB's agreement to such earlier date which agreement shall not be unreasonably withheld;

"**Company**": means Smith Cogeneration (Bangladesh) Pvt. Ltd., a company incorporated under laws of Bangladesh with its principal office located at 57-A, Road 28, Gulshan, Dhaka 1212, and its successors and permitted assigns;

"**Company's Connection Facilities**": the connection facilities (other than Interconnection Facilities) to be installed by the Company;

"**Company Transportation Facilities**" means all of the gas pipeline, valves and equipment, approved by the BPDB prior to installation and compatible with the Equipment at the Point of Delivery, to be installed by or on behalf of the Company and to be owned by the Company, which pipeline, valves and equipment are necessary to interconnect the Plant with the Transportation Facilities.

"**Confidential Information**": is defined in Article 17.1;

"**Contracted Capacity**": initially 100 MW ± 10 MW, thereafter as specified in Schedule 9 at Reference Conditions that the Company has proposed to build, own and operate under this Agreement;

"**Contractor**": any person with whom the Company enters into a Turnkey Agreement or an Operating and Maintenance Agreement and each such person's subcontractors of any tier, and each of their successors and permitted assigns;

"**Control Centre**": The load despatch centre located in Dhaka, or such other control centre designated by BPDB from time to time (but not more than one at any time) from which BPDB shall Despatch the Plant;

"**Day**": the 24 hour period beginning and ending at 12:00 midnight Bangladesh time;

"**Default**": is defined in Article 14.4;

October 14th, 1997

3

"**Delivery Point**": the point of common coupling on BPDB's System at which Net Electrical Output from the Plant is delivered as specified in Part C of Schedule 1;

"**Despatch Instruction**" or "**Despatch**": an instruction given by BPDB to the Company in relation to the operation of the Plant in accordance with Article 6.3;

"**Dispute**": is defined in Article 18.1;

"**Economic Despatch**": the distribution of the total BPDB energy needs among available sources of generation for optimum system economy, security and reliability;

"**Effective Date**": is defined in Article 3.1;

"**Electricity Act**": is the Electricity Act, 1910 (Act IX 1910) and amendments thereto;

"**Emergency**": a condition or situation that, in the reasonable opinion of BPDB poses an imminent threat of (i) materially and adversely affecting the ability of BPDB to maintain a safe, adequate and continuous electrical service to its customers; or (ii) present a physical threat to persons, property or equipment for the safety, integrity or reliability of BPDB's System;

"**Equipment**": means all of the pipes, equipment and materials at or near the Point of Delivery that the BPDB must install after the date of this Agreement to supply Gas to the Company pursuant to the terms of this Agreement;

"**Equivalent Downtime**": the number of kWh of generation capability lost due to taking all or any number of generators out of service, as calculated pursuant to Schedule 2;

"**Event of Default**": is defined in Articles 14.1 and 14.2;

"**Exchange Rate**": on any business day, the rate of exchange for the conversion of Takas into US Dollars as announced by the Bangladesh Bank to be in effect on such business day;

"**Expert**": a person appointed in accordance with the provisions of Article 18.2;

"**Financing Agreements**": the agreements relating to the provision of financing for the construction and/or operation and/or permanent financing or refinancing of the Plant to be entered into between the Company and banks or other financial institutions or any organization from

October 14th, 1997                                      4



which funding is provided;

"**Force Majeure**": as defined in Article 13.1;

"**Fuel Supplier**": the company or other entity or organization which may be appointed by the Company from time to time to supply liquid fuel or Natural Gas (in case of Natural Gas, only after prior approval of BPDB) to the Plant in accordance with the Fuel Supply Agreement and any successors thereto;

"**Fuel Supply Agreement**": the agreement or agreements which the Company may enter into, on terms and conditions mutually agreeable to both parties, by and between the Company and the Fuel Suppliers for the provision of liquid fuel or Natural Gas fuel for the Plant and any successor agreements thereto; provided that the Fuel Supply Agreement for the supply of Natural Gas fuel to the Plant shall be subject to the reasonable approval of the BPDB prior to its execution by the Company;

"**Full Commercial Operation Date**": the Day as notified to BPDB in accordance with Article 5.8;

"**Functional Specifications**": the functional specifications for the Plant set out in Paragraph 1 of Part A of Schedule 1;

"**Gas**": means Natural Gas that is tendered for delivery and sale under this Agreement by the BPDB to the Company having a Lower Heating Value of not less than 900 BTUs (LHV) per Standard Cubic Foot and in full conformance with the Gas Specifications, and any Natural Gas not in full conformance with the Gas Specifications which the Company agrees to accept pursuant to Article 22.4.

"**Gas Date**" shall have the meaning assigned to it in Article 22.1.2;

"**Gas Invoice**": shall have the meaning assigned to it in Article 22.7.1;

"**Gas Invoice Amount**": shall have the meaning assigned to it in Article 22.7.1;

"**Gas Metering System**": means orifice meter runs, straightening vanes, valves, gauges, pressure and temperature records, and other appurtenances necessary to accurately measure the volumetric quantities of Gas delivered and supplied to the Company under this Agreement, all to be installed in the Measuring Station;

"**Gas Order**": means the communication from the Company to the BPDB setting forth the quantities of Gas planned to be required by the Plant in accordance with the Despatch Instruction received from the BPDB and the Operating Procedures.

October 14th, 1997

5

"**Gas Price**": means the price per MSCF of Gas (including Taxes payable in Bangladesh on the purchase and sale of Gas and the transportation cost to the Point of Delivery) in effect from time to time;

"**Gas Specifications**": means together, the Quality Specifications and the Pressure Specifications as set forth in Schedule 13 hereto;

"**GOB**": the Government of the People's Republic of Bangladesh;

"**Governmental Authority**": the GOB, government owned or controlled corporation or governmental agency, division or department or other executive, judicial, legislative, administrative, regulatory, constitutional, statutory, military or police authority whether national or local in nature, of or in the People's Republic of Bangladesh;

"**Guarantee**": means the Guarantee issued by the GOB to the Company pursuant to the Implementation Agreement;

"**Guaranteed Capacity**": the Capacity of the Plant (in MWs) established by the most recent Capacity Test conducted during Commissioning of the Plant or thereafter (taking into account any permitted retest thereof) in accordance with Part D of Schedule 3;

"**Guaranteed Heat Rate**": means the guaranteed heat rate of the Plant as specified in Schedule 1;

"**Implementation Agreement**": the Implementation Agreement, dated thereof, by and between the GOB and the Company;

"**Indirect Taxes and Duties**": all forms of taxation, impost, levy or duty and all penalties, charges, interest and other costs relating thereto imposed pursuant to the laws of the People's Republic of Bangladesh in respect of the sale of electricity or on any equipment or materials used in connection therewith or in respect of the right or act of producing or transmitting electricity which result in an increase or decrease in the operational costs of the Company in performing its obligations under this Agreement and for the avoidance of doubt do not include any form of taxation, impost, levy or duty imposed on the profits, income or gains of the Company;

"**Interconnection Facilities**": the 132 kV interconnecting transmission line connecting the Plant with the BPDB's nearest sub-station and all protective devices necessary for the protection of the interconnecting transmission line on BPDB's side of the Delivery Point.

"**Investors**": means the holders from time to time of any shares of the Company with voting or other rights of management and control and any securities of the Company that are convertible into such shares at the option

October 14th, 1997

6

of the holder.

"**Invoice**": shall have the meaning assigned to it in Article 9.1;

"**kW**": Kilowatts;

"**kWh**" Kilowatt hours;

"**LC Bank**":    Sonali Bank or any other scheduled bank in Bangladesh acceptable to the Company and the Lenders which issues the Letter of Credit to the Company;

"**Legal Requirements**": any statute, law, regulation or other legislation, or any published decision, holding, ruling, interpretation, reinterpretation, rule, decree, order or directive of any Governmental Authority having jurisdiction in respect of this Agreement, including matters related to the construction, operation and maintenance of the Plant, which is binding on either Party.

"**Lender**": the lenders, party to the Financing Agreements together with their respective successors and assigns;

"**Letter of Credit**" **or** "**L/C**": means the transferable, irrevocable, unconditional, on demand, revolving letter of credit in the form of Schedule 14 hereto, posted by BPDB in favor of the Company pursuant to Article 9.9;

"**License**": (the license) granted under Section 3 of the Electricity Act;

"**Liquidated Damages Notice**": is defined in Article 16.7;

"**Loss**": means any loss, damage, liability, payment, obligation, claim, action, cost or penalty (excluding any indirect or consequential loss, damage, profit, liability, payment or obligation) or expense related thereto (including without limitation reasonable legal fees);

"**Lower Heating Value**" or "**LHV**":  means the amount of heat (measured in BTU) obtained from the complete combustion, at constant pressure, of a cubic foot of Gas at a temperature of 60°F, the Gas free of water vapor and at an absolute pressure of 14.73 psia,under standard gravitational force (acceleration 980.665 centimeters per second per second) with air of the same temperature and pressure as the Gas,and the products of combustion cooled to the initial temperature of gas and water being formed by the combustion products being condensed to the liquid state;

"**Measuring Station**":  means a properly equipped station installed by the Company ( at the Company's sole cost and expense) located adjacent to the Site immediately upstream of the Point of Delivery for measuring the volume and controlling the pressure of Gas delivered to the Company

hereunder, which station shall include, without limitation, the Gas Metering System, the Additional Measuring Equipment and pressure control devices;

"**Metering System**": the meters and metering devices (including transmitters for power line carrier signals for BPDB's remote terminal units), as specified in Part B of Schedule 1, installed by the Company and owned by the BPDB and used to measure Capacity and the delivery and receipt of Net Electrical Output but excluding the Back-Up Metering System;

"**Minimum Guaranteed Payment" or "MGP**":  shall have the meaning assigned to it in Article 9.6;

"**Monthly Plant Factor" or "MPF**":  shall have the meaning assigned to it in Part B of Schedule 4;

"**Monthly Scheduled Outage Notice**": shall have the meaning assigned to it in Part A of Schedule 2;

"**MSCF**":  means one thousand (1,000) standard cubic feet;

"**MVAR**": Megavar;

"**MW**": Megawatt;

"**MWh**": Megawatt hours;

"**Minimum Tariff Payment" or "MEP**" is defined in Part B of Schedule 4;

"**Natural Gas**":  means any mixture of hydrocarbons or of hydrocarbons and other gases, in a gaseous state, consisting primarily of methane, carbon dioxide and nitrogen, and including casinghead gas produced with crude oil, natural gas from gas-wells and residue gas resulting from processing of casinghead or gas-well gas;

"**Net Electrical Output" or "NEO**": net electrical energy expressed in kWh delivered to the Delivery Point by the Company for sale to BPDB during testing and Commissioning of the Plant and, following the Full Commercial Operations Date, when Despatched by BPDB;

"**Operating and Despatch Procedures**": the procedures set out in Part C of Schedule 3;

"**Operating Procedures**":  the meaning attributed thereto in Article 22.2;

"**Operating and Maintenance Agreement**": the agreement or agreements to be entered into by the Company for the operation and maintenance of the Plant;

"**Operating Characteristics**":    the    performance    and    operating

characteristics of the Plant for which values are specified in the Functional Specifications;

"**Operating Committee**": is defined in Article 6.5;

"**Operating Period**": the period from the Full Commercial Operation Date until the end of the Term;

"**Operating Year**": a period of one (1) year beginning on the Full Commercial Operation Date specified or any anniversary thereof;

"**Parties**": BPDB and the Company, and "**Party**" means either of them;

"**Pf**": means power factor, the ratio of active power to apparent power;

"**Peak Hours**":  means those hours of the Day as informed by the BPDB to the Company from time to time;

"**Performance Bond**": is defined in Article 16.6;

"**Performance Bonds**": shall include Performance Bond and Second Performance Bond;

"**Plant**": the brand new dual fuel Barge Mounted Power Plant as described in Part A of Schedule 1 to be owned by the Company and stationed at the Site including all generators, turbines, fuel storage and handling facilities, and associated equipment thereon, all onshore and offshore facilities built by the Company for use in connection with the operation and maintenance thereof and the Company's Connection Facilities;

"**Plant Commercial Operations Test**": the tests to be carried out on the Plant as a whole, as specified in Part A of Schedule 3;

"**Point of Delivery**":  means the inlet flange of the Company Transportation Facilities terminating at the Measuring Station and immediately downstream of the Measuring Station;

"**Preliminary Estimate**": shall have the meaning assigned to it in Article 13.11;

"**Pressure Specifications**":  The delivery pressure specifications for Gas delivered to the Company by the BPDB hereunder as set forth in Schedule 13 hereto;

"**Program of Works**": the program for the construction and installation of the Plant set out in Schedule 6;

"**Project Agreements**": means this Agreement, the Implementation

October 14th, 1997

9

Agreement, the Turnkey Agreement, Financing Agreements and the Operating and Maintenance Agreement.

"**Prudent Operating Practices**": means practices followed from time to time by the power industry, as such practices may be applicable in Bangladesh, having regard to engineering and operational considerations, including manufacturers' recommendations, System Characteristics and the Functional Specifications. Prudent Operating Practices are not limited to optimum practices, methods and acts to the exclusion of all others, but rather are a spectrum of possible practices, methods and acts which could have been expected to accomplish the desired result at reasonable cost consistent with reliability and safety;

"**psia**": means pounds per square inch absolute;

"**psig**": means pounds per square inch gauge;

"**Quality Specifications**": means the quality specifications for Gas delivered to the Company by the BPDB hereunder as set for in Schedule 13 hereto;

"**Reactive Power**": the wattless component of the product of voltage and current, which the Plant shall provide to or absorb from the BPDB's System which is measured in MVAR;

"**Recovery Allowance**": is defined in Article 13.9.

"**Reference Condition**": 35°C, 98% relative humidity and 1.013 bar;

"**Report**": shall have the meaning assigned to it in Article 13.12;

"**Required Commissioning Date**": is defined in Article 4.7;

"**Required Full Commercial Operation Date**": is defined in Article 3.2;

"**Restoration**": shall have the meaning assigned to it in Article 13.11;

"**Restoration Cost Estimate**": shall have the meaning assigned to it in Article 13.11;

"**Restoration Schedule**": shall have the meaning assigned to it in Article 13.11;

"**Rules**": is defined in Article 18.1;

"**Second Performance Bond**": is defined in Article 16.6;

"**Scheduled Outage**": a planned interruption of some or all of the Plant's

Capacity by the Company that has been scheduled in accordance with Schedule 2;

"Security Stock": is defined in Article 8.6;

"Site": the land and marine areas on which the Plant is to be located, as described in Schedule 10;

"SCF" or "Standard Cubic Foot": means a volume of gas that occupies one cubic foot at a base temperature of sixty degrees Fahrenheit (60° F) and at a base pressure of 14.73 psia;

"System Characteristics": the characteristics of BPDB's System which include among others voltage, (level and waveform), current, frequency (level and waveform) and fault level;

"Taka" or "Tk" the lawful currency of Bangladesh;

"Tariff Charge" or "MEC": the amounts payable by BPDB in accordance with Part A of Schedule 4;

"Tariff Charge Rate" or "$ECR_p$," is defined in Part A of Schedule 4;

"Taxes": all forms of taxation, duties, imposts, levies and rates whenever imposed and applicable pursuant to the laws of Bangladesh;

"Term": The period from the Effective Date until expiry of a period of fifteen (15) years commencing on the Full Commercial Operation Date. This period shall be extended by the aggregate of all Days events of Force Majeure were in existence on or after the Full Commercial Operation Date;

"Transportation Facilities": means that portion of the pipeline capacity and related facilities of the BPDB, which are required to provide service to the Plant from the existing Natural Gas transmission and distribution network to the Point of Delivery;

"Turnkey Agreement": the agreement or agreements to be entered into, at the discretion of the Company, by and between the Company and the construction contractor for the design, procurement and construction of the Plant;

"Undertaking": shall have the meaning assigned to it in Schedule 14;

"Unscheduled Outage": is defined in Part B of Schedule 2;

"US$" or "US Dollars": the lawful currency of the United States of America;

World Bank's Environmental Guidelines": the (May 1995) Draft World Bank Environment, Health and Safety Guidelines as in existence on the Effective Date.

1.2     Interpretation: in this Agreement, unless the context otherwise requires:

    1.2.1   reference to a business day is a reference to any Day on which banks are open for business in Bangladesh;

    1.2.2   reference to a month is a reference to a calendar month;

    1.2.3   words in the singular shall be interpreted as referring to the plural and vice versa, and words denoting natural persons shall be interpreted as referring to corporations and any other legal entities and vice versa;

    1.2.4   a requirement that a payment be made on a Day which is not a business day shall be construed as a requirement that the payment be made on the next business day;

    1.2.5   the headings are for convenience only and shall not be considered in construing this Agreement;

    1.2.6   references to Articles, Sections, Schedules and Annexes are references to Articles and Sections of, and Schedules and Annexes to, this Agreement;

    1.2.7   whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed; and

    1.2.8   the terms "include" and "including" mean without limitation.

    1.2.9   in carrying out their obligations and duties under this Agreement each Party shall have an implied obligation of good faith.

**Article 2**
**Scope and Duration**

2.1    Scope: The Company shall design, procure, finance, test, commission, own, operate and maintain the Plant, seek to make the Contracted Capacity Available and in compliance with the Operating Characteristics and sell the Net Electrical Output to BPDB, and BPDB shall purchase and pay for Net Electrical Output, in accordance with and subject to the terms and conditions of this Agreement.

2.2    Term of Agreement: This Agreement shall come into force when executed by or on behalf of the Parties and shall continue in force until the expiry of a period of fifteen (15) years commencing on the Full Commercial Operation Date, unless earlier terminated in accordance with its terms. The Term shall be extended by the aggregate of all Days Force Majeure events were in existence on or after the Full Commercial Operation Date.

2.3    Extension: The Term may be extended, subject to agreement in writing by the Parties to such extension at the latest twelve (12) months prior to its expiry, and on such terms as the Parties shall agree.

2.4    Removal of Plant: In the event the Company removes the Plant from the Site upon the expiration of the Term, or any extension(s) thereof, BPDB shall cooperate in disconnecting the Plant from the Interconnection Facilities and the Company's Connection Facilities to facilitate such removal.

2.5    Interconnection Facilities:

The Company shall be responsible for generating and stepping up of power to the 132kV level and will arrange interconnection between the Plant and nearest 132 kV grid sub-station through a 132 kV transmission line/cable. The Company shall supply and install the 132 kV cable mounting structures on the barge. The Company shall be responsible for complete protection system necessary for the Plant including step up transformer, circuit breaker and auxiliaries. The company shall design, procure and install in their Plant the interfacing including facility for supervisory control and data acquisition systems (SCADA) link/protection equipment matching with protective devices in the respective sub-station of BPDB. Company shall provide one dedicated protection core for interconnection line protection and also provide facilities for inclusion of the Metering System and Back-up Metering System.

BPDB will bear the expenses of installation of the Interconnection Facilities. The cost of such Interconnection Facilities shall be mutually agreed between the Parties within thirty (30) Days of the date of submission of such cost estimate to the BPDB. In the event that the Parties fail to agree on the cost of estimate within the stipulated thirty (30) Days period, the matter shall be

October 14th, 1997          13

referred to an Expert for cost determination. The decision of the Expert shall be final and binding upon both Parties. Notwithstanding the provisions of Article 18.2, the Expert shall be appointed within seven (7) Days of the expiry of the stipulated thirty (30) Day period, and the Expert shall render determination within fifteen (15) Days of his appointment.

2.6    <u>Acquisition of Right of Way</u>: BPDB shall within four weeks of the Effective Date provide the Company with such leases, rights of way, permits, licenses and other rights of use for the land, waterways and water bottoms including the areas constituting the Site as necessary for, and in form and substance reasonably acceptable to the Company to install, operate and maintain the Plant for generation and supply of power to BPDB's System.

2.7    <u>Provision of Utilities</u>: BPDB shall act as facilitator, at the Company's expense at reasonable rates, and arrange for the installation and provision of the necessary utility services to the Plant, including:

     (a)    within twelve (12) weeks after the Effective Date, fresh potable water in a minimum quantity of 50 US gallons per minute;

     (b)    within twelve (12) weeks after the Effective Date, temporary electrical power for the construction and Commissioning of the Plant in a minimum quantity of 2 MW at 11 kV;

     (c)    within sixteen (16) weeks after the Effective Date, eight dedicated telephone lines; and

     (d)    delivery of electrical power for emergencies and start-ups during operations.

# Article 3
## Commencement

3.1 Effective Date: The rights and obligations of the Parties hereunder shall take effect on later of the date of execution of this Agreement or the Implementation Agreement (the "Effective Date").

3.2 Required Full Commercial Operation Date: The Company shall not be required to operate the Plant prior to the Required Full Commercial Operation Date. The Required Full Commercial Operation Date of the Plant shall be the later of:

  3.2.1 the date on which the Full Commercial Operations Date occurs;

    or

  3.2.2 the fifteen (15) Days after the grant of License to the Company;

    Provided that the Required Full Commercial Operation Date shall be extended as provided for in Articles 5.10, 13.4 and 13.5 of this Agreement or extended pursuant to the provisions of Article 4.5(a), Article 7.1(a)  Article 11.4 and Article 11.5 of the Implementation Agreement.

## Article 4
## Construction

4.1     The Company's Responsibility: The Company shall design, furnish, construct and install in accordance with the Program of Works the Plant so as to comply in all material respects with the Functional Specification and to be consistent with the System Characteristics.

4.2     Interconnection Facilities:: Interconnection Facilities will be installed in accordance with Article 2.5 and in accordance with the Program of Works.

4.3     Information: Each Party shall keep the other Party informed of the progress of the design, furnishing, construction and installation of the facilities to be installed by it pursuant to Article 4.1 or 4.2, and every month shall provide a progress report thereof.

4.4     Local Contracts: The Company shall, where commercially reasonable, award contracts to contractors with existing operations in Bangladesh and suppliers of materials and services provided that the quality, delivery times, costs reliability and other terms are comparable to those offered by foreign contractors and/or suppliers.

4.5     Monitor Progress: The Company shall:

    4.5.1     ensure that BPDB and any representatives appointed by BPDB are afforded reasonable access to the place where the Plant is being constructed and the Site upon giving the Company reasonable notice, provided that such access does not materially interfere with the construction works or expose any person on the Site to any danger and that all persons granted such access shall comply with the reasonable instructions and directions of the Company or its Contractors, including all safety procedures; and

    4.5.2     make available for inspection at the Site copies of all plans and designs other than any proprietary information of the Company or any Contractor in relation to the construction of the Plant or any part thereof;

4.6     Disclaimer: The Company

    4.6.1     accepts that any engineering review or inspection conducted by BPDB pursuant to Article 4.5 is solely for its own information and accordingly by conducting such review or inspection BPDB makes no representation as to the engineering soundness of the Plant;

    4.6.2     shall in no way represent to any third party that, as a result of any review or inspection by BPDB, BPDB is responsible for the engineering soundness of the Plant; and

4.6.3    shall, subject to the other provisions of this Agreement, be solely responsible for the technical feasibility, operational capacity and reliability of the Plant.

4.7    <u>Failure to achieve Full Commercial Operation Date</u>: If the Full Commercial Operation Date shall not occur on or prior to the date which is ten (10) months from the Effective Date, as such date has been extended by agreement of the Parties or as provided for in Articles 5.10, 13.4 and 13.5 of this Agreement or extended pursuant to the provisions of Article 4.5(a), Article 7.1(a) Article 11.4 and Article 11.5 of the Implementation Agreement (the "Required Commissioning Date") then:

4.7.1    for each Day occurring after the Required Commissioning Date, the Company shall pay monthly in arrears to BPDB the amount of liquidated damages specified in Article 16.1 in accordance with Article 16; and

4.7.2    the Company shall have no further liability to BPDB in respect of such delay.



**Article 5**
**Commissioning and Testing**

5.1 <u>The Company's obligations</u>: The Company shall test and commission the Plant in accordance with the Commissioning and Testing Procedures (including test tolerances and criteria) set out in Part A of Schedule 3 and the further procedures agreed or determined pursuant to Article 5.4 and otherwise in accordance with Prudent Operating Practice.

5.2 <u>Notifications</u>: The Company shall give BPDB not less than sixty (60) Days notice of the date of the commencement of Commissioning of the Plant, and not less than sixty (60) Days notice of the date on which the Plant Commercial Operations Test shall be commenced, provided that the Company may postpone any such date by giving BPDB not less than seven (7) Days notice of the rescheduled date.

5.3 <u>BPDB attendance</u>: BPDB shall have the right to attend at the Site of the Plant on each occasion on which a Plant Commercial Operations Test or a retest thereof is being conducted, and to inspect and witness such test or retest, and to receive within fifteen (15) Days after such test or retest a copy of the test reports. If BPDB fails to be present at the Site at the time scheduled for the Plant Commercial Operations Test or a retest thereof after the Company has given the notice required pursuant to Article 5.2, the Company may perform the Plant Commercial Operations Test or retest at the scheduled time and BPDB shall not be entitled to object to or question such test or retest on the basis of its own failure to be present.

5.4 <u>Detailed procedures</u>: The Parties shall, not later than sixty (60) Days before the Commissioning Date, agree on a program and detailed procedures for testing and Commissioning the Plant in accordance with, and consistent with, Part A of Schedule 3. Any detailed procedures not agreed to by the Parties by such date shall be referred to an Expert for final determination pursuant to Article 18.2.

5.5 <u>Interconnection Facilities</u>: The installation, testing and commissioning of the Interconnection Facilities shall be completed not later than forty-five (45) Days prior to the Commissioning Date so that the Commissioning of the Plant can commence on or at any time after the Commissioning Date.

5.6 <u>BPDB cooperation</u>: BPDB will cooperate with the Company so as to enable the Company to Commission and test the Plant in accordance with this Article 5 and in particular will authorize connection to BPDB's System and Despatch the Plant to the extent reasonably required by the Company for such purpose and in accordance with the procedures in Part A of Schedule 3 and agreed or determined under Article 5.4.

5.7 <u>Retesting</u>: Where any Plant Commercial Operations Test (including any retest arranged under this sub-Article) of the Plant is not completed

satisfactorily the Company may conduct a further test as soon as it is able to do so upon no less than 12 hours prior notice of such further test to BPDB.

5.8 <u>Plant Commercial Operations Tests</u>:  The Plant Commercial Operations Tests shall be carried out as stated in Part A of Schedule 3.  Upon satisfactory completion of the Plant Commercial Operations Tests, the Company shall notify BPDB that the Plant Commercial Operations Test has been successfully completed, and that the Full Commercial Operation Date shall occur on the following Day.  The Company shall also procure a certificate of an independent engineer approved by BPDB (such approval not to be unreasonably withheld), certifying that the Plant's testing has been completed and that the Plant is available for full commercial operation and shall provide a copy of such certificate to BPDB by no later than seven (7) Days after the Company receives such certificate.

5.9 <u>Commissioning and testing output</u>:  BPDB shall pay to the Company Tariff Charges in accordance with Part A of Schedule 4 for all Net Electrical Output supplied to the Delivery Point after the Commissioning Date and prior to the Full Commercial Operation Date.

5.10 <u>BPDB's failure to accept power in the Commissioning period</u>:  In the event Company is unable to undertake the Commissioning and/or testing of the Plant in accordance with the programs and procedures agreed pursuant to Article 5.4 due to failure by BPDB to issue sufficient Despatch Instructions for the Plant or accept power, the Required Commissioning Date and the Required Full Commercial Operation Date shall be extended on an hour-for-hour basis by the aggregate of the periods of such failures and BPDB shall pay liquidated damages to the Company as provided in Article 16.8.

### Article 6
### Operating and Despatch Procedures

6.1.   Operation: The Company during the Operating Period shall operate the Plant in a manner consistent with Prudent Operating Practice, in compliance with the Despatch Instructions and on the basis of the System Characteristics.

6.2    Notification:  In accordance with the Operating and Despatch Procedures and any procedure agreed to or determined under Article 6.4, the Company shall keep BPDB informed by regular daily declarations, together with prompt declarations of any change, of the Plant's Availability and any impairment of its Operating Characteristics, provided that during Scheduled Outages of the Plant, the portion of the Plant's Capacity on Scheduled Outages shall be deemed to be declared Unavailable unless the Company makes a contrary declaration.

6.3    Despatch Instructions:  BPDB shall issue Despatch Instructions consistent with and within the Functional Specification, declarations of Availability which are in force and Operating Characteristics, subject to any impairment due to Force Majeure or otherwise and any Despatch constraints and in accordance with the Operating and Despatch Procedures and any procedures agreed upon or determined under Article 6.4, and shall ensure that BPDB 's System maintains and complies with and does not deviate from the System Characteristics.  BPDB shall at no time Despatch the Plant in excess of the Company's declaration of Availability for such time pursuant to Article 6.2.

   6.3.1   Restriction on Despatch Instruction:  BPDB shall normally not Despatch the Plant for its continuous operation during steady loading hours of BPDB's System outside the following ranges:

   (i)  100% - 80%  of Guaranteed Capacity
   (ii) 50% - 40% of Guaranteed Capacity

6.4    Further Procedures: The Parties shall, not later than the Commissioning Date, agree (in accordance with and consistent with Operating and Despatch Procedures and all other terms of this Agreement) such further procedures as shall be necessary in accordance with Prudent Operating Practice for the Despatch of the Plant and operational communications between the Parties. Any further procedures not agreed by the Parties by the Commissioning Date shall be referred to an Expert for final determination pursuant to Article 18.2.

6.5    Operating Committee

6.5.1    No later than four (4) months after the Effective Date, the Parties shall establish an Operating Committee.

6.5.2    The Operating Committee will comprise four (4) members and each Party shall designate two (2) members. Each Party may remove or replace any of its Operating Committee members at any time upon notice to the other Party. The convenor of the Operating Committee shall be a designee of BPDB.

6.5.3    The Operating Committee shall develop procedures for the holding of meetings, the keeping of minutes of meetings and the appointment and operation of sub-committees.

6.5.4    The Operating Committee shall serve as a point of coordination and negotiation for the two parties. It will establish procedures relating to the interaction of the Plant, the Metering System, the Interconnection Facilities and the BPDB's System; and, where appropriate, attempt to resolve and propose solutions to disputes arising under this Agreement. These matters shall include the following:

6.5.4.1    the coordination of the respective programs and procedures of the Parties for the construction, commissioning and operation of the Interconnection Facilities, the Metering system and the Plant, and agreement where necessary upon the respective commissioning procedures,

6.5.4.2    the discussion of the steps to be taken on the occurrence of any Force Majeure Event or the shutdown or reduction in capacity for any other reason of the Interconnection Facilities or the Plant;

6.5.4.3    the coordination of outages;

6.5.4.4    safety matters affecting the Plant, the Parties or their contractors;

6.5.4.5    clarification of emergency plans developed by BPDB for recovery from a local or widespread electrical blackout;

6.5.4.6    review and revision, subject to BPDB approval, of protection schemes; and

6.5.4.7    any other matter mutually agreed to by the Parties.

6.5.5    Decisions of the Operating Committee shall require the approval of a majority of the members thereof.

6.5.6   The Parties shall instruct their representatives on the Operating Committee to act in good faith in dealing with matters considered by the Operating Committee. The Parties shall consider and use reasonable efforts to incorporate decisions of the Operating Committee. Actions taken in conformance with the decisions of the Operating Committee shall be presumed to be in compliance with the terms of this Agreement. Neither the Operating Committee nor any decisions thereof shall amend this Agreement.

### Article 7
### Maintenance and Repair

7.1  BPDB Maintenance: BPDB shall in accordance with Prudent Operating Practice maintain and repair the Interconnection Facilities.

7.2  Capacity Test after Commissioning Date: A Capacity Test shall be performed in accordance with Part D of Schedule 3 (i) upon completion of the installation of the steam turbine generator converting the Plant from simple cycle to combined cycle, (ii) upon completion of the conversion of the Plant to natural gas operations, and (iii) annually at times mutually agreed upon by the Company and BPDB; provided that such test shall to the extent possible be conducted within one month of major overhaul or other significant repair. The Company may within 24 hours of completion of an annual Capacity Test, reject the annual Capacity Test and may conduct a retest thereof, provided, however, that the Company cannot conduct more than two(2) re-tests with respect to each annual Capacity Test. The Company shall give BPDB at least 24 hours notice and the first retest, if any, shall be conducted within six (6) Days of the completion of the rejected annual Capacity Test and any second retest shall be conducted within six (6) Days of the completion of the first retest. Any time during the Term of this Agreement if the Guaranteed Capacity is less than 90 MW, then the OMT part of the tariff shall be reduced, and calculated, in accordance with Article 16.5. Anytime thereafter, if the Company demonstrates that the Guaranteed Capacity is more than 90 MW, the OMT part of the Tariff Charge will be back to the original OMT as provided in Part A of Schedule 5.

7.3  Attendance at Capacity Test: The Company shall give BPDB reasonable notice of its intention to conduct a Capacity Test or retest and BPDB shall be entitled to attend and witness such test or retest. If BPDB fails to be present at the Site at the time scheduled for any Capacity Test or retest after the Company has given the notice required pursuant to Articles 7.2 or 7.4, as the case may be, the Company may perform the Capacity Test or retest at the scheduled time and BPDB shall not be entitled to object to or question such test or retest on the basis of its own failure to be present.

7.4  Additional Capacity Tests: Between the annual Capacity Tests as provided in Article 7.2 if BPDB reasonably believes that the current Guaranteed Capacity does not accurately reflect the Capacity Available to BPDB's System, BPDB shall have the right to request one additional Capacity Test of the Plant. The Company shall be entitled to one retest of any such test requested by BPDB provided that it rejects the test within 12 hours of completing the test. The test requested by BPDB and, as appropriate, the retest by the Company shall be conducted within six (6) Days of its request or, as the case may be, the rejection, and the Company shall give BPDB not less than 24 hours notice of its intention to perform the test provided that neither the test requested by BPDB nor any retest by the Company shall be conducted during periods of Schedule Outage or Force Majeure events.

*Confidential*

Notwithstanding anything to the contrary,, if the Company at anytime reasonably believes that the current Guaranteed Capacity does not accurately reflect the Capacity Available to BPDB's System, the Company shall have the right to conduct a Capacity Test of the Plant, provided that the Company provides advance notice thereof to BPDB. The Company shall be entitled to conduct one retest of any such test provided that it rejects the test within 48 hours of its completion. The test and, as appropriate, the retest shall be conducted within six (6) Days of notice thereof or, as the case may be, the rejection, and the Company shall give BPDB not less than 24 hours notice of its intention to perform the test. The Capacity demonstrated by such test shall be the Guaranteed Capacity for all purposes of this Agreement.

7.5    <u>Disputes:</u> Any dispute as to the results of a Capacity Test shall be referred to an Expert pursuant to Article 18.2.

October 14th, 1997                                    24

**Article 8**

**Sale and Purchase of Electricity**

8.1    Sale and Purchases: From the Commissioning Date the Company shall sell and BPDB shall purchase all the Net Electrical Output generated in accordance with BPDB's Despatch Instructions.

8.2    Tariff Charges: BPDB shall pay the Company Tariff Charges ascertained in accordance with Part A of Schedule 4.

8.3    Delivery Point: Electricity sold and purchased pursuant to this Agreement shall be delivered at the Delivery Point and all transmission losses before the Delivery Point shall be for the Company' account and all transmission losses beyond the Delivery Point shall be for BPDB's account.

8.4    Metered Quantities: The quantities of Net Electrical Output delivered at the Delivery Point shall be metered and determined in accordance with the provisions of Article 10.

8.5    Despatch: Despatch Instructions will be in accordance with Article 6 and Schedule 3 of this Agreement

8.6    Fuel Stock: The Company shall at all times before the Gas Date maintain (at the Plant and/or at such other place or places as the Company and BPDB may agree) a stock of liquid fuel (the "Security Stock") which stock shall not be less than the total amount of fuel required to operate the Plant at 80% of the current Guaranteed Capacity for a continuous period of thirty (30) days. If in order to comply with a Despatch Instruction the Company has to utilize any part of the Security Stock, it shall replace any such part of the Security Stock as it shall have utilized as soon as reasonably practicable and in any event not later than fifteen (15) days after use. The Company shall provide to BPDB such evidence of quantities of fuel delivered as BPDB may reasonably request. BPDB shall extend reasonable help for obtaining of any authorization required for the purchase or importation of fuel by the Company.

8.7    Source of fuel supply: With the availability of Natural Gas as fuel, Natural Gas will be primary fuel for the operation of the Plant and the Tariff Charges shall be calculated in accordance with Part A of Schedule 5. Thereafter, the Company will convert the Plant to use Natural Gas as fuel.

8.7.1    The Company shall arrange its own source of supply of liquid fuel required exclusively for the Plant during Commissioning, testing and operations of the Plant in accordance with the existing Law of Bangladesh.

8.8  Gas Supply Matters:

8.8.1  BPDB shall (i) construct and complete, or cause to be constructed and completed, all pipelines necessary to provide adequate supplies of pipeline quality Natural Gas to the Plant, (ii) provide, or cause to be provided, to the Company at the Plant natural gas in sufficient volumes, pressures (not to be less than 150 psig), quality and other specifications to permit the Plant to operate in compliance with this Agreement.

8.8.2  If BPDB fails to meet its obligations under Article 8.8.1 on or before the expiry of a one year period from the Full Commercial Operations Date, then the Company shall have the option to either (i) suspend operation of the Plant for a period equal to the period of delay or shortfall by BPDB in meeting its obligations under Article 8.8.1, during which period of suspension BPDB shall pay to the Company each month Tariff Charges, including MEP, ascertained in accordance with Part A of Schedule 4 based on zero (0%) MW Despatch Instruction and the OMT for gas operations established under Part A of Schedule 5; or (ii) continue operations using liquid fuel for a period equal to the period of delay by BPDB in meeting its obligations under Article 8.8.1, during which period the FT portion of the Tariff Charges shall be calculated as set forth in Part D of Schedule 5 for liquid fuel.

8.8.3  Upon BPDB complying with its obligations under Article 8.8.1, the Company shall complete the conversion of the Plant to the use of Natural Gas as fuel. Upon the completion of such conversion, the Company shall conduct a Capacity Test under Article 7.2 of the Plant to determine the Guaranteed Capacity of the Plant while operating on Natural Gas.

October 14th, 1997                                26

**Article 9**
**Invoice and Payment**

9.1 <u>Invoices</u>: The Company shall, within thirty (30) Days of the end of each month (beginning with the month in which the Commissioning Date occurs until the expiration of the Term) prepare and issue to BPDB an Invoice in respect of the charges due from BPDB for that month.

9.2 <u>Content of Invoice</u>: Each Invoice prepared by the Company shall be substantially in accordance with the form attached hereto as Schedule 12 or such other form as the Parties may agree from time to time. Recovery Allowance, Liquidated Damages, or any other charges payable under this Agreement shall be payable by the Parties under same terms and condition as applicable to monthly Invoice.

9.3 <u>Payment due date</u>: Tariff Charges and any other amount payable by BPDB hereunder shall be due and payable within forty-five (45) Days after the date of delivery of the Invoice.

9.4 <u>Late payment interest</u>: Any amount properly due from BPDB to the Company under this Agreement and remaining unpaid after the due date for payment shall bear interest at the Bank Rate from and including the date when the amount in question was due until but excluding the date when it is received by the Company, accruing from day to day at simple interest.

9.5 <u>Calculation</u>: Invoiced amounts due to the Company will be paid by the BPDB in Bangladesh Taka at the Exchange Rate for purchase of US Dollars as on the business Day immediately preceding the date on which payment is made, plus commissions and other conversion fees payable by the Company for conversion of such amounts to US Dollars.

9.6 <u>Disputed payments</u>: If any sum or part of any sum shown on an Invoice rendered by the Company is disputed in good faith by BPDB then the Parties shall use their best efforts to resolve the Dispute in accordance with Article 18 within the time limits set forth therein and then the payment of the undisputed sums or parts shall not be withheld on those grounds and shall be paid to the Company when due; and Upon resolution of the Dispute, the BPDB shall release to the Company the payments determined to be due to the Company, together with interest at the Bank Rate from and including the date when the sum in question was due until but excluding the date when it is received by the Company. Notwithstanding anything to the contrary, BPDB shall not withhold in any month that amount which is equivalent to Minimum Guaranteed Payment (MGP) as calculated below, on account of any dispute or otherwise.

Where, MGP = OMT * GC * 24 * (Days in month) * 0.5

Where:

October 14th, 1997                                              27

OMT = is the Tariff Charge Rate other than FT(fuel) in Part A of Schedule 4
at 50% Monthly Plant Factor.

GC = is the Guaranteed Capacity in kWs

9.7 Taxes etc: All payments under this Agreement shall be made free and clear from, and without set-off, deduction or withholding on account of, any form of taxes including Indirect Taxes and Duties.

9.8 Company's Account: All amounts payable under this Article by BPDB to the Company under this Agreement shall be paid by way of bank transfer to the account of the Company at a bank in Bangladesh to be notified by the Company to BPDB within three (3) months of the date of the execution of this Agreement.

9.9 Letter of Credit

9.9.1 Establishment of Letter of Credit: BPDB shall cause Sonali Bank or any other scheduled bank that is reasonably acceptable to the Company to issue the Letter of Credit in the form of Schedule 14 hereto and in accordance with this Article 9.9. The Letter of Credit, in Taka denomination, shall be issued to the Company not later than thirty (30) Days after the delivery of notice to BPDB by the Company pursuant to Article 5.2 of this Agreement. The initial term of the Letter of Credit shall not be less than the Term of the PPA. In case of any extension of the PPA, BPDB shall, not less than thirty (30) Days prior to its expiration, renew or replace the Letter of Credit on agreed terms to this Letter of Credit.

9.9.2 Letter of Credit Amount: The amount of the Letter of Credit shall be an amount necessary to meet two (2) months of Minimum Guaranteed Payments (assuming for the first Letter of Credit, a Guaranteed Capacity of 90 MW, a 50% Monthly Plant Factor, and an Exchange Rate as is in effect on the Business Day immediately preceding the date in which the Letter of Credit is issued) ("Letter of Credit Amount" or "L/C Amount").

The Letter of Credit Amount will be re-calculated and adjusted every three (3) months after the Full Commercial Operation Date in order to account for any changes, from the date of the last balance calculation, in the Guaranteed Capacity, OMT and Exchange Rate. If as a result of any such re-calculation, BPDB is required to increase the amount of the Letter of Credit, it shall do so within five (5) days of the three (3) month anniversary of the Full Commercial Operation Date when such re-calculation was made.

9.9.3 Drawdown on Letter of Credit: Payment will be as per the terms and conditions of the Letter of Credit as provided in Schedule 14.

9.9.4 BPDB acknowledges that the Company may assign the Letter of Credit to or for the benefit of the Lender in accordance with Article 20.2.

October 14th, 1997

28

9.9.5    The Company shall submit four (4) copies of the monthly tariff Invoice duly prepared and signed in accordance with the PPA to the authorized officer of the BPDB.

NA

**Article 10**
**Metering**

10.1  Installation of Metering System: The Company shall, at its expense, procure and install the Metering System and upon completion, convey the Metering System to BPDB. The Company, at its expense, shall procure, install, own and maintain the Backup Metering System.

10.2  Testing of Meter System: With respect to the Metering System, either Party shall have the right at its own expense to:

   10.2.1  inspect such Metering System upon reasonable notice;

   10.2.2  attend and witness tests, adjustments and recalibration of such Metering System carried out by the other Party pursuant to Part B of Schedule 3;

   10.2.3  require the testing, adjustment for error and recalibration of such Metering System; and

   10.2.4  install check metering in relation to Metering System whose purpose is to determine Net Electrical Output; provided that Invoices and payments hereunder shall not be based on any such check metering unless the Parties otherwise agree.

10.3  Specification etc. of Metering System: The specification and required limits of accuracy of Metering System, and the metering point (the electrical point at which such Metering System is positioned), shall be as specified in Part B of Schedule 1.

10.4  Defective Metering System: Where it is agreed or determined that any Metering System is defective (including operating outside the relevant limit of accuracy in Part B of Schedule 1), then such Metering System shall be repaired, adjusted, or re-calibrated, and if necessary replaced in accordance with the provisions set out in paragraph 1(g) of Part B of Schedule 3.

10.5  Meter error: Where in the circumstances referred to in Article 10.4 it is necessary to re-determine any quantity measured or recorded by defective Metering System the provisions of paragraph 2(b) of Part B of Schedule 3 shall apply.

10.6  Meter sealing: The Metering System shall comply with the specifications set out in Part B of Schedule 1 and shall be jointly sealed. Such seals shall be broken only by BPDB personnel. The Company shall be given at least twenty-four (24) hours advance notice of the breaking of seals on the Metering System provided however that no such notice shall be necessary when the breaking of a seal is necessitated by the occurrence of an Emergency.

October 14th, 1997

30

10.7    Meter tampering: BPDB and the Company shall undertake not to tamper or otherwise interfere with the Metering System in any way with the object of distorting the quantity measured or recorded by the Metering System. Where it is alleged that the Metering System has been tampered or interfered with, the quantity of Net Electrical Output delivered to BPDB for the period during which the alleged tampering or interference occurred shall be determined as provided in paragraph 2(b) of Part B of Schedule 3.

10.8    Metering procedures: The Parties shall adopt and implement the procedures and arrangements set out in Part B of Schedule 3 for reading, testing, adjusting and re-calibrating Metering System.

10.9    Disputes: Any dispute arising under this Article 10, Part B of Schedule 1 or Part B of Schedule 3 shall be referred to the determination of an Expert pursuant to Article 18.2.

10.10   Telecommunication:

The Company, at its sole cost and expense, shall provide:

(a)    Telecommunications system for (i) telecommunication and teleprotection facilities at BPDB's nearest grid sub-station and the Plant control room; and (ii) telemetering and data interface for BPDB's supervisory control and data acquisition systems (SCADA);

(b)    An extension of the load despatch center's PBX system in the control room of the Plant to permit voice communications between the Plant and the load despatch center (which voice communications may be recorded as provided in Section 3 of Part C of Schedule 3); and

(c)    Equipment in the Plant to transmit and receive facsimiles.

The selection and installation of items to be provided by the Company in accordance with this Article 10.10 shall be subject to the prior written approval of BPDB.

10.11   Power Line Carrier Communication Signals: BPDB will provide power line carrier communication signals to the Plant control room to communicate with Control Center.

## Article 11
### Insurance

The Company/Affiliate/Contractors/holding company/any other associated parties shall:

11.1   take out and maintain in full force and effect such policies of insurance as are specified in Schedule 8 with internationally reputable insurance companies including, at the Company's option, with insurance companies organized outside of Bangladesh; however, the Company shall not be in breach of its obligations hereunder if and to the extent that any particular insurance is unavailable to it on commercially reasonable terms for reasons other than negligence or default, by or on the condition of, the Company;

11.2   provide to BPDB certificates from the insurers that issue the policies effected by it, which certificates shall include evidence that the premiums payable thereunder have been paid;

11.3   except as otherwise required by the Financing Agreements, apply the proceeds of claims against such policies, relating to damage to the Plant, in repairing and restoring the Plant; and

11.4   obtain waivers of rights of subrogation against BPDB.

October 14th, 1997                              32

**Article 12**

**Undertakings and Warranties of the Parties**

12.1    Undertakings of the Company:  The Company undertakes that it will:

12.1.1    so far as is material to BPDB hereunder, comply with all applicable Legal Requirements;

12.1.2    make or cause to be made, in a timely fashion, and shall diligently pursue applications for all Authorizations required to be in the Company's name for the operation of the Plant and any other of its obligations under this Agreement; and

12.1.3    indemnify BPDB against all costs reasonably incurred by BPDB in the discharge of its obligation under Article 12.3.2 below.

12.2    Representations and Warranties of the Company:  The Company represents and warrants that:

12.2.1    the Plant shall be designed, constructed and completed in a good and workmanlike manner, only with materials and equipment that are brand new, unused, not reconditioned, utility grade and suitable for their intended use, and in such a manner as to provide that the useful life of the Plant, with proper operation and maintenance, will be at least equal to the Term of this Agreement and in accordance in all material respects with sound engineering practices, and Prudent Operating Practices;

12.2.2    the Company is a limited liability company duly incorporated and validly existing under the laws of Bangladesh and has all requisite legal power and authority to execute this Agreement and to carry out the terms, conditions and provisions hereof;

12.2.3    this Agreement constitutes the valid, legal and binding obligations of the Company, enforceable in accordance with the terms hereof except as the enforceability may be limited by applicable laws affecting creditors' rights generally and general principles of equity;

12.2.4    there are no actions, suits or proceedings pending or, to the Company's knowledge, threatened, against or affecting the Company before any court or administrative body or arbitral tribunal that, if adversely determined, would materially and adversely affect the ability of the Company to meet and carry out its obligations under this Agreement;

12.2.5    the execution, delivery and performance by the Company of this Agreement have been duly authorized by all requisite corporate action, and, to the best of the Company's knowledge, does not

October 14th, 1997

33

violate the laws of Bangladesh or any applicable order of any Governmental Authority or contravene in any material respect any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound; and

12.2.6 the Plant shall be constructed, operated and maintained in accordance with internationally acceptable engineering standards and accepted environmental standards as specified here below:

    (i)    The design, construction and operation of the Plant with regard to water discharges, emissions, and noise levels, shall comply with the World Bank's Environmental Guidelines and be subject to constraints imposed by the laws of Bangladesh.

12.2.7 Attached to this Agreement are true and correct copies of the resolutions of the Company's Board of Directors or similar resolutions authorizing the Company's execution, delivery and performance of this Agreement, and of a power of attorney pursuant to such Board resolution specifically authorizing named individuals to execute this Agreement on behalf of the Company.

12.3    <u>Undertakings of BPDB</u>: BPDB undertakes that it will:

12.3.1 comply with all applicable Legal Requirements and will keep in force all Authorizations required for the performance of its obligations under this agreement;

12.3.2 use reasonable efforts to assist the Company in obtaining on a timely basis and in maintaining throughout the Term all Authorizations required by the Company;

12.3.3 to the extent there is a Change in Law, use reasonable endeavors to assist the Company to obtain all Authorizations necessary for the continued operation or maintenance of the Plant;

12.3.4 BPDB shall operate and maintain the Interconnection Facilities and BPDB's System in accordance with Prudent Operating Practices so as not to have a material adverse effect on the Plant; and

12.3.5 within 30 Days of the Company's request, in connection with the financing of the Plant, BPDB shall deliver a certificate, executed by a duly authorized officer of BPDB, affirming the representations in Article 12.4 and shall cause the Ministry of Law, GOB to issue an opinion addressed to such parties as the Company shall request, which opinion shall affirm the validity of the representations of BPDB made in Article 12.4, the validity and enforceability of this

Agreement and the Implementation Agreement, set forth such further matters as the Company may reasonably request.

12.4  Representations and Warranties of BPDB: BPDB represents and warrants that:

12.4.1  BPDB is a statutory body organized and validly existing under the laws of Bangladesh and has all requisite legal power and authority to execute this Agreement and to carry out the terms, conditions and provisions hereof;

12.4.2  all legislative, administrative or other governmental action required to authorize the execution, delivery and performance by BPDB of this Agreement and the transactions contemplated herein have been taken and are in full force and effect;

12.4.3  this Agreement constitutes the valid, legal and binding obligation of BPDB, enforceable in accordance with the terms hereof except as the enforceability may be limited by applicable laws and general principles of equity;

12.4.4  there are no actions, suits or proceedings pending or, to BPDB's knowledge, threatened, against or affecting BPDB before any court or administrative body or arbitral tribunal concerning or relating to this Agreement, the subject matter hereof, or the Plant;

12.4.5  the execution, delivery and performance by BPDB of this Agreement have been duly authorized by all requisite corporate action, and, does not violate the laws of Bangladesh or any applicable order of any Governmental Authority or contravene in any material respect any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound.

12.4.6  Attached to this Agreement are true and correct copies of the resolutions of BPDB's Board of Directors or similar resolutions authorizing BPDB's execution, delivery and performance of this Agreement, and of a power of attorney pursuant to such Board resolution specifically authorizing named individuals to execute this Agreement on behalf of BPDB.

Article 13

## Force Majeure

13.1 <u>Events of Force Majeure</u>: For the purposes of this Agreement "Force Majeure" means subject to Article 13.2 any event or circumstance or combination of events and circumstances which materially and adversely affects the performance of either Party of its obligations under or pursuant to this Agreement and is not within the reasonable control (directly or indirectly) of the Party affected, to the extent that such event or circumstance or its material and adverse effects cannot be prevented, avoided, or removed by such Party through the exercise of diligence and reasonable care and acting in accordance with Prudent Operating Practice. "Force Majeure" shall include each of the following events and circumstances to the extent that they satisfy the foregoing requirements:

13.1.1 events or circumstances of the following nature which occur inside or involve/affect Bangladesh, including:

(a) any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, public disorder, act of terrorism, or similar events;

(b) radioactive contamination or ionizing radiation or resulting from another event of Force Majeure under Article 13.1.1;

(c) labor disputes, including strikes, works to rule or go-slow or lockouts, that are not limited to disputes regarding wages, working conditions, and similar matters between the Company and its employees, but that extend beyond the Plant or are widespread or nationwide or that are of a political, religious or ethnic nature;

(d) a nationwide shortage of fuel that prevents the Fuel Supplier from providing adequate deliveries of fuel to the Plant;

(e) Change in Law;

(f) action or inaction of any Governmental Authority (including expropriation, nationalization or compulsory acquisition or acts claimed to be justified by executive necessity);

(g) the failure to obtain or to obtain within ninety (90) Days from the date of application, or the failure to remain in full force and effect, any Authorization necessary for the implementation of this Agreement or required to start, continue, or implement immediately any work or activities, or perform any obligations, under this Agreement, which failure

NA

October 14th, 1997

36

shall not have been caused by any act or omission on the part of the Company; or

13.1.2   other events beyond the reasonable control of the affected Party including:

    (a)    an act of God including lightning, fire, earthquakes, volcanic activity, floods, storms, cyclones, typhoons, or tornadoes;

    (b)    epidemics or plagues;

    (c)    fire, explosions or chemical or radioactive contamination (other than resulting from an event described in Article 13.1.1, in which case it shall be an event of Force Majeure under Article 13.1.1);

    (d)    labor disputes, including strikes, works to rule or go-slow or lockouts, that:

        (i)    occur outside Bangladesh and do not involve Bangladesh, and

        (ii)    are widespread or nationwide or are of a political, religious or ethnic nature, or

        (iii)    Occur prior to the Full Commercial Operation Date or thereafter only as it affects generation of energy due to delay in delivery of specially manufactured machinery or equipment;

    (e)    any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, public disorder, act of terrorism, or similar events occurring outside Bangladesh and not involving Bangladesh; or

    (f)    delay in the delivery to the Company of a major piece of machinery or equipment that has been timely ordered, but only to the extent that such delay is caused solely by an accident in transportation or results directly from Force Majeure, (other than resulting from an event described in Article 13.1.1, in which case it shall be an event of Force Majeure under Article 13.1.1).

13.2   <u>Exclusions from Force Majeure</u>: The following events or circumstances shall not constitute Force Majeure except in the case of Articles 13.2.1, 13.2.2 or 13.2.3 to the extent that they result directly from an event of Force Majeure:

October 14th, 1997           37

13.2.1 late delivery to the Company of machinery, equipment, materials, spare parts or consumables;

13.2.2 a delay in the performance of any Contractor;

13.2.3 normal wear and tear or breakdown in equipment; or

13.2.4 labor disputes, including strikes, works to rule, go-slows or lockouts involving a dispute between a Party and its own employees regarding wages, working conditions and similar matters that are not part of an event described in Article 13.1.1(c) or 13.1.2(d).

13.3     Notice of Force Majeure: Procedure

As soon as possible following the date of commencement of any event of Force Majeure, if either Party desires to invoke such event of Force Majeure as a cause for delay or failure in performance of any obligation hereunder, it shall advise the other Party in writing of such date and the nature and expected duration of such event of Force Majeure. Within a reasonable time following the date of termination of such event of Force Majeure, the Party having invoked such event of Force Majeure as a cause for such delay or cost increase shall submit to the other Party reasonable proof of the nature of such delay or failure and its consequences. The Parties shall there upon consult with one another concerning the effect of such delay or failure and reschedule Plant activities to avoid or minimize the consequences resulting from the event of Force Majeure. The Parties:

13.3.1 shall make reasonable efforts to prevent and reduce to a minimum and mitigate the effect of any delay or cost increase occasioned by any event of Force Majeure including recourse to alternate acceptable sources of services, equipment and materials and construction equipment; and,

13.3.2 shall use reasonable efforts to ensure resumption of normal performance of this Agreement after the occurrence of any event of Force Majeure and shall perform their obligations to the maximum extent practicable agreed between the Parties.

Notwithstanding their duty to mitigate the effects of any event of Force Majeure as set forth in Articles 13.3.1 and 13.3.2, neither Party shall be required to settle any labor dispute or litigation on terms which, (i) in the sole judgment of the affected Party, are contrary to such Party's interest, or (ii) are contrary to the labor laws of Bangladesh.

13.4     Effect of Force Majeure

13.4.1 Subject to the provision of Article 13.3 if a Party is prevented from or delayed in performing an obligation hereunder by reason of Force

Majeure:

(i)      the affected Party shall be relieved from the consequences of its failure to perform or delay in performance of that obligation (other than an obligation to make a payment);

(ii)      any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended on a day for day basis to the extent that the performance of such obligations are affected by the Force Majeure; and

(iii)      if any event of Force Majeure continues beyond a period of two hundred and seventy (270) Days, either Party shall be entitled to terminate this Agreement by giving written notice of not less than seven (7) Days to the other Party.

13.4.2    The right to terminate provided under Article 13.4.1(iii) shall not apply if more than two hundred and seventy (270) Days is needed to mitigate such Force Majeure because of the need to special order or manufacture machinery, equipment or parts and the Company has timely ordered such machinery, equipment or parts.

13.5    <u>Construction Force Majeure</u>: If, prior to the Commissioning Date or the Full Commercial Operation Date, as a result of (i) an event of Force Majeure described in Article 13.1.1, or (ii) a failure of BPDB or GOB to meet any of their obligations under this Agreement, or the Implementation Agreement, the Company is delayed in or prevented from performing any of its obligations, then:

13.5.1    the dates for performance of such obligations (including the Required Commissioning Date and the Required Full Commercial Operation Date) shall be revised to new dates which are extended by the period of such delay; and

13.5.2    the Company shall be entitled to receive Recovery Allowance payments under Article 13.9 to recover fully the increased costs incurred by the Company or for which it is liable that are attributable to such Force Majeure events that extend for more than 30 Days or failures of BPDB or GOB to perform and which increased costs are not recovered under any insurance policy coverage required by Article 11; provided that the Company has taken out such policies of insurance and has timely paid the premiums thereof.

13.6    <u>Payments during Force Majeure</u>: Upon the occurrence of any Force Majeure event after the Full Commercial Operation Date that affects the ability of the Company to make Capacity Available or the BPDB to take delivery of Capacity, then

13.6.1 during any Force Majeure event described in Article 13.1.2 affecting the Company, and not directly affecting the BPDB, BPDB shall pay to the Company Tariff Charges for the Net Electrical Output delivered to BPDB's System during such Force Majeure event, if any, without giving effect to the Minimum Tariff Payment component of the Tariff Charge;

13.6.2 during any Force Majeure event described in Article 13.1.1, BPDB shall pay to the Company in any month the Tariff Charges for such month ascertained in accordance with Part A of Schedule 4; and

13.6.3 during any Force Majeure event described in Article 13.1.1, the sole effect of which is to prevent or delay the delivery of liquid fuel to the Plant, then BPDB shall have no obligation to pay the Minimum Tariff Payment component of the Tariff Charges under Article 13.6.2 until thirty-one (31) days after the inception of such Force Majeure event.

13.6.4 during any Force Majeure event described in Article 13.1.2 affecting the BPDB and not directly affecting the Company, BPDB shall pay to the Company Tariff Charges for the Net Electrical Output delivered to BPDB's System during such Force Majeure event. In addition, Company shall also be entitled to receive seventy-five (75%) percent of the Minimum Tariff Payment for those hours during which such an event of Force Majeure were in existence..

13.7 <u>Recovery Allowance for Certain Force Majeures:</u> If a Force Majeure event described in Article 13.1.1 results in damage to, or other adverse effects on the Plant, the Procedure for Restoration shall be in accordance with Article 13.11 and Article 13.12. If this Agreement is not terminated by BPDB pursuant to Article 14.7.2, the Company shall be entitled to receive Recovery Allowance payments under Article 13.9 from BPDB to recover fully the difference between the restoration costs incurred and any insurance proceeds received by the Company as a result of the occurrence of such Force Majeure. The amount of any Recovery Allowance due under this Article shall be determined pursuant to Article 13.9.

13.8 <u>Recovery Allowance For Change in Law:</u>

13.8.1 In the event of the occurrence of a Change in Law (including a Change in Law that becomes applicable to the Company because of damage to and the restoration of the Plant) that requires a material modification or a material capital addition to the Plant, which is completed by the Company, or in lieu thereof or in addition thereto, an increase or decrease in operating costs including the use or quality of fuel or consumables by the Plant, and this Agreement is not terminated by BPDB pursuant to Article 14.7.2, the Company will be

entitled to receive Recovery Allowance payments under Article 13.9 from BPDB to recover fully the costs of complying with the Change in Law, including the costs of any material modifications or material capital additions to the Plant that are necessary for the Company to come into compliance with the Change in Law. The amount of any Recovery Allowance due under this Article shall be determined pursuant to Article 13.9.

13.8.2   In the event of the occurrence of a Change in Tax, which Change in Tax increases the amount of Tax (or Indirect Taxes and Duties) payment or withholding by the Company or the Investors or in respect of which Tax (or Indirect Taxes and Duties) the Company is required to make an adjustment to payments to any Contractor, Lender or Fuel Supplier and from which Tax (or Indirect Taxes and Duties) or Change in Tax the Company or such other party, as applicable, is not exempt, then the Company will be entitled to receive Recovery Allowance payments under Article 13.9 to recover fully such increase. In the event of the occurrence of a Change in Tax which decreases the amount of such Tax (or Indirect Taxes and Duties) payment or withholding, then BPDB will be entitled to receive a credit under Article 13.9 to reflect fully such decrease. The amount of any Recovery Allowance due or to be credited under this Article shall be determined pursuant to Article 13.9.

13.9   Amounts to be Recovered:

13.9.1   The amounts of the Recovery Allowance to be recovered by the Company pursuant to Articles 13.5, 13.7 and 13.8.1 shall include (i) all financing costs incurred and return of and on equity contributions made in connection with the increased costs, restoration of the Plant or the compliance with the Change in Law, and (ii) the cost of additional quantities or higher quality of fuel or consumables or other additional operating costs that are directly attributable to or result from the schedule delay, restoration of the Plant or compliance by the Company with the Change in Law. Any reduction in cost due to a decrease in the use or quality of fuel or consumables or other operating costs by the Plant that are directly attributable to or result from the schedule delay, restoration of the Plant or compliance by the Company with the Change in Law shall be credited to BPDB. At any given time, the amount of such Recovery Allowance shall be amortized on a straight line basis over the lesser of (i) the term of any financing incurred in connection with the increased costs, restoration of the Plant or the compliance with the Change in Law, or (ii) remaining Term of the Agreement using the Bank Rate on a simple interest basis, and shall be set forth on the invoices from the Company to BPDB separately from the Tariff Charges.

October 14th, 1997                                    41

13.9.2  The amounts of the Recovery Allowance to be recovered by the Company or credited to BPDB pursuant to Article 13.8.2 (i) in the case of a one-time charge (or a one-time increase or reduction in a charge) shall be recovered or credited over the 12-month period following the Change in Tax, or (ii) in the case of a periodic assessment shall be recovered or credited over the period between assessments. Such amounts shall be set forth on the invoices from the Company to BPDB separately from the Tariff Charges.

13.9.3  The Parties shall negotiate in good faith to agree on the amount of the Recovery Allowance due to the Company by BPDB or to be credited to BPDB by the Company. If the Parties fail to agree on such amounts within sixty (60) Days of the date that a Party first provides a written request to the other Party for such Recovery Allowance or credit, then the matter shall be resolved by Arbitration in accordance with Article 18.1.

13.10  Payment of Recovery Allowance/Credits: Once agreed by the Parties (or determined in accordance with Article 18.1) pursuant to Article 13.9, the Company shall include any Recovery Allowance amounts due to the Company or credits due to BPDB under Article 13.9 as adjustments to its Invoices to BPDB. Any such Recovery Allowance amounts due the Company shall be identified as such and shall be stated separately from any Tariff Charges included in such Invoice. If any such credits are due to BPDB, the amounts thereof shall be set off against the amounts due from BPDB to the Company in each such Invoice. Any Recovery Amounts payable by BPDB hereunder shall be due and payable within forty-five (45) Days after the date of delivery of the Invoice.

13.11  Restoration; Procedure

(a)  In the event that a Force Majeure event described in Article 13.1.1 results in damage to the Plant or that compliance by the Company with a Change in Law requires a material modification or a material capital addition to the Plant (each such event referred to as "Restoration"), the Parties shall, within seven (7) Days after the date by which the Company was first required to provide notice to the BPDB under Article 13.3, except if the event has not ended by the time of such notice, in which case within seven (7) Days of the ceasing of such Force Majeure event, constitute a committee to develop a preliminary written estimate (the "Preliminary Estimate") of: (i) the projected range of cost to effect the Restoration, less any insurance proceeds available or likely to become available to the Company (the "Restoration Cost Estimate"); and (ii) a preliminary schedule for the completion of the Restoration(such schedule shall be referred to herein as a "Restoration Schedule"). The size and the composition of this committee shall be mutually agreed between the Parties, and the members of the committee may include among others, technical, financial, and legal experts and representatives of Lenders and insurance companies. The committee shall make the Preliminary

NA

October 14th, 1997

42

Estimate as comprehensive and as complete as possible under the circumstances. The committee shall within fourteen (14) days of its composition, finalize and submit the Preliminary Estimate to the Parties.

    (i)    If the Parties agree within three(3) Days of the receipt of the Preliminary Estimate, with the Restoration Cost Estimate and with the Restoration Schedule, then the Company shall proceed with the Restoration in accordance with the Restoration Schedule.

    (ii)    If the Parties disagree or are unable to agree, within three(3) Days of the receipt of the Preliminary Estimate, with either the Restoration Cost Estimate or the Restoration Schedule, then the Parties shall proceed with the preparation of a Report.

Notwithstanding anything to the contrary, anytime before or after the constitution of the committee, the Parties or the members of the committee, as the case may be, are of the opinion that instead, the Report shall be prepared in accordance with Article 17.12, then the Parties shall immediately cause the creation of the Report in place of the Preliminary Estimate.

    (b)    If a Report is required to be prepared, then at the conclusion of the meetings of the Parties to discuss the Report, the Parties shall either agree or disagree with respect to the matters addressed therein. If the Parties reach agreement on such matters, or, in the case of a disagreement, after resolution by an Expert pursuant to Article 13.12, the BPDB shall, within fifteen (15) Days of such agreement or resolution, provide the Company with a written notice of its election to either (i) terminate this Agreement and pay the Compensation Amount or (ii) authorize the Company to proceed with Restoration

    (c)    In the event of the occurrence of a Force Majeure event under this Agreement that prevents the operation of the Plant because BPDB is unable to receive power from the Plant and in such event the Plant is not able to operate for more than two hundred seventy (270) Days, then Company shall have the option to terminate this Agreement and, upon such termination, the BPDB shall be required to pay to the Company the Compensation Amount.

13.12    Appraisal Report and Use of Expert

    (a)    When required by Article 13.11, the Parties shall appoint a mutually acceptable firm of international repute for the preparation of an appraisal report (the "Report") within seven (7) Days after the date it was determined that a Report would be necessary, and deliver a copy of such Report to the BPDB within twenty-eight (28) Days thereafter. The Report shall address, in such detail as is practicable under the circumstances and accompanied by reasonable supporting data, the following matters (to the extent applicable):

(i)    (i) describe the Force Majeure event and the damage to, and/or the other effects or impacts on, the Plant, (ii) estimate in good faith the time it will take to restore the Plant (as much as it may be possible to do so) to its condition immediately prior to the Force Majeure event or to bring the Plant into compliance with the Change in Law and (iii) propose a Restoration Schedule; provide a statement and explanation in good faith regarding whether restoration or modification of the Plant or necessary capital additions are technically feasible and financially viable, including the Company's good faith estimate of:

       (A)    the costs to restore the Plant to its condition immediately prior to the Force Majeure event and the associated delay costs or the costs to come into compliance with the Change in Law;

       (B)    the insurance proceeds, if any, that may be recovered, the date or dates on which such proceeds may be received, and the particular purposes for which such proceeds are required to be applied; and

(ii)    in the case of a Force Majeure event, provide certificates and reports of the Company's financial and technical advisers, as appropriate or as reasonably requested by the BPDB, in support of the applicable matters referred to in this Article 13.12.

(b)    Within seven (7) Days of the delivery of a Report to BPDB or such further time as the Parties may agree, the Parties shall meet to discuss the Report and any action(s) required to be taken. In connection with the review by the BPDB of a Report, the Company shall provide promptly to the BPDB such additional financial and related information pertaining to the Report and the matters described therein as the BPDB may reasonably request.

(c)    In the case Parties disagree with the Report, then the Disputes between the BPDB and the Company shall be submitted to an Expert pursuant to Article 18. Notwithstanding any other provision in this Agreement to the contrary regarding the role of Experts in resolving disputes, unless the Parties agree to the contrary in a writing signed by both Parties at the time the Expert is selected, the decision of the Expert as to any matter referred under Articles 13.5 and 13.6 shall be final and binding on both Parties and shall not be subject to appeal. The Parties expressly waive, to the fullest extent permitted by law, any and all rights that they may now have or may have in the future to contest the decision of the Expert before any court or other adjudicatory or administrative body. Notwithstanding anything to the contrary contained in Article 18, the Parties shall appoint a mutually acceptable Expert within seven (7) Days of the disagreement on the Report and the Expert shall render the determination within thirty (30) Days of reference of the matter to the Expert.

## Article 14
### Termination and Default

14.1    The Company's Events of Default: For the purposes of this Agreement an Event of Default in respect of the Company shall be:

    14.1.1    subject to the provisions of Article 14.4 and provided that no such event shall be an Event of Default by the Company if it results from a breach by BPDB of this Agreement or from a breach by the GOB of the Implementation Agreement, any of the following events:

        (i)    the willful and un-excused abandonment by the Company of the Plant for a period of thirty (30) consecutive Days without the written consent of BPDB after the Full Commercial Operation Date;

        (ii)    the breach by the Company of any of its material obligations under this Agreement;

    14.1.2    in relation to the Company or substantially all of its assets, the commencement of bankruptcy, insolvency, winding up, liquidation, or other similar proceeding, or the appointment of a trustee, liquidator, custodian, receiver or similar person, unless such proceeding or appointment is capable of being and is set aside or stayed within sixty (60) Days.

14.2    BPDB Events of Default: For the purposes of this Agreement an Event of Default in respect of BPDB shall be:

    14.2.1    subject to the provisions of Article 14.4 and provided that no such event shall be an Event of Default by BPDB if it results from a breach by the Company of this Agreement, the breach by BPDB of any of its material obligations under this Agreement;

    14.2.2    in relation to BPDB or substantially all of its assets, the commencement of bankruptcy, insolvency, winding up, liquidation, or other similar proceeding, or the appointment of a trustee, liquidator, custodian, receiver or similar person, unless such proceeding or appointment is capable of being and is set aside or stayed within sixty (60) Days;

    14.2.3    failure to pay any Tariff Charges or other amounts due to the Company within one hundred and twenty (120) days from the date of the Company's invoice for such Tariff Charges or other amounts, which is not subject to a bonafide dispute.

14.3    Defaulting Party etc.: For the purposes of this Agreement the Company is the defaulting Party in relation to the events of Default specified in Article

14.1 and BPDB is the defaulting Party in relation to the events of Default specified in Article 14.2 and (in each case) the other Party is the non-defaulting Party.

14.4     <u>Remedial Procedures</u>: Upon the occurrence of any event (a "Default") specified in Article 14.1.1 or 14.2.1 which is capable of remedy the non-defaulting Party may give notice to the defaulting Party of the occurrence of such default and requiring the remedy thereof, and if after such notice has been given:

    14.4.1    the defaulting Party does not, within thirty (30) Days (five (5) Days in the case of a Default under Article 14.2.3) after receipt of the non-defaulting Party's notice

       (i)     where such Default is capable of remedy within such thirty (30) Day period (five (5) Day period in the case of a Default under Article 14.2.3), remedy the Default; or

       (ii)     where such Default is capable of remedy but not within such thirty (30) Day period, furnish to the non-defaulting Party a detailed program reasonably acceptable to the non-defaulting Party for the remedy as promptly as is practicable of the Default; or

    14.4.2    the defaulting Party fails to remedy the Default in accordance with such remedial program

then the non-defaulting Party may give notice to the defaulting Party that such default is an Event of Default, but no event specified in Article 14.1.1 or 14.2.1 which is capable of remedy shall be an Event of Default except pursuant to the provisions of this Article 14.4.

14.5     <u>Termination</u>: Upon an Event of Default and the expiration of any remedial period under Article 14.4.1 or 14.4.2, the non-defaulting Party may upon not less than seven (7) Days notice to the defaulting Party terminate this Agreement; provided:

    14.5.1    BPDB may not terminate this Agreement as a result of a Company Event of Default without first giving a copy of any notices required to be given to the Company under Article 14 to the Lenders and providing the Lenders two-hundred seventy (270) Days after receipt of the notice to terminate pursuant to this Article 14.5.1 to cure the Company 's Event of Default, provided that during the continuance of the Company's Event of Default, BPDB shall only be required to pay for the Net Electrical Output delivered to the Delivery Point until the Company's Event of Default is cured and upon such cure, BPDB shall resume paying the full Tariff

October 14th, 1997

46

Charges in accordance with this Agreement.

14.5.2  The Company may not terminate this Agreement as a result of a BPDB Event of Default (other than a BPDB Event of Default involving any BPDB failure to pay amounts due the Company) without first giving a copy of any notices required to be given to the BPDB under Article 14 to the GOB and providing the GOB two-hundred seventy (270) Days after receipt of the notice to terminate pursuant to this Article 14.5.2 to cure the BPDB Event of Default.  The two-hundred seventy (270) Day cure period provided to the GOB under this Article 14.5.2 (i) shall not apply to any BPDB Event of Default involving any BPDB failure to pay amounts due the Company and (ii) shall not be in duplication of or in addition to any cure period provided to the GOB under the Implementation Agreement or the Guarantee.

14.6   Survival of Rights: The expiry or termination of this Agreement shall not affect any right or obligation which may have accrued prior to such expiry or termination and shall not affect obligations of each of the Parties under this Agreement which are expressed to continue after such expiry or termination.

14.7   Compensation Upon Termination:

14.7.1   Upon:

(i)   termination of this Agreement by the Company pursuant to Article 14.5 due to an Event of Default by BPDB;

(ii)   termination of this Agreement pursuant to Article 13.4.1 as a result of the continuation of an event of Force Majeure described in Article 13.1.1 beyond a period of two hundred and seventy (270) Days;

(iii)   termination of the Implementation Agreement by the Company pursuant to Article 13.5 thereof due to a GOB Event of Default or pursuant to Article 11.4 thereof; or

(iv)   a breach by GOB of its material obligations under the Guarantee;

the BPDB shall pay the Company the Compensation Amount pursuant to Article 14.7.3  and return the Performance Bonds to the Company with no draws thereon. The Company thereafter shall transfer the Plant to the

October 14th, 1997

47

14.7.2 If either a Force Majeure event described in Article 13.1.1 or a Change in Law occurs after the Full Commercial Operations Date and would entitle the Company to receive Recovery Allowance payments pursuant to Article 13.7 or 13.8.1, BPDB may elect to terminate this Agreement by giving written notice or not less than seven (7) Days to the Company. BPDB may make such election only prior to the Company's incurring any restoration or compliance costs related thereto. Upon such termination, BPDB shall pay the Company the Compensation Amount pursuant to Article 14.7.3 and return the Performance Bonds to the Company with no draws thereon,. The Company thereafter shall transfer the Plant to the BPDB.

14.7.3 "Compensation Amount" means, at any given time, in the case of Articles 14.7.1 and 14.7.2;

$$CA = [(.65 * NPV) + TP + RA] + TA$$

where:

CA = Compensation Amount due to the company

NPV = the net present value of the Minimum Guaranteed Payment payable to the Company in each month calculatedon the basis of OMT at 50% Monthly Plant Factor and the last Guaranteed Capacity of the Plant for the months (or fractions thereof) remaining in the initial Term of the Power Purchase Agreement at such time, applying a discount rate of twelve percent (12%) to such Minimum Guaranteed Payments.

TP = the amounts of any termination payments payable by the Company upon termination by it of any Fuel Supply Agreement and any other Project Agreements that it would have to terminate as a result of the termination of this Agreement.

RA = any un-recovered Recovery Allowance payments to be made pursuant to Article 13.

TA = Any Taxes (and Indirect Taxes and Duties), if any, imposed on or in connection with the Compensation Amount ("CA") or the transfer thereof by the Company to the Lenders and/or Investors.

The Compensation Amount shall be paid in US Dollars.

14.7.4    In the event of a termination of this Agreement by BPDB pursuant to Article 14.5 due to an Event of Default by the Company, BPDB may forfeit the Performance Bonds as liquidated damages. The Company shall retain the Plant and shall have the right to remove the Plant from the Site and/or Bangladesh pursuant to Article 2.4.

14.8    Suspension: The Company may, by giving 30 Days notice to BPDB, suspend operations at the Plant upon any failure by BPDB to pay any Tariff Charges or other amounts due to the Company within one hundred twenty (120) Days from the date of the Company's Invoice for such Tariff Charges or other amounts. The Company under this clause cannot suspend operation for a dispute arising out of electrical or mechanical fault in the Metering System. BPDB shall not be entitled to Despatch the Plant during such suspension of operations. The period of suspension shall not be included in the calculation of Short Supply Penalty pursuant to Article 16.3. If the Company has given BPDB notice of the Company's intention to suspend operations hereunder, the Company may not give a termination notice to BPDB until 30 Days after the date of such notice.

October 14th, 1997

49

ARTICLE 15
INDEMNIFICATION AND LIABILITY

15.1  Limitation of Liability

Except as provided in Article 15.2, neither Party shall be liable to the other Party in
contract, tort, warranty, strict liability, or any other legal theory for any indirect,
consequential, incidental, punitive, or exemplary damages. Neither Party shall have
any liability to the other Party except pursuant to, or for breach of, this Agreement;
provided, however, that this provision is not intended to constitute a waiver of any
rights of one Party against the other with regard to matters unrelated to this
Agreement or to any activity not contemplated by this Agreement.

15.2  Indemnification

(a)  The BPDB shall defend and indemnify the Company and its directors,
officers and employees against, and hold the Company and its directors,
officers and employees harmless from, at all times after the date hereof, any
and all Losses incurred, suffered, sustained, or required to be paid, directly or
indirectly, by, or sought to be imposed upon, the Company and its directors,
officers and employees for personal injury or death to persons or damage to
property arising out of the negligent or intentional act or omission of the
BPDB in connection with this Agreement.

(b)  The Company shall defend and indemnify the BPDB and its members,
officers and employees against, and hold the BPDB and its members,
officers and employees harmless from, at all times after the date hereof, any
and all Losses incurred, suffered, sustained, or required to be paid, directly or
indirectly, by, or sought to be imposed upon, the BPDB and its members,
officers and employees for personal injury or death to persons or damage to
property arising out of the negligent or intentional act or omission of the
Company in connection with this Agreement.

(c)  In the event that any Loss results from the joint or concurrent negligent or
intentional acts or omissions of the Parties, each Party shall be liable under
this indemnification in proportion to its relative degree of fault.

(d)  The provisions of this Article 15.2 shall survive for a period of one (1) years
following the termination of this Agreement.

15.3  Indemnification for Fines and Penalties

Any fines or other penalties incurred by the Company for non-compliance with
applicable Laws of Bangladesh or other governmental actions taken pursuant
thereto or the Consents shall not be reimbursed by the BPDB but shall be the sole
responsibility of the Company.  The Company shall have the right, but not the
obligation to contest and appeal any fines it believes have been imposed in violation
of the Laws of Bangladesh.

15.4    Limitation on Indemnification

(a)    Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, ten thousand Dollars ($10,000). For purposes of this Article 15.4, a Loss (or claim for indemnification) shall be deemed to arise in the Year during which the event giving rise to the Loss (or claim for indemnification) occurred or, in the case where the event is continuing in more than one Year, in the Year during which the event ends.

(b)    Neither Party shall be entitled to indemnification under Article 15.2 if and to the extent that a Party has received payment in full in respect of a Loss or proceeding under the indemnities contained in the Implementation Agreement in respect of the relevant act or omission.

15.5    Notice of Proceedings

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 15.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

15.6    Defense of Claims

(a)    The indemnifying Party shall be entitled, at its option, and expense and with counsel of its selection, to assume and control the defense of any claim, action, suit or proceeding in respect of, resulting from, relating to or arising out of any matter for which it is obligated to indemnify the other Party hereunder; provided, it gives prompt notice of its intention to do so to the indemnified Party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defense.

(b)    Notwithstanding the provisions of Article 15.6(a), unless and until the indemnifying Party acknowledges in writing its obligation to indemnify the indemnified Party and assumes control of the defense of a claim, action or proceeding in accordance with Article 15.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, action, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c)    Upon assumption by the indemnifying Party of the control of the defense of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the

October 14th, 1997                                                    51

indemnified Party in the defense of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgment of the indemnification and assumption of the defense.

(d)     Neither Party shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying Party may settle or compromise any claim without the approval of the indemnified Party. Except where such consent is unreasonably withheld, if a Party settles or compromises any claim, action, suit or proceeding in respect of which it would otherwise be entitled to be indemnified by the other Party without the prior written consent of the other Party, the other Party shall be excused from any obligation to indemnify the Party making such settlement or compromise in respect of such settlement or compromise.

(e)     Following the acknowledgment of the indemnification and the assumption of the defense by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such action, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless:

(i)     the employment of counsel by such indemnified Party has been authorized in writing by the indemnifying Party;

(ii)    the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defense of such action;

(iii)   the indemnifying Party shall not in fact have employed independent counsel to assume the defense of such action and shall have been so notified by the indemnified Party; or

(iv)    the indemnified Party shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defenses available to it that are different from or additional to those available to the indemnifying Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon it beyond the scope of this Agreement.

If clause (ii), (iii) or (iv) of this Article 15.6(e) shall be applicable, then counsel for the indemnified Party shall have the right to direct the defense of such claim, action, suit or proceeding on behalf of the indemnified Party and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

15.7    Implementation Agreement Double Jeopardy

(a)     Settlement or waiver in writing by GOB of any dispute or breach under the Implementation Agreement shall be binding on the BPDB, with respect to

October 14th, 1997

52

such issue or claim, as the case may be, based upon the same facts or acts or omission by the Company.

(b)  Settlement or waiver in writing by the Company of any dispute or breach under the Implementation Agreement shall be binding on the Company with respect to such issue or claim, as the case may be, based upon the same facts or acts or omission by the BPDB.

(c)  Nothing in this Article 15.7 shall prevent the BPDB and GOB from separately initiating proceedings to terminate this Agreement and the Implementation Agreement, respectively, pursuant to Article 14 of this Agreement and Articles XIII of the Implementation Agreement.

October 14th, 1997

53

## Article 16
## Liquidated Damages

Liquidated Damages to be Paid by Company

16.1  Delay in Full Commercial Operation:  If the Full Commercial Operation Date of the Plant shall not occur on or prior to the date which is ten (10) months from the date of the execution of this Agreement as such date has been extended by agreement of the Parties or extended pursuant to Articles 5.10, 13.4 and 13.5 of this Agreement or extended pursuant to the provisions of Article 4.5(a), Article 7.1(a), Article 11.4 and Article 11.5 of the Implementation Agreement, the Company shall pay BPDB as liquidated damages for delays in Full Commercial Operation Date a sum equal to US$10,000 per day or fraction thereof up to a maximum of sixty (60) days. After this period, BPDB shall have the right to terminate this Agreement and forfeit the Performance Bond forthwith.

16.2  Lower Output Capacity: In the event upon completion of the Capacity Test, if the Guaranteed Capacity is less than 90 MW, then the Company after paying one time liquidated damages in accordance with this Article will be deemed to have reached Full Commercial Operations Date for all purposes of this Agreement and the capacity as demonstrated by the test will be the Guaranteed Capacity of the Plant.

| Tested Capacity | Penalty |
|---|---|
| $85 \leq x < 90$ MW | $20,000 per MW of shortfall |
| $80 \leq x < 85$ MW | $35,000 per MW of shortfall |

Where:

$x$ = Capacity as demonstrated in Capacity Test

Within six (6) months after the Capacity Test or any retest, the Company will be required to enhance the Guaranteed Capacity back to 90 MW. In case the Company fails, and such time has not been extended by the parties hereto or has been as a consequence of Force Majeure, then BPDB may terminate this Agreement.

16.2.1  After the Full Commercial Operation Date, if and only if the Guaranteed Capacity at Full Commercial Operation Date is more than or equal to 90 MW and the Company fails to deliver in a particular day a minimum of 90 MW as per Despatch Instruction from BPDB then the Company shall pay BPDB a liquidated damage for lower output at the rate of US$834 for shortage of each MW below 90 MW for each peak hour until another Despatch Instruction is given to lower the Capacity of the Plant below 90 MW, provided

October 14th, 1997                                      54

that there will be no liquidated damage if the Company can deliver minimum 90 MW within one hour of the said Despatch Instruction.

16.3 Short supply of energy: Each month, the Company shall calculate and pay any Short Supply Penalty due from the Company to BPDB pursuant to the formula set forth below. The Company shall not be liable for any Short Supply Penalty in any month in which the BPDB has failed to Despatch the Plant and has taken power in an amount in excess of 50% of the Guaranteed Capacity of the Plant (expressed in kWs) in that month.

$$SSP = [(GC \times MPF) - NEO] \times OMT_p \times 2.0$$

Where:
SSP = Short Supply Penalty in US$ due to BPDB

GC= Guaranteed Capacity of the Plant expressed in kW and multiplied by the number of hours in the month

MPF = the Monthly Plant Factor (50%)

$OMT_p$ = The OMT portion of the Tariff Charge rate for a 50% Monthly Plant Factor for the same month.

NEO = The Net Electrical Output of the Plant over the same month plus (i) the Equivalent Downtime for Scheduled Outages and Unscheduled Outages during that month plus (ii) the Equivalent Downtime on account of Force Majeure during that month plus (iii) the Equivalent Downtime on account of BPDB despatch instruction during that month and (iv) the Equivalent Downtime on account of BPDB's fault which shall include delay in customs clearance as provided in Article 7.1(a) of the Implementation Agreement.

16.4 Inspection during construction period: A team comprising two members each nominated by the Parties shall inspect on a monthly basis the progress of construction of the Plant in accordance with the Program of Works submitted by the Company. The expenses of each team member incurred during such inspection shall be borne by the Party nominating such member.

16.4.1 Failure to attain monthly progress: If in any month the Company fails to achieve any target dates identified in the Program of Works set forth in Schedule 6 of this Agreement regarding the design, construction, installation, testing and Commercial Operation of the Plant, then the Company shall accrue monthly liquidated damages payable to BPDB equal to US$300,000 and pro-rata for any part of a month up to a maximum in aggregate of two months or, if earlier, until the date of any succeeding target dates identified in the Program of Works that is achieved by the Company. If the

Company shall achieve the Full Commercial Operation Date on or prior to the Required Commercial Operation Date, then any liquidated damages accrued by the Company to BPDB under this Article 16.4.1 shall be credited back to the Company and no amount of liquidated damages shall be payable by the Company to BPDB pursuant to this Article 16.4.1. If the Full Commercial Operations Date of the Plant shall not occur on or prior to the Required Commissioning Date, the amount of liquidated damages accrued by the Company under this Article 16.4.1 less the amount of liquidated damages payable by the Company pursuant to Article 16.1 shall become due and shall be paid to BPDB by the Company pursuant to Article 16.7; provided that, in no event, shall the amount of liquidated damages payable by the Company pursuant to this Article 16.4.1 and pursuant to Article 16.1 in the aggregate exceed US$600,000, except in case of termination under Article 16.1 where BPDB would have the right to forfeit the Performance Bond.

16.5   OMT Reduction for Derated Capacity after Commissioning: After Commissioning, if the Guaranteed Capacity of the Plant is less than 90 MW, then the OMT part of the tariff during the period from the most recent Capacity Test to the next Capacity Test shall be calculated as per the following formula:

Derated Guaranteed Capacity = C in MW
OMT part of tariff after derating = $OMT_p$
Then $OMT_p$ = C/90 * OMT of the concerned year and Monthly Plant Factor

This formula shall only apply for that period of time when derated Guaranteed Capacity is lower than 90 MW.

16.6   Performance Bonds:

16.6.1   Within fifteen (15) Days after the execution of this Agreement, the Company shall provide BPDB a performance bond (the "Performance Bond") in the form provided in Schedule 11, which shall be continuing security, in an amount of US Dollars One Million Five Hundred Thousand (US$1,500,000) to ensure Company's obligations hereunder including its obligations to pay liquidated damages. In addition to the Performance Bond and to further ensure the Company's obligations hereunder, the Company will provide BPDB a performance bond (the "Second Performance Bond") in the form provided in Schedule 11 not later than two hundred and seventy (270) Days after the Effective Date or thirty (30) Days prior to the Required Full Commercial Operations Date, whichever is earlier, in the amount of US Dollars Eight Million Five Hundred Thousand (US$8,500,000).

16.6.2 On the first day of each Operating Year starting from the first anniversary of the Full Commercial Operations Date, the required amount of the Second Performance Bond shall be reduced by US Dollars Six Hundred Sixty-Seven Thousand (US$667,000) until the Second Performance Bond has been reduced to the amount of US Dollars One Million Five Hundred Thousand (US$1,500,000) after which the Company shall maintain the Second Performance Bond in such amount as required by 16.6.3.

16.6.3 Company shall maintain the Performance Bonds at the designated level (US$ 3,000,000) at all times during the Term; provided that Company may have fifteen (15) Days to replenish the Performance Bonds so as to return it to the designated level, in the event that BPDB retains or collects funds from the Performance Bonds.

16.7 <u>Payments of Liquidated Damages:</u> Within fifteen (15) Days after the end of each month, BPDB shall compute and advise the Company by written notice (a "Liquidated Damages Notice") of the amount of liquidated damages due to BPDB pursuant to this Agreement for the preceding month. Company shall pay to BPDB the undisputed amount of the liquidated damages shown on the Liquidated Damages Notice within fifteen (15) Days of delivery of the Liquidated Damages Notice (the "Liquidated Damages Due Date") in Bangladesh Taka at the Exchange Rate as on the business day immediately preceding the date on which payment is made, and interest shall accrue on any unpaid amount from the Liquidated Damages Due Date at the Bank Rate. Unless the entire undisputed amount of liquidated damages reflected on the Liquidated Damages Notice is paid to BPDB by the Company, the undisputed amount of such liquidated damages plus accrued interest due to BPDB shall be set off against amounts owed the Company by BPDB on the next statement(s) submitted to BPDB pursuant to Article 9. If the undisputed amount of Liquidated Damages plus accrued interest due to BPDB is greater than the amount which can be set off against three (3) consecutive statements, Company shall within fifteen (15) Days after the date of service of the third statement, pay to BPDB any unpaid and undisputed amount of Liquidated Damages plus accrued interest. If the Company does not then pay to BPDB the unpaid and undisputed amount plus accrued interest, BPDB may immediately deduct this sum from the Performance Bonds. If the Parties are unable to reach agreement regarding the disputed amount of any liquidated damages within sixty (60) Days of the date of the Liquidated Damages Notice, either Party may refer such matter for final resolution by arbitration in accordance with Article 18.1. During the pendency of any such dispute as to the amount of liquidated damages, BPDB may not draw on or deduct such disputed amounts from the Performance Bonds.

NA

Liquidated Damages to be Paid by BPDB

16.8     In the event that;

    16.8.1     for any reason (other than a failure by the Company to perform its obligations in accordance with this Agreement), BPDB fails to meet any other obligation under this Agreement or GOB fails to meet any of its obligations under the Implementation Agreement and such failure causes a delay in the Plant Commercial Operations Test or the Full Commercial Operation Date, or

    16.8.2     in the event Company is unable to undertake the full commercial operation and/or testing of the Plant in accordance with the programs and procedures agreed pursuant to Article 5.4 due to failure by BPDB to Despatch the Plant or accept power,

then, in addition to any extension of the Required Commissioning Date or the Required Full Commercial Operation Date provided for in this Agreement, from and after the scheduled Full Commercial Operation Date prevailing on the date of such failure and until the failures specified in Articles 16.8.1 and 16.8.2 are remedied, BPDB shall pay to the Company the Minimum Guaranteed Payment monthly (and pro rated for any portion of a month), in arrears.  For purposes of calculating the Minimum Guaranteed Payment due from BPDB to the Company under this Article 16.8, the Guaranteed Capacity shall be 90 MW.  If the BPDB makes any payments to Company under this Article 16.8 and the Guaranteed Capacity established at the Full Commercial Operation Date is less than 90 MW, then the amount by which any payments made by BPDB under this Article 16.8 exceeds the amount that the BPDB would have paid to Company had such payments been made based on the Guaranteed Capacity actually demonstrated at the Full Commercial Operations Date shall be refunded to BPDB by the Company.

**ARTICLE 17**
**Confidentiality**

17.1    <u>Confidential Information</u> :  Each Party agrees that it will, and will ensure that its employees, officers and directors will, hold in confidence all information, documentation, data and know-how disclosed to it by the other Party and designated in writing as "Confidential" ("Confidential Information"), and will not disclose to any third party or use Confidential Information or any part thereof without the other Party's prior written approval, provided that ;

(a)    this Clause shall not apply to Confidential Information which is in the public domain other than by reason of a breach of this Article 17.1, or was already in the rightful possession of the recipient Party, or was obtained by the recipient Party in good faith from a third party entitled to disclose it; and

(b)    a Party may disclose Confidential Information in accordance with any legal requirement to do so, or to financial institutions, consultants and contractors whose duties reasonably require such disclosure.

17.2    <u>Survival</u> :  The provisions of this clause 17 shall survive for a period of two (2) years after the termination or expiration of this Agreement.

October 14th, 1997                                         59

## Article 18
## Dispute Resolution

18.1    Arbitration: Any dispute or difference of any kind between the Parties in connection with or arising out of this Agreement or the breach, termination or validity hereof (a "Dispute") that is not resolved pursuant to Article 18.2 shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC) (the "Rules") in accordance with the said Rules which Rules are deemed to be incorporated by reference into this Clause 18.1.  It is hereby agreed that:

18.1.1  The site of the arbitration shall be London, England;

18.1.2  There shall be three arbitrators, each Party selecting one arbitrator within 15 Days after the claimant commences the arbitration by giving written notice of arbitration and the third (and presiding) arbitrator selected by the two arbitrators so selected within thirty (30) Days after their appointment.  If the two arbitrators cannot agree on the third arbitrator within such thirty (30) Day period, the third arbitrator shall be appointed in accordance with the ICC Rules;

18.1.3  The language of the arbitration shall be English;

18.1.4  The award rendered shall apportion the costs of the arbitration.  Any monetary award shall be made and payable in US Dollars, free of any tax or other deduction, and shall include interest from the date of any breach or other violation of this Agreement to the date on which the award is paid, at a rate determined by the arbitrator but in no event less than the Bank Rate, as of the date of the claimant's formal notice of arbitration;

18.1.5  The award shall be in writing and shall set forth in reasonable detail the facts of the Dispute and the reasons for the tribunal's decision;

18.1.6  The award in such arbitration shall be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction for its enforcement, and the Parties renounce any right of application or appeal to the courts or any right to state a special case for the opinion of the court in connection with any question of law arising in the course of the arbitration or with respect to the decision of the tribunal insofar as such renunciation can be validly made;

18.1.7  Notwithstanding the provisions of Article 21 of this Agreement, the agreement to arbitrate contained in this Article 18 and the interpretation of this Agreement, shall, in so far as they relate to arbitration under this Article, be governed by and construed in accordance with the Laws of England. The arbitral tribunal may

consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Project Agreements, Fuel Supply Agreement, or Financing Agreements that provides for ICC arbitration if the subject matter of the disputes arises out of or related to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral tribunal appointed for the arbitration proceeding that was commenced first in time. Except as otherwise provided in this Article 18.1.7, the rights of the Parties to proceed with dispute resolution under Article 18.1 shall be independent of their rights or the rights of related entities to proceed with dispute resolution under any of the other Project Agreements, the Fuel Supply Agreements, or the Financing Agreements; and

18.1.8   If there is a conflict between this Agreement and the  Rules, this Agreement shall, to the extent of the conflict, prevail over the Rules

18.2    Expert: where the Agreement provides that any Dispute or other matter shall be referred to an Expert or when the Parties hereinafter decide to refer any Dispute to an  Expert the Parties so agree:

18.2.1   The Expert shall be an independent person with relevant experience and willing to act between the Parties within fourteen (14) Days of a request in writing by either Party through mutual consent having regard to the nature of the Dispute and if the Parties cannot mutually agree on an Expert within fourteen (14) Days, then either Party may request the International Chamber of Commerce Centre for Expertise to suggest a person of appropriate reputation and experience, who shall be the Expert.

18.2.2   For a period of thirty (30) Days after the appointment of the Expert or such other period as the Parties may agree, each Party may make such written submissions as it wishes to the Expert and shall simultaneously provide a copy to the other Party and at the end of such thirty (30) Day period each Party shall have a period of twenty-one (21) Days to make counter-submissions to the Expert (with a copy to the other Party) in reply to the other Party's written submissions made during the aforementioned thirty (30) Day period provided that neither Party shall during such twenty-one (21) Day period make any written counter-submission which purports to reply, to raise or refer to any new matters not raised or referred to in any submission made during the aforementioned thirty (30) Day period;

18.2.3   At the end of the twenty-one (21) Day period referred to in Article 18.2.2 above, and no later than fourteen (14) Days thereafter, either Party may, with the consent of the Expert and at a time and place

October 14th, 1997

61

decided by the Expert, make an oral presentation to the Expert in the presence of the other Party commenting on or explaining matters previously submitted to the Expert in writing;

18.2.4 The Expert shall render his determination in writing within fourteen (14) Days of the completion of the oral presentation given in accordance with Article 18.2.3 (or in the absence of such oral presentations, fourteen (14) Days after completion of the periods for written submissions provided in Article 18.2.2) and give reasonable details of the reasons for his determination;

18.2.5 The decision of the Expert with respect to any Dispute or matter referred to such Expert pursuant to Article 5.4 or 6.4 shall be final and binding on the Parties save in the event of fraud or manifest error or in the event such decision is unenforceable. With respect to all other Disputes or matters referred to an Expert under this Agreement, if either Party does not accept the recommendation of the Expert with respect to such Dispute or matter or if the Expert has not submitted such recommendation within the time period provided in Article 18.2.4, either Party may initiate arbitration proceedings in accordance with Article 18.1. Nothing in this Article shall prohibit the Parties to agree with respect to any Dispute that the determination of such Expert shall be final and binding, before the referral of such Dispute to the Expert.

18.2.6 The Expert's fees and expenses shall be payable by the Parties in equal amounts, unless the Expert (having regard to the conduct of the Parties with respect to the dispute in question) shall direct in his determination that such costs and expenses should be borne by one Party only, in which case that Party shall pay such fees and expenses in accordance with such direction and if the terms of the Expert's appointment provided for the payment of his fees and expenses before the delivery of his determination, the Parties shall pay such fees and expenses in equal amounts, and shall make adjustment payments inter se following such directions;

18.2.7 The Expert shall act as an Expert and not as an arbitrator.

18.3 Exclusivity: Neither Party shall have any right to commence or maintain any legal proceeding concerning a Dispute relating to this Agreement until the Dispute has been resolved in accordance with Article 18.1 or 18.2, and then only to enforce or execute the award under such procedure.

18.4 Confidentiality: The Parties shall each secure that all Experts and Arbitrators shall agree to be bound by the provisions of Article 17 of this Agreement as a condition of appointment.

18.5 Continuance of Obligations: Both Parties shall continue to perform their

obligations under this Agreement during any Expert or Arbitration proceeding provided that the right to terminate this Agreement or suspend operations pursuant to Article 14 is not restricted by this Article 18.5.

18.6    Commercial Acts

18.6.1    BPDB unconditionally and irrevocably agrees that it is subject to suit in Bangladesh with respect to its obligations under this Article 18 to engage in an Expert determination or to engage in arbitration, or with respect to any action in aid of arbitration, or with respect to enforcement of an award resulting from an arbitration or Expert determination held pursuant to this Article 18.    BPDB unconditionally and irrevocably agrees that the execution, delivery and performance of this Agreement constitute private and commercial acts and not sovereign acts.    In furtherance of the foregoing, BPDB hereby irrevocably and unconditionally consents generally in respect of the enforcement of any judgment enforcing an arbitral or Expert award against it in any such proceedings in any jurisdiction, to the giving of any relief or the issue of any process in connection with such proceedings (including the enforcement or execution against or in respect of any of its assets);

18.6.2    The Company unconditionally and irrevocably agrees that it is subject to suit in Bangladesh with respect to its obligations under this Article 18 to engage in an Expert determination or to engage in arbitration, or with respect to any action in aid of arbitration, or with respect to enforcement of an award resulting from an arbitration or Expert determination held pursuant to this Article 18.    The Company unconditionally and irrevocably agrees that the execution, delivery and performance of this Agreement constitute private and commercial acts.    In furtherance of the foregoing, the Company hereby irrevocably and unconditionally consents generally in respect of the enforcement of any judgment enforcing an arbitral or Expert award against it in any such proceedings in any jurisdiction, to the giving of any relief or the issue of any process in connection with such proceedings (including the enforcement or execution against or in respect of any of its assets).

18.7    Consent to Jurisdiction

18.7.1    Each Party irrevocably and unconditionally consents to the jurisdiction of any competent court located in a jurisdiction (i) where the arbitration or Expert determination is to be held with respect to an action to compel or in aid of arbitration or Expert determination pursuant to this Article 18, or (ii) where the Party against whom enforcement is sought has assets in an action filed by the other Party to enforce an award or decision of the arbitrators or Expert.    Each Party further agrees not to assert that such action has been brought

in an inconvenient forum, and consents to the enforcement of an arbitral or Expert award made in accordance with Article 18 against any of its assets. Each Party consents that service of any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration or Expert determination under Article 18, for any court action to compel or in aid of such arbitration or Expert determination, or for the entry of judgment on any award made by the arbitrators or Expert, may be made in accordance with Article 20.6.

NA

October 14th, 1997

64

# Article 19
## Maintenance of Operation Records

19.1 Each Party shall keep complete and accurate records and all other data required by each of them for the purposes of proper administration of this Agreement. Among other records and data required hereby or elsewhere in this Agreement, the Company shall maintain an accurate and up-to-date operating log, in a format acceptable to BPDB, at the Plant with records of :

    19.1.1 real and Reactive Power production for each clock hour and 132 kV voltage at all times;

    19.1.2 changes in operating status, scheduled outages, forced outages and partial forced outages;

    19.1.3 any, unusual conditions found during inspections; and

all such records and data shall be maintained for a minimum of sixty (60) months after the creation of such records or data provided that each party shall not dispose of or destroy any such records or data after such (36) month period unless the party desiring to dispose of or destroy any such records or data gives thirty (30) Days prior written notice to the other Party, generally describing the records or data to be destroyed or disposed of, and the Party receiving such notice does not object thereto in writing within ten (10) Days. If a written objection is received within such ten (10) Day period, the objecting Party shall have a period of sixty (60) Days after the date of such written objection within which to inspect and copy the records or data proposed to be disposed of or destroyed, which records and data shall be made available within such sixty (60) Day period by BPDB or the Company as the case may be, at such Party's offices in Dhaka. After the expiration of such sixty (60) Day period, the Party desiring to dispose of or destroy such records or data shall be permitted to do so.

19.2 Either Party shall have the right, upon ten (10) Days prior written notice to the other Party, to examine the records and data of the other Party relating to this Agreement or the operation and Despatch of the Plant at any time during normal office hours during the period such records and data are required hereunder to be maintained.

19.3 The Company shall prepare daily log-sheet on hourly basis containing MW (available & delivered), Plant Factor, MVAR and Net Electrical Output despatched in accordance with Despatch Instruction in two copies, one of which shall be delivered to BPDB.

October 14th, 1997                    65

## Article 20
## Miscellaneous Provisions

20.1    BPDB Approval of Contracts: On entering into a Project Agreement the Company shall provide one copy of each Project Agreement to BPDB. Except for change orders which do not substantially affect the operating Capacity, performance, or reliability of the Plant, no material modification shall be made to any of the Project Agreements without BPDB's approval, provided that BPDB shall not withhold such approval unless, in BPDB's reasonable judgment, the modification would materially prejudice the ability of the Company to perform its obligations under this Agreement, or results in the Agreement being materially more onerous and such approval shall be deemed to have been provided thirty (30) Days after written request for such approval unless BPDB expressly withholds such approval in accordance with this Article 20.1. Such Project Agreements shall not be transferred or assigned to a person other than an Affiliate or any parties under the Financing Agreements without the approval of BPDB such approval not to be withheld unless BPDB is of the reasonable opinion that the transfer or assignment is such as to render BPDB unable to perform its obligations under this Agreement.

20.2    Assignment: Financing:

   20.2.1   Neither Party shall assign any of its rights or obligations under this Agreement without the prior written consent of the other Party. Notwithstanding the foregoing, for the purpose of financing the Plant, the Company may assign to, or grant a security interest in favor of, the Lenders in its rights and interests under or pursuant to (i) this Agreement, (ii) the Guarantee and the Implementation Agreement, (iii) the Plant, (iv) the Site and the rights to the Site, (v) the movable, immovable and intellectual property of the Company, or (vi) the revenues or any of the rights or assets of the Company including Authorizations without increasing the financial risks and responsibilities of BPDB under this Agreement.

   20.2.2   The BPDB hereby acknowledges, but without liability, that the Company may initially finance the construction of the Plant using debt financing to be provided or guaranteed by Investors or their Affiliates and thereafter to refinance such Investor provided or guaranteed debt financing with third-party non-recourse financing at such time as the Company is able to procure such third party financing.

   20.2.3   The BPDB hereby agrees to cooperate in good faith with the Company in its pursuit of such financing for the Plant including by executing and delivering acknowledgments to such parties as the Company may direct of the rights of such parties under mortgages and pledges granted by the Company over the Plant or its other

October 14th, 1997                                          66

assets and rights and by taking such actions; provided, however, that nothing in this Article 20.2.3 shall require BPDB or GOB to incur any expense or create any financial obligations to the Company or any other parities.

20.3    Sub-Contractors: The Company shall be entitled to engage third parties as contractors for the performance of its obligations hereunder provided that no such engagement shall relieve the Company of its obligations under this Agreement.

20.4    Variation: This Agreement may not be varied nor any of its provisions waived except by an agreement in writing signed by the Parties.

20.5    Waivers of Rights: No delay or forbearance by either Party in exercising any right, power, privilege or remedy under this Agreement shall operate to impair or be construed as a waiver of such right, power, privilege or remedy.

20.6    Notices: Except for communications in accordance with the Operating and Despatch Procedures, any notice or other communication to be given by one Party to the other under or in connection with this Agreement shall be given in writing and may be delivered or sent by prepaid airmail or facsimile to the recipient at the address, and marked for the attention of the person, specified in Schedule 7 or such other address or person from time to time designated by notice to the other in accordance with this Clause; and any such notice or communication shall be deemed to be received upon delivery or five (5) Days after posting, or when sent by facsimile.

20.7    Effect of Illegality etc: If for any reason whatever any provision of this Agreement is or becomes or is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforce ability of any other provisions and in any such case the parties will negotiate in good faith with a view to agreeing on one or more provisions to be substituted thereof which are not invalid, illegal or unenforceable and produce as nearly as is practicable in all the circumstances the appropriate balance of the commercial interests of the Parties.

20.8    Entire Agreement: This Agreement contains or expressly refers to the entire agreement between the Parties with respect to its subject matter and expressly excludes any warranty, condition or other undertaking implied at law or by custom and supersedes all previous agreements, understandings and documentation between the Parties with respect to its subject matter and each of the Parties acknowledges and confirms that it does not enter into this Agreement in reliance on any representation, warranty, instruments, documents or other undertaking by the other Party not fully reflected in the terms of this Agreement.

20.9    Records and Accounts: The Company shall keep proper books of record

October 14th, 1997

67

and account, in sufficient detail, in which all correct entries will be made of all dealings or transactions of or in relation to its business and affairs, in accordance with generally accepted accounting principles in Bangladesh, consistently applied. The Company shall permit BPDB to examine all relevant books, records, reports and other papers of the Company relevant to this Agreement. The Company shall keep such books, records, reports and other papers in sufficient detail to permit BPDB to examine these. Any such examination by BPDB shall be made upon reasonable advance notice to the Company. All records and accounts shall be subjected to an audit as of the end of each financial year by a firm of independent public accountants selected by the Company, which firm shall be experienced in electric utility accounting. Such firm's audit report shall be submitted to Company, with a copy to BPDB, within ninety (90) Days after the end of such financial year.

20.10    Affirmation: Each of the Company and BPDB declares and affirms that it and its Affiliates, officers, directors, employees and agents have not paid, given, offered, promised or authorized the payment of giving, directly or indirectly, of any monies or anything of value to any person (whether a government official or private individual) for the purpose of influencing or inducing any government official or employee, political party or official thereof, or any candidate for political office, to procure this Agreement, to obtain or retain business or direct business to any person in relation to this Agreement, or to take any other action or decision favorable to the Company, the Plant, or any Owner or Affiliate thereof. The Company and BPDB undertake not to engage, and to cause their Affiliates, officers, directors, employees and agents not to engage, in any of the said or similar acts relative to this Agreement. Furthermore, each Party agrees that it and its Affiliates, officers, directors, employees and agents will not take any action, or fail to take any action, which action or failure to act would subject the other party or any Affiliate thereof to liability or penalty under any applicable laws, rules or regulations of any jurisdiction dealing with improper or illegal payments, gifts or gratuities. Each Party shall notify the other promptly upon the discovery of any noncompliance with this Article.

20.11    Counterparts: This Agreement is executed in two counterparts, each of which shall constitute an original, but both counterparts shall together constitute but one and the same instrument.

20.12    Language: The language for the purpose of administering and interpreting this Agreement shall be English.

NA

October 14th, 1997                                     68

**Article 21**
**Governing Law**

21.1    This Agreement shall be governed by and construed in accordance with the laws of Bangladesh.

October 14th, 1997

69

**Article 22**
**Delivery and Supply of Gas**

22.1    Supply of Gas

22.1.1    For the purposes of this Article, BPDB shall include BPDB's designee.

22.1.2    Supply and Delivery:  Subject to and in accordance with the Operating Procedures to be developed pursuant to Article 22.2 hereof, and the other provisions of this Article, (i) the BPDB shall supply to the Company, all of the Plant's requirements for Gas from the date on which Natural Gas is made available to the Company pursuant to the terms and conditions of this Agreement (the "Gas Date") till the expiry of the Term, and (ii) except as expressly set forth herein, all such Gas delivered hereunder shall conform in all respects to the Gas Specifications..

22.1.3    Contract Entitlement:  From and after the Gas Date, the BPDB shall make available and deliver at the Point of Delivery the quantity of Gas requested by Company in its Gas Orders issued in accordance with the Operating Procedures.

22.2    Operating Procedures

22.2.1    Telephone Notification:  For purposes of deliveries of Gas pursuant to this Article, Company shall, until notified otherwise by the BPDB, provide instructions by telephone to the BPDB's designees; provided, that such telephone instructions shall be promptly confirmed in writing.

22.2.2    Preparation of Operating Procedures:  At least three (3) months prior to the Gas Date, the Company and the BPDB shall jointly initiate the preparation of a set of mutually agreed written operating procedures to facilitate the Parties' performance under this Article (the "Operating Procedures").  If the Parties are unable to agree upon the terms of the Operating Procedures at least forty five (45) Days prior to the Gas Date, the Parties shall refer the matter for determination by an Expert in accordance with the provisions of Article 18.  The Operating Procedures shall be completed and available for use at least fifteen (15) Days prior to the Gas Date.

22.2.3    Operating Procedure Amendments:  From time to time during the Term, either Party may propose Operating Procedure amendments to better achieve the objectives of this Article or for the mutual benefit of the Parties. Such proposals shall be delivered in writing by a proposing Party to the other Party.  If the Parties are unable to agree upon the terms of such proposed amendments within three (3) months of the delivery of such proposed amendment, the Parties shall refer the matter for determination by an Expert in accordance with Article 18.

22.3    Measurement

### 22.3.1 Measuring Station.

(a)    To determine the quantities and quality of Gas delivered, the Company shall procure, install, own and maintain a properly tested and operational Measuring Station, including Pressure control devices, on or before the beginning of the Gas Date.

(b)    The Measuring Station shall be located immediately upstream of the Point of Delivery and outside of Company's property line. The Gas Metering System contained in the Measuring Station shall be capable of recording the quantity of Gas delivered for each Day. The Gas Metering System shall operate at an accuracy of measurement of plus or minus (+/-) two percent (2%). No meter shall be connected to or disconnected (at the Measuring Station) from the Gas pipe except jointly by the authorized personnel of the BPDB and the Company. The meter shall be inspected periodically as agreed by the Parties.

### 22.3.2 Meter Readings:
Meter readings (whether recorded from visual readings at the Measuring Station, or computed from measurement charts and records) shall be recorded at the end of each Month. Gas quantities delivered and supplied hereunder shall be determined from such readings or records in accordance with the provisions of this Article. Should any Dispute arise between the Parties as to quantities of Gas delivered hereunder, the Parties shall in good faith reconcile their differences in accordance with the mechanism set forth in this Article. If the Parties are unable to reconcile their differences as to metered quantities, the Dispute shall be referred to an Expert for resolution pursuant to Article 18.

### 22.3.3 Measurement:
The unit of measurement for Gas delivered and supplied under this Article shall be one (1) MSCF, or any other unit mutually agreed between the Parties. Whether determined by the flow meters, manually, or by other means, the unit of volumetric measurement shall be a cubic foot of Gas and the term "cubic foot of Gas" shall mean a cubic foot of Gas at an absolute pressure of 14.73 pounds per square inch and a temperature of sixty (60) degrees Fahrenheit, without adjustment of water vapor content, but correction factors for pressure, temperature, specific gravity, deviations from Boyle's Law and Charles' Law, expansion and Reynold's number, manometer, Orifice Thermal Expansion, and Gauge Location Factors, etc., specified in the relevant American Gas Association report, shall be applied. The value of atmospheric pressure for calculating the pressure factor shall be 14.73 pounds per square inch and value of acceleration due to gravity shall be 32.174 feet per second per second. The Gas delivered hereunder shall be measured in accordance with the methods in use in the industry generally and recommended by the Gas Measurement Committee of the Gas Department of the American Gas Association, applied in a practical manner

October 14th, 1997                    71

Authority.

22.3.4 <u>Accuracy of Equipment</u>: The accuracy of the measuring and testing equipment described in Article 22.3.1 shall be verified when requested by either Party, but not more often than quarterly and not less often than annually. If, upon any test, the measuring equipment is found to be inaccurate:

(a) By less than two percent (2%), the previous reading thereof shall be considered correct but such meter shall be adjusted at once to read correctly.

(b) By more than two percent (2%) the registration of such meter shall be corrected at the rate of such inaccuracy for any period which is definitely known or agreed upon, failing which for a period extending back one-half (1/2) of the time elapsed from the date of the last calibration and then a corresponding adjustment shall be made with respect to gas delivered hereunder during such period. Following any test, metering equipment found inaccurate shall be immediately corrected by the Parties to a condition of accuracy.

22.3.5 <u>Alternate Measurement Determination</u>: If, for any reason, the Gas Metering System is (i) out of adjustment, (ii) out of service, or (iii) out of repair and the total calculated hourly flow rate through each meter run is found to be in error by an amount in excess of the magnitude described in Article 22.3.4(b) above, the total quantity of Gas delivered shall be re-determined in accordance with the first of the following methods which is feasible:

(a) by using the registration of any mutually agreeable check metering facility, if installed and accurately registering (subject to testing as described herein);

(b) by correcting the error by re-reading of the official charts, or by straight forward application of a correction factor to the quantities recorded for the period (if the net percentage of error is ascertainable by calibration, tests or mathematical calculation);

(c) where parallel multiple meter runs exist, by calculation using the registration of such parallel meter runs; <u>provided</u>, that they are measuring gas from upstream and downstream headers in common with the faulty metering equipment, are not controlled by separate regulators, and are accurately registering;

(d) by estimating the quantity, based upon deliveries made during periods of similar conditions when the meter was registering accurately.

Operating Procedures for determination of Lower Heating Value of the Gas delivered to the Point of Delivery shall be established consistent with Article 22.3.1

22.3.7 **Equipment Testing**: For testing the accuracy of measuring and testing equipment as provided under Article 22.3.4 either Party may give reasonable notice, but in no event less than five (5) Business Days' notice, to the other Party of tests so that each Party may conveniently, at its own expense, have its representative present at such tests.

22.3.8 **Company's Check Meters**: Company may install, maintain and operate, at its sole cost and expense, check measuring equipment; provided, however, that such equipment shall be installed in a manner that will not interfere with the operation of the Measuring Station (including the Gas Metering System) and that such check measuring equipment shall be on Company's property; provided further, that the Company's check measuring equipment shall not be used for any purposes hereunder except as expressly provided in Article 22.3.5

22.4 **Quality, Quantity and Delivery Pressure**

22.4.1 **Conformance with Gas Specifications**: Subject to the provisions of Article 22.4.3, the BPDB shall deliver and supply Gas to the Company under the terms of this Article in full conformance with the Gas Specifications, including, without limitation, the Quality Specifications and the maximum and minimum delivery pressures set forth in the Pressure Specifications.

22.4.2 **Rejection of Non-Conforming Natural Gas**: Except as provided in Article 22.4.3, the Company, at its sole option, may refuse to accept delivery of any Natural Gas which is not in conformance with the Gas Specifications and shall give contemporaneous written notice to the BPDB of such refusal and the reason for such refusal. The BPDB shall take immediate remedial action to cause the non-conforming Natural Gas to fully conform to the Gas Specifications and to meet the delivery requirements of this Article. Until such time that the BPDB demonstrates to the Company's satisfaction that such non-conforming Natural Gas in fact fully conforms to the Gas Specifications and to the delivery requirements of this Article, such non-conforming Natural Gas shall not be deemed to be delivered and supplied pursuant to the terms of this Agreement.

22.4.3 **Acceptance of Non-Conforming Natural Gas**: At the BPDB's request or at the sole option of the Company, the Company may endeavor, but never shall be obligated, to accept Natural Gas which does not fully conform to the Gas Specifications and the delivery requirements of this Agreement and which can be made available to it by the BPDB. Such endeavors shall be limited to those situations where, in the Company's sole judgment, the receipt of such non-conforming Natural Gas will not (a) in any way

October 14th, 1997

73

adversely affect the operating capabilities or design characteristics of the Plant (including without limitation the Plant's capacity, efficiency, reliability, safety, environmental compliance or profitability), (b) be contrary to manufacturers' recommendations with respect to the Plant or any part thereof, or (c) violate the relevant stipulation of the World Bank Environmental Guidelines. The Company's agreement to accept Natural Gas not fully conforming to the Gas Specifications shall not be taken in any way to modify or alter the Gas Specifications or bind the Company at any future time to accept any Natural Gas that does not fully conform to the Gas Specifications.

22.4.4    Failure to Deliver Gas:  For the purposes of this Agreement, including Part B of Schedule 4, any failure of BPDB to supply and deliver Gas to the Company, including on account of an event of Force Majeure defined in Article 13.1.1 shall be BPDB's fault and shall entitle the Company to receive Minimum Tariff Payment.  Any failure of BPDB to supply and deliver Gas to the Company on account of an event of Force Majeure defined in Article 13.1.2 shall entitle the Company to receive seventy-five (75%) percent of the Minimum Tariff Payment for those hours during which such an event of Force Majeure were in existence.  The Company shall be excused without any liability for failure to perform any obligation under this Agreement on account of such non-supply or non-delivery of Gas to the Plant pursuant to the Gas Order.  It is understood between the Parties that payment by BPDB under this Article 22.4.4 shall be payable to the Company provided that the Net Electrical Output of the Plant is less than 50% of the Guaranteed Capacity (multiplied by the hours in the month) in any month.


22.5    Risk of Loss, Title and Indemnification

22.5.1    Risk of Loss and Title:  The BPDB shall be responsible for all of the BPDB's facilities upstream of the Point of Delivery.  The Company shall be responsible for all of Company's facilities downstream of the Point of Delivery.  Unless the Parties agree in writing otherwise, risk of loss and title to all Gas delivered to the Company pursuant to the terms and conditions of this Article shall pass from the BPDB to the Company at the Point of Delivery.

22.5.2    Indemnification:  Without limiting any other remedies that may be available to the BPDB or the Company hereunder or pursuant to applicable law, the following indemnification provisions shall apply:

(a)    The BPDB:  The BPDB shall be deemed to be in exclusive control and possession of all Gas delivered hereunder and shall be responsible for any damage or injury caused thereby until the same shall have been delivered to the Company at the Point of Delivery. The BPDB shall indemnify, defend and hold the Company, for itself and as trustee for its officers, directors, shareholders, employees and

October 14th, 1997                                  74

its Contractors, harmless from any and all Losses resulting from property damage and injury to and death of persons, arising from any negligent act or omission by the BPDB with respect to (i) Natural Gas delivered by the BPDB up to and including the Point of Delivery wherever such damage or injury occurs upstream or downstream of the Point of Delivery.

(b)    The Company:  After receipt of Gas at the Point of Delivery, the Company shall be deemed to be in exclusive control and possession of such Gas and shall be responsible for any damage or injury caused thereby. The Company shall indemnify, defend and hold the BPDB, for itself and as trustee for its officers, directors, shareholders and employees, harmless from any and all Losses resulting from property damage and injury to and death of persons, arising from any negligent act or omission by the Company with respect to (i) Gas delivered hereunder after the Point of Delivery wherever such damage or injury occurs upstream or downstream of the Point of Delivery.

(c)    Joint Negligence:  In the event injury or damage results from the joint or concurrent negligent or intentional acts and/or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

(d)    Survival:  The provisions of this Article 22.5 shall survive for a period of two (2) years following the termination of this Agreement.

22.6    Curtailment, Interruption and Shutdown

22.6.1    Permitted Interruption by BPDB:  After giving at least twenty four (24) hours notice in advance for carrying out necessary extensions, maintenance, repair and/or alterations work on the BPDB's pipelines, equipment and devices, the BPDB shall have the right, without any liability, damages or other compensation to the Company hereunder, to reduce or interrupt Gas supply to the Plant for periods not to exceed thirty (30) hours during any one period of interruption and one hundred and twenty (120) hours in the aggregate in each twelve (12)-Month period. Notwithstanding the preceding sentence, in the case during any Scheduled Outage of the Plant (unless all of the gas turbines and steam turbines are down for outages), BPDB elects to interrupt the supply of Gas for the purposes of Article 22.6.1, then this period for which BPDB interrupts the supply, provided that the BPDB interruption of Gas supply does not extend beyond the Scheduled Outage period of the Plant, shall be excluded for the purposes of calculating the period of thirty (30) hours and one hundred and twenty (120) hours in the preceding sentence.  If and to the extent possible, the BPDB agrees to schedule any outages during the Scheduled Outage period of the Plant in accordance with Schedule 2 of this Agreement and Article 22.6.2 below or if such outage cannot be delayed until a Scheduled Outage period of the Plant,

NA

October 14th, 1997

75

during Non-Peak Hours, which hours shall be advised by the Company to the BPDB within forty-eight (48) hours of the designation or any change thereof. Except for an Emergency not foreseen in the ordinary course, any reduction in or interruption in the supply of Gas will be arranged in advance at a mutually agreed time.

22.6.2    Coordination:  The BPDB and the Company shall make every effort to coordinate their respective shutdown times for purposes of respective maintenance and repair. Non-delivery or a reduction in the delivery of Gas by the BPDB during any such mutually agreed shutdown period shall not constitute a breach or default of the performance obligations of the BPDB under this Article and, notwithstanding anything to the contrary contained in this Article, shall not give rise to any claim by the Company for any compensation or damages hereunder. The Company and the BPDB also agree that to enable the BPDB to complete any maintenance or repair of the BPDBs' facilities which has been scheduled during such a shutdown period, the BPDB may reduce or interrupt the supply of Gas pursuant to Article 22.6.1, above.

## 22.7    Gas Price and Adjustment

### 22.7.1    Billing Amount

(a)    Subject to Article 22.7.2 below and the other terms and conditions of this Article, the BPDB shall raise an Invoice in Takas at the end of every month ("Gas Invoice") for Gas actually delivered to, and received by, the Company at the Point of Delivery pursuant to the Company's Gas Orders during such month.

(b)    The amount to be paid by the Company for all Gas delivered at the Point of Delivery under this Article shall be based upon the Gas Price as notified by the Relevant Authority from time to time.

(c)    Every month, the Company shall subtract the Gas Invoice Amount from the Invoice amount, provided that the Company receives the Gas Invoice before the dispatch of Invoice to BPDB. The Gas Invoice Amount shall be calculated by multiplying Gas Price by the quantity of Gas delivered and supplied by BPDB to the Company during such month measured in MSCFs as adjusted pursuant to Article 22.7.2.

Gas Invoice Amount = Gas Price x Quantity of Gas (MSCF) * Adjustment Factor

22.7.2    Price Adjustment: The BPDB and the Company agree that Gas being supplied hereunder will have a Lower Heating Value between 935 and 955 BTUs per Standard Cubic Foot (but shall not at any time have a Lower Heating Value of less than 900 BTUs per Standard Cubic Foot). From and

October 14th, 1997

76

after the date that Additional Measuring Equipment is installed by the Company (at the Company's sole cost and expense), that will accurately measure on a continuous basis the BTU content (LHV) of the Gas delivered to the Company at the Point of Delivery under this Article. If the Gas delivered to the Company by the BPDB during any month has an average BTU content (LHV) below 935 BTUs (Lower Heating Value per Standard Cubic Foot) or in excess of 955 BTUs (Lower Heating Value per Standard Cubic Foot), the Parties agree that the price of Gas per MSCF shall be adjusted pro rata to offset the reduced or excess BTU content of the Gas delivered by the BPDB to the Company during such month. The Company shall use all reasonable efforts to install and have fully operational the Additional Measuring Equipment on or before the Gas Date.   The Gas Invoice Amount pursuant to this Article shall be calculated by multiplying the Gas Amount and the Adjustment Factor, where Adjustment Factor is equal to the value obtained by dividing the `average monthly BTU content (LHV) of the Gas' by 945.

In the case the Average Monthly BTU (Lower Heating Value per Standard Cubic Foot) Content is less than 935 BTU (Lower Heating Value per Standard Cubic Foot) or greater than 955 BTU (Lower Heating Value per Standard Cubic Foot), then

$$\text{Adjustment Factor} \quad = \quad \frac{\underline{\text{Average Monthly BTU Content of the Gas}}}{945}$$

In the case the Average Monthly BTU (Lower Heating Value per Standard Cubic Foot) Content is equal to or greater than 935 BTU (Lower Heating Value per Standard Cubic Foot) and less than or equal to 955 BTU (Lower Heating Value per Standard Cubic Foot), then

$$\text{Adjustment Factor} \quad = \quad 1$$

22.8    Billing

22.8.1    Monthly Billing: The BPDB's bills for the supply of Gas shall be furnished to Company on a calendar month basis.

22.8.2    Posting and Adjustment: The BPDB shall, within thirty (30) Days of the end of each month, prepare and issue to the Company, the Gas Invoice in respect of charges due from the Company for that month.

22.8.3    Method of Adjustment: In case the Company receives the Gas Invoice before the date on which the Company dispatches the Invoice to BPDB, the Company shall make appropriate deductions from the Invoice amount.  In case the Company receives the Gas Invoice after it has already dispatched to BPDB the Invoice, then BPDB shall have the right to deduct the Gas Invoice Amount, provided however, if before the Payment due date pursuant to Article 9.3, the Company disputes any portion of such Gas

Invoice Amount, then pending resolution of any Dispute, BPDB shall have no right to deduct any amount in excess of the FT portion of the tariff Invoice, from the Invoice amount. Any such Disputes shall be resolved in accordance with Article 18.

October 14th, 1997

78

IN WITNESS WHEREOF, THE PARTIES HAVE ENTERED INTO THIS
AGREEMENT AS OF THE DATE FIRST WRITTEN ABOVE.

**Bangladesh Power Development Board**

By: _____

(Nuruddin M. Kamal)
Chairman

Witness: _____

(A.Y.M. Ziaul Haq)
Member Planning & Development

_____

(Md. Monwar Hossain)
Secretary

**Smith Cogeneration
(Bangladesh) Pvt. Ltd.**

By: _____

(George B. Jongeling)
Director

Witness: _____

(Nauman Ahmad)

_____

(Mohit Saraf)

October 14th, 1997

79

**Schedule 1**
**Facilities to be installed by BPDB and the Company**

### Part A: Plant Characteristics

The Plant shall be new and unused with following characteristics:

Section 1.    Functional Specification of the Plant

Contracted Capacity                                    100 MW ± 10 MW

a)    Number of power plant(s) on each Barge:        2 CTG, 1 STG....
b)    Total output of power plant(s) measured at     130 MW (liquid)
      132 kV delivery point, at 0.80 p.f., 50 Hz     130 MW (gas)
      and at the site ambient conditions of 35°C,
      1.013 bar and 98% R.H.


Facility Basic Design Data

The following is the equipment with specification data sheet with basic design data of the Plant

| Prime Mover | Design rating | |
|---|---|---|
| **Simple Cycle** | | |
| Gross MW capacity of plant at site ambient conditions of 35°C, 1.013 and 98% R.H. | CTG 92.2 (liquid) | CTG 93.7 (gas) |
| Net MW capacity of plant at above ambient conditions | 90.5 | 92.0 |
| **Combined Cycle** | | |
| Gross MW capacity of plant at site ambient conditions of 35°C, 1.013 and 98% R.H. | CTG later (liquid) | STG later (liquid) |
| Net MW capacity of plant at above ambient conditions | later | later |
| Gross MW capacity of plant at site ambient conditions of 35°C, 1.013 and 98% R.H. | CTG 91.5 (gas) | STG 49.6 (gas) |
| Net MW capacity of plant at above ambient conditions | 87.7 | 49.3 |
| RPM of prime mover | 5423 | 3000 |
| No. of cylinders and strokes (in the case of Diesel generating set). | N/A | N/A |

October 14th, 1997                        80

No. of stages of compressor and turbine (in the case of Gas turbine).       19 (Compressor.)
                                                                            3 (Turbine)

Simple Cycle:

| | | |
|---|---|---|
| Heat rate in Kcal / kWh based on output at Generator terminals | 2921 | 2884 |
| and ambient conditions of 35°C, 1.013 bar, 98% R.H., L.H.V of fuel. | (liquid) | (gas) |
| Heat rate in BTU / kWh based on above conditions, LHV | 11592 | 11446 |

Combined Cycle:

| | | |
|---|---|---|
| Heat rate in Kcal / kWh based on output at Generator terminals | Later | 1933 |
| and ambient conditions of 35°C, 1.013 bar, 98% R.H., L.H.V of fuel. | (liquid) | (gas) |
| Heat rate in BTU / kWh based on above conditions, LHV | Later | 7672 |

| Generator | Design rating | |
|---|---|---|
| | **CTG** | **STG** |
| MVA Capacity, MVA @ 35 C | 60 | 65 |
| Rated Voltage, kV (rms) | 11.50 | 11.50 |
| Voltage Range | ±10% | ±10% |
| Frequency Rated, kV (rms) | 50 Hz | 50 Hz |
| Frequency Range | 48-52 Hz | 48-52 Hz |
| Power Factor | 0.85 | 0.85 |
| Maximum Active Power Capacity, MW @ 35C & 0.85 PF, lagging | 51 | 55 |
| Minimum Active Power Capacity, MW (Recommended) | 40 | 22 |
| Reactive Capability Curves at Rated Operating Voltage | Fig 1 | Fig 2 |
| Stator Winding Connection | WYE | WYE |
| Unsaturated Direct Axis Synchronous Reactance % on rated kV, MVA | 260 % | 215 % |

| Quadrature Axis Synchronous Reactance | CTG | 0.221 PU +- 15 % |
|---|---|---|
| | STG | 0.175 PU +- 15 % |

| Negative Sequence Reactance | CTG | 0.185 PU |
|---|---|---|
| | STG | 0.156 PU |

| Zero Sequence Reactance | CTG | 0.105 PU |
|---|---|---|
| | STG | 0.075 PU |

Leakage Reactance (not part of standard data sheet from manufacturer)

| | | |
|---|---|---|
| Direct Axis Open Circuit Time Constant seconds | 9.6 | 9.6 |
| Direct Axis Open Circuit Sub-transient Time Constant seconds | 0.05 | 0.05 |

| Generator     (continued) | Design rating |
|---|---|

October 14th, 1997                          81

(Quadrature Axis Open circuit sub-transient time constant ( not part of standard manufacturer data sheet)

| | | |
|---|---|---|
| Direct Axis Short Circuit Transient time constant seconds | 0.65 | 0.63 |
| Direct Axis Short Circuit Sub-transient Transient time constant | 0.04 secs | 0.04 secs |
| | | |
| Inertia Constant (Generator ) kW-sec/kVA | 0.74 | 0.88 |
| Short Circuit Ratio | greater than 0.5 | |

| Excitation | CTG | STG |
|---|---|---|
| Type | Brushless | Brushless |
| Exciter Rated Load Field Voltage V | Fig 3 | Fig 4 |
| Nominal Exciter Ceiling Voltage (+polarity), V | Fig 3 | Fig 4 |
| Nominal Exciter Ceiling Voltage (-polarity), V | Fig 3 | Fig 4 |
| Overspeed Curve Following full load dropping | Fig 3 | Fig 4 |
| Block diagram of Excitation System | Fig 3 | Fig 4 |
| Values of Gains, Time Constants and Ceiling(+/-). | Fig 3 | Fig 4 |
| Adopted PO System | Fig 3 | Fig 4 |

Generator Switchgear

Electrical characteristics :

| | | |
|---|---|---|
| Rated voltage rms. | 15 kV | later |
| Systematical interrupting capacity at rated voltage. | 750 MVA | later |
| Rated continuous rms current at 50 Hz. | 3000 A | later |
| Momentary short circuit current withstanding capacity. | 58 KA RMS ASY | later |
| Three second symmetrical current. | 36 KA | later |
| Rated interrupting time at rated frequency. | 5 cycles | later |
| Basic insulation level (BIL) | 95 KV | later |
| Control voltage. | 120 V DC | later |

Step-up Transformer

Rated MVA:
CTG -

STG -

H winding ONAN/ONAF /104/130
X,Y winding  ONAN/ONAF/52/65
ONAN/ONAF/54/68

Rated Voltage, KV
CTG -
STG

11.5/11.5/132
11.5/132

October 14th, 1997                    82

# EXCITATION SYSTEM MODEL

## TYPE AC1 BRUSHLESS EXCITATION SYSTEM INCORPORATING
## A TYPE MAVR AUTOMATIC VOLTAGE REGULATOR

BRUSH

| Reference no | Westinghouse | Rating | 51.2 MW, 0.80 pf | Supply | 11.50 kV, 50 Hz |
|---|---|---|---|---|---|
| Frame sizes | Generator | BDAX 7-290R | Exciter | BXJ 40.20 | Pilot Exciter | PMX 34.10 |

The excitation system is a type AC1 system as defined in IEEE 421, 1972. The system model and nomenclature are those suggested for a type AC1 system in IEEE Transactions, Vol. PAS 100, No. 2, February 1981 - "Excitation System Models for Power System Stability Studies."

**Transfer Function Diagram**



Fig 3 – EM Turbine

## Generator / Exciter Parameters

| | | | |
|---|---|---|---|
| $V_R$ | 1 per unit exciter field voltage on air gap line (hot) | 5.5 | volts |
| $R_r$ | Exciter field resistance (hot) | 5.6 | ohms |
| $V_s$ | Open circuit A.V.R. supply voltage at 100% speed | 225 | volts |
| $T_g$ | Exciter field time constant | 1.3 | sec |
| $K_g$ | Exciter constant | 1.0 | — |
| $S_{g75}$ | Exciter saturation function at 75% ceiling voltage | 0.16 | |
| $S_{g100}$ | Exciter saturation function at 100% ceiling voltage | 1.96 | |
| $K_D$ | Demagnetising factor (function of exciter reactance) | 0.89 | |
| $K_C$ | Rectifier loading factor | 0.15 | |
| $E_{rg}$ | Rotor voltage at full load (hot) | 186 | volts |
| $I_{rg}$ | Rotor current at full load (hot) | 1042 | amps |

## Automatic Voltage Regulator Parameters

| | | | |
|---|---|---|---|
| $T_A$ | Regulator time constant | 0.1 | sec |
| $T_B$ | Regulator time constant | 0.022 | sec |
| $T_C$ | Regulator time constant | 0.0 | sec |
| $T_F$ | Feedback time constant (adjustable in the range 0.03 to 1.00 seconds) | 0.6 | sec* |
| $V_{Rmax}$ | Per unit maximum regulator output voltage | 27. | p.u. |
| $V_{Rmin}$ | Per unit minimum regulator output voltage | 0.0 | p.u. |
| $K_A$ | Per unit voltage regulator gain | 2000 | |
| $K_F$ | Per unit stabilising circuit gain (adjustable in the range 0.0 to 0.03 V/(V/kH) | 0.025 | |

* Typical settings

Figure 3                CTG

83

# EXCITATION SYSTEM MODEL

## TYPE AC1 BRUSHLESS EXCITATION SYSTEM INCORPORATING
## A TYPE MAVR AUTOMATIC VOLTAGE REGULATOR

**BRUSH**

Reference no.    Westinghouse     Rating   87.2 MW, 0.80 pf     Supply   11.5 kV, 50 Hz

Frame sizes   Generator   8DAX 7J340R    Exciter   BX 10.20     Pilot Exciter   MXJ 44.07

The excitation system is a type AC1 system as defined in IEEE 421, 1972. The system model and nomenclature are those suggested for a type AC1 system in IEEE Transactions, Vol. PAS 100, No. 2, February 1981 - "Excitation System Models for Power System Stability Studies."

### Transfer Function Diagram

Fig 4 - STEAM PHASE-E



### Generator / Exciter Parameters

| | | | |
|---|---|---|---|
| $V_R$ | 1 per unit exciter field voltage on air gap line (hot) | 5.4 | volts |
| $R_f$ | Exciter field resistance (hot) | 7.1 | ohms |
| $V_S$ | Open circuit A.V.R. supply voltage at 100% speed | 125 | volts |
| $T_E$ | Exciter field time constant | 1.2 | sec |
| $K_E$ | Exciter constant | 1.0 | |
| $S_{E75}$ | Exciter saturation function at 75% ceiling voltage | 0.35 | |
| $S_{E100}$ | Exciter saturation function at 100% ceiling voltage | 3.25 | |
| $K_D$ | Demagnetising factor (function of exciter reactance) | 1.23 | |
| $K_C$ | Rectifier loading factor | 0.11 | |
| $E_{FD}$ | Rotor voltage at full load (hot) | 204 | volts |
| $I_{FD}$ | Rotor current at full load (hot) | 997 | amps |

### Automatic Voltage Regulator Parameters

| | | | |
|---|---|---|---|
| $T_A$ | Regulator time constant | 0.1 | sec. |
| $T_B$ | Regulator time constant | 0.022 | sec. |
| $T_C$ | Regulator time constant | 0.0 | sec |
| $T_F$ | Feedback time constant (adjustable in the range 0.05 to 1.00 seconds) | 0.6 | sec* |
| $V_{Rmax}$ | Per unit maximum regulator output voltage | 26 | p.u. |
| $V_{Rmin}$ | Per unit minimum regulator output voltage | 0.0 | p.u. |
| $K_A$ | Per unit voltage regulator gain | 2135 | |
| $K_F$ | Per unit stabilise circuit gain (adjustable in the range 0.0 to 0.05 V/Hz) | 0.023 | * |

* Typical settings

Figure 4          STG

84

| Step-up Transformer (continued) | CTG | STG |
|---|---|---|
| Maximum and Minimum operating voltages, kV (rms) | ± 10% | ± 10% |
| Connection of winding | D/D/W | D/W |

Positive zero sequence Reactances % on Rated kV Base

| | CTG | STG |
|---|---|---|
| i.    HE-L ( H to X) | 8% * | 8% ** |
| ii.   HE-T (H to Y) | 8% * | N/A |
| iii.  L-T (X to Y) | 8% * | N/A |

      * 39 MVA base      ** 41 MVA base

| Potential Transformer | CTG | STG |
|---|---|---|
| Type : | Electromagnetic | |
| System Max Voltage  kV r.m.s. | 145 kV | |
| Primary Voltage Rating kV r.m.s. | 132 kV | |
| Primary Connection | STAR | |
| No. of Secondary Windings | 2 | |
| Voltage Ratio | 132V (3 phs)/110V (3 phs) | |
| Accuracy Class/ Standard Burden | CL 0.2/70 VA | |

## 132kV Circuit Breaker

**Electrical Characteristics**

| | |
|---|---|
| Rated Voltage rms | SF6 type |
| Symmetrical interrupting capacity at rated voltage | 145 kV |
| 50 Hz rated continuous current, rms | 1250 A |
| Short time current carrying capability | 40 KA, 1 sec |
| Rated interrupting time  50 Hz basis | 50 ms |
| Insulation levels, (BIL) | 650 kV |
| control voltage | 110 V DC |

**Physical Characteristics**

| | |
|---|---|
| Type: | Outside |
| No. of Poles : | 3 |
| Tank: | Puffer |
| Type of Mounting | Foot Mounted |

**Bushing Characteristics**

| | |
|---|---|
| Voltage Rating | 145 kV |
| Impulse test | 650 kV |
| Leakage length | 21 kV/mm |
| Terminal connectors | Bolted Type |

October 14th, 1997

NA

85

Current transformers

| Multi Ratio Multicore: | Four (4), 2 Metering |
| Accuracy class / Burden | CL 0.2/5P20, 70 VA |
| Number of C.T. per breaker | 1/phase |

| Final Paint Finish | As per manufacturer's recommendation |
| Auxiliary Supply | 110 V DC |
| Auxiliary Switches | 3+3 NO/NC |

| 132kV Lightning Arrester | CTG | STG |
|---|---|---|
| Rated voltage.(kv) | later | |
| Rated current (ka) | later | |
| Gap less type(MOSA). | later | |

Section 2.    Interconnection Facilities:  As described in Article 2.5 of this PPA.

Section 3.    Company's connection Facilities : As described in Article 2.5 of this PPA.

Section 4.    The preliminary information/data provided in this Functional Specification (Schedule 1, Part A) are true and correct as of the date hereof. However, such information may change as the design of the Plant proceeds; therefore, the company may change Functional Specification during the detailed design process without consulting with, or obtaining the approval of, BPDB provided such changes have no material impact on the operation of BPDB's System. Required Functional Specification changes which could reasonably be expected to impact the operation of BPDB's System will be referred to BPDB for approval, which approval shall not be unreasonably withheld or delayed.

Section 5.    Environmental: The Plant will meet the World Bank's 1995 Environmental Guidelines.

## Part B:  Metering System

Section 1.    Metering Equipment

(a)    The Company, at its expense, shall procure, install at the 132 kV Delivery Point and commission both the Metering System and the Back-up Metering System. The Company will thereafter transfer the Metering System to BPDB to own and maintain as their property. The Company will own and maintain the Back-Up Metering System.

October 14th, 1997

86

(b) The metering points to record the kWh, kW and kVAR exchange between the Company and BPDB shall be as shown in an appropriate diagram to be provided by the Company. The current and voltage transformers will measure current and voltage on the high voltage line termination of the 132 kV terminal of the Plant. The Metering System and Back-up Metering System shall be located on the barge housing all marshaling cubicles, control and metering panels and communication equipment. Any photographic facilities will be provided by the Company as part of the verification process for monthly meter readings at both locations.

(c) The Metering System and the Backup Metering System shall be to a mutually agreed international standard providing a measured accuracy of 0.2%.

(d) BPDB shall, at its expense, procure, install, own, and operate a check meter in its nearest grid substation in which its 132kV interconnection line will terminate. The check meter shall meet the specifications and accuracy limits specified in Section 1 of Part B of this Schedule 1 and shall be jointly tested and sealed by the Parties. The seals on the check meter shall not be broken by BPDB without giving the Company three (3) Days' advance notice and an opportunity to be present when the seals are to be broken.

Section 2. Installation of Metering Systems

Prior to the installation of the Metering System by the Company, the Company shall deliver to BPDB the scheme of the Metering System and the specification of the metering equipment for the Plant for BPDB's approval. BPDB will provide written comments on the metering plan within thirty (30) Days of its receipt.. The Company shall revise the plan taking into account BPDB's comments received during such thirty (30) Day period concerning the metering scheme and deliver final copies to BPDB. BPDB will approve the final scheme within fifteen (15) Days or notify the Company that it does not approve the scheme, giving its reasons therefor . If BPDB does not provide comments on the initial plan within such thirty (30) Days or give reasons for not approving the revised plan within such fifteen (15) Day period, BPDB shall be deemed to have approved such scheme. Upon approval or deemed approval by BPDB, the Company will complete the design and commence construction of the Metering System. Such installation shall be completed not later than fifteen (15) Days prior to the scheduled date to begin initial testing of the Plant. The Company shall provide BPDB with fifteen (15) Days advance notice of, and BPDB shall have the right, as its sole expense, to observe and inspect, the installation of the Metering System. BPDB shall be notified not less than fifteen (15) Days prior to, and shall have the right, at its sole expense, to observe and inspect the installation of the Back-up Metering System by the Company.

October 14th, 1997

NA

87

**Part C:  Delivery Point**

BPDB shall receive the power from the Barge Mounted Power Plant by a single circuit 132kV transmission line one end of which will be terminating within the BPDB's nearest 132kV grid sub-station and the other end will be connected to the cable structure mounted on the barge.  The Delivery Point shall be the 132kV cable connection structure provided by the Company on the barge.

## Schedule 2
## Maintenance Allowances for the Plant

### Part A: Establishing Scheduled Outage Periods

1.  Within thirty (30) Days after receipt of BPDB's year ahead notification of its monthly requirement for Net Electrical Output, the Company shall submit to BPDB its estimated requirement for Scheduled Outage time for the following Operating Year (the "Annual Scheduled Outage Estimate"). The Annual Scheduled Outage Estimate shall indicate the Scheduled Outage time that the Company estimates will be required in each month of the forthcoming Operating Year. The Scheduled Outage time in the Annual Schedule Outage Estimate shall not exceed thirty-six (36) Days for each kW of Guaranteed Capacity, as demonstrated by the last successful Capacity Test, for the entire forthcoming Operating Year except that the Annual Scheduled Outage Estimate for every fifth (5th) Operating Year, the Company may schedule up to forty-eight (48) Days for each kW of Guaranteed Capacity as demonstrated by the last successful Capacity Test. The Company may apportion the Scheduled Outage time among any of the units in the Plant.

2.  Not later than fifteen (15) Days before the beginning of each month, the Company shall provide a notice (the "Monthly Scheduled Outage Notice") to BPDB. The Monthly Scheduled Outage Notice shall either confirm the estimated Scheduled Outage time for that month that was set forth in the Annual Scheduled Outage Estimate or any changes from that estimate, thereby confirming the Scheduled Outage time that the Company will require during that month.. The aggregate Scheduled Outage time for the Operating Year shall in all cases be subject to the thirty-six (36) Day or forty-eight (48) Day limits set forth in paragraph 1 of this Schedule 2. The Company shall be free to apportion the Scheduled Outage time in the Monthly Scheduled Outage Notice among any of the generators in the Plant. The Company shall attach a report to each regular monthly Invoice it sends to BPDB that indicates the Company's actual apportionment and use of Scheduled Outage time on a per generator basis during the Month .

3.  The available Scheduled Outage time (expressed as kWh of lost generation capacity) for a given Operating Year shall be calculated as the Guaranteed Capacity (kW) times 36 Days (48 Days in every 5th Operating Year) times 24 hours/day. The usage of Schedule Outage time shall be calculated based on Equivalent Downtime. (As an example, the Equivalent Downtime used in removing a 15,000 kW generator from service for 30 hours would be 450,000 kWh of Equivalent Downtime; If the Plant is partially affected by an outage or otherwise, then the Equivalent Downtime shall be calculated in accordance with kWs affected.)

4.  If BPDB reasonably objects to the Company's schedule for Scheduled

Outages set out in the Annual Scheduled Outage Estimate, then, BPDB may request a modification of the schedule and the Operating Committee shall meet within fifteen (15) Days of BPDB's request to discuss schedule for Scheduled Outages for the following Operating Year based on Prudent Operating Practices.

## Part B: Rescheduling Scheduled Outage Periods

1. ### BPDB Requested Reschedules

    BPDB may, by providing the Company with five (5) Days notice prior to the start of any Scheduled Outage, request that any Scheduled Outage be rescheduled to a more convenient time . The Company shall use reasonable efforts to reschedule such Scheduled Outage in accordance with BPDB's request; provided, however, that if in the Company's opinion delaying or rescheduling the Scheduled Outage period would be inconsistent with Prudent Operating Practices or could be damaging to the Plant or risk the safety of its operating staff, the Company may refuse to reschedule, or may require a shorter delay prior to conducting, the Scheduled Outage period as requested by BPDB.

2. ### Company Requested Reschedules

    The Company may upon five (5) Days notice to BPDB request that any Scheduled Outage be rescheduled to a more convenient time . BPDB shall approve such request unless other BPDB System generation is scheduled out of service and BPDB is unlikely to be able to meet BPDB System demand if the Company's request is approved. In the case of BPDB's disapproval of the Company's request, BPDB shall  request that any Scheduled Outage be rescheduled to a more convenient time . The Company shall use reasonable efforts to reschedule such Scheduled Outage in accordance with BPDB's request; provided, however, that if in the Company's opinion delaying or rescheduling the Scheduled Outage period would be inconsistent with Prudent Operating Practices or could be damaging to the Plant or risk the safety of its operating staff, the Company may refuse to reschedule, or may require a shorter delay prior to conducting, the Scheduled Outage period as requested by BPDB. If the Plant has an Emergency or forced outage where generation is lost or anticipated to be lost(an "Unscheduled Outage"), the Company may take a Scheduled Outage with a reasonable notice to BPDB. Any such Unscheduled Outage shall require the use of 1.5 hours of available Scheduled Outage Equivalent Downtime for every hour the Unscheduled Outage is in effect for the amount of generation so affected.

October 14th, 1997

90

**Part C: Carry-forward of Unused Scheduled Outage Time**

The Company shall be allowed to carry-forward into the following months any Scheduled Outage time unused in the previous months, as provided in the "Annual Scheduled Outage Estimate"

The Company shall be allowed to carry-forward into the following Operating Years any Scheduled Outage time unused in a given Operating Year provided that such carry-forward for any given Operating Year shall be limited to fifteen (15) Days for each kW of Guaranteed Capacity.

**Schedule 3**
**Procedures**

## Part A: Commissioning and Testing Procedures

1.    GENERAL

Commissioning tests shall be performed during start-up operations to ensure that the Plant can perform in conformance with the specific requirements set forth below and that all the designated functions of the equipment referenced are proven. Only after successful completion of these tests will the Plant be considered to be successfully commissioned.

During all Commissioning tests the Company's start -up and operating personnel shall be present and shall be responsible for the operation of the units.

The Company and BPDB shall agree on safety procedures that deal with the impact that the Plant may have on BPDB's System. These procedures shall cover permits to work, rules for operation of the Interconnection Facilities and compliance with BPDB's GENERAL REGULATIONS AND STANDARD OPERATING CODE (1992) as such may apply to the Plant and all other aspects of safety pertaining to the operation of the Plant.

The Company shall provide such notices regarding the dates on which tests are to be performed as is required under Article 5.

2.    The Company shall provide a report to BPDB that the Plant Commercial Operations Tests have been successfully completed. The report will include results of tests conducted to verify:

    A.    Auxiliaries:

        1.    the safe operation of all auxiliaries in accordance with their respective design specifications and manufacturer's recommendations;

        2.    that the mechanical and electrical protective devices function properly at their correct settings, that interlocks, pressure relief devices, and over current devices operate properly; and

        3    that standby auxiliaries automatically start up on loss of power to running auxiliaries.

    B.    generator heat run tests; a copy attached of the manufacturer's report of the generator heat run tests conducted to ensure that the temperature increases in the generator stators and rotors do not exceed the limits set forth in the manufacturers specifications.

NA

October 14th, 1997

92

C.   reactive capacity; a copy attached (i) the manufacturer's test data demonstrating that the Plant's generators meet the reactive capability of the manufacturers' generator capability curve and specifically that the requirements of Part A of Schedule 1 are met, and (ii) the manufacturer's generator capability curve.

D.   full load rejection; include the results of the test conducted to verify the ability of the Plant and its auxiliaries to withstand full and part load rejection and remain in a safe condition.

E.   noise levels; include the results of the tests conducted to verify compliance of the Plant's equipment with the sound pressure levels in the World Bank Environmental Guidelines.

## COMMISSIONING TESTS

1.   Guaranteed Capacity

During Commissioning, the Capacity of the Plant will be demonstrated by conducting one or more Capacity Tests, as more specifically provided for in this Agreement, in accordance with the test procedures set forth in Part D of this Schedule 3. The test procedures in accordance with which such tests are to be conducted, as well as procedures for correcting to Reference Conditions shall be developed, reviewed and approved by the Operating Committee.

2.   Reliability Run

A reliability run will be carried out as part of the Commissioning tests. The run will be for a continuous period of 5 Days (120 hours) and will include 48 continuous hours at maximum continuous rating. The output during the remaining 72 hours of the tests will be as required by BPDB under Despatch. The test shall have been satisfactorily completed only if it continues without interruption for not less than 120 hours; provided, however, that if the BPDB system causes a trip of the Plant or any generator within the Plant, the test shall be suspended and restarted as soon as the Company in its judgment determines to do so. Hours toward completing the test up to the trip shall be final and only the remaining test period needs to be satisfied.

3.   Synchronizing Checks

The Plant will be synchronized with BPDB's System at the 132 kV terminal on the barge. Before the machines are permitted to be run in parallel with the BPDB's System, procedure, controls, and safety systems will be established by the Company in order to ensure that it is safe to do so. Tests reasonably required to assure safe synchronization of the Plant and each

generator shall be witnessed by BPDB who shall be satisfied that all the instruments associated with the synchronizing operation are functioning correctly.

Design of the system to synchronize across the 132 kV breaker will be developed by the Company and submitted to BPDB for approval, such approval not to be unreasonably withheld or delayed.

4.    Electrical Protective Devices

All electrical protective systems, circuits, devices and instruments shall be tested on Site to demonstrate settings and proper functioning.

5.    Mechanical Protective Devices

Tests on overspeed trip and other mechanical protective devices shall be carried out to prove the effectiveness of their operation.

6.    Automatic Voltage Regulator (AVR) Droop

The AVR shall be capable of controlling the generator voltage over the range of +/- 10% of rated voltage with a droop characteristic of +/-0.5%. The final trimming of the controls can be done at a later stage.

7.    Governor Operation

The operation of the speed governor will be demonstrated over its range, the droop being adjustable between 2% and 8%. The final trimming of the controls can be done at a later stage.

8.    Reactive Capacity

The "Generator Capability Curve" which demonstrates the capability of the generators to meet the requirements of Part A of Schedule 1 will be specifically reviewed and approved by the Company and provided to BPDB.

**Part B: Meter Procedures**

1.    Testing of Metering System:

(a)    BPDB, in coordination with the Company, shall initially test the Metering System for accuracy in accordance with this Schedule 3 by the Company, in coordination with BPDB, shall initially test the Back-up Metering System in accordance with this Schedule 3 by the later of fifteen (15) Days after it is installed by the Company or five (5) Days after the completion of Interconnection Facility. Thereafter, BPDB at is sole expense shall test the Metering System at intervals of not less than twice a year at six (6) months apart or as

frequently as BPDB desires after giving the Company no less than forty eight (48) hours advance notice. The Company may have a representative present during any such testing as well as during any inspection of the Metering System or adjustment thereof.

(b)     BPDB shall also test the Metering System at any other time reasonably requested by the Company, such additional testing to be at the Company's expense unless the test indicates that the Metering System is inaccurate by more than zero point two percent (0.2%), in which case BPDB shall bear the cost of the additional test. The Company may have a representative present during any such testing, as well as during any inspection of the metering system or adjustment thereof.

(c.)    After any testing or re-calibration of the Metering System, the Metering System shall be doubly sealed in the presence of both Parties.

(d)     When on the Site, BPDB will follow all reasonable requests of the Company and, notwithstanding any other provision in this Agreement to the contrary, shall indemnify and hold the Company harmless from any loss or damage sustained by virtue of BPDB 's negligence or willful misconduct in the performance of its obligations but only to the extent that such loss or damage is not covered by insurance of the Company.

(e)     Compensation will be made for the errors of current and voltage transformers in the meter calibration or during the computation of records. Current and Voltage transformers will be tested for ratio and phase angle errors following manufacture at and accredited testing station in the presence of representatives from the Company, and BPDB. Test certificates issued by the testing station will be issued independently to both parties.

(f)     Testing and calibration of the Back-Up Metering System shall be carried out by the Company after giving appropriate notice to BPDB, no less frequently than twice each year and with no longer than 6 months between tests, or in the event of either Party having reasonable cause to believe the Backup Metering System is outside specified limits. During such tests and calibration, BPDB shall have the right to have a representative present at all times to witness the test.

(g)     Repair, Replacement or Recalibration of Metering System.

When any component of the Metering System or BPDB's check meters is found to be outside the specified limits of accuracy or otherwise not functioning properly, BPDB shall forthwith repair,

recalibrate, or replace such component of the Metering System or check meter at its expense. Similarly, when any component of the Back-up Metering System is found to be outside the specified limits of accuracy or otherwise not functioning properly, the Company shall forthwith repair, recalibrate or replace such component of the Back-Up Metering System at its expense. Upon the completion of any examination, maintenance, repair or recalibration of, or replacement of any component in the Metering System, BPDB's check meters, or the Back-Up Metering System, the Metering System, BPDB's check meters, and the Back-Up Metering System, as the case may be, shall be jointly sealed in the presence of both Parties.

2.    Reading of Meters

(a)    Procedures: The Metering System shall be read every month on the last Day of each month (or such other Day as may be mutually agreed upon by the Parties) for the purpose of determining the Net Electrical Output of the Plant since the preceding reading.    The Company shall read the Metering System during normal business hour, unless otherwise mutually agreed by the Parties, shall give BPDB at least forty-eight(48) hours notice of the time the Company shall read the Metering System. In the event that a BPDB representative is  present at such reading of the Metering System for the purpose of measuring of Net Electrical Output, then such reading shall be jointly taken and recorded. In the event that a BPDB representative is not present at a reading of Net Electrical Output, then the Company's representative shall take and record such reading and make a photographic record thereof. The Company shall maintain a log of all such meter readings. Measurements recorded shall be delivered by the recording Party to the non-recording Party by facsimile within forty-eight (48) hours after the readings are taken. In the event that the metering System is not in service as a result of maintenance, repairs or testing then the Back-Up Metering System, shall be used during the period that the Metering System is not in service and the foregoing provisions of this Section shall apply to the reading of the Back-up metering System.

(b)    Inaccuracies in Metering System : When, as a result of any test of the Metering System, the Meter System is found to be inaccurate by more than zero point two percent (0.2%) or is otherwise functioning improperly, then the correct amount of Net Electrical Output delivered to BPDB for the actual period during which inaccurate measurements were made (if any) shall be determined as follows :

(i)    First, the readings of the Back-Up Metering System, if any, shall be utilized to calculate the correct amount of Net Electrical Output, unless a test of such Back-Up Metering

System, as required by either Party, reveals that the Back-Up Meter System is inaccurate by more than zero point two percent (0.2%) or is otherwise functioning improperly;

(ii) If there is no Back-Up Metering System or if the Back-Up Meter reading is found to be inaccurate by more than zero point two percent (0.2%) or is otherwise functioning improperly, then the Company and BPDB shall jointly prepare an estimate of the correct reading on the basis of all available information, including BPDB's check meter reading and such guidelines as may have been agreed between BPDB and the Company. In preparing an estimate of the correct reading by use of BPDB, check meter, the Parties will estimate the line losses between the Delivery Point and BPDB's check meter. These line losses will be added to the BPDB check meter reading to arrive at an estimate of the energy delivery to BPDB by the Company during the period over which the BPDB's check meter reading is being used.

(iii) In the event that BPDB and the Company fail to agree upon an estimate for the correct reading, BPDB shall pay to the Company Minimum Guaranteed Payment and the matter may be referred by either Party for determination by an Expert pursuant to Article 18; and

(iv) The difference between the previous payments by BPDB for the period of inaccuracy and the recalculated amount shall be offset against or added to the next payment to the Company under this Agreement, as appropriate. If the period of inaccuracy cannot be accurately determined, it shall be deemed to have begun on the date which is midway between the date the meter was found to be inaccurate and the date of the last meter reading accepted by the Parties as accurate. In no event, however, shall any such adjustment be made for any period prior to the date on which the Meter System was last tested and found to be accurate within plus or minus zero point two percent (0.2%) and not otherwise functioning improperly.

.1.    Scheduling and Despatch

(a)    In order to assist with scheduling of the Plant to meet the requirements of BPDB, the Parties agree that the following procedures will be adhered to:

(i)    Year Ahead Notification: Not less than ninety (90) Days before the Full Commercial Operation Date and thereafter not less than ninety (90) Days before the beginning of each subsequent Operating Year, BPDB shall provide to the Company estimated requirements on a monthly basis for Net Electrical Output for the Operating Year in which the Commercial Operation Date is scheduled to occur, and thereafter for each subsequent Operating Year. BPDB shall not be bound by these figures.

(ii)    Month Ahead Notification: Not less than fourteen (14) Days before the beginning of the month prior to the Full Commercial Operation Date and thereafter not less than fourteen (14) Days before the beginning of each month, BPDB shall provide to the Company estimated requirements, on a day-by-day basis, for Net Electrical Output during that month and also, provisionally, for the following month. BPDB shall not be bound by these figures.

(iii)    Week Ahead Notification: Not less than forty-eight (48) hours before the beginning of the week prior to the Commercial Operation Date and thereafter not less than forty-eight (48) hours before the beginning of each week, BPDB shall provide to the Company estimated requirements, on an hour-by-hour basis, for Net Electrical Output during that week and also, provisionally, during the following week. BPDB shall not be bound by these figures.

(iv)    Plant Availability Notification: The Company shall, by 1200 hours each Day, inform BPDB of the Capacity of the Plant available during each hour of the Day commencing thirty-six (36) hours ahead and, provisionally, for the Day immediately thereafter. Such estimates shall not be binding upon the Company.

(v)    Day Ahead Notification: Not less than seven (7) hours before the start of each Day, BPDB shall provide to the Company firm requirements, on an hour-by-hour basis, for Net Electrical Output, start-ups and Reactive Power

requirement that Day and also, provisionally, during following Day. BPDB shall not be bound by these figures.

(b) Notice of change of Operating Levels: The Company shall change the operating level promptly on receipt of a valid Despatch Instruction from the Control Center in accordance with the procedures set forth herein and Prudent Operating Practice.

(c) The Company agrees to comply with the instructions it receives from BPDB for Despatching the Plant. In the event that the Company is unable to comply for reasons other than the instructions being inconsistent with the Functional Specifications or System Characteristics, BPDB's sole remedy shall be the collection of damages, if any, payable in accordance with Article 16.

2. Operation in Accordance with Despatch

The Plant shall be operated by the Company in accordance with the Economic Despatch and the Functional Specifications; provided, however, the Plant shall not be required to operate for substantial periods of time outside of the ranges set forth in Section 6.3.1 of the Agreement.

3. Recording of Telephone Communications

Each Party hereby authorizes the other Party to record all telephone voice communications relating to operation, control and Despatch of the Plant received from the other Party pursuant to this Agreement and shall supply, at the request of the other Party, a copy or transcript of any such recording.

## Part D: Capacity Test Procedures

During the Commissioning of the Plant and annually thereafter, as provided in Article 7.2, a test shall be performed by the Company to demonstrate the maximum Net Electrical Output of the Plant. The Company may at any time during the Commissioning of the Plant and annually thereafter when required or permitted by Article 7 request full Despatch of the Plant in order to complete the Capacity Test. BPDB shall, in not less than six (6) hours, provide such Despatch. The Plant will be stabilized at maximum capacity, consistent with the manufacturer's recommendation, for approximately two (2) hours prior to the Company's confirmation of the start of the six (6) hour Capacity Test. Data (kWh, kW, MVAR, ambient conditions, fuel samples, cooling water temperature, BPDB System parameters (voltage and frequency) and other information as required to fully carry out the procedures established under Article 5.4) will be taken at thirty (30) minute intervals over the six (6) hour test period. The Net Electrical Output corrected to Reference Conditions (35°C, 98% relative humidity and 1.013 bar) will be calculated for each of the twelve (12) thirty (30) minute periods using data collected above and divided by the time over which the energy was generated to determine the capacity (kW) over each such period. The result from the highest eleven (11) of the twelve (12) thirty (30) minute tests will be averaged and such average will be the result for the test (Guaranteed Capacity).

**Payment**

**Part A :  Tariff Charges**

1.    Calculation of Tariff Charges

For the purposes of Article 8.2, BPDB shall pay monthly to the Company the Tariff Charges (MEC) for the Net Electrical Output delivered at the Delivery Point in response to Despatch Instructions on a monthly basis and MEP, calculated as follows:

$$MEC = NEO * ECRp + MEP$$

Where :

MEC    is the aggregate amount of Tariff Charges  payable in respect of that month.

NEO    is the aggregate month Net Electrical Output (kWh) delivered at the Delivery Point in such month.

ECRp    is the weighted average Tariff Charge Rate (expressed in Tk./kWh) prevailing in accordance with paragraph 2 below.

MEP    has the meaning as set forth in Part B below.

2.    Tariff Charge Rate

The Tariff Charge Rate ($ECR_p$)for the Net Electrical Output during each month shall be calculated as follows :

$$ECRp = FT + OMT$$

Where :

ECRp    =    the weighted average Tariff Charge Rate for the Net Electrical Output delivered during such month  (expressed as Tk./kWh)

FT    =    the weighted average FT (Fuel Component of the Tariff Charge) as specified in Part A of Schedule 5 and duly adjusted as specified in Part C of Schedule 5.

OMT =    the weighted average Price component on account of all other costs (other than fuel) including profit as specified in Part A of Schedule 5 and adjusted for Monthly Plant Factor in accordance with Part B of Schedule 5.

October 14th, 1997                                        100

Weighted average Tariff Charge Rate/weighted average FT/weighted average GMD in a month shall be determined on the basis of the following formula:

$$\text{Weighted average} = \frac{NEO_1 \times t_1 + NEO_2 \times t_2 + \dots + NEO_n \times t_n}{NEO_1 + NEO_2 + \dots + NEO_n}$$

where:

| | | |
|---|---|---|
| NEO | = | amount of energy delivered with respect to variable $t_n$ |
| $t_n$ | = | Tariff Charge Rate/FT/OMT, as the case may be |

<u>Note:</u> NEO(s) will be taken from daily log sheets or as decided by the Operating Committee

## Part B: Minimum Tariff Payment (MEP)

The Company shall be entitled to receive the Minimum Tariff Payment (MEP) in a billing month provided MPF is less than fifty (50%) percent where:

MPF = Monthly Plant Factor for the month, which is calculated as NEO ÷ [GC(kW)) * hours in month] * 100.

GC = is the Guaranteed Capacity in kW and shall not exceed 110 MW

If in any particular month the MPF is less than 50% due to (i) BPDB's fault which shall include delay in custom clearance as provided in Art 7.1(a) of the Implementation Agreement, (ii) Force Majeure events described under Article 13.1.1, (iii) BPDB's failure to Despatch the Plant, or (iv) Force Majeure events described in Article 13.1.2. affecting BPDB, then the Company shall receive MEP part of the tariff in accordance with the formula provided hereinafter.

MEP = MIN (MGE - NEO, Ph * GC) * OMT at 50% MPF

Where:

MIN = the minimum of the two numbers separated by commas

MGE = GC(kW) * hours in month * 0.5

NEO = is the aggregate kWh delivered by the Company at the Delivery Point in a month

Ph = aggregate number of hours (i) lost in a month due to BPDB's fault which shall include delay on account of custom clearance as provided in Art 7.1(a) of the Implementation Agreement, (ii) lost in a month due to a Force Majeure event described in Article 13.1.1, (iii) lost in a month due to

October 14th, 1997

101

BPDB's Despatch Instruction, and (b) number of hours lost in a month due to a Force Majeure event described in Article 13.1.2 affecting BPDB multiplied by 0.75

[For Example: If a 100 MW Plant operates at 50 MW due to Despatch Instruction, Force Majeure, etc for 24 hours, then the relevant Ph will be equal to 12 hours]

GC     =     is the Guaranteed Capacity in kW and shall not exceed 110 MW

<u>**Schedule 5**</u>
<u>**Tariff Schedule**</u>

<u>**Part A: Tariff Charges on Natural Gas**</u>

**Tariff Schedule Format**
**(On the basis of Natural Gas as fuel)**

| Period | | Tariff in US$/Kwh for Monthly Plant Factor | | | | Tariff in Tk/Kwh for Monthly Plant Factor | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 50% | 60% | 70% | 80% | 50% | 60% | 70% | 80% |
| 1st Year | FT | 0.0087 | 0.0087 | 0.0087 | 0.0087 | 0.37072 | 0.37072 | 0.37072 | 0.37072 |
| (Base Year) | OMT | 0.0479 | 0.0409 | 0.0354 | 0.0329 | 2.04111 | 1.74283 | 1.50846 | 1.40193 |
| 2nd Year | OMT | 0.0493 | 0.0421 | 0.0364 | 0.0338 | 2.10077 | 1.79397 | 1.55108 | 1.44029 |
| 3rd Year | OMT | 0.0508 | 0.0433 | 0.0375 | 0.0349 | 2.16469 | 1.84510 | 1.59795 | 1.48716 |
| 4th Year | OMT | 0.0523 | 0.0446 | 0.0386 | 0.0359 | 2.22861 | 1.90050 | 1.64482 | 1.52977 |
| 5th Year | OMT | 0.0539 | 0.0460 | 0.0398 | 0.0370 | 2.29679 | 1.96015 | 1.69596 | 1.57664 |
| 6th Year | OMT | 0.0555 | 0.0474 | 0.0410 | 0.0381 | 2.36497 | 2.01981 | 1.74709 | 1.62352 |
| 7th Year | OMT | 0.0571 | 0.0488 | 0.0422 | 0.0392 | 2.43315 | 2.07947 | 1.79823 | 1.67039 |
| 8th Year | OMT | 0.0588 | 0.0502 | 0.0435 | 0.0404 | 2.50559 | 2.13912 | 1.85362 | 1.72152 |
| 9thYear | OMT | 0.0606 | 0.0517 | 0.0448 | 0.0416 | 2.58229 | 2.20304 | 1.90902 | 1.77266 |
| 10th Year | OMT | 0.0624 | 0.0533 | 0.0461 | 0.0429 | 2.65899 | 2.27122 | 1.96441 | 1.82805 |
| 11th Year | OMT | 0.0643 | 0.0549 | 0.0475 | 0.0441 | 2.73995 | 2.33940 | 2.02407 | 1.87919 |
| 12th Year | OMT | 0.0662 | 0.0565 | 0.0489 | 0.0455 | 2.82091 | 2.40758 | 2.08373 | 1.93885 |
| 13th Year | OMT | 0.0479 | 0.0409 | 0.0354 | 0.0329 | 2.04111 | 1.74283 | 1.50846 | 1.40193 |
| 14th Year | OMT | 0.0493 | 0.0421 | 0.0364 | 0.0338 | 2.10077 | 1.79397 | 1.55108 | 1.44029 |
| 15th Year | OMT | 0.0508 | 0.0433 | 0.0375 | 0.0349 | 2.16469 | 1.84510 | 1.59795 | 1.48716 |

<u>Assumptions:</u>
1. Fuel Natural Gas at Tk. 47.5976 ($1.117)/MSCF
2. Exchange Rate: US$1.00 = Tk. 42.612. Reference BPDB Memo:1626-BPDB(SEC.)/Dev-110/96 dated 12/12/96

FT =  The price component of Fuel per kWh of energy generated.

OMT=  The price component on account of all other costs including profit per kWh
of energy supplied at the Delivery Point, excluding fuel, provided that where
OMT from the above table is to be used in this Agreement, it shall be
adjusted according to the following formula for the purposes of billing and
payment by the LC Bank:

$$OMT_{Adjusted} = ( OMT_{table} * PER/42.612 * 99\%)$$

where

$OMT_{table}$ = the appropriate OMT price from the above table

PER = the prevailing Exchange Rate (expressed in Taka)
on the Business Day immediately preceding the
date on which the Company prepares the Invoice
or the date on which the LC Bank pays for the
Invoice, as the case may be.

October 14th, 1997             103

$$OMT_{Taka} = (OMT_{table} * 1\%)$$

Both FT and OMT together will constitute the tariff per kWh of Net Electrical Output delivered to the Delivery Point.

### PART B:  OMT Calculation (for both Natural Gas and Liquid Fuel)

In determining the value of OMT based on the above table, if the Monthly Plant Factor (MPF) is:

1.  Less than or equal to 50%
    $$OMT = OMT(50\%)$$

2.  Greater than 50% and less than 60%
    $$OMT = OMT(50\%) - ([OMT(50\%) - OMT(60\%)]/(0.1) * (MPF - 0.5))$$

3.  Equal to 60%
    $$OMT = OMT(60\%)$$

4.  Greater than 60% and less than 70%
    $$OMT = OMT(60\%) - ([OMT(60\%) - OMT(70\%)]/(0.1) * (MPF - 0.6))$$

5.  Equal to 70%
    $$OMT = OMT(70\%)$$

6.  Greater than 70% and less than 80%
    $$OMT = OMT(70\%) - ([OMT(70\%) - OMT(80\%)]/(0.1) * (MPF - 0.7))$$

7.  Equal to or greater than 80%
    $$OMT = OMT(80\%)$$

Where:

MPF    =    Monthly Plant Factor .
       =    $(NEO \div (GC(kW) * hours\ in\ month)) * 100$

OMT(50%)    =    OMT of concerned year at 50% Monthly Plant Factor.

OMT(60%)    =    OMT of concerned year at 60% Monthly Plant Factor.

OMT(70%)    =    OMT of concerned year at 70% Monthly Plant Factor.

OMT(80%)    =    OMT of concerned year at 80% Monthly Plant Factor.

October 14th, 1997                    104

**Part C:   FT Calculation on Natural Gas**

The FT will be adjusted by multiplying FT as specified in Part A of Schedule 5 with the following Fuel Price Adjustment Factor:

$$FP_n = Fuel\ Price_n\ /\ Fuel\ Price_b$$

Where :-

$$FP_n = Fuel\ Adjustment\ Factor\ on\ Date\ n$$

Fuel Price $_n$ = Fuel Price delivered to the Plant in \$/MSCF or Tk./MSCF, as the case may be, inclusive of all costs, including taxes and duties

Fuel Price $_b$ = Base Fuel Price as specified in Part A of Schedule 5 (Tk. 47.5976/MSCF).

**PART D:   Tariff on Liquid Fuel**

### Tariff Schedule Format
### (On the basis of Liquid Fuel)

| Period | | Tariff in US$/Kwh for Monthly Plant Factor | | | | Tariff in Tk/Kwh for Monthly Plant Factor | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 50% | 60% | 70% | 80% | 50% | 60% | 70% | 80% |
| 1st Year | FT | 0.0192 | 0.0192 | 0.0192 | 0.0192 | 0.81815 | 0.81815 | 0.81815 | 0.81815 |
| (Base Year) | OMT | 0.0509 | 0.0424 | 0.0364 | 0.0318 | 2.16895 | 1.80675 | 1.55108 | 1.35506 |
| 2nd Year | FT | 0.0239 | 0.0239 | 0.0239 | 0.0239 | 1.01843 | 1.01843 | 1.01843 | 1.01843 |
| | OMT | 0.0500 | 0.0423 | 0.0371 | 0.0346 | 2.13060 | 1.80249 | 1.58091 | 1.47438 |
| 3rd Year | OMT | 0.0515 | 0.0435 | 0.0382 | 0.0356 | 2.19452 | 1.85362 | 1.62778 | 1.51699 |
| 4th Year | OMT | 0.0531 | 0.0449 | 0.0394 | 0.0367 | 2.26270 | 1.91328 | 1.67891 | 1.56386 |
| 5th Year | OMT | 0.0546 | 0.0462 | 0.0406 | 0.0378 | 2.32662 | 1.96867 | 1.73005 | 1.61073 |
| 6th Year | OMT | 0.0563 | 0.0476 | 0.0418 | 0.0389 | 2.39906 | 2.02853 | 1.78118 | 1.65761 |
| 7th Year | OMT | 0.0580 | 0.0490 | 0.0430 | 0.0401 | 2.47150 | 2.08799 | 1.83232 | 1.70874 |
| 8th Year | OMT | 0.0597 | 0.0505 | 0.0443 | 0.0413 | 2.54394 | 2.15191 | 1.88771 | 1.75988 |
| 9th Year | OMT | 0.0615 | 0.0520 | 0.0457 | 0.0425 | 2.62064 | 2.21582 | 1.94737 | 1.81101 |
| 10th Year | OMT | 0.0633 | 0.0536 | 0.0470 | 0.0438 | 2.69734 | 2.28400 | 2.00276 | 1.86641 |
| 11th Year | OMT | 0.0652 | 0.0552 | 0.0484 | 0.0451 | 2.77830 | 2.35218 | 2.06242 | 1.92180 |
| 12th Year | OMT | 0.0672 | 0.0568 | 0.0499 | 0.0464 | 2.86353 | 2.42036 | 2.12634 | 1.97720 |
| 13th Year | OMT | 0.0692 | 0.0585 | 0.0514 | 0.0478 | 2.94875 | 2.49280 | 2.19026 | 2.03685 |
| 14th Year | OMT | 0.0713 | 0.0603 | 0.0529 | 0.0493 | 3.03824 | 2.56950 | 2.25417 | 2.10077 |
| 15th Year | OMT | 0.0734 | 0.0621 | 0.0545 | 0.0507 | 3.12772 | 2.64621 | 2.32235 | 2.16043 |

Assumptions:
1. 1st Year Liquid Fuel fixed at Tk. 0.81815/kWh
2. 2nd Year Liquid Fuel priced at Tk. 639.18 (\$15)/barrel
3. Exchange Rate: US\$1.00 = Tk. 42.612.  Reference BPDB Memo:1626-BPDB(SEC.)/Dev-110/96 dated 12/12/96

FT =        The price component of Fuel per kWh of energy generated.

OMT=        The price component on account of all other costs including profit per kWh of energy supplied at the Delivery Point, excluding fuel, provided that where OMT from the above table is to be used in this Agreement, it shall be adjusted according to the following formula for the purposes of billing and payment by the LC Bank:

October 14th, 1997                    105

$$OMT_{Adjusted} \quad = ( OMT_{table} * PER/42.612 * 99\%)$$

where

$$OMT_{table} \quad = \text{the appropriate OMT price from the above table}$$

$$PER \quad = \text{the prevailing Exchange Rate (expressed in Taka)}$$
on the Business Day immediately preceding the
date on which the Company prepares the Invoice
or the date on which the LC Bank pays for the
Invoice, as the case may be.

$$OMT_{Taka.} \quad = (OMT_{table} * 1\%)$$

Both FT and OMT together will constitute the tariff per kWh of Net Electrical Output delivered to the Delivery Point.

Anytime after the first year anniversary of the Full Commercial Operations Date, BPDB requests the Company to operate on liquid fuel, the FT portion of the liquid fuel tariff will be a pass-through item to BPDB as actuals. OMT shall be as specified in Part D of Schedule 5 and calculated in accordance with Part B of Schedule 5.

FT will be adjusted by multiplying the liquid fuel FT as specified in Part D of Schedule 5 with the following fuel adjustment factor.

$$FP_n = \text{Fuel Price}_n / \text{Fuel Price}_b$$

Where:

$FP_n$ = Fuel Adjustment Factor on Date 'n'

$\text{Fuel Price}_n$ = delivered price of fuel at the Plant in Tk. /barrel which shall include the cost of such fuel delivery to the Site.

$\text{Fuel Price}_b$ = Fuel Price as per the Company's bid documents of Tk. 639.18/barrel.

October 14th, 1997                                    106

Schedule 6

**Program of Works**

| Milestone | | Weeks |
|---|---|---|
| 1. | Preliminary Engineering | 3 |
| 2. | Start Construction at Site | 9 |
| 3. | Complete Construction of Barge | 18 |
| 4. | Begin Power Plant Assembly | 20 |
| 5. | Complete Construction of Power Plant on Barge | 30 |
| 6. | Plant arrives at Site | 39 |
| 7. | Interconnect and Commissioning | 42 |
| 8. | Commercial Operations Date | 44 |

October 14th, 1997                                     107

<u>Schedule 7</u>
<u>Parties addresses and notice details</u>

<u>Company</u>

Company Address:     Smith Cogeneration (Bangladesh) Pvt. Ltd.
                     #57-A, Road 28, Gulshan
                     Dhaka 1212
                     Bangladesh

Tel:                 +88-02-887-877
Fax:                 +88-02-886-724BPDB

Bangladesh Power Development Board
WAPDA Building
Motijheel C/A
Dhaka-1000
Bangladesh

Tel :                +88-02-956-7350

Fax:                 +88-02-956-4765

October 14th, 1997                      108

## Schedule 8
### Insurance

### Part A: Construction Period

(The period from the date on which notice to proceed is given to the Turnkey Contractor until the Full Commercial Operation Date)

1.   Marine and Air Cargo Insurance

| Cover: | All materials, equipment, machinery, spares and other items for incorporation in the Plant against all risks of physical loss or damage while in transit by sea or air from country of origin any where in the world to the Site or vice versa from the time of the insured items leaving warehouse or factory for shipment to the Site including the completed facility if fabricated elsewhere and transported to the Site. Covered to institute Cargo Clauses (air), institute War Clauses (Air), (Sending By Post), institute Strikes Clause (Cargo, Air Cargo) or equivalent. |
|---|---|
| Sum Insured | An amount equal to the replacement cost of the item(s) shipped plus freight |
| Deductible | Not to exceed US$250,000 for each loss. |
| Insured | The Company, the Lenders, Contractors and other parties required under the Project Agreements. |

2.   Advance Loss Profits Insurance (following Marine incident) or "Marine Consequential Loss Insurance"

| Cover | Against loss of revenue following delay in start of commercial operations as a direct result of physical loss or damage to the materials, equipment, machinery and other items in transit by sea or air to the Site, to the extent covered under the Marine Cargo insurance. |
|---|---|
| Sum Insured | An amount equal to the estimated continuing expenses, including debt service, during the indemnity period. |
| Indemnity Period | 9 months or the period required to repair or replace materials, equipment or machinery, whichever is greater. |
| Deductible | Not to exceed 60 Days. |
| Insured | The Company and the Lenders to the extent of their interest |

3.    Construction All Risks Insurance

| | |
|---|---|
| Cover | The contract works executed and in the course of execution, materials and temporary works, while on the Site, against all risks of physical loss or damage other than war and kindred risks, nuclear risks, unexplained shortage, cost of replacing or repairing items which are defective in workmanship, material or design; penalties; consequential losses; cash; vehicles; vessels; aircraft and other standard exclusions contained in such policies.  At Company's option, such coverage to apply for fabrication, loadout and off loading if conducted away from the Site. |

| | |
|---|---|
| Sum Insured | Full replacement cost of the Plant. |

| | |
|---|---|
| Deductibles | In relation to Contract Works, Materials, etc. and subject to availability on commercially reasonable terms. |

(a)  arising during the construction and testing period:

| | | |
|---|---|---|
| (i) | from Storm, Tempest, Flood, Water Damage Earthquake, Subsidence And Collapse | Not to exceed US$500,000 |
| (ii) | from any other cause other than in (a)(i) above US$ | Not to exceed US$500,000 |

(b)  arising out of operational testing or commissioning:

| | | |
|---|---|---|
| (i) | of the prime mover and electrical electrical generator | Not to exceed US$500,000 |
| (ii) | of Plant other than the prime mover and associated electrical generator | Not to exceed US$500,000 |

| | |
|---|---|
| Period of Cover | Construction, testing and Commissioning periods of the Plant from mobilization of the Company's Contractors until the date of the Full Commercial Operation Date. |

| | |
|---|---|
| Insured | The Company, its Contractors, the Lenders, all suppliers on the Site and other parties as required under the Project Agreements; BPDB shall be added as an additional insured only to the extent that the Company is liable to the BPDB under the terms of the PPA. |

October 14th, 1997

110

4.  Advance Loss of Profit Insurance (following C.A.R.) "Delay in Start Up Insurance"

| | |
|---|---|
| <u>Cover</u> | Against loss of revenue following delay in start-up of commercial operations as a direct result of physical loss of or damage to the works during construction or operational testing to the extent that such loss or damage is covered under the Construction All Risks policy. |
| <u>Sum Insured</u> | An amount equal to the estimated continuing expenses, including debt service, during the indemnity period. |
| <u>Indemnity Period</u> | Not less that 9 months. |
| <u>Insured</u> | The Company and the Lenders to the extent of their interest. |
| <u>Deductible</u> | Not more than 90 Days. |
| <u>Period of Cover</u> | Construction, testing and Commissioning periods of the Plant from mobilization of the Company's Contractors until the date of the Full Commercial Operation Date. |

5.  <u>Public Liability Insurance</u>

| | |
|---|---|
| <u>Cover</u> | Against legal liability including marine liabilities to third parties for bodily injury or damage to property arising out of the construction, testing and Commissioning of the Plant. |
| <u>Sum Insured</u> | For any one claim US$25,000,000. |
| <u>Deductible</u> | Not to exceed US$10,000 for each claim for damage property. None for injury to persons |
| <u>Insured</u> | The Company worldwide, and Contractors and BPDB for activities at the Site only. |
| <u>Period of Cover</u> | The actual construction, testing and Commissioning of the Plant from mobilization of the Company's Contracts until the date of the Full Commercial Operation Date. |

6.  <u>Miscellaneous</u>

Other insurance as is customary, desirable or necessary to comply with local requirements, such as Workmen Compensation Insurance for all workmen employed by the Company during the construction for the Plant and Motor insurance for vehicles used by the Company.

October 14th, 1997                                      111

**Part B: Operating Period**

(The period from the Full Commercial Operating Date until the end of the Term)

1.  All Risks Insurance for Fixed Assets

    Cover        All building contents, machinery stock, fixtures, fittings and all other personal property forming part of the Plant against "All Risks" of physical loss or damage, including (but not limited to) those resulting from fire, lighting, explosion, spontaneous combustion, storm, wind, tempest, flood, hurricane, water damage, riot, strikes, malicious damage, earthquake, collapse and/or loss of contents of tanks, subject to standard policy exclusions.

    Sum Insured   Full replacement cost of the Plant;

    Deductible    Not to exceed US$500,000 each loss.

    Insured       The Company and the Lenders; BPDB shall be added, as an additional insured only to the extent that the Company is liable to BPDB under the tenure of the PPA.

2.  Business Interruption Insurance Following Physical Loss Damage

    Cover         Loss of revenue due to loss of Capacity and/or loss of output as a direct consequence of physical loss of or damage to the Plant and caused by a peril insured under paragraph 1 above.

    Sum Insured   An amount equal to the estimated continuing expenses, including debt service, during the indemnity period.

    Indemnity
    Period        Not less than 9 months.

    Deductible    Not more than 60 Days.

    Insured       The Company and the Lenders to the extent of their interest.

3.  Machinery Breakdown Insurance

    Cover         All machinery plant and ancillary equipment forming part of the Plant against sudden and unforeseen physical loss or damage resulting from mechanical and electrical breakdown or derangement, explosion or collapse of pressure vessels, electrical short circuits, vibration, misalignment, excessive current or voltage, abnormal stress, centrifugal forces, failure of protective or regulating devices, overheating, entry of foreign bodies, and other similar causes.

NA

October 14th, 1997                                112

| | |
|---|---|
| Sum Insured | Full replacement cost of all machinery, Plant, boilers, etc. |
| Deductible | US$500,000 each loss. |
| Insured | The Company and the Lenders; BPDB shall be named as an additional insured. |

4.   **Business Interruption Following Machinery Breakdown**

| | |
|---|---|
| Cover | Loss of revenue due to loss of Capacity and/or loss of output as a direct consequent of physical loss or damage to the Plant caused by a peril insured under paragraph 3 above. |
| Sum Insured | An amount equal to the estimated continuing expenses, including debt service, during the indemnity period. |
| Indemnity Period | Not less than 9 months. |
| Deductible | Not more than 90 Days. |
| Insured | The Company and the Lenders to the extent of their interest. |

5.   **Public Liability Insurance**

| | |
|---|---|
| Cover | Legal liability including marine liabilities of the insured for damage to property of third parties or bodily injury to third parties arising out of the ownership, operation and maintenance of the Plant. |
| Sum Insured | US $25,000,000 for any occurrence. |
| Deductible | US $10,000 each claim for property.  None for injury to persons. |
| Insured | The Company and the Lenders; BPDB shall be named as an additional insured to the extent of the Company's Indemnity obligation elsewhere in this Agreement. |

6.   **Miscellaneous**

Other insurance which are customary, desirable or necessary to comply with local or other requirements, such as Workmen's Compensation Insurance for all workmen employed by the Company during Plant operation, and Motor Insurance on any vehicle used by the Company.

October 14th, 1997                              113

**Schedule 9**

## Expansion of Project to Combined-Cycle

1    <u>Contracted Capacity:</u> Anytime after the expiration of a six (6) month period after the Full Commercial Operation Date of the Plant, the Company will enhance the capacity of the Plant by converting it to combined-cycle.  When the Company so elects, and the Company demonstrates that the Guaranteed Capacity of the combined-cycle Plant is higher than the original Contracted Capacity of the Plant, then notwithstanding any other provision of the Agreement the new Guaranteed Capacity will become the Contracted Capacity and the Guaranteed Capacity for all purposes of this Agreement including for the purposes of calculating the Minimum Tariff Payment pursuant to Part B of Schedule 4 and Minimum Guaranteed Payment, from the date of such Capacity Test.

2    BPDB shall allow the Company not to operate the Plant for a maximum period of thirty (30) Days as is required for the conversion of the Plant from simple cycle to combined cycle.  BPDB shall not be under any financial obligation with regards to such conversion including for the loss of revenue to the Company during the period of such conversion.

October 14th, 1997                           114

**Schedule 10**
**Description of the Site.**

[MAP OF SITE IS ATTACHED]

NA

October 14th, 1997

115



LEGEND:

HOUSE : Concrete Building, Tin roofed/Brick Building.
Tin shed, Hut, Grass yard & Mosque.
Road : Asphalt,Dirt & Bridled Road
Trees: Mango, Jackfruit, Guava, Coconut, Betelpalm.
Tallpalm, Betelnut, Bamboo, Banana, Bush & Others
River,Khal, Tank, Ditch, Cutting

## Schedule 11
## Performance Bond Form

To the Secretary, Bangladesh Power Development Board

WHEREAS Smith Cogeneration (Bangladesh) Pvt. Ltd.

(hereinafter called "the Seller") has undertaken, in pursuance of the Power Purchase Agreement dated 14th October, 1997 to supply Electrical Power (hereinafter called "the Contract").

AND WHEREAS it has been stipulated by you in the said contract that the Seller shall furnish you with an irrevocable and unconditional Bank Guarantee by a schedule Bank in Bangladesh or by a foreign Bank endorsed and authenticated by a schedule Bank in Bangladesh for the sum specified herein as security for compliance with the Seller's performance obligations in accordance with the Contract.

AND WHEREAS we have agreed to provide the seller a guarantee :

THEREFOREE WE hereby affirm that we are Guarantors and responsible to you, on behalf of the Seller, up to a total of US$ 1,500,000 (US Dollar one million five hundred thousands only) and we undertake to pay you, upon your first written demand declaring the Seller to be in default under the contract and without cavil or argument, any sum or sums within the limits of $1,500,000 as aforesaid, without your needing to prove or to show grounds or reasons for your demand or the sum specified therein.

This Guarantee is valid until the _____ day of _____ 19 _____ and it is irrevocable and unconditional.

Signature and seal of the Guarantors

_____

_____

_____

Date        _____
Address     _____

October 14th, 1997                            116

**Second Performance Bond Form**

To the Secretary, Bangladesh Power Development Board

WHEREAS Smith Cogeneration (Bangladesh) Pvt. Ltd.

(hereinafter called "the Seller") has undertaken, in pursuance of the Power Purchase Agreement dated 14th October, 1997 to supply Electrical Power (hereinafter called "the Contract").

AND WHEREAS it has been stipulated by you in the said contract that the Seller shall furnish you with an irrevocable and unconditional Bank Guarantee by a schedule Bank in Bangladesh or by a foreign Bank endorsed and authenticated by a schedule Bank in Bangladesh for the sum specified herein as security for compliance with the Seller's performance obligations in accordance with the Contract.

AND WHEREAS we have agreed to provide the seller a guarantee :

THEREFOREE WE hereby affirm that we are Guarantors and responsible to you, on behalf of the Seller, up to a total of US$ 8,500,000 (US Dollar eight million five hundred thousands only) (and in accordance with Article 16.6 with respect to the reducing balance of the performance bond) and we undertake to pay you, upon your first written demand declaring the Seller to be in default under the contract and without cavil or argument, any sum or sums within the limits of $8,500,000 as aforesaid, without your needing to prove or to show grounds or reasons for your demand or the sum specified therein.

This Guarantee is valid until the _____ day of _____ 19 _____ and it is irrevocable and unconditional.

Signature and seal of the Guarantors

_____

_____

_____

Date     _____

Address  _____

October 14th, 1997                    117

*Confidential*

**Schedule 12**
**Form of Pro Forma Invoice**

**INVOICE FOR [INSERT MONTH AND YEAR]**

[NAME AND ADDRESS
OF COMPANY]

The Bangladesh Power Development Board
WAPDA Building
Motijheel C/A
Dhaka-1000
Bangladesh

Invoice No.
Invoice date:

---

**Monthly Plant Factor**

NEO (Net Electrical Output for the
month) in kWh
= Final Meter Reading for month - Initial Meter Reading for month
= _____ kWh

Guaranteed Capacity (GC) = _____ MW
Number of hours in month = [Number of Days in Month] * 24
Monthly Plant Factor (MPF) = $\dfrac{\text{NEO}}{\text{GC} * 1000 * \text{Number of hrs. in month}}$
= _____ %

---

**A. OMT CHARGE**

**OMT Payment**

$\text{OMT}_{\text{Adjusted}}$ (from Schedule 5 - Part B) = Tk. _____ /kWh * $\dfrac{\text{prevailing Exchange Rate}[1]}{\text{Reference Exchange Rate}[2]}$ * 99%

$\text{OMT}_{\text{Taka}}$ (from Schedule 5 - Part B) = Tk. _____ /kWh * 1%

**OMT Payment** = (NEO * ($\text{OMT}_{\text{Adjusted}}$ + $\text{OMT}_{\text{Taka}}$))
= Tk. _____

**Minimum Tariff Payment**

MGE = GC * [Numbers of hrs. in month] * 50%
= _____

Ph = _____ hrs.

MEP (MEP is zero (0) if MPF => 50%) = ($\text{OMT}_{\text{Adjusted}}$ + $\text{OMT}_{\text{Taka}}$) * MIN (MGE - NEO, Ph * GC)

**Minimum Tariff Payment (MEP)** = Tk. _____

**OMT CHARGE** = OMT Payment + Minimum Tariff Payment
= Tk. _____ + Tk. _____
= Tk. _____

October 14th, 1997

118

**B. FT CHARGE**

FT (from Schedule 5) = Tk. _____ /kWh * $\dfrac{\text{Gas Price}}{\text{Reference Gas Price}^2}$

$FT_{Adjusted}$ (Adjusted for Δ gas price) = Tk. _____ /kWh

**FT CHARGE** = (NEO * $FT_{Adjusted}$)

= Tk. _____

---

**C. GAS PAYMENT**

Quantity of Gas Consumed = Final Gas Meter Reading for month - Initial Gas Meter Reading for month

= _____ MSCF

Gas Price = Tk. _____ /MSCF

Adjustment Factor (per Article 22.7.2) = _____

**GAS PAYMENT** = Quantity of Gas Consumed * Gas Price * Adjustment Factor

= _____ MSCF * Tk. _____ /MSCF * Adjustment Factor

= Tk. _____

---

**D. NET INVOICE AMOUNT**

US Dollar adjusted Net Invoice Amount = (99% * A)

Taka Net Invoice Amount = (1% * A) + B - C

**NET INVOICE AMOUNT** = US Dollar adjusted Net Invoice Amount + Taka Net Invoice Amount

= [(99% * A)] + [(1% * A) + B - C]

= Tk. _____

---

**E. NET AMOUNT PAYABLE**
(to be calculated on date of payment)

1. Dollar adjusted Invoice Amount = [(99% * A)] * $\dfrac{\text{Pmt. Exchange Rate}^4}{\text{prevailing Exchange Rate}^1}$

= Tk. _____

2. Taka Invoice Amount = [(1% * A) + B - C]

= Tk. _____

3. Disputed Amount[5] = Tk. _____

4. Foreign Exchange Adjustment[6] = Tk. _____

**NET AMOUNT PAYABLE** = 1 + 2 + 3 + 4

= Tk. _____

October 14th, 1997                    119

*Confidential*

Notes:
1. Exchange Rate as announced by Bangladesh Bank on date of Invoice.
2. Reference Exchange Rate defined as US$1=Tk. 42.612 in Schedule 5 as per BPDB Memo: 1626-BPDB(SEC.)/Dev-110/96 dated 12/12/96. Exchange Rate protection for 99% of OMT.
3. Reference Gas Price defined as Tk. 47.5976($1.117)/MSCF in Schedule 5 as per BPDB Memo: 1626-BPDB(SEC.)/Dev-110/96 dated 12/12/96.
4. Exchange Rate at which dollars are made available to the Company in exchange for Takas.
5. Disputed Amount adjusted to reflect Pmt. Exchange Rate per the provisions of Article 9.6.
6. Other adjustment on account of conversion of Takas to US Dollars

October 14th, 1997                                120

## Schedule 13
## Gas Specifications

Gas supplied and delivered by the Fuel Supplier to the Plant at the Point of Delivery shall the following specifications:

### Natural Gas Composition

| | |
|---|---|
| Methane | 96.5% - 97.5% |
| Ethane | 1.5% - 1.9% |
| Propane | 0.4% - 0.5% |
| Butane | 0.2% - 0.4% |
| Carbon Dioxide | 0.25% - 0.32% |
| Nitrogen | 0.13% - 0.35% |
| Impurities | 1.02% - (-0.97%) |
| | 100% - 100% |

| | |
|---|---|
| Net spec. Energy NSE (i.e. lower calorific value) at 15.5 Deg. C., 0.98 bar | 34.59 - 34.34 (Mj/M³) |
| Gas Density at 15 Deg. C. 0.98 bar | 0.58 - 0.6 (Kg/M³) |
| Moisture Content | 0.106 - 0.112 (g/M³) |
| Condensate (based on Imp. Gal) | Approx. 0.32 (ml/M³) |

### Gas Pressure Specification

The pressure at which Gas is delivered by the Fuel Supplier to the Plant at the Point of Delivery shall not be less than 150 psig.

October 14th, 1997                      121

<u>Schedule 14</u>

<u>SAMPLE LETTER OF CREDIT</u>

**Letter of Credit**

Date:   October ____, 1997

Smith Cogeneration (Bangladesh) Pvt. Ltd.
57-A, Road #28, Gulshan
Dhaka 1212, Bangladesh

Dear Sir:

At the request of Bangladesh Power Development Board, established under Bangladesh Board order, 1972 (P.O. No. 59 of 1972), Sonali Bank hereby opens and establishes this Letter of Credit No. _____ (the "Letter of Credit" or "L/C") on the terms and conditions set forth below:

1. **L/C Number:**    [_____]

2. **Place of Issue:**    Dhaka, Bangladesh

3. **Effective Date:**    [ insert the date of issuance here ] [ Within 30 Days of the receipt of the first notice to Opener, in accordance with Article 5.2 of the Power Purchase Agreement dated _____ ("PPA")]

4. **Opener:**    Bangladesh Power Development Board
WAPDA Building, 1st Floor
Motijheel Commercial Area
Dhaka, Bangladesh

5. **Opening Bank:**    Sonali Bank
Local Office
Motijheel Commercial Area
Dhaka, Bangladesh

6. **Beneficiary:**    Smith Cogeneration (Bangladesh) Pvt. Ltd., a private limited company, incorporated under the Companies Act, 1994 and having its principal office at 57A, Road #28, Gulshan, Dhaka 1212, Bangladesh

7. **Type of Credit:**    Irrevocable, revolving, and Assignable in accordance with Article 20.2 of the PPA.

October 14th, 1997

122

8. **Expiry Date:**    [insert the date of expiry here][The expiry date of the Term of the PPA.]

9. **L/C Amount:** The revolving sum of the Letter of Credit shall be equivalent to two months of Minimum Tariff Payment ("MGP"), as defined in the PPA. The L/C Amount shall be adjusted quarterly on account of variation in the OMT, Guaranteed Capacity and Exchange Rate.

10. Procedure for Payment

(i)    In accordance with the provisions of the PPA, the Beneficiary will be paid against each monthly Invoice, certified by the Opener, within 45 Days of the submission of the said Invoice by the Beneficiary to the Opener. Payment will be made by debiting the Opener's bank account and crediting the same to the Beneficiary's bank account.

(ii)    If the Opener fails to make payment of the said Invoice amount within 45 Days of its presentation, in accordance with the PPA, then the Beneficiary shall be paid directly by the Opening Bank in accordance with the provisions of the PPA and upon submission of a sight draft stating on its face: "Drawn under Sonali Bank, Irrevocable Letter of Credit No. [___]", along with the Invoice, accompanied by a written undertaking signed by an authorized officer of the Beneficiary, in the form of Exhibits A hereto (an "Undertaking" - the Undertaking forms an integral part of this Letter of Credit).

11. Procedure for Payment in Case of Dispute:

(i)    The Beneficiary shall immediately communicate to the Opening Bank, the date on which the said Invoice was presented to the Opener. In case of any discrepancy in the said Invoice, the Opener shall communicate such discrepancy to the Beneficiary and the Opening Bank, within 38 Days of the submission of the said Invoice.

(ii)    The Opening Bank shall call upon a meeting of the Opener and the Beneficiary on the 40th Day of the date of presentation of the said Invoice. If the 40th Day is not a Business Day, then the meeting shall be called on the first Business Day thereafter. The Opener and the Beneficiary shall reconcile their account in good faith so as to arrive at a mutually acceptable amount due to the Beneficiary. There shall be no obligation on part of the Opening Bank as regards to the results of the said meeting.

(iii)    If the Opener does not communicate its objection to the Opening Bank and/or does not participate in the meeting, the Opening Bank shall pay the Beneficiary in accordance with the Beneficiary's Undertaking as provided in paragraph 10 (ii) of this Letter of Credit.

(iv)    Notwithstanding anything to the contrary, the Opening Bank shall not make payment to the Beneficiary before the expiry of the 45 Day period from the date of presentation of Invoice, unless so instructed by the Opener.

October 14th, 1997                                    123

12. Upon each draw, the amount of the Letter of Credit shall be replenished to the L/C Amount.

13. The Opening Bank shall immediately communicate to the Beneficiary and the Opener the amount and the time at which payment has been transferred to the Beneficiary's account pursuant to this Letter of Credit.

14. This document sets forth in full, the terms of the Opening Bank's undertaking under the Letter of Credit and such undertaking shall not in any way be modified, amended, limited, amplified or affected in any other manner except with the written agreement of the Opening Bank, the Opener and the Beneficiary.

15. Assignment of this Letter of Credit shall be effected upon receipt by the Opening Bank, a duly completed request for assignment from the Beneficiary, provided, however, that the request for assignment is in accordance with Article 20.2 of the PPA.

16. Presentation of any Undertaking and all communication in writing with respect to the Letter of Credit shall be made during normal banking hours and addressed to the Opening Bank and marked to the attention of [state designation].

17. THE LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION) ICC PUBLICATION NO. 500; PROVIDED, HOWEVER, TO THE EXTENT THAT THERE IS ANY CONFLICT BETWEEN THIS DOCUMENT AND THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION) ICC PUBLICATION NO. 500, THE TERMS OF THIS DOCUMENT SHALL PREVAIL.

18. All drawings under the Letters of Credit must be presented to the Opening Bank on or before the Expiry Date. Unless claims are so presented, all rights and benefits under the Letter of Credit shall be forfeited and the Opening Bank shall be released of all claims, demands or liabilities of any kind or character whatsoever. Notwithstanding anything contained herein above, the original of this document must be returned to the Opening Bank within two (2) Business Days after the Expiry Date, for cancellation.

19. Capitalized terms not defined herein shall have the meaning attributable to it in the PPA.

20. As used herein "Business Day" shall mean a Day on which commercial banks in Dhaka are not required or authorized by law or executive order to remain closed. If any obligation herein falls on a Day which is not a Business Day, then the obligation shall be performed on the next Business Day.

Yours faithfully,

For and on behalf of Sonali Bank

October 14th, 1997

124

EXHIBIT A
TO
LETTER OF CREDIT

### [UNDERTAKING FOR A DRAWING] ["UNDERTAKING"]

The undersigned, a duly authorized officer of Smith Cogeneration (Bangladesh) Pvt. Ltd. (the "Beneficiary"), hereby certifies to Sonali Bank (the "Opening Bank"), with reference to Sonali Bank, Irrevocable Letter of Credit No. [___] issued by the Opening Bank in favor of the Beneficiary (the "Letter of Credit") (any capitalized term used herein and not defined shall have its respective meaning as set forth in the Letter of Credit) that:

1.    The Beneficiary is the Beneficiary under the Letter of Credit.

2.    This drawing in the amount of _____ is being made pursuant to the Power Purchase Agreement dated _____ ("PPA") between Smith Cogeneration (Bangladesh) Pvt. Ltd. and the Bangladesh Power Development Board ("Opener"). We hereby certify that the amount shown in the Invoice No. ____ dated ____ for the month of _____ accompanying this Undertaking is due and payable to the Beneficiary under Article 8.2 of the PPA and 45 Days have expired since the presentation of the Invoice to the Opener and [no amounts shown in this Invoice have been disputed by the Opener]/[ Tk. _____ of the amounts shown in the Invoice have been disputed by the Opener, and the amount of the drawing made hereunder does not exceed the amount the Benficiary is entitled to draw taking into account the disputed amount and the provisions of Article 9.6 of the PPA]. We hereby certify that such payment has not been made to us.

3.    Upon receipt of the amount demanded under this Undertaking, Beneficiary will adjust the same amount directly in the payment of the Opener's obligations to the Beneficiary under the PPA.

4.    Concurrently with the presentation of this Undertaking via telecopy or facsimile transmission and a copy by hand delivery to the Opening Bank, the Beneficiary has sent a copy of this Undertaking to the Opener via telecopy or facsimile transmission and a copy by hand delivery at its address set forth in the Letter of Credit.

IN WITNESS WHEREOF, the Beneficiary has executed and delivered this Undertaking as of the [____] Day of [_____], 199[_].

SMITH COGENERATION (BANGLADESH) PVT. LTD.

By: _____
Title: _____

October 14th, 1997                                125

EXHIBIT 2

## CERTIFICATION

I, Donna Francescani, hereby certify that this is a true and correct copy of the *Implementation Agreement by and between The People's Republic of Bangladesh Represented by Ministry of Energy and Mineral Resources and Smith Cogeneration (Bangladesh) Pvt. Ltd.,* dated October 16, 1997, Relating to Barge Mounted Power Plant at Haripur, Dist. Narayanganj, Bangladesh.

*Donna M. Francescani*
Donna Francescani

District of Columbia: SS
Subscribed and sworn to before me this 24th day of October, 2006.

*Carol A. Friend*
Notary Public, D.C.

**Carol A. Friend**
**Notary Public, District of Columbia**
**My Commission Expires 2/28/09**

IMPLEMENTATION AGREEMENT

BY AND BETWEEN

THE PEOPLE'S REPUBLIC OF BANGLADESH

REPRESENTED BY

MINISTRY OF ENERGY
AND MINERAL RESOURCES

- and -

SMITH COGENERATION (BANGLADESH) PVT. LTD.

DATED October 16th 1997

RELATING TO

Barge Mounted Power Plant

at

Haripur, Dist. Narayanganj
Bangladesh

**Table of Contents**

| | | |
|---|---|---|
| Article I | Definitions | 1 |
| Article II | Interpretations | 6 |
| Article III | Term | 7 |
| Article IV | Consent for Project | 8 |
| Article V | Site Acquisition, Construction and Operation | 11 |
| Article VI | Liability; Insurance | 13 |
| Article VII | Import Controls | 17 |
| Article VIII | Transfer of Funds | 19 |
| Article IX | Assignment and Security | 21 |
| Article X | Restriction on Acquisition and Transfer of Shares | 23 |
| Article XI | Force Majeure | 26 |
| Article XII | Taxation, Customs Duties | 30 |
| Article XIII | Termination | 32 |
| Article XIV | Rights and Obligations of Parties upon Termination | 37 |
| Article XV | Resolution of Disputes | 41 |
| Article XVI | Guarantee | 44 |
| Article XVII | Notices | 45 |
| Article XVIII | Miscellaneous Provisions | 47 |
| | | |
| Schedule I | Consents | 54 |
| Schedule II | Form of Guarantee | 56 |

October //, 1997

i

# ARTICLE 1
## DEFINITIONS

Whenever the following capitalized terms are used in this Agreement or the Schedules hereto, whether in the singular or the plural, whether in the past, present or the future tense, they shall have the meanings ascribed to each of them below, unless the context otherwise requires:

"**Agreement**": means this Implementation Agreement dated hereof by and between the Company and GOB, including all Schedules and Annexes hereto, as amended, supplemented, and modified from time to time in writing by the Parties; provided that the Lenders, Contractors, and Investors are not parties to this Agreement.

"**Bangladesh**": means the People's Republic of Bangladesh;

"**Bangladesh Bank**": means the Bangladesh Bank established by the Bangladesh Bank Order, 1972 (Presidential Order No. 127 of 1972), for the purpose of carrying on the business of central banking in Bangladesh and shall include its successors;

"**Bank Rate**": is the interest rate announced by the Bangladesh Bank from time to time;

"**BPDB**": means the Bangladesh Power Development Board constituted by the Bangladesh Water and Power Development Boards Order, 1972 (P. O. No.59 of 1972) and shall include its successors and permitted assigns;

"**Business Day**": means any Day that banks in Dhaka, Bangladesh are legally permitted to be open for business;

"**Change in Law**": means (a) the adoption, promulgation, change, repeal or modification after the date of this Agreement of any Legal Requirement, including any Change in Tax (b) the imposition upon the Company, its Contractors, the Lenders, or a Fuel Supplier of any material condition in connection with the issuance, renewal, extension, replacement or modification of any Authorization after the date of this Agreement that in either case (i) establishes requirements for the construction, financing, ownership, operation or maintenance of the Project that are materially more restrictive than the most restrictive requirements in effect as of the date of this Agreement or (ii) has a material and adverse effect on the Company, the Project or the return (net of tax) to the Investors of the Company;

"**Company**": means Smith Cogeneration (Bangladesh) Pvt. Ltd., a private limited company incorporated under the Laws of Bangladesh with its principal office located at 57-A, Road 28, Gulshan, Dhaka 1212, Bangladesh, and its permitted successors and assigns;

"**Compensation Amount**": bears the meaning attributable thereto in Article 14.7 of the Power Purchase Agreement;

"**Commissioning Date**": bears the meaning attributable thereto in the Power Purchase Agreement;

October 6, 1997

1

"**Consents**": means all such approvals, consents, authorizations, acknowledgements, licenses or permits including Lapse of Consent, required to be issued by any Public Sector Entity including Relevant Authority to the Company for the establishment of the Company or to the Company or to the Contractors for the construction, financing, ownership, operation, and maintenance of the Project by the Company or by the Contractors, including without limitation those Consents listed in Schedule 1;

"**Construction Contractor**": means the Contractor , and any successor thereto appointed by the Company and not objected to by the GOB pursuant to Article 5.2(b) of this Agreement;

"**Contractors**": means any person with whom the Company enters into a Turnkey Agreement or an O & M Agreement or a fuel supply agreement and each such person's subcontractors of any tier, and each of their successors and permitted assigns;

"**Customs Duties and VAT**": means customs duties levied under the Customs Act IV of 1969, as amended from time to time, and value added tax levied under the Value Added Tax Act, 1991 (Act XXII of 1991) as amended from time to time, and import duties including license fees, and other taxes, duties, charges, fees or levies, but excludes charges of a commercial nature associated with the importation of goods; unless exemptions are permissible under the said laws or are expressly granted to the Company or the Contractor, pursuant to the terms of this Agreement;

"**Day**": means each twenty-four (24) hour period beginning and ending at 12:00 midnight Bangladesh time;

"**Default**": bears the meaning attributable thereto in Article 13.4 of this Agreement;

"**Dollar**": and "**$**" means the lawful currency of the United States of America;

"**Environmental Liabilities**":  means all losses, damages, and expenses (including, without limitation, the reasonable costs of investigation, testing, containment, removal, cleanup, abatement or remediation and attorneys' reasonable fees and costs), whether or not quantified in amount, relating to the presence in the environment of Hazardous Materials attributable to the Plant from and after the later of the date of acquisition by the Company of any immovable property portion of the Site or the date of signing of this Agreement to the earlier of the date of transfer of the Plant or the Site to the GOB or, as the case may be, its designee, or the violation by the Company, its agents or employees of any environmental Laws of Bangladesh or other Standard by which the Company is bound; provided, however, that Environmental Liabilities shall not include any losses, damages or expenses (including, without limitation, any cost of investigation, testing or containment or renewal, cleanup, abatement or remediation or attorneys' fees or cost) relating to, or arising out of, any Hazardous Material, which was lawful and in compliance with such Laws of Bangladesh or such Standard at the time of the occurrence of such act or omission.

"**Exchange Rate**": means on any Business Day, the rate of exchange for the conversion of Takas into US Dollars as announced by the Bangladesh Bank to be in effect on such Business Day;

"**Financing Agreements**": bears the meaning attributable thereto in the Power Purchase Agreement;

October 16, 1997                        2

Case 1:06-cv-01827-RMC    Document 1-3    Filed 10/24/2006    Page 7 of 70

"**Foreign Currency**": means any currency other than the currency of Bangladesh, Taka;

"**Foreign Investors**": means shareholders of the Company who are foreigners or foreign corporations or non-resident Bangladeshis or non-resident Bangladeshis holding dual nationalities;

"**Full Commercial Operations Date**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**Fuel Supplier**": means BPDB, and shall include its successors and permitted assigns.

"**Fuel Supply Agreement**": means the agreement between the Fuel Supplier and the Company, pursuant to the terms of Power Purchase Agreement, for the supply and delivery of natural gas to the Plant for the entire Term of the Power Purchase Agreement;

"**GOB**": means the Government of the People's Republic of Bangladesh;

"**Guarantee**" means the guarantee issued by the GOB to the Company pursuant to this Agreement, in the form set out in Schedule 2;

"**Hazardous Material**": means any pollutant, contaminant, solid waste, hydrocarbon product, toxic or hazardous substance or waste, any flammable, explosive or radioactive materials regulated under, or subject to, any Laws of Bangladesh;

"**Investor**": means the holders from time to time of any shares of the Company with voting or other rights of management and control and any securities of the Company that are convertible into such shares at the option of the holder;

"**Lapse of Consent**": means any Consent (a) ceasing to remain in full force and effect or (b) not being issued or renewed upon application having been properly and timely made or (c) being made subject, subsequent to its grant, upon renewal or otherwise, to any terms or conditions that materially and adversely affect the Company's ability to perform its obligations under any Project Agreement, Site Agreement or Fuel Supply Agreement in each of the above instances despite the Company's compliance with the applicable procedural and substantive requirements as applied in a "non-discriminatory" (as explained in Article 2.1(f)) manner;

"**Laws of Bangladesh**": means in relation to this Agreement all laws in force in Bangladesh and includes all rules, regulations, orders, directives, notifications made or issued by any Public Sector Entity or other competent authority pursuant to or under any such law and any decree or judicial decision given or pronounced by any court or tribunal of competent jurisdiction;

"**Lien**": means any encumbrance, lien, charge or security interest upon or in the Plant;

"**Lenders**": means the lenders party to the Financing Agreements together with their respective successors and assigns;

"**Month**": means a month according to the Gregorian calendar;

October 16, 1997                                    3

"**O&M Agreement**": means the operations and maintenance agreement, if any, between the Company and the O&M Contractor for the operation and maintenance of the Plant, as amended or superseded from time to time;

"**O&M Contractor**": means the operations and maintenance Contractor and any successor thereto, or any other company appointed by the Company from time to time and not objected to by the GOB pursuant to Article 5.3(c) of this Agreement;

"**Ordinary Share Capital**": means any shares of the Company with voting or other rights of management and control and any securities of the Company that are convertible into such shares at the option of the holder;

"**Parties**": means the GOB and the Company;

"**Party**": means either the GOB or the Company, as the case may be;

"**Permitted Liens**": means minor imperfections of title and encumbrances that in the aggregate are not substantial in amount, do not detract from the value of the property subject thereto or impair the Plant, and existed at the date of acquisition of the Site or have arisen only in the ordinary course of business and consistent with normal utility practices;

"**Power Purchase Agreement**": means the agreement, dated October 14th, 1997, entered into between BPDB and the Company for the purchase and sale of electric power generated by the Plant, including the obligation of BPDB to supply and deliver fuel to the Plant, as amended from time to time;

"**Plant**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**Performance Bond**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**Prescribed Fee**": means, with respect to a particular Consent, the charge or fee, if any, prescribed by the Laws of Bangladesh;

"**Prescribed Form**": means, with respect to a particular Consent the form, if any, (including all information and details) prescribed by the Laws of Bangladesh for the application for, or renewal of, such Consent;

"**Project**": means the development, design, engineering, manufacture, financing, construction, permitting, completion, commissioning, insurance, ownership, operation and maintenance of the Plant and all activities incidental thereto;

"**Project Agreements**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**Public Sector Entity**": means the GOB and any department, instrumentality, board, agency or authority thereof, any local governmental authority with jurisdiction over the area where the Company, the Project or any part thereof operates, courts or tribunals in Bangladesh and any department, authority, instrumentality, agency or judicial body of the GOB or any such local

October 16, 1997                           4

governmental authority, and including, but not limited to, only for so long as they are the
control and direction of the GOB, BPDB or the Bangladesh Bank;

"**Recovery Allowance**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**Relevant Authority**" means the department, authority, instrumentality or agency from which a
Consent is to be obtained and any authority, body or other person having jurisdiction under the
Laws of Bangladesh with respect to the Company, the Project or the financing, construction,
operation or maintenance of the Project (other than BPDB );

"**Required Commissioning Date**": bears the meaning attributable thereto in the Power Purchase
Agreement;

"**Site**":  bears the meaning attributable thereto in the Power Purchase Agreement;

"**Site Agreement**":  shall have the meaning attributable in Article 5.1 of this Agreement;

"**Standard**":  means the environmental guidelines laid down by the World Bank Environmental
Guidelines;

"**Taka**" and "**Tk.**": mean the lawful currency of Bangladesh;

"**Tariff Charge**":  bears the meaning attributable thereto in the Power Purchase Agreement;

"**Turnkey Agreement**": bears the meaning attributable thereto in the Power Purchase Agreement;

"**VAT**":  shall mean all Value Added Tax;

"**World Bank Environmental Guidelines**":  bears the meaning attributable thereto in the Power
Purchase Agreement;

October 11, 1997                                            5

# ARTICLE II
## INTERPRETATION

2.1     Interpretation

In this Agreement:

(a)     the headings are for convenience only and shall be ignored in construing this Agreement;

(b)     the singular includes the plural and vice versa; and words denoting natural person shall be interpreted as referring to a corporation or any other legal entity and vice versa;

(c)     references to Articles, Sections, and Schedules are, unless the context otherwise requires, references to Articles and Sections of, and Schedules to, this Agreement;

(d)     unless otherwise expressly provided herein, whenever a consent or approval is required by one Party from the other Party, such consent or approval shall not be unreasonably withheld or delayed;

(e)     in carrying out their obligations and duties under this Agreement each Party shall have an implied obligation of good faith; and

(f)     the use of the terms "non-discriminatory" and "discriminatory" herein is not intended to prohibit or limit in any way the GOB or any Public Sector Entity from making rational distinctions between parties or from utilizing measures, establishing conditions, or enforcing requirements that are, in each case, intended or designed to advance public interest by the GOB or Public Sector Entity or of a Consent. They are intended, however, to prohibit the use of governmental authority, over, for example, permits and licenses, so as to deprive the Company, the Investors or parties to Project Agreements of the benefits of this Agreement or the Power Purchase Agreement, the Fuel Supply Agreement, Site Agreement or Project Agreements by the application of a higher standard to the Company, the Investors or parties to Project Agreements (alone, or together with others in a small class) than to others similarly situated because of, for example, its foreign ownership, or so as to gain commercial or political advantage.

(g)     any capitalized term not defined herein shall have the same meaning as assigned to it in the Power Purchase Agreement dated 14th Oct 1997

(h)     reference to a month refers to a Calendar Month;

(i)     the term "include" and "including" means without limitation;

October 16, 1997                6

# ARTICLE III
## TERM

This Agreement shall commence and be effective on the date hereof, and shall, unless terminated earlier in accordance with the terms of this Agreement, continue in full force and effect for a period of fifteen (15) years commencing on the Full Commercial Operation Date. This period shall be extended by the aggregate of all Days Force Majeure events were in existence on or after the Full Commercial Operation Date, provided, however, that in the case of any other extension of the Power Purchase Agreement, this Agreement may be extended as mutually agreed at that time. In the event that the Power Purchase Agreement is terminated by the BPDB in accordance with the terms thereof, GOB shall have the right to terminate this Agreement in accordance with the terms hereof.

October 16, 1997                              7

## ARTICLE IV
## CONSENTS FOR PROJECT

4.1    Applications by the Company for Consents

(a)    The Company shall make or cause to be made all applications (whether initial or renewal applications) for the Consents in the Prescribed Form and with the Prescribed Fee to the Relevant Authorities and shall diligently pursue all such applications. The information supplied in the applications shall be complete and accurate and shall satisfy the substantive and procedural requirements of the Laws of Bangladesh applied in a "non-discriminatory" manner.  In the event that the Relevant Authorities are not satisfied with the information supplied in the application, including non-compliance with any of the substantive or procedural requirements of the Laws of Bangladesh, the Relevant Authority shall communicate to the Company their objection within seven (7) days of the submission of such application.  Otherwise, it shall be deemed at the expiry of a thirty (30) Day period that the application was complete when submitted in all respect.

(b)    The Company shall make application for all Consents as provided in Schedule 1 within fifteen (15) Days of the execution of this Agreement.

4.2    Reporting Requirement

(a)    The Company shall make or cause to be made, at least monthly prior to the Full Commercial Operation Date, and at least quarterly thereafter reports listing its schedule for submitting Consent application forms or renewal application forms, the status of any Consent applications then outstanding, notifications of the granting or denial of any Consent or renewal Consent, and notifications of any violations of any Consent. Each report shall include copies of all applications and notifications discussed in the report which have not been provided with a previous report. The first section of each report shall also summarize any problems regarding any material Consent or Consent application that may affect the Company's performance under this Agreement or the Power Purchase Agreement.

(b)    In the event of any Lapse of Consent, the Company shall submit a report pursuant to this Article 4.2 within seven (7) Days after becoming aware thereof.

4.3    GOB Support to Obtain Consents

(a)    Subject to the Company's timely submission of the reports required by Article 4.2, upon request of the Company, the GOB shall support and use best efforts to expedite the consideration and approval of the Company's applications for the Consents or re-issuance thereof filed pursuant to Article 4.1, and the timely issuance thereof or re-issuance of a Consent to the Company.  The GOB shall cause the issuance of Consents or re-issuance of Consents within thirty (30) Days of filing by the Company of the application thereof.

(b)  Any request for support under this Article shall be accompanied with copies of the application for the Consent, any notice that the issuance or re-issuance of the Consent was denied or deferred, and a statement of the Company's efforts in obtaining the issuance or re-issuance of the Consent to date.

(c)  Provided the Company and the Contractors comply with all applicable Laws of Bangladesh, the GOB will expeditiously grant applications of the Company and the Contractors for work permits, employment passes, visas, and other permits, as necessary for individuals involved in the Project. Notwithstanding the foregoing, however, the GOB may, in any individual case, decline to grant an application, or expel a person previously admitted, to protect the national security interests and public health and safety of Bangladesh, as reasonably determined by the GOB.

(d)  GOB shall ensure that all Consents are provided to the Company at first instance for the initial term of this Agreement unless it is in contravention to the Laws of Bangladesh. In the event that it is in contravention to the Laws of Bangladesh for a Consent to be valid for the initial term of this Agreement, GOB shall ensure that the said Consents are made available to the Company for the maximum permissible period in accordance with the Laws of Bangladesh.

(e)  GOB undertakes that those Consents as provided in Schedule 1 of this Agreement are the Consents which the Company or any of the parties to the Project Agreements are required to obtain in accordance with the existing Laws of Bangladesh. In the event after the execution of this Agreement, the Company or any of the parties to the Project Agreements is required to obtain any Consent other than those provided in Schedule 1, GOB shall communicate to the Company any such requirement. The Company shall cause application for such Consent to be filed within fifteen (15) Days of such communication, and GOB shall cause the issuance of such Consent within thirty (30) Days of filing of the application thereof. Notwithstanding anything to the contrary, pending filing of such application or issuance of such Consent, the GOB agrees to permit the normal operation of the Project. Any such failure on the part of the GOB shall entitle the Company to a Day-for-Day extension to the milestones outlined in Schedule 6 of the Power Purchase Agreement, in the case such failure of the GOB adversely affects the construction, commissioning or testing of the Plant prior to the Full Commercial Operation Date. In the case such failure of the GOB adversely affects the operation and maintenance of the Plant after the Full Commercial Operation Date, the Company shall receive the Minimum Tariff Payment pursuant to Schedule 4 of the Power Purchase Agreement.

4.4  Conditions to Consents

(a)  The GOB or any Relevant Authority may attach such "non-discriminatory" terms and conditions to the issuance or renewal of any of the Consents as are in accordance with the Laws of Bangladesh, and the attachment of such terms and conditions shall not in and of itself constitute a breach of this Agreement by the GOB.

October 16, 1997

9

(b)    The Company and the Contractors shall abide by all such terms and conditions. If the Company or any of the Contractors fails to abide by any term or condition of any Consent, then the exercise by the GOB or any Relevant Authority of a power pursuant to the Laws of Bangladesh in respect of such failure shall not of itself constitute a breach of this Agreement by the GOB, a Force Majeure Event under Article XI of this Agreement, or a GOB Event of Default under Article XIII of this Agreement, provided that the GOB gives seven (7) Days written notice to the Company to abide by the terms and conditions of such Consent.

4.5    Remedies for GOB Nonperformance

(a)    Notwithstanding anything to the contrary in the Power Purchase Agreement, if the Company and its Contractors have complied and are in compliance with Article 4.1 and Article 4.2 and any of the Consents are not received within thirty (30) Days beginning from the date of submitting the application or if there is any Lapse of Consent in respect of a Consent prior to Full Commercial Operation Date, the Required Full Commercial Operation Date, and the Required Commissioning Date shall be extended on a Day-for-Day basis for each Day that any of such Consents remains outstanding or that any such Lapse of Consent continues, as the case may be, following the expiration of the thirty (30) Days period. In the case more than one Consents is outstanding, then the Day for Day extension shall be with respect to the last Consent that remains outstanding.

(b)    If such outstanding Consent or Consents have not been issued or renewed by the end of three (3) months beginning on the date of application or the date on which the Lapse of Consent occurred, the Company may terminate this Agreement, the Power Purchase Agreement and the Fuel Supply Agreements with no further obligations to the GOB, BPDB and the Fuel Supplier respectively.

Upon such termination, notwithstanding any provision to the contrary in this Agreement, or the Power Purchase Agreement, the Performance Bond shall be returned to the Company by the GOB forthwith with no draws thereon, except for the recovery of any payment with respect to which, the GOB has a right to withhold any payment pursuant to the terms of this Agreement.

4.6    Generation Policy

The GOB shall take such actions as are reasonable and appropriate under the circumstances to ensure that the Company and the Project receive the fiscal incentives, concessions, financial arrangements and other benefits as are provided under Articles 5 and Article 6 of the "Private Sector Power Generation Policy of Bangladesh - October 1996". GOB undertakes that all the fiscal incentives, concessions, consents and other benefits made applicable to the Company under this Agreement or the Guarantee shall be made applicable in equal respect to all other parties to the Project Agreements.

October 16, 1997                    10

# ARTICLE V
## SITE ACQUISITION, CONSTRUCTION AND OPERATION

5.1    Acquisition of Site

(a)    The Company shall acquire through lease a Site identified or approved by the GOB. Any lease for the Site shall be in form and substance acceptable to the GOB and the Company. The approval of the Site shall be through an arrangement between the Company and BPDB called the "Site Agreement". It is agreed by and between the Parties that the lease rental for the Site shall be nominal and the period of the lease shall be more than the Term of the Power Purchase Agreement by at least one year.

(b)    The Company shall make arrangements for the delivery and the receipt at the port facilities in Bangladesh of equipment and materials necessary to construct the Plant, and make arrangements for transport to the Site of all such equipment and materials from the port facilities. The Company shall complete these activities in compliance with the terms of this Agreement and the Power Purchase Agreement.

(c)    If at any time the Company encounters difficulties in acquiring the Site such that it will be prevented or impaired in meeting its obligations hereunder or under the Power Purchase Agreement, then upon request of the Company (and provided that the Company has complied with its obligations hereunder), the GOB shall take such actions as are reasonable and appropriate under the circumstances (which may include, in the sole discretion and election of the GOB, the acquisition of the Site by the GOB under the existing Laws of Bangladesh for and on behalf of the Company) to assist the Company in its efforts to acquire the Site in accordance with the terms hereof. Notwithstanding anything to the contrary, GOB shall cause the transfer of the Site to the Company, on mutually agreed terms and conditions, within thirty (30) Days of filing by the Company a request for such transfer.

5.2    Construction and Operation of Plant; Appointment of Contractors

(a)    The Company shall design, construct, install, test, commission, own, operate and maintain the Plant in accordance with the provisions of this Agreement, the Power Purchase Agreement, the Laws of Bangladesh and, to the extent not inconsistent therewith, the World Bank's Environmental Guidelines; provided, however, that the Company may contract with the Construction Contractor to design, construct, install, and commission the Plant and the O&M Contractor to operate and maintain the Plant; provided, further, that the appointment of the Construction Contractor and the O&M Contractor by the Company shall not relieve the Company of any of its obligations or potential liability regarding the design, financing, insuring, acquisition, construction, completion, operation, or maintenance of the Plant.

(b)    Turnkey Agreement; Construction Contractor.

The Company shall deliver to GOB a certificate of a duly authorized officer of the Company describing any proposed Turnkey Agreement (or any replacement or substitute Turnkey Agreement) and setting out the name and nationality of the

October 16, 1997                    11

Construction Contractor (and any replacement or substitute thereto) and any major subcontractor (and any replacement or substitute thereto) not later than thirty (30) Days prior to the execution thereof. If no objection is raised by GOB within seven (7) Days, it shall be deemed to have been accepted.

(c)    O&M Agreement; O&M Contractor

The Company shall deliver to GOB a certificate of a duly authorized officer of the Company describing any proposed O&M Agreement (or any replacement or substitute O&M Contract) and setting out the name and nationality of the O&M Contractor (and any replacement or substitute thereto) and any major subcontractor (and any replacement or substitute thereto) not later than fifteen (15) Days prior to the execution thereof. If no objection is raised by GOB within seven (7) Days, it shall be deemed to have been accepted.

(d)    Operation of the Plant by the Company

Notwithstanding anything contained in this Article V to the contrary, the Company shall be entitled, upon notice to GOB and BPDB, to engage its own personnel and operate the Plant or, in the case where the O&M Agreement then in effect has been terminated by the Company in accordance with its terms, engage some or all of the personnel of the former O&M Contractor and operate the Plant, in either case with prior notice to the GOB.

5.3    Plant Security

The Company shall provide adequate security personnel, adequately trained and experienced, for the protection and security of the Site on a twenty-four (24) hour per Day, seven (7) Day per week basis. From time to time, the Company may request additional security forces from the GOB to meet unusual security requirements. All such additional security forces shall remain under the exclusive control and direction of the GOB. Actual expenses incurred by the GOB in providing such security forces requested by the Company shall be reimbursed to the GOB by the Company.

October ___, 1997                    12

ARTICLE VI
LIABILITY; INSURANCE

6.1  Limitation of Liability

Except as provided in Article 6.2, neither Party shall be liable to the other Party in contract, tort, warranty, strict liability, or any other legal theory for any indirect, consequential, incidental, punitive, or exemplary damages. Neither Party shall have any liability to the other Party except pursuant to, or for breach of, this Agreement or the Guarantee; provided, however, that this provision is not intended to constitute a waiver of any rights of one Party against the other with regard to matters unrelated to this Agreement or to any activity not contemplated by this Agreement.

6.2  Indemnification

(a)  The GOB shall defend and indemnify the Company and its directors, officers and employees against, and hold the Company and its directors, officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, the Company and its directors, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the GOB and/or any Public Sector Entity in connection with this Agreement.

(b)  The Company shall defend and indemnify the GOB and its ministers, officers and employees against, and hold the GOB and its ministers, officers and employees harmless from, at all times after the date hereof, any and all Losses incurred, suffered, sustained, or required to be paid, directly or indirectly, by, or sought to be imposed upon, the GOB and its ministers, officers and employees for personal injury or death to persons or damage to property arising out of the negligent or intentional act or omission of the Company in connection with this Agreement.

(c)  In the event that any Loss results from the joint or concurrent negligent or intentional acts or omissions of the Parties, each Party shall be liable under this indemnification in proportion to its relative degree of fault.

(d)  The provisions of this Article 6.2 shall survive for a period of two (2) years following the termination of this Agreement.

6.3  Indemnification for Fines and Penalties

Any fines or other penalties incurred by the Company for non-compliance with applicable Laws of Bangladesh or other governmental actions taken pursuant thereto or the Consents shall not be reimbursed by the GOB but shall be the sole responsibility of the Company. The Company shall have the right, but not the obligation to contest and appeal any fines it believes have been imposed in violation of the Laws of Bangladesh.

6.4  Limitation on Indemnification

October 16, 1997                              13

(a)     Each Party shall be solely liable, and shall not be entitled to assert any claim for indemnification under this Agreement, for any Loss that would otherwise be the subject of indemnification under this Agreement until all such Losses of such Party arising during the then-current Year exceed, in the aggregate, one hundred thousand Dollars ($100,000). For purposes of this Article 6.4, a Loss (or claim for indemnification) shall be deemed to arise in the Year during which the event giving rise to the Loss (or claim for indemnification) occurred or, in the case where the event is continuing in more than one Year, in the Year during which the event ends.

(b)     Neither Party shall be entitled to indemnification under Article 6.2 if and to the extent that a Party has received payment in full in respect of a Loss or proceeding under the indemnities contained in the Power Purchase Agreement in respect of the relevant act or omission.

6.5     Notice of Proceedings

Each Party shall promptly notify the other Party of any Loss or proceeding in respect of which it is or may be entitled to indemnification under Article 6.2. Such notice shall be given as soon as reasonably practicable after the relevant Party becomes aware of the Loss or proceeding.

6.6     Defense of Claims

(a)     The indemnifying Party shall be entitled, at its option, and expense and with counsel of its selection, to assume and control the defense of any claim, action, suit or proceeding in respect of, resulting from, relating to or arising out of any matter for which it is obligated to indemnify the other Party hereunder; provided, it gives prompt notice of its intention to do so to the indemnified Party and reimburses the indemnified Party for the reasonable costs and expenses incurred by the indemnified Party prior to the assumption by the indemnifying Party of such defense.

(b)     Notwithstanding the provisions of Article 6.6(a), unless and until the indemnifying Party acknowledges in writing its obligation to indemnify the indemnified Party and assumes control of the defense of a claim, suit, action or proceeding in accordance with Article 6.6(a), the indemnified Party shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, action, suit or proceeding by any third party alleged or asserted against such Party in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the indemnifying Party hereunder.

(c)     Upon assumption by the indemnifying Party of the control of the defense of a claim, suit, action or proceeding, the indemnifying Party shall reimburse the indemnified Party for the reasonable costs and expenses of the indemnified Party in the defense of the claim, suit, action or proceeding prior to the indemnifying Party's acknowledgment of the indemnification and assumption of the defense.

(d)     Neither Party shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other Party; provided, however, that after agreeing in writing to indemnify the indemnified Party, the indemnifying

October 11, 1997                          14

Party may settle or compromise any claim without the approval of the other Party. Except where such consent is unreasonably withheld, if a Party settles or compromises any claim, action, suit or proceeding in respect of which it would otherwise be entitled to be indemnified by the other Party without the prior written consent of the other Party, the other Party shall be excused from any obligation to indemnify the Party making such settlement or compromise in respect of such settlement or compromise.

(e)    Following the acknowledgment of the indemnification and the assumption of the defense by the indemnifying Party, the indemnified Party shall have the right to employ its own counsel and such counsel may participate in such action, but the fees and expenses of such counsel shall be at the expense of such indemnified Party, when and as incurred, unless:

(i)    the employment of counsel by such indemnified Party has been authorized in writing by the indemnifying Party;

(ii)    the indemnified Party shall have reasonably concluded that there may be a conflict of interest between the indemnifying Party and the indemnified Party in the conduct of the defense of such action;

(iii)    the indemnifying Party shall not in fact have employed independent counsel to assume the defense of such action and shall have been so notified by the indemnified Party; or

(iv)    the indemnified Party shall have reasonably concluded and specifically notified the indemnifying Party either that there may be specific defenses available to it that are different from or additional to those available to the indemnifying Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon it beyond the scope of this Agreement.

If clause (ii), (iii) or (iv) of this Article 6.6(e) shall be applicable, then counsel for the indemnified Party shall have the right to direct the defense of such claim, action, suit or proceeding on behalf of the indemnified Party and the reasonable fees and disbursements of such counsel shall constitute legal or other expenses hereunder.

6.7    Power Purchase Agreement Double Jeopardy

(a)    Settlement or waiver in writing by BPDB of any dispute or breach under the Power Purchase Agreement shall be binding on the GOB, with respect to such issue or claim, as the case may be, based upon the same facts or acts or omission by the Company.

(b)    Settlement or waiver in writing by the Company of any dispute or breach under the Power Purchase Agreement shall be binding on the Company with respect to such issue or claim, as the case may be, based upon the same facts or acts or omission by the GOB.

(c)    Nothing in this Article 6.7 shall prevent the GOB and BPDB from separately

October 16, 1997          15

initiating proceedings to terminate this Agreement and the Power Purchase Agreement, respectively, pursuant to Article XIII of this Agreement and Articles 14 of the Power Purchase Agreement. Notwithstanding anything to the contrary, this Agreement and the Guarantee cannot be terminated by the GOB, prior to the termination of the Power Purchase Agreement by the BPDB.

6.8  Maintenance of Specified Insurance Policies

The Company shall obtain and maintain insurance from financially strong and internationally reputable insurance companies in accordance with Article 11 of the Power Purchase Agreement. If and to the extent that the GOB can be named as an additional insured on any fire, peril, casualty, and liability insurance policies covering the Plant, the GOB shall be so named by the Company; provided, however, that the GOB agrees to subordinate its interest in all such policies to the interests of the Lenders, commitments of Company/Investors to other parties and to the interest of the Investors.

October 16, 1997                                   16

**ARTICLE VII**
**IMPORT CONTROLS**

7.1    Right to Import

(a)    The GOB encourages the Company and its Contractors to incorporate as much locally produced material, equipment, and supplies as possible in the construction commissioning, operation and maintenance of the Plant. Nonetheless, the Company and its Contractors shall be entitled to import without restriction and without payment of any Taxes, including Custom Duties and VAT, all items required for the design, construction, completion, operation and maintenance of the Project. Upon execution of this Agreement, the GOB shall instruct its custom authorities to release on a priority basis and never to detain all such items and all items imported, exported or re-imported pursuant to this Article VII following due application to the proper authorities for such clearances. Any failure of customs authorities to release within ten (10) Business Days following application for such clearance by the Company or its Contractors or their agents for their use, any item being imported, exported or re-imported shall entitle the Company a Day-for-Day extension to the milestones outlined in Schedule 6 of the Power Purchase Agreement, in the case such failure of custom authorities adversely affects the construction, commissioning or testing of the Plant prior to the Full Commercial Operation Date and shall entitle the Company to receive the Minimum Tariff Payment pursuant to Schedule 4 of the Power Purchase Agreement, in the case such failure of custom authorities adversely affects the operation and maintenance of the Plant after the Full Commercial Operation Date.

(b)    All items not consumed or incorporated into the Project may be freely re-exported by the Company without incurring liability for payment of any Taxes, including Customs Duties and VAT in Bangladesh. The GOB may, as provided by the Laws of Bangladesh, require the Company to re-export any items or equipment used in the construction of the Project that are not reasonably required for the Company to operate and maintain the Plant, unless the Company agrees promptly to pay the normal Customs Duties and VAT for those items and equipment or represents to the GOB that the Company intends to retain such items as it may require for the operation and maintenance of the Project and undertakes not to use such items for any other purposes except for the purposes of the Project. The Company shall be afforded a reasonable time, but not less than three (3) months following the expansion of the Project to Combined-Cycle, to re-export any such items or equipment required by the GOB to be re-exported.

(c)    Spare Parts: Exemption from Custom Duties shall apply in case of spare parts with a value, including cost and transportation, of ten (10%) percent of the total Plant and equipment cost, including cost and transportation to the Site.

October 16, 1997                          17

7.2    Export and Re-import

The Company shall be entitled to export without restriction and without payment of any Taxes, including Custom Duties and VAT all unnecessary unused items or used items of Project and machinery imported by it under Article 7.1 for permanent installation in the Plant for the purpose of repair or refurbishment outside Bangladesh and to re-import the same without restriction and without payment of any Taxes, including Custom Duties and VAT, provided that these items are properly listed and authenticated. GOB shall, at the request of the Company, take reasonable measures to expedite the issuance of any Consent required for the export and re-import of such parts of the Plant and machinery. Upon termination of this Agreement, or the Power Purchase Agreement and except as otherwise provided in the Power Purchase Agreement, the Company shall be entitled to remove the Plant or any portion thereof from the Site and export the same outside Bangladesh without the payment of any Taxes, including Customs Duties and VAT. Notwithstanding anything to the contrary, GOB shall have the right to recover any payment due to it under this Agreement before permitting the Company to export the Plant or any portion thereof.

October ___, 1997                                 18

# ARTICLE VIII
## TRANSFER OF FUNDS

8.1    Use of Bangladesh Bank Accounts; Exceptions

All of the Company's transactions related to the Project that require foreign exchange, including debt servicing and repatriation of earnings, will be initiated through bank accounts in Bangladesh; provided, however, that foreign exchange provided by foreign Lenders, liquidated damages paid by foreign Contractors or vendors, proceeds of insurance and reinsurance by foreign insurers, and any other foreign sources that are used to pay foreign Contractors, vendors, insurers, re-insurers or Lenders may be paid directly to such persons through bank accounts of the Company located outside Bangladesh; however, the Company shall make available to the GOB the statements and accounts reflecting all such payments.

8.2    Consent to Foreign Currency Accounts

The GOB shall ensure that the Bangladesh Bank gives the Company and its Contractors, consents for the opening, operation of, and retention of earnings of foreign currency in, bank accounts inside Bangladesh (including, without limitation, the payment of all Foreign Currency received under the Financing Agreements or otherwise by the Company into such accounts and withdrawals therefrom). The GOB shall ensure that the Bangladesh Bank gives the Company permission to maintain bank accounts outside Bangladesh, and transfer any funds from its accounts in Bangladesh to its accounts maintained outside Bangladesh as are necessary to implement and carry out the Project in accordance with the Laws of Bangladesh prevailing on the date of this Agreement and the Power Purchase Agreement, provided, however, that nothing in this Agreement shall prevent the Company from opening, operating and retaining moneys in additional foreign currency bank accounts outside Bangladesh from time to time after the date of this Agreement if and to the extent that it is or becomes otherwise permitted under the Laws of Bangladesh.

8.3    Transfer and Repatriation of Necessary Funds

(a)    Subject to the other provisions of this Article 8, the foreign currency exchange and transfer abroad of all funds related to the Project shall be governed by the Foreign Exchange Regulations Act 1947 of Bangladesh as in existence on the date hereof.

(b)    The GOB shall permit free transfer of all funds and financial settlements necessary to implement and carry out the Project in accordance with the terms of this Agreement, and shall ensure full, timely, and unencumbered repatriation rights with respect to all Foreign Currency converted from Takas, whether converted through normal commercial banking channels or directly through the Bangladesh Bank, as provided in Article 8.4.

8.4    Availability of Foreign Exchange

(a)    The Company shall be permitted to purchase Foreign Currency through normal commercial banking channels to the extent necessary for (i) meeting the Company's

October \_\_, 1997                                    19

obligations under this Agreement, the Fuel Supply Agreements, and the Project Agreements, (ii) the repatriation by the Company of dividends to Foreign Investors and proceeds of sale including upon dissolution or liquidation (iii) after the Full Commercial Operation Date, the Foreign Currency expenses of the Project (including, without limitation, remuneration of the O&M Contractor, where applicable, fees, salaries and other monetary emoluments and the purchase of fuel and spare parts), the payment of premiums and fees to offshore insurers and re-insurers, (iv) repayments of principal (scheduled or accelerated by Lenders); interest (including default interest), commissions, fees, expenses, costs, make-whole payments, and other pre-payment costs; and the realization of payment under the Guarantee or other security, (v) payments in foreign currency to Contractors in connection with any restoration, modification or capital addition resulting from Force Majeure or Change in Law, or (vi) any Compensation Amount paid to the Company in the event of Termination.

(b)    Upon application having been made by the Company in the Prescribed Form, the GOB shall, on such requested date, make available to the Company through the Bangladesh Bank, to the extent that dollars are not available through normal commercial banking channels, at the Exchange Rate on the Business Day immediately preceding the date on which payment in Takas was made to the Company with respect to the applicable invoice, the form of which is shown in Schedule 12 of the Power Purchase Agreement, or any Compensation Payment, Dollars in the requested amount to the extent necessary for the transactions identified in Article 8.4(a) above.   The rate applicable to such conversion shall be the Exchange Rate on the Business Day immediately preceding the date on which payment in Takas was made to the Company with respect to the applicable invoice or Compensation Amount (if Compensation Amount upon termination is not paid in Dollars), and the GOB shall ensure that the Company shall upon receipt, be entitled to immediately remit or cause the remittance of any and all Dollars so received.

(c)    The nominated commercial bank of the Company shall be free to buy foreign exchange from Bangladesh Bank for the Company for the purpose mentioned at (a) above; to the extent not procured from the inter-bank foreign exchange market. The rate applicable to such conversion (exchange) shall be the Exchange Rate, as provided in Article 8.4(b).

ARTICLE IX
**ASSIGNMENT AND SECURITY**

9.1    <u>Assignment</u>

Except as provided in Article 9.2, below, no assignment or transfer by a Party of this Agreement or such Party's rights or obligations hereunder shall be effective without the prior written consent of the other Party.

9.2    <u>Creation of Security</u>

(a)    Notwithstanding the provisions of Article 9.1, for the purpose of financing the Project, in connection with the signing of Power Purchase Agreement and this Agreement, the Company may assign to, or create a security interest in favor of, the Lenders in its rights and interests under or pursuant to (i) this Agreement, (ii) any agreement or document included within or contemplated by the Power Purchase Agreement and this Agreement , (iii) the Plant, (iv) the movable, immovable and intellectual property of the Company including the Site, and (v) the revenues or any of the rights or assets of the Company.

(b)    The Lenders shall have no rights (except as expressly provided herein) or obligations to the GOB under this Agreement until such time as the Lenders or their designees succeed to the Company's interest under this Agreement, whether by exercise of their rights or remedies under the Financing Agreement or otherwise, in which case the Lenders or their designees shall give notice in writing of such succession (a "Succession Notice") to the GOB and shall assume liability for all of the Company's obligations under this Agreement, including payment of any amounts due and owing to the GOB for defaults by the Company under this Agreement (other than damages or penalties incurred by the Company under Article 6.2(b), except for such damages and penalties arising while the Lenders, pursuant to their rights and remedies under the Financing Agreement have assumed control of the Project, and then only if the general liability insurance required by Article 6.9 is not in effect), arising prior to the Lenders' or such designees' succession to the Company's interest in and under this Agreement; provided, that any liability of the Lenders or their designees shall be strictly limited to the Lenders' interest in the Project.

(c)    Except as otherwise set forth in Article 9.2(b), neither the Lenders nor their designees shall be liable for the performance or observance of any of the obligations or duties of the Company under this Agreement, nor shall the assignment by the Company of this Agreement to the Lenders pursuant to Articles 9.2(a) give rise to any duties or obligations whatsoever on the part of any of the Lenders owing to the GOB.

(d)    Upon notification by the Lenders to the GOB of the occurrence and continuance of an event of default under the Financing Agreement and the succession of the Lenders to the Company's interests in and under this Agreement, the Lenders shall have the right, among others, to:

October 11, 1997                    21

(i)     take possession of the Plant and prior to the Full Commercial Operation Date, complete construction of the Plant and operate the same and, after the Full Commercial Operation Date, operate the same; and

(ii)    cure any continuing Company Event of Default as provided under Article 13.5.1 of this Agreement.

(e)    Without the requirement of obtaining any further consent from the GOB, upon the exercise by the Lenders or their designees of any of the remedies set forth in the Financing Agreement, the Lenders may assign their rights and interests and the rights of the Company under this Agreement to any Transferee (as hereinafter defined) so long as such Transferee shall assume in writing for the benefit of the GOB all of the obligations of the Company under this Agreement. Upon such assignment and assumption, the Lenders shall be relieved of all obligations under this Agreement arising after such assignment and assumptions.

(f)     Upon notice to the GOB of a default under the Financing Agreement, the GOB shall, at the request and expense (as and when incurred by the GOB) of the Lenders, cooperate with the Lenders in the Lenders' exercise of such rights under this Agreement and the Financing Agreement.

(g)    As used herein; a "Transferee" shall be a person who:

(i)     is a company organized and existing under the Laws of Bangladesh;

(ii)    either is an experienced power plant operator or shall have agreed to engage the services of a person who is an experienced power plant operator;

(iii)   shall have paid all amounts, if any, then due and payable to the GOB under this Agreement; and

(iv)    shall have expressly assumed in writing for the benefit of the GOB the obligations of the Company under this Agreement (including but not limited to) the obligation of the Company to maintain and operate the Plant in accordance with the requirements of the Power Purchase Agreement.

Notwithstanding the foregoing, the Transferee shall secure prior approval of GOB.

(h)    At the request of the Company, delivered to the GOB not less than thirty (30) Days in advance, the GOB shall execute and deliver after signing of Power Purchase Agreement and this Agreement acknowledgments to the Lenders or their designees with respect to any security created pursuant to this Article IX and the rights of such parties under this Agreement, as the Lenders may reasonably request in accordance with customary practices in transactions of this nature.

9.3    Delivery of Financing Agreement

Within thirty (30) Days of the execution of the Financing Agreements or any material amendments thereof, the Company shall deliver to the GOB all the documents of the Financing Agreements.

October 16, 1997                                22

# ARTICLE X
## RESTRICTIONS ON ACQUISITIONS AND TRANSFERS OF SHARES OR ASSETS

10.1    Assurance Against Discriminatory Action

The GOB shall not take any discriminatory action which materially and adversely affects the Project or the performance of the Company's obligations or the enjoyment of its rights or the interests of the Investors or Lenders under the Power Purchase Agreement and this Agreement or expropriate or, except as hereinafter provided, acquire the Project or the Company, whether in whole or in part. Nothing in the foregoing shall apply to any actions taken by the GOB or BPDB pursuant to their respective rights and obligations arising under this Agreement and the Power Purchase Agreement.

10.2    Acquisition of Shares or Assets

(a)    The GOB undertakes to the Company that neither it nor BPDB, nor any Public Sector Entity will expropriate, compulsorily acquire, nationalize, or otherwise compulsorily procure any Ordinary Share Capital or assets (except as provided in Article 14.1 of its security interest in such assets) of the Company.

(b)    The GOB further undertakes to the Company that during the term of this Agreement neither it nor BPDB, any Public Sector Entity nor any corporation or company directly or indirectly owned or controlled by the GOB and/or any Public Sector Entity will, otherwise than as mentioned in Article 10.2(a), acquire any Ordinary Share Capital if the result would be for the GOB and/or any Public Sector Entity and/or any corporation or company directly or indirectly owned or controlled by the GOB and/or any Public Sector Entity to own or control eleven percent (11%) or more of the issued Ordinary Share Capital.

(c)    Notwithstanding Articles 10.2(a) and 10.2(b), nothing in this Agreement shall be construed as a waiver by the GOB or BPDB of BPDB's exercise of its power of eminent domain so long as it is exercised in accordance with the Laws of Bangladesh and the effect of such exercise does not materially adversely affect the Company's ability to perform its obligations under and enjoy the benefits of the Power Purchase Agreement or, without just and adequate compensation, adversely affect its use and enjoyment of the Site.

10.3    Restriction on Transfer of Shares

(a)    With respect to the transfer of the registered ownership of any Ordinary Share Capital, the Company shall make appropriate provisions in its Articles of Association to ensure compliance with the following provisions of this Article 10.3, shall include appropriate legends on all share certificates evidencing Ordinary Share Capital of the Company to put prospective purchasers of such Ordinary Share Capital on notice of the restrictions in the following provisions and, to the extent permitted by the Laws of Bangladesh, shall not register or give effect to any purported transfer of Ordinary Share Capital that is not in compliance with such restrictions or do not bear such legend.

October 16, 1997                    23

(b)  The Company shall decline to register the transfer of issued Ordinary Share Capital to persons of a nationality that is specifically proscribed in any notice delivered by the GOB to the Company for the period specified in such notice or until such time that the Company is notified that the proscription is revised or rescinded. The GOB undertakes that it shall not proscribe any nationalities other than those nationalities that the GOB considers in its sole discretion to be prejudicial to the national interest of Bangladesh for persons having such nationality to hold Ordinary Share Capital. The Company shall use reasonable means under the circumstances to investigate the declaration of nationality stated on any application for registration or transfer of Ordinary Share Capital if, as a result of such transfer, the Investor making such application would hold five percent (5%) or more of the issued Ordinary Share Capital of the Company. In all other cases, the Company shall be entitled to rely on such declaration to determine whether registration is permitted under this Article 10.3(b). Where any such declaration discloses that the prospective purchaser is a national of Bangladesh or the nationality of a state not proscribed by the GOB in its notice to the Company, then the Company shall be at liberty to register the transfer or issue of the shares.

(c)  No Initial Shareholder shall transfer any Ordinary Share Capital owned by it at any time prior to the Full Commercial Operation Date or for a period of five (5) years after the Full Commercial Operation Date, except for:

  (i)  a transfer to another Initial Shareholder;

  (ii)  subject to the national interests of Bangladesh, as such interests shall be determined in the sole discretion of the GOB, a transfer to a wholly-owned affiliate corporation of any Initial Shareholder that continues as such wholly-owned affiliate corporation;

  (iii)  a transfer required by any Laws of Bangladesh or by the operation of the Laws of Bangladesh or by order of a court, tribunal, or governmental authority or agency with appropriate jurisdiction;

  (iv)  a transfer resulting from the creation or enforcement of a security interest in or over any Ordinary Share Capital in accordance with the Power Purchase Agreement and this Agreement;

  (v)  a transfer to which the GOB has given its prior written approval; or

  (vi)  a transfer of part of its holding; provided, that the Initial Shareholders retain more than twenty six (26%) percent of the outstanding Ordinary Share Capital.

(d)  No Initial Shareholder shall transfer any Ordinary Share Capital so as to reduce the holding of the initial Shareholders below twenty six (26%) percent after the expiration of a period of five (5) years from the Full Commercial Operation Date except with the prior written approval of the GOB; provided, however, that the GOB hereby agrees that such approval shall be granted unless the GOB determines that such a transfer would be prejudicial to the national interest of Bangladesh;

October 6, 1997                        24

provided; further, that such approval shall be deemed given unless it is denied in writing within thirty (30) Days of the GOB's receiving a written request therefor.

October ___, 1997

25

## ARTICLE XI
## FORCE MAJEURE

11.1    Events of Force Majeure: For the purposes of this Agreement "Force Majeure" means, subject to Article 11.2, any event or circumstance or combination of events and circumstances which materially and adversely affects the performance by either party of its obligations under or pursuant to this Agreement, Power Purchase Agreement, Site Agreement or Fuel Supply Agreements and is not within the reasonable control of the party affected, to the extent that such event or circumstance or its material and adverse effects cannot be prevented, avoided, or removed by such party through the exercise of diligence and reasonable care and acting in accordance with Prudent Operating Practice. "Force Majeure" shall include each of the following events and circumstances to the extent that they satisfy the foregoing requirements:

11.1.1    events or circumstances of the following nature which occur inside or involve Bangladesh :

    (a)    any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, public disorder, act of terrorism, or similar events;

    (b)    radioactive contamination or ionizing radiation originated form a source in Bangladesh or resulting from any other event of Force Majeure under Article 11.1.1;

    (c)    labor disputes, including strikes, works to rule or go-slow or lockouts, that are not limited to disputes regarding wages, working conditions, and similar matters between the Company and its employees, but that extend beyond the Plant or are widespread or nationwide or that are of a political, religious or ethnic nature;

    (d)    a nationwide shortage of fuel that prevents the Fuel Supplier from providing adequate deliveries of fuel to the Plant;

    (e)    Change in Law;

    (f)    action or inaction of any Public Sector Entity or any Governmental Authority (including expropriation, nationalization or compulsory acquisition or acts claimed to be justified by executive necessity); or

    (g)    failure to obtain or to obtain within ninety (90) Days from the date of application, or the failure to remain in full force and effect, any Consent necessary for the implementation of this Agreement or required to start, continue, or implement immediately any work or activities, or perform any obligations, under this Agreement, which failure shall not have been caused by any act or omission on the part of the Company.

October 10, 1997                                26

11.1.2  other events beyond the reasonable control of the affected party including :

(a)  an act of God including lightning, fire, earthquakes, volcanic activity, floods, storms, cyclones, typhoons, or tornadoes;

(b)  epidemics or plagues;

(c)  fire, explosions or chemical or radioactive contamination (other than resulting from an event described in Article 11.1.1, in which case it shall be an event of Force Majeure under Article 11.1.1);

(d)  labor disputes including strikes, works to rule or go slow or lockouts, that :

(i)  occur outside Bangladesh and not involving Bangladesh but having relevance to the performance of the affected party under the Project Agreements;

(ii)  are widespread or nationwide or that are of a political, religious or ethnic nature and are not part of an event described in Article 11.1.1(c); or

(iii)  occur prior to the Full Commercial Operation Date or thereafter as it affects production of energy due to delay in delivery of major, specially manufactured machinery or equipment;

(e)  any act of war (whether declared or undeclared), invasion, armed conflict or act of foreign enemy, blockade, embargo, revolution, riot, insurrection, civil commotion, public disorder, act of terrorism, or similar events occurring outside Bangladesh and not involving Bangladesh but having relevance to the performance of the affected party under the Project Agreements; or

(f)  delay in the delivery to the Company of a major piece of machinery or equipment that has been timely ordered, but only to the extent that such delay is caused solely by an accident in transportation or results directly from Force Majeure, (other than resulting from an event described in Article 11.1.1, in which case it shall be an event of Force Majeure under Article 11.1.1)

11.2  Exclusions from Force Majeure: The following events or circumstances shall not constitute Force Majeure except in the case of Articles 11.2.1, 11.2.2 or 11.2.3 to the extent that they result directly from an event of Force Majeure:

11.2.1  late delivery to the Company of machinery, equipment, materials, spare parts or consumables;

11.2.2  a delay in the performance of any Contractor;

11.2.3  normal wear and tear or breakdown in equipment; or

October 16, 1997                    27

11.2.4 labor disputes, including strikes, works to rule, go-slows or lockouts involving a dispute between a party and its own employees regarding wages, working conditions and similar matters that are not part of an event described in Article 11.1.1(c) or 11.1.2(d).

11.3    Notice of Force Majeure: Procedure

As soon as possible following the date of commencement of any event of Force Majeure, if either Party desires to invoke such event of Force Majeure as a cause for delay or failure in performance of any obligation hereunder, it shall advise the other Party in writing of such date and the nature and expected duration of such event of Force Majeure. Within a reasonable time following the date of termination of such event of Force Majeure, the Party having invoked such event of Force Majeure as a cause for such delay or cost increase shall submit to the other Party reasonable proof of the nature of such delay or failure and its consequences. The Parties shall there upon consult with one another concerning the effect of such delay or failure and reschedule Plant activities to avoid or minimize the consequences resulting from the event of Force Majeure. The Parties:

11.3.1  shall make all reasonable efforts to prevent and reduce to a minimum and mitigate the effect of any delay or cost increase occasioned by any event of Force Majeure including recourse to alternate acceptable sources of services, equipment and materials and construction equipment; and,

11.3.2  shall use reasonable efforts to ensure resumption of normal performance of this Agreement after the occurrence of any event of Force Majeure and shall perform their obligations to the maximum extent practicable agreed between the Parties.

Notwithstanding their duty to mitigate the effects of any event of Force Majeure as set forth in Articles 11.3.1 and 11.3.2, neither Party shall be required to settle any labor dispute or litigation on terms which, (i) in the sole judgment of the affected Party, are contrary to such Party's interest, or (ii) are contrary to the labor laws of Bangladesh.

11.4    Effect of Force Majeure

11.4.1  Subject to the provision of Article 11.3 if a Party is prevented from or delayed in performing an obligation hereunder by reason of Force Majeure:

(i)     the affected Party shall be relieved from the consequences of its failure to perform or delay in the performance of that obligation (other than an obligation to make a payment if due); and

(ii)    any performance deadline that the affected Party is obligated to meet under this Agreement shall be extended on a Day for Day basis to the extent that the performance of such obligations are affected by the Force Majeure; and

October ___, 1997                              28

(iii)   without prejudice to amounts payable pursuant to this Article 11 or Article 4, the unaffected Party shall not bear any liability for any loss or expense suffered by the affected Party as a result of a Force Majeure event; and

(iv)   if any event of Force Majeure continues beyond a period of two hundred and seventy (270) Days, either Party shall be entitled to terminate this Agreement by giving written notice of not less than seven (7) Days to the other Party.

11.4.2   The right to terminate provided under Article 11.4.1(iv) shall not apply if more than two hundred and seventy (270) Days is needed to mitigate such Force Majeure because of the need to special order or manufacture machinery, equipment or parts and the Company has timely ordered such machinery, equipment or parts.

11.5   <u>Construction Force Majeure</u>:

If, prior to the Commissioning Date or the Full Commercial Operation Date, as a result of (i) an event of Force Majeure described in Article 11.1.1, or (ii) a failure of BPDB, Fuel Supplier or GOB to meet any of their obligations under this Agreement, the Power Purchase Agreement or the Fuel Supply Agreements, the Company is delayed in or prevented from performing any of its obligations, then:

11.5.1   the dates for performance of such obligations (including the Required Commissioning Date and the Required Full Commercial Operation Date) shall be revised to new dates which are extended by the period of such delay; and

11.5.2   the Company shall be entitled to receive Recovery Allowance in accordance with the provision provided in the Power Purchase Agreement.

11.6   Notwithstanding anything to the contrary contained herein this Article 11, GOB shall not be an affected party and cannot claim any benefit under this Article 11, if it is affected by one or more of the events or circumstances provided for in Article 11.1.1.

# ARTICLE XII
## TAXATION AND CUSTOMS DUTIES

12.1    Taxation of Company

(a)    Provided that the Company maintains its existence as a company organized under the Laws of Bangladesh operating exclusively as a power generation company, the Company shall, for the Term of this Agreement as defined in Article 3 of this Agreement, be exempt from Taxation in Bangladesh (or withholding of tax by BPDB or GOB) on its income from Tariff Charges ( as defined in the Power Purchase Agreement) and other payments under this Agreement, the    Power Purchase Agreement, Site Agreement or Fuel Supply Agreement including any Recovery Allowance and Compensation Amount.

(b)    (i)    The Company and its Contractors shall be allowed to import Plant and machinery , repaired and refurbished parts, to be incorporated into the Plant or required for the construction, commissioning, testing, operation and maintenance of the  Plant without payment of Taxes, including Customs Duties and VAT, and the GOB shall grant the necessary exemptions to give effect to this Article 12.1(b) if and when necessary.

(ii)    In the event that there is a claim of Customs Duties and VAT due on Project, repaired or refurbished parts, machinery or equipment imported prior to the Full Commercial Operations Date for incorporation into, or use in the construction, operation, or maintenance of the  Project, and the Company chooses, notwithstanding the provisions of Article 12.1(b)(i), to pay such duties under protest, upon notice to the GOB by the Company, the GOB shall ensure that the dispute is resolved consistent with the terms of this Agreement and the Laws of Bangladesh within thirty (30) Days after the Company files its refund claim with the relevant Public Sector Entity.

(c)    The Company shall be exempt from stamp tax and/or registration fees or other similar fees or Taxes for the registration of Financing Agreements and other documents relating to the Project.

12.2    Taxation of Lenders

The non-resident Lenders shall not be subject to Taxation or withholding tax in Bangladesh by the GOB in respect of their income from interest and fees arising from loans extended to the Company during the term of the Power Purchase Agreement for purposes of the design and construction of the Project and the bridge or permanent financing provided to the Company for the Project pursuant to the Financing Agreements, subject, however, to the fulfillment of all applicable conditions specified in the relevant bilateral tax treaty applicable to each Lender's country in conjunction with the Income Tax Ordinance, 1984, as amended  from time to time.

12.3    Foreign Investors

Foreign Investors will be governed by the bilateral tax treaties with their respective countries. If there is no bilateral tax treaty between Bangladesh and any Foreign Investors' country of residence, the Foreign Investor will be taxed in accordance with the Laws of Bangladesh.

12.4    Tax Change Not a Breach

No charge or assessment of a Tax or duty on the Company or the Foreign Lenders in excess of the rate provided under this Article shall be a breach of this Agreement by the GOB; provided, that the charge or assessment of a tax or duty in excess of the rate provided hereunder is recovered through a Recovery Allowance or an adjustment in the compensation payable under the Power Purchase Agreement.

12.5    Other Taxes

The Company shall be exempted from any imposition of Tax on the sale of electricity to BPDB.

**ARTICLE XIII**
**TERMINATION AND DEFAULT**

13.1    The Company's Events of Default:

Termination by the GOB

Each of the following events shall be an event of default by the Company (each a "Company Event of Default"), which, if not cured within the time period permitted (if any) to cure, shall give rise to the right on the part of the GOB to terminate this Agreement pursuant to Article 13.5; provided, however, that no such event shall be a Company Event of Default (i) if it results from a breach by the GOB of this Agreement or the Guarantee, (ii) if it results from a breach by BPDB of the Power Purchase Agreement or (iii) if it results from a breach by the Fuel Supplier of the Fuel Supply Agreement, or (iv) if it occurs as a result of or during a Force Majeure event for the period provided pursuant to Article 11.4(iv):

(i)     the abandonment by the Company of the operation of the Plant after the Full Commercial Operations Date for a consecutive period of thirty (30) Days without prior notice to, and the prior written consent of, the GOB; provided, however, that the Company shall not be deemed to have abandoned its operation of the Plant so long as it is using reasonable efforts to regain control of the Plant or reinstate such operation;

(ii)    except for the purpose of amalgamation or reconstruction (provided, that such amalgamation or reconstruction does not affect the ability of the amalgamated or reconstructed entity, as the case may be, to perform its obligations under this Agreement), the occurrence of any of the following events: (i) the passing of a resolution by the shareholders of the Company for the winding up of the Company; (ii) the voluntary filing by the Company of a petition of bankruptcy, moratorium, or other similar relief; (iii) the appointment of a liquidator in a proceeding for the winding up of the Company after notice to the Company and due hearing, which appointment has not been set aside or stayed within ninety (90) Days of such appointment; (iv) the making by a court with jurisdiction over the Company of an order winding up the Company that is not stayed or reversed by a court of competent authority within ninety (90) Days;

(iii)   any representation, or warranty by the Company in this Agreement proving to have been incorrect, in any material respect, when made and such representation, or warranty having a material and adverse effect on the Company's ability to perform its obligations under this Agreement;

(iv)    unless such breach is caused by a breach of the Power Purchase Agreement by BPDB or the Fuel Supply Agreement by the Fuel Supplier, any material breach by the Company of this Agreement, the Power Purchase Agreement, or the Fuel Supply Agreement that is not remedied within thirty (30) Days after the receipt of notice from the GOB, BPDB or the Fuel Supplier, respectively, stating that a material breach of such agreement has occurred that could result in the termination

October 6, 1997                    32

of the respective agreement, identifying the material breach in question in reasonable detail, and demanding remedy thereof; or

13.2    <u>GOB Events of Default</u>:

<u>Termination by the Company</u>:
Each of the following events shall be an event of default by the GOB (each a "GOB Event of Default"), which, if not cured within the time period permitted (if any) to cure shall give rise to the right on the part of the Company to terminate this Agreement pursuant to Article 13.5.

(i)    the expropriation, compulsory acquisition, or nationalization by the GOB or any Public Sector Entity or any corporation/ company owned or controlled by the GOB and/or Public Sector Entity of (i) any Ordinary Share Capital, or (ii) any material asset or right of the Company;

(ii)    any procurement by the GOB or any Public Sector Entity or any corporation/company owned or controlled by the GOB and/or Public Sector Entity of (i) any Ordinary Share Capital if the result would be for the GOB and/or one or more Public Sector Entities to acquire control of the Company or its management (and there shall be an irrebuttable presumption that the ownership by the GOB and/or any Public Sector Entity of more than eleven percent (11%) of the Ordinary Share Capital shall constitute such control), or (ii) any material asset or right of the Company;

(iii)    the dissolution, pursuant to law, of BPDB, except for (i) the privatization of BPDB's thermal power stations or area boards (provided, however, that in the case of privatization of BPDB or area boards, all of BPDB's obligations under this Agreement must be assigned pursuant to law to or contractually assumed, through a novation or otherwise, by one or more entities, which has legal capacity and appropriate commercial ability to perform such obligations in the reasonable opinion of the Company and the Lenders) or (ii) an amalgamation, reorganization, reconstruction, or further privatization of BPDB, or any or all of its successors, where the GOB without interruption guarantees the performance of the succeeding entity or entities on the same terms and conditions as contained in the Guarantee or such other commercial security is provided for the obligation of the succeeding entity or entities that in the reasonable business judgment of the Company provides an adequate alternative to the Guarantee (provided, however, that all of BPDB's obligations under this Agreement must be assigned pursuant to law to or contractually assumed, through a novation or otherwise, by one or more entities, each of which has the legal capacity and appropriate commercial ability to perform its obligations in the reasonable opinion of the Company and the Lenders);

(iv)    the dissolution, pursuant to law, of the Fuel Supplier, except for an amalgamation, reorganization, reconstruction, or privatization of the Fuel Supplier where the GOB without interruption guarantees the performance of the succeeding entity or entities on the same terms and conditions as the Guarantee or such other commercial security is provided for the obligation of the succeeding entity or entities that in the

October 11, 1997                            33

reasonable business judgment of the Company and the Lenders provide an adequate alternative to the Guarantee and all of the Fuel Supplier's obligations under this Agreement and the Fuel Supply Agreement are assigned pursuant to law to or contractually assumed, through a novation or otherwise, by one or more entities, each of which has the legal capacity and appropriate commercial function to perform its obligations;

(v)    unless such breach is caused by a breach of the Power Purchase Agreement or breach of the Implementation Agreement by the Company, any material breach by the GOB of this Agreement or the Guarantee that is not remedied, within thirty (30) Days after notice from the Company to the GOB stating that a material breach of the agreement has occurred that could result in the termination of this Agreement, identifying the material breach in reasonable detail, and demanding remedy thereof;

(vi)    unless such breach is caused by a breach of the Power Purchase Agreement or breach of the Implementation Agreement by the Company, any material breach by BPDB or the Fuel Supplier of the Power Purchase Agreement or the Fuel Supply Agreement, respectively including but not limited to failure on behalf of BPDB to activate the Letter of Credit at first instance or any failure to replenish the Letter of Credit to its full amount within five (5) Business Days of each withdrawal, that is not remedied within thirty (30) Days after the receipt of a notice from the Company to BPDB or the Fuel Supplier, as the case may be, in each case with a copy of the notice to the GOB, that states that a material breach of the relevant agreement has occurred that could result in the termination of that agreement, identifying the breach in reasonable detail, and demands remedy thereof;

(vii)    any Change in Law (A) making unenforceable, invalid, or void any material undertaking of the GOB, BPDB, or the Fuel Supplier under this Agreement, the Guarantee, the Power Purchase Agreement or the Fuel Supply Agreement; or (B) making it unlawful for the Company, the Lenders or the Investors to make or receive any payment, to perform any obligation or to enjoy or enforce any material right under this Agreement, Power Purchase Agreement or the Fuel Supply Agreement or any such payment, the performance of any such material obligation or the enjoyment or enforcement of any such material right becomes unenforceable, invalid or void as a result of any such Change in Law, which Change in Law remains in place for more than fifteen (15) Days without an arrangement being provided to exempt the Company, the Lenders or the Investors from the effect of such Change in Law;

(viii)    any Change in Law from those in existence on the date hereof placing any material restrictions or limitations (beyond those restrictions or limitations that are in existence on the date of the execution of this Agreement) on the ability of the Company to exchange Takas for Dollars, or for Foreign Investors to repatriate, any capital, dividends distributions or other proceeds from the Company (provided, that such distributions do not arise in connection with a breach of this Agreement), which restrictions or limitations remain in place for more than fifteen (15) Days

October 16, 1997            34

without an arrangement being provided to exempt the Company or its Foreign Investors from all such restrictions and limitations;

(ix) any representation, or warranty by the GOB in this Agreement proving to have been incorrect, in any material respect, when made and such representation, or warranty having a material and adverse effect on the GOB's ability to perform its obligations under this Agreement;

(x) unless such breach is caused by a breach of the Power Purchase Agreement or breach of the Implementation Agreement by the Company, the failure by the Company after the Full Commercial Operations Date to obtain, revalidate and have in full force and effect any Consents; or

(xi) any default by the Guarantor in making payments required to be made by it under the Guarantee on the due date specified in the Guarantee.

13.3 Defaulting Party etc.: For the purposes of this Agreement the Company is the defaulting Party in relation to the events of Default specified in Article 13.1 and GOB is the defaulting Party in relation to the events of Default specified in Article 13.2 and (in each case) the other Party is the non-defaulting Party.

13.4 Remedial Procedures: Upon the occurrence of any event (a "Default") specified in Article 13.1 or 13.2 which is capable of remedy, the non-defaulting Party may give notice to the defaulting Party of the occurrence of such default and requiring the remedy thereof, and if after such notice has been given:

13.4.1 the defaulting Party does not, within thirty (30) Days after receipt of the non-defaulting Party's notice

(i) where such Default is capable of remedy within such thirty (30) Days period, remedy the Default; or

(ii) where such Default is capable of remedy but not within such thirty (30) Day period, furnish to the non-defaulting Party a detailed program reasonably acceptable to the non-defaulting Party for the remedy as promptly as is practicable of the Default; or

13.4.2 the defaulting Party fails to remedy the Default in accordance with such remedial program then the non-defaulting Party may give notice to the defaulting Party that such default is an Event of Default, but no event specified in Article 13.1 or 13.2. which is capable of remedy shall be an Event of Default except pursuant to the provisions of this Article 13.4.

13.5 Termination: Upon an Event of Default and the expiration of any remedial period under Article 13.4.1 or 13.4.2, the non-defaulting Party may upon not less than seven (7) Days notice to the defaulting Party terminate this Agreement; provided:

13.5.1 GOB may not terminate this Agreement as a result of a Company Event of Default

October 16, 1997                                      35

without first giving a copy of any notices required to be given to the Company under Article XVII to the Lenders and providing the Lenders two-hundred seventy (270) Days after receipt of the notice to terminate pursuant to this Article 13.5.1 to cure the Company Event of Default; provided that the Lenders shall be deemed to have cured any Company Event of Default arising under Articles 13.1(ii) and 13.1(iii) if they exercise their rights to foreclose on their security in the Plant or otherwise notify GOB that they have assumed responsibility for operating the Plant under the Project Agreements on or prior the date their two hundred and seventy (270) Day cure period expires.

13.5.2    Anything in this Agreement notwithstanding, the Company shall not seek to terminate this Agreement, the Power Purchase Agreement or the Fuel Supply Agreement due to any default by BPDB or the Fuel Supplier without first giving, with respect to any such default, a copy of any notice required to be given to BPDB or the Fuel Supplier, as the case may be, under  Power Purchase Agreement or  the Fuel Supply Agreement to the GOB, such notices to include a request to the GOB to cure any such default within the same cure period as provided to BPDB or the Fuel Supplier, as the case may be, under the Power Purchase Agreement or the Fuel Supply Agreement, respectively, and such cure period to commence upon delivery of each such notice to the GOB. The Company shall also give to the GOB copies of any notice that the Company delivers to BPDB or the Fuel Supplier pursuant to the Power Purchase Agreement and the Fuel Supply Agreement, respectively. Each such notice shall be made and governed in accordance with Article XVII.

October 16, 1997                     36

**ARTICLE XIV**
**RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION**

14.1    Compensation Upon Termination

(a)    Company Event of Default

(i)    In the event the GOB terminates this Agreement pursuant to Article 13.1 (i) through (iv) as a result of a Company Event of Default, the GOB or BPDB shall be entitled to encash in full the Performance Bond, pursuant to the terms of Power Purchase Agreement.

(ii)   In the event the GOB terminates this Agreement pursuant to Article 13.1 (i) through (iv) as a result of a Company Event of Default, the GOB or its designee shall have the right, but shall not be required, to acquire all of the Company's rights, title and interests in and to the Plant; provided, that the GOB or its designee pays the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon the receipt of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB. If the GOB does not elect to purchase the Plant upon the effective date of the termination, the GOB shall have no further rights or interest in, or obligations to, the Plant.

(b)    GOB Event of Default

In the event the Company terminates this Agreement pursuant to Article 13.2(i) through (xi) as a result of a GOB Event of Default, the Company may elect to transfer the Plant to the GOB or its designee and, upon such election, the GOB or its designee shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon the receipt of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

(c)    Termination following Change in Law

In the event of a termination of this Agreement following a Change in Law, the Company may elect to transfer the Plant to the GOB or its designee and, upon such election, the GOB shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement.  Upon payment of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

(d)    Termination following Force Majeure Event pursuant to Article 11.1.2

If following a Force Majeure Event pursuant to Article 11.1.2, the GOB terminates·

this Agreement in accordance to the Power Purchase Agreement, as a result of the Company's failure to timely complete the restoration in accordance to the Power Purchase Agreement, the GOB or its designee shall have the right, but shall not be required, to acquire all of the Company's rights, title, and interests in and to the Plant; provided, however, the GOB or its designee pays the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon the receipt of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB. If the GOB does not elect to purchase the Plant upon the effective date of the termination, GOB shall have no further rights to or interest in the Plant.

(e)    Termination Following Force Majeure Event pursuant to Article 11.1.1

    (i)    If following a Force Majeure Event, the Parties agree and an expert determines that restoration is feasible, but the GOB elects to terminate this Agreement, the GOB shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon payment of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

    (ii)    If following a Force Majeure Event, the Parties agree and an expert determines that restoration is not feasible, the GOB shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon payment of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

(f)    Termination Following Force Majeure Event Under the Power Purchase Agreement

    (i)    If, following a Force Majeure Event affecting BPDB, either Party pursuant to this Agreement elects to terminate this Agreement after 270 Days, the GOB shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon receipt of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

    (ii)    If, following a Force Majeure Event pursuant to Article 11.1.2 affecting the Plant, the GOB pursuant to this Agreement elects to terminate this Agreement after 270 Days, the GOB shall pay the Company the Compensation Amount set forth in Article 14.7.3 of the Power Purchase Agreement. Upon receipt of such Compensation Amount, the Company shall immediately transfer the possession of the Plant to the GOB and thereafter the Company shall immediately transfer the ownership in the Plant to the GOB.

(g)    Use of Certain Insurance Proceeds

If this Agreement is terminated pursuant to Article XIII following a Force Majeure Event, and insurance proceeds are available in connection with the Force Majeure Event, then the total amount of the net proceeds made available under the insurance policies to which the Company is entitled with respect to the Plant shall, if not used to effect a restoration or make repairs to the Plant, be used to pay the following items in the following order of priority:

(i)    to the payment of all indebtedness secured by the Plant; and

(ii)    then to the Company.

(h)    Upon the Company's election to sell the Plant to GOB or on the GOB's election to purchase the Plant from the Company as the case may be, pursuant to the terms and conditions of this Article, and upon Company's demand for the Compensation Amount for such sale or purchase, GOB shall within sixty (60) Days of a written demand thereof by the Company, pay such Compensation Amount as set forth in Article 14.7.3 of the Power Purchase Agreement minus any amount with respect to which the GOB has a right to withhold any payment pursuant to the terms of this Agreement, and return the Performance Bond with no draws thereon.

14.2    Obligations Upon Termination

Upon the expiration or earlier termination of this Agreement, the Parties shall have no further obligations hereunder except for obligations that arose prior to or arise upon such expiration or termination and obligations that expressly survive such expiration or termination pursuant to this Agreement, provided, however, that notwithstanding anything to the contrary in this Agreement, the rights and obligations set out in Article VII (Import Control), Article VIII (Transfer of Funds), Article XII (Taxation; Customs Duties), Article XIV (Rights and Obligations of Parties upon Termination), Article XV (Resolution of Disputes) and Article XVIII (Miscellaneous Provisions) shall survive any termination or expiration of this Agreement until all such provisions are fulfilled including the export of the Plant outside Bangladesh, and all funds payable hereunder by GOB are received by the Company or the Lenders upon the sale or other disposal of the assets related to the Project, including, without limitation, proceeds from the enforcement by the Lenders of the security created by the Company under or pursuant to the Power Purchase Agreement and this Agreement have been repatriated and if the Company or the Foreign Investors so desire, all the Takas less local expenses ( including any amount with respect to which the GOB has a right to withhold any payment pursuant to the terms of this Agreement), if any are converted into US Dollars and repatriated.

14.3    Plant to be Free and Clear

Any transfer of the Plant by the Company to the GOB (or its designee) in accordance with the provisions of this Article XIV shall be made free and clear of all Environmental Liabilities and all Liens and encumbrances other than Permitted Liens; provided, that the GOB has paid to the Company all Compensation Amounts that are payable in accordance with this Article XIV.

October 1, 1997                            39

14.4    Inspection of Plant

In the case GOB elects to acquire all of the Company's rights, title and interest in the Plant, in accordance with the terms of this Agreement, and upon 24 hours notice by the GOB to the Company for the inspection of the Plant, the Company shall permit GOB to conduct such inspection in accordance with the Prudent Operating Practices.

October 16, 1997                    40

# ARTICLE XV
## RESOLUTION OF DISPUTES

15.1 <u>Arbitration</u>: Any dispute or difference of any kind between the Parties in connection with or arising out of this Agreement or the breach, termination or validity hereof (a "Dispute") shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC)(the "Rules") in accordance with the said Rules which Rules are deemed to be incorporated by reference into this Clause 15.1. It is hereby agreed that:

15.1.1 The site of the arbitration shall be London, England;

15.1.2 There shall be three arbitrators, each Party selecting one arbitrator within 15 Days after the claimant commences the arbitration by giving written notice of arbitration and the third (and presiding) arbitrator selected by the two arbitrators so selected within 30 Days after their appointment. If the two arbitrators cannot agree on the third arbitrator within such 30 Day period, the third arbitrator shall be appointed in accordance with the ICC Rules;

15.1.3 The language of the arbitration shall be English;

15.1.4 The award rendered shall apportion the costs of the arbitration. Any monetary award shall be made and payable in US Dollars, free of any tax or other deduction, and shall include interest from the date of any breach or other violation of this Agreement to the date on which the award is paid, at a rate determined by the arbitrator but in no event less than the Bank Rate, as of the date of the claimant's formal notice of arbitration;

15.1.5 The award shall be in writing and shall set forth in reasonable detail the facts of the Dispute and the reasons for the tribunal's decision;

15.1.6 The award in such arbitration shall be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction for its enforcement, and the Parties renounce any right of application or appeal to the courts or any right to start a special case for the opinion of the court in connection with any question of law arising in the course of the arbitration or with respect to the decision of the tribunal insofar as such renunciation can be validly made;

15.1.7 Notwithstanding the provisions of Article XIX, the agreement to arbitrate contained in this Article XV and the interpretation of this Agreement, the Power Purchase Agreement, the Site Agreement and the Fuel Supply Agreements shall, in so far as they relate to arbitration under this Article, be governed by and construed in accordance with the Laws of England. The arbitral tribunal may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Project Agreements, Fuel Supply Agreement, or Financing Agreements that provides for ICC arbitration if the subject matter of the disputes arises out of or related to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral

tribunal appointed for the arbitration proceeding that was commenced first in time. Except as otherwise provided in this Article 15.1.7, the rights of the Parties to proceed with dispute resolution under Article 15.1 shall be independent of their rights or the rights of related entities to proceed with dispute resolution under any of the other Project Agreements, the Fuel Supply Agreements, or the Financing Agreements; and

15.1.8  If there is a conflict between this Agreement and the Rules, this Agreement shall, to the extent of the conflict, prevail over the Rules.

15.2  <u>Exclusivity</u>: Neither Party shall have any right to commence or maintain any legal proceeding concerning a Dispute relating to this Agreement until the Dispute has been resolved in accordance with Article 15.1, and then only to enforce or execute the award under such procedure.

15.3  <u>Confidentiality</u>: The Parties shall each secure that all Arbitrators shall agree to be bound by confidentiality as a condition of appointment.

15.4  <u>Continuance of Obligations</u>: Both Parties shall continue to perform their obligations under this Agreement during any Arbitration proceeding provided that the right to terminate this Agreement pursuant to Article XIII is not restricted by this Article 15.4.

15.5  <u>Commercial Acts</u>

15.5.1  GOB unconditionally and irrevocably agrees that it is subject to suit in Bangladesh and England with respect to its obligations under this Article XV to engage in arbitration, or with respect to any action in aid of arbitration, or with respect to enforcement of an award resulting from an arbitration held pursuant to this Article XV. GOB unconditionally and irrevocably agrees that the execution, delivery and performance of this Agreement, the Guarantee, the Power Purchase Agreement and the Fuel Supply Agreement where it is a party constitute private and commercial acts and not sovereign acts. In furtherance of the foregoing, GOB hereby irrevocably and unconditionally consents generally in respect of the enforcement of any judgment enforcing an arbitral award against it in any such proceedings in any jurisdiction, to the giving of any relief or the issue of any process in connection with such proceedings (including the enforcement or execution against or in respect of any of its assets);

15.5.2  The Company unconditionally and irrevocably agrees that it is subject to suit in Bangladesh and England with respect to its obligations under this Article XV to engage in arbitration, or with respect to any action in aid of arbitration, or with respect to enforcement of an award resulting from an arbitration held pursuant to this Article XV. The Company unconditionally and irrevocably agrees that the execution, delivery and performance of this Agreement, the Guarantee, the Power Purchase Agreement and the Fuel Supply Agreement where it is a party constitute private and commercial acts. In furtherance of the foregoing, the Company hereby irrevocably and unconditionally consents generally in respect of the enforcement of any judgment enforcing an arbitral award against it in any such proceedings in any

October 16, 1997                                        42

jurisdiction, to the giving of any relief or the issue of any process in connection with such proceedings (including the enforcement or execution against or in respect of any of its assets).

15.6    Consent to Jurisdiction

Each Party irrevocably and unconditionally consents to the jurisdiction of any competent court located in a jurisdiction (i) where the arbitration is to be held with respect to an action to compel or in aid of arbitration pursuant to this Article XV, or (ii) where the Party against whom enforcement is sought has assets, in an action filed by the other Party to enforce an award or decision of the arbitrators. Each Party further agrees not to assert that such action has been brought in an inconvenient forum, and consents to the enforcement of an arbitral award made in accordance with Article XV against any of its assets. Each Party consents that service of any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under Article XV, for any court action to compel or in aid of such arbitration, or for the entry of judgment on any award made by the arbitrators, may be made in accordance with this Article XV.

October 16, 1997                          43

# ARTICLE XVI
## GUARANTEE

The GOB shall, on signing of the Power Purchase Agreement by the BPDB, execute and deliver to the Company the Guarantee in the form set out in  Schedule 2 attached.

October 16, 1997                    44

## ARTICLE XVII
### NOTICES

17.1    Address for Notices

All notices, communications, or other documents (together "Notices") to be given or made by one Party to the other Party pursuant to this Agreement shall be in writing, shall be addressed for the attention of the person indicated below, and shall either be delivered personally or sent by telegram, registered or certified mail, or facsimile. The addresses for service of the Parties and their respective facsimile numbers shall be:

(a)    For the GOB:

      Attention:     _____

      Address:      _____
              Dhaka, Bangladesh

      Telephone:     _____

      Facsimile:     _____

(b)    For the Company:

      Attention:     _____

      Address:      _____
              Dhaka, Bangladesh

      Telephone:     _____

      Facsimile:     _____

or such other addresses and facsimile numbers as either Party may have notified to the other Party in accordance with this Article 17.1.

17.2    Delivery

All Notices shall be deemed delivered (a) when presented personally, (b) if received on a Business Day for the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified above and, if received on a Day that is not Business Day for the receiving Party, on the first Business Day following the date transmitted by facsimile to the receiving Party's facsimile number specified above, (c) three (3) Business Days after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by Notice delivered to the delivering Party at its address or facsimile number specified above) or (d) five (5) Days after being deposited in a regularly maintained receptacle for the postal service in

October __, 1997               45

Bangladesh, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed.

October 10, 1997                46

# ARTICLE XVIII
## MISCELLANEOUS PROVISIONS

18.1   Variations in Writing; Amendment of Project Agreements

    (a)    All additions, amendments and variations to this Agreement shall be binding only if in writing, expressly stated to be such an addition, amendment or variation, and signed by duly authorized representatives of the Parties.

    (b)    No amendment or modification of the Power Purchase Agreement or the Fuel Supply Agreements shall be effective without the prior written consent of the GOB if and to the extent that such amendment or modification materially increases the obligations or liabilities of the GOB under this Agreement or the Guarantee.

18.2   Entire Agreement

This Agreement contains or expressly refers to the entire agreement between the Parties with respect to its subject matter and expressly excludes any warranty, condition or other undertaking implied at law or by custom and supersedes all previous agreements, understandings and documentation between the Parties with respect to its subject matter and each of the Parties acknowledges and confirms that it does not enter into this Agreement in reliance on any representation, warranty, instruments, documents or other undertaking by the other Party not fully reflected in the terms of this Agreement..

18.3   Waivers

    (a)    No waiver by either Party of any default by the other in the performance of any of the provisions of this Agreement:

        (i)    shall operate or be construed as a waiver of any other or further default whether of a like or different character; or

        (ii)    shall be effective unless in writing duly executed by an authorized representative of the Party.

    (b)    The failure by either Party to insist on any occasion upon the performance of the terms, conditions, and provisions of this Agreement, or time or other indulgence granted by one Party to the other, shall not thereby act as a waiver of the breach, as acceptance of any variation, or as the relinquishment of any such right hereunder, which shall remain in full force and effect.

18.4   Confidentiality

    (a)    Each of the Parties shall ensure that their employees, directors, officials, Contractors, subcontractors, consultants, and agents, and each of their respective permitted successors and assigns, hold in confidence all documents and other information whether technical or commercial, which is marked "Confidential" by

October 16, 1997         47

either Party or is of a confidential nature supplied to it by or on behalf of the other Party relating to the Project and shall not (save as required by law or appropriate regulatory authorities or is required to be disclosed for the benefit of prospective lenders, or prospective investors in the Company or the respective professional advisers of the parties or of such lenders or investors as aforesaid) publish or otherwise disclose or use the same for its own purposes, otherwise than as may be required to perform its obligations under this Agreement. The provisions of this Article 18.4 shall survive the termination of this Agreement, but shall expire and be of no further effect upon the fifth (5th) anniversary of the date of termination of this Agreement.

(b)     The provisions of Article 18.4(a) above shall not apply to:

   (i)     information in the public domain otherwise than by breach of this Agreement;

   (ii)    information in the possession of the receiving Party thereof before divulgence that was not obtained under any obligation of confidentiality; and

   (iii)   information obtained from a third party who the receiving Party believes, after reasonable inquiry, is free to divulge the same so long as the information was not obtained by the receiving Party under any obligation of confidentiality to the third party.

(c)     Nothing herein shall preclude the use of provisions similar to those contained in this Agreement, in any other agreements prepared and issued in connection with other projects.

18.5    Accounts and Reports

The Company shall keep proper books of record and account, in sufficient detail, in which all correct entries will be made of all dealings or transactions of or in relation to its business and affairs, in accordance with generally accepted accounting principles in Bangladesh, consistently applied. The Company shall permit GOB to examine all relevant books, records, reports and other papers of the Company necessary to verify the Company's compliance with the provisions of this Agreement. The Company shall keep such books, records, reports and other papers in sufficient detail to permit GOB to examine these. Any such examination by GOB shall be made upon reasonable advance notice to the Company. All records and accounts shall be subjected to an audit as of the end of each financial year by a firm of independent public accountants selected by the Company, which firm shall be experienced in electric utility accounting. Such firm's audit report shall be submitted to Company, with a copy to GOB, within ninety (90) Days after the end of such financial year.

18.6    Successors and Assigns

This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of the Parties.

October ___, 1997                          48

No review, non-objection, or approval by the GOB of any agreement, document, instrument, drawing, specifications or design proposed by the Company shall relieve the Company from any liability that it would otherwise have had for its negligence in the preparation of such agreement, document, instrument, drawing, specification or design or failure to comply with applicable Laws of Bangladesh or to satisfy the Company's obligations under this Agreement, the Power Purchase Agreement, and the Fuel Supply Agreement with respect thereto, nor shall the GOB be liable to the Company or any other person by reason of its review, non-objection, or approval of an agreement, document, instrument, drawing, specification, or design.

18.8    No Third Party Beneficiaries

This Agreement shall not confer any right of suit or action whatsoever on any third party, except for the specific rights granted to the Lenders hereunder.

18.9    Affirmation

The Company declares and affirms that the Company and its shareholders, directors, officers, employees, and agents have not paid or received, nor undertaken to pay or receive, any bribe, pay-off, kick-back, or unlawful commission and that the Company and its shareholders, directors, officers, employees, and agents have not in any other way or manner paid any sums, whether in Bangladeshi currency or foreign currency and whether in Bangladesh or abroad, given or offered to give any gifts and presents in Bangladesh or abroad, to any person or company to procure this Agreement. The Company undertakes not to engage in any of these or similar acts during the term of this Agreement.

18.10   Partial Invalidity:

If for any reason whatever any provision of this Agreement is or becomes or is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, such invalidity, illegality or un-enforceability shall not affect the validity, legality or enforce ability of any other provisions and in any such case the Parties will negotiate in good faith with a view to agreeing on one or more provisions to be substituted therefore which are not invalid, illegal or unenforceable and produce as nearly as is practicable in all the circumstances the appropriate balance of the commercial interests of the Parties.

18.11   Limited Recourse

Notwithstanding any provision of this Agreement to the contrary and without limiting any protection against liability that may be available under the Laws of Bangladesh, (i) there shall be no recourse against any Investor or any of their stockholders, officers, directors or employees individually for any liability to the GOB arising out of or in connection with this Agreement (whether for breach, default or non-performance of any obligation under this Agreement or for any failure to make any payment(s) required to be made hereunder) and (ii) neither any Investor nor any of their stockholders, officers, directors or employees individually shall be named in any

action or suit brought by or on behalf of the GOB under this Agreement, whether for damages, specific performance or any other equitable relief, it being acknowledged and agreed that the GOB shall only have recourse to the assets of the Company.

18.12   Project Financing Cooperation

(a)   The GOB hereby acknowledges, but without liability, that the Company intents to initially finance the construction of the Project using debt financing to be provided or guaranteed by the Foreign Investors or their affiliates, Contractors or any other third party and thereafter to refinance such Foreign Investor provided or guaranteed financing with third-party limited recourse project financing at such time as the Company is able to procure such third-party financing.

(b)   The GOB hereby agrees to cooperate in good faith with the Company in its pursuit of such financing for the Project including by executing and delivering acknowledgments to such parties as the Company may direct of the rights of such parties under mortgages and pledges granted by the Company over the Project or its assets and rights and by taking similar actions; provided, however, that nothing in this Article 18.12 shall require BPDB to incur any expense or create any financial obligations to the Company or any other parties.

(c)   Within thirty (30) Days of the Company's request, in connection with the financing of the Project, the GOB shall deliver a certificate, executed by a duly authorized individual, affirming the representations in Article 18.14 and shall Ministry of Law to issue an opinion addressed to such parties as the Company shall request, which opinion shall affirm the validity of the representations of the GOB made in Article 18.14 and set forth such further matters as the Company may reasonably request.

18.13   Representations and Warranties of the Company

The Company represents and warrants that:

(a)   The Company is a limited liability company duly incorporated and validly existing under the Laws of Bangladesh and has all requisite legal power and authority to execute this Agreement, and to carry out the terms, conditions and provisions hereof;

(b)   This Agreement constitutes the valid legal and binding obligations of the Company and enforceable in accordance with the terms hereof except as the enforceability may be limited by application laws affecting creditors' rights generally and general principles of equity;

(c)   There are no actions, suits or proceedings pending or, to the Company's knowledge, threatened against or affecting the Company before any court or administrative body or arbitral tribunal that, if adversely determined, would materially and adversely affect the ability of the Company to meet and carry out its obligations under this Agreement;

October 16, 1997                    50

(d)    The execution, delivery and performance by the Company of this Agreement have been duly authorized by all requisite corporate action, and, to the best of the Company's knowledge, does not violate the Laws of Bangladesh or any applicable order of any Public Sector Entity or contravene in any material respect any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound;

(e)    Attached to this Agreement are true and correct copies of the resolution of the Company's Board of Directors or similar resolutions authorizing the Company's execution, delivery and performance of this Agreement, and of a Power or Attorney pursuant to such Board resolution specifically authorizing named individuals to execute this Agreement on behalf of the Company.

18.14   <u>Representations and Warranties of the GOB</u>:

The GOB represents and warrants that:

(a)    The Ministry of Energy and Mineral Resources has all requisite legal power and authority to execute and deliver this Agreement and the Guarantee on behalf of the GOB and the GOB has all requisite legal power and authority to carry out the terms, conditions and provisions of hereof and thereof;

(b)    All executive, legislative, administrative of other governmental action required to authorize the execution, delivery and performance by GOB of this Agreement and the Guarantee and the transactions contemplate herein and therein have been taken and are in full force and effect;

(c)    This Agreement and the Guarantee constitute the valid, legal and binding obligations of GOB, enforceable in accordance with their terms;

(d)    There are no actions, suits or proceedings pending or, to the GOB's knowledge, threatened, against or affecting the GOB before any court or administrative body or arbitral tribunal concerning or relating to this Agreement or the Guarantee, the subject matter hereof or thereof, or the Project;

(e)    This Agreement and the Guarantee have duly executed and delivered by the Ministry of Energy and Mineral Resources of behalf of the GOB and the execution, delivery and performance by the GOB of this Agreement and the Guarantee do not violate the Laws of Bangladesh or any applicable order of any Public Sector Entity or contravene in any material respect any provision of, or constitute a default under, any other agreement or instrument to which it is a party or by which it or its property may be bound; and

(f)    Attached to this Agreement are true and correct copies of resolution authorizing the GOB's execution, delivery and performance of this Agreement and the Guarantee, and of a Power of Attorney pursuant to such resolution specifically authorizing named individuals to execute this Agreement and the Guarantee on behalf of the GOB.

October 16, 1997        51

## ARTICLE XIX
## GOVERNING LAW

19.1    This Agreement shall be governed by and construed   in accordance with the laws of Bangladesh.

October 16, 1997                                    52

IN WITNESS WHEREOF, THE PARTIES HAVE ENTERED INTO THIS AGREEMENT AS
OF THE DATE FIRST WRITTEN ABOVE.

**The Peoples' Republic of Bangladesh**

By: _____

Title: _____
Mirza Tasadduq Hussain
Joint Secretary
M/o Energy & Mineral Resources
Govt. of the People's Republic
of Bangladesh,

Witness: _____

_____

**Smith Cogeneration**
**(Bangladesh) Pvt. Ltd.**

By: _____
(George B. Jongeling)    Oct. 16, 1997
Director                 5:10 P.M.

Witness: _____   Oct 16, 1997
(Nauman Ahmad)                          5:10 pm

_____   Oct 16 th 1997
(Mohit Saraf)                 5-10 pm

October 16, 1997                    53

**SCHEDULE 9**
**CONSENTS**

Particulars of Consent and Relevant Authority

| Sl. No. | Consent | Issuer |
|---|---|---|
| 1. | Registration for availing infrastructural facilities and institutional support<br><br>(a) TIN certificate.<br><br>(b) Trade License.<br><br>(c) Membership Certificate of relevant trade association/chamber.<br><br>(d) Certificate from the nominated Bank regarding opening of account.<br><br>(e) Incorporation certificate. | BOI |
| 2. | Registration for Foreign Loan, Suppliers Credit etc.<br><br>(a) Copy of foreign loan agreement | BOI |
| 3. | Work Permit for project personnel | BOI |
| 4. | Permission for obtaining Industrial Plot. | BOI/PC |
| 5. | Registration in the JS Company<br><br>(a) Memorandum & Articles of Association duly vetted by Bangladesh Embassy for 100% foreign owned Co.<br><br>(b) Clearance of name from JS Co. for JV Co.<br><br>(c) Copy of JV Agreement for JV Co.<br><br>(d) Bank encashment certificate for foreign Co. as Bangladesh Co. | Registrar, JS Co. |
| 6. | Remittance of salaries and savings by expatriates above 50% | BB |

October 16, 1997                              54

| 7. | Permission to transfer of shares | BB / SEC |
|---|---|---|
| 8. | Permission for Insurance outside Bangladesh | M/O Commerce |
| 9. | Exemption from Import Permit Fee | M/O Commerce |
| 10. | Import Registration Certificate (IRC) | CCI & E |
| 11. | Security Clearance for the personnel | MOHA |
| 12. | Complex Security (if desired) | MOHA |
| 13. | Exemption from Import Tax, CD & VAT | NBR |
| 14. | Exemption from Income Tax. | NBR |
| 15. | Consent to issue of capital | SEC |
| 16. | Stamp Duty Exemption | NBR |
| 17. | Environmental clearance | DOE |
| 18. | Electricity Generation License | CEI |
| 19. | Foreign Currency Account | BB |

**Legend**     :          1, 2, 3,       ...............     -   Consent.
                          (a),(b), (c)    ...............     -   Supporting document to obtain.
Consent
Abbreviation:  BOI        -        Board of Investment
               BB         -        Bangladesh Bank
               CCI & E    -        Chief Controller of Import and Export.
               JS Co.     -        Joint Stock Company
               MOHA       -        Ministry of Home Affairs
               NBR        -        National Board of Revenue
               PC         -        Power Cell
               SEC        -        Securities and Exchange Commission
               SBC        -        Shadharan Bima Corporation.
               DOE                 Department of Environment
               CEI                 Chief Electrical Inspector
                                   Ministry of Energy and Mineral Resources

October 6, 1997                      55

## SCHEDULE 2
## GUARANTEE

THIS GUARANTEE is made at Dhaka on the __16__ of October, 1997

### BETWEEN:

THE PEOPLE'S REPUBLIC OF BANGLADESH  represented by MINISTRY OF ENERGY AND MINERAL RESOURCES (the "Guarantor");

### AND

Smith Cogeneration (Bangladesh) Pvt. Ltd., a private limited company incorporated under the laws of Bangladesh, whose registered office is located at 57A, Road 28, Gulshan, Dhaka 1212, Bangladesh (the "Company").

WHEREAS:

The Guarantor and the Company have entered into an Implementation Agreement (the "Implementation Agreement"), of which this Guarantee is an integral part.;

The Bangladesh Power Development Board ("BPDB") has entered into a Power Purchase Agreement with the Company (the "Power Purchase Agreement");

In accordance with Article XVI of the Implementation Agreement, the Guarantor has agreed to enter into this Guarantee.;

NOW THEREFORE, IT IS HEREBY AGREED as follows:

October 16, 1997                              56

## Article 1: __GUARANTEE__

1.1    Guarantee

In consideration of the Company entering into the Power Purchase Agreement with BPDB, Implementation Agreement with GOB, and the Fuel Supply Agreement with the Fuel Supplier, the Guarantor hereby irrevocably and unconditionally guarantees and promises, (a) to pay the Company any and every sum of money BPDB and the Fuel Supplier are obligated to pay to the Company under or pursuant to the Power Purchase Agreement and the Fuel Supply Agreement that BPDB or the Fuel Supplier has failed to pay when due in accordance with the terms of those agreements, which obligation of the GOB shall include monetary damages arising out of any failure by BPDB or the Fuel Supplier to perform their respective obligations under the Power Purchase Agreement or the Fuel Supply Agreement, to the extent that any failure to perform such obligations gives rise to monetary damages, (b) the full and punctual performance by BPDB, the Fuel Supplier and the GOB of any and all obligations to be performed by BPDB, the Fuel Supplier and the GOB under the Power Purchase Agreement, the Fuel Supply Agreement and the Implementation Agreement, respectively; and (c) to make US Dollars available for the conversion of all payment received by the Company from BPDB, the Fuel Supplier and GOB in Takas to US Dollars pursuant to the terms and conditions of the Implementation Agreement, and (d) to ensure that all tax and fiscal incentives including those set out in Article 4 of this Guarantee are extended to the Company and to the parties to the Project Agreements.

1.2    Waiver of Defenses

The obligations of the Guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect until all the covenants, terms, and agreements set forth in the Power Purchase Agreement, the Fuel Supply Agreement and the Implementation Agreement shall have been completely discharged and performed, unless waived by the Company in writing. The obligations of the Guarantor shall not be modified or impaired upon (and the Guarantor waives any defense to the performance of such obligations based upon) the happening from time to time of any event, including the following:

1.2.1    the modification or extension of time for payment of any amounts due or of time for performance of any of the covenants, terms, or agreements of BPDB, the Fuel Supplier or the GOB set forth in the Power Purchase Agreement, the Fuel Supply Agreement or the Implementation Agreement, respectively.

1.2.2    amendments to the Power Purchase Agreement, the Fuel Supply Agreement or the Implementation Agreement, as the case may be.

1.2.3    the failure, omission, or delay by the Company to enforce, ascertain, or exercise any right, power, or remedy under or pursuant to the terms of the Power Purchase Agreement, the Fuel Supply Agreement, the Implementation Agreement or this Guarantee;

October __16__, 1997                    57

1.2.4    the bankruptcy, insolvency, or other failure or financial disability of BPDB, the Fuel Supplier or the Company;

1.2.5    the addition, or partial or entire release of any guarantor, maker or other party (including BPDB or the Fuel Supplier) primarily or secondarily responsible for the performance of any of the covenants, terms, or agreements set forth in the Power Purchase Agreement or the Fuel Supply Agreement or by any extension, waiver, amendment, or any other thing or circumstance whatsoever in law or in equity that may release or create a defense or discharge for a guarantor (other than complete performance in accordance with the terms of the Power Purchase Agreement or the Fuel Supply Agreement);

1.2.6    any failure of BPDB, the Fuel Supplier or the GOB to comply with the requirements of any law, regulation or order;

1.2.7    the dissolution, privatization, reorganization or any other legal alteration of the legal structure of BPDB or the Fuel Supplier;

1.2.8    any assignment by the Company of the Implementation Agreement, the Guarantee, the Power Purchase Agreement or the Fuel Supply Agreement; or

1.2.9    the invalidity, irregularity or unenforceability of this Guarantee, the Implementation Agreement, the Power Purchase Agreement, the Fuel Supply Agreement or any provision thereof or any obligation thereunder.

1.3    Continuing Guarantee

1.3.1    This Guarantee shall be a continuing security and, accordingly, shall extend to cover (i) the balance of monies due to the Company at any time from BPDB, the Fuel Supplier or the GOB, as the case may be, under each of the respective agreements. No demand made by the Company hereunder shall prejudice or restrict the right of the Company to make further or other demands.

1.4    Additional Security

1.4.1    This Guarantee shall be in addition to, and not in substitution for or derogation of, any other security that the Company may at any time hold in respect of the obligations of BPDB under the Power Purchase Agreement or the Fuel Supplier under the Fuel Supply Agreement or the GOB under the Implementation Agreement.

1.4.2    The Company may enforce this Guarantee notwithstanding that it may hold any other guarantee, lien, or security of or for the obligations of BPDB under the Power Purchase Agreement or the Fuel Supplier under the Fuel Supply Agreement or the GOB under the Implementation Agreement or have available to it any other remedy at law or equity.

1.4.3    The Guarantor shall ensure that at all times the claim of the Company against it under this Guarantee rank first with the claims of all its other unsecured creditors, save those claims which are preferred by any bankruptcy, insolvency, liquidation or similar laws of general application.

October 16, 1997                      58

1.5     Preliminary Demand

1.5.1   Notwithstanding that this Guarantee is the unconditional obligation of the Guarantor, before taking steps to enforce this Guarantee and demand payment from the Guarantor, the Company agrees to make demand in writing for payment from BPDB, the Fuel Supplier or the GOB, as the case may be. After fifteen (15) Days from the due date of payment or performance was first due, the Company may notify the Guarantor in writing that payment from BPDB, the Fuel Supplier or the GOB, as the case may be, is past due and make a demand for payment or performance, as the case may be, from the Guarantor under this Guarantee, and the Guarantor shall make payment or make or cause such performance, in each case within five (5) Business Days (as defined in the Implementation Agreement). Following service of which notice, late payments hereunder shall bear mark-up at an annual rate equal to that established for late payment in the applicable agreement (the Power Purchase Agreement or the Fuel Supply Agreement, as the case may be).

1.5.2   Except as provided in Article 1.5.1, the Company shall not be obliged before taking steps to enforce this Guarantee to make any further demand from BPDB or the Fuel Supplier or the GOB or to exercise any other remedies that may be available to it under or in respect of the Power Purchase Agreement or the Fuel Supply Agreement or the Implementation Agreement, as the case may be, or to enforce any other guarantee, lien or security or to initiate any proceedings or obtain judgment against BPDB or the Fuel Supplier.

1.6     Certification

Any demand for payment made pursuant to this Guarantee shall be made in person by a duly authorized officer of the Company at the Guarantor's offices at [identify location] and shall be accompanied by a certificate signed by a duly authorized officer of the Company stating that:

"We hereby certify that (A) (1) [Name of Company] (the "Company") is making this demand on the Government of the People's Republic of Bangladesh (the "Guarantor") in the amount of Takas [insert amount] in accordance with Article 1 of the Guarantee dated **16th Oct** 1997, between the Guarantor and the Company; (2) the amount specified above is due and payable by the Bangladesh Power Development Board ("BPDB"), [Name of Fuel Supplier] (the "Fuel Supplier"), ("GOB") as the case may be under the Power Purchase Agreement between the Company and BPDB or, the Fuel Supply Agreement between the Company and the Fuel Supplier, or the Implementation Agreement between the GOB and the Company, as the case may be; (3) demand in writing for payment from BPDB or the Fuel Supplier or the GOB as the case may be, was made on the date payment was due and not less than fifteen(15) Days from the date of such demand and (4) such amount, on the date hereof, remains unpaid by BPDB or the Fuel Supplier or the GOB, as the case may be".

1.7     Subordination

October 16, 1997                          59

Any right that the Guarantor may at any time have to be indemnified by BPDB or the Fuel Supplier, as the case may be, in respect of sums paid out by the Guarantor in performance of this Guarantee shall be subordinated to the rights of the Company to recover from BPDB or the Fuel Supplier in full all sums that are then due and payable from BPDB or the Fuel Supplier under the Power Purchase Agreement or the Fuel Supply Agreement, respectively.

1.8     No Set-off

No set-off, counterclaim, reduction, or diminution of any obligation that the Guarantor has or may have against the Company nor any right of subrogation that the Guarantor has or may have against the Company shall be available to the Guarantor against the Company in connection with any obligation of the Guarantor to the Company under this Guarantee, except for the right to set-off amounts which are due and payable by the Company to BPDB or the Fuel Supplier under the Power Purchase Agreement or the Fuel Supply Agreement, respectively.

1.9     Consent to Jurisdiction; Arbitration

    1.9.1     Arbitration; Submission to Jurisdiction

        Any dispute between the Parties arising out of or in connection with the Guarantee shall be resolved in accordance with the provisions of Article XV of the Implementation Agreement.

## Article 2: TAXATION

In addition to any amount then due and payable to the Company by BPDB or the Fuel Supplier, as the case may be, under the Power Purchase Agreement or the Fuel Supply Agreement respectively, and payable by the Guarantor under the terms of this Guarantee, the Guarantor shall be liable for any duty, impost, levy, charge, fee, or tax of whatsoever nature ("Tax") levied or imposed by a Public Sector Entity or any political subdivision or authority thereof on or with regard to any payment hereunder unless the payment, if made by BPDB or the Fuel Supplier, as the case may be, would itself have caused the Company to become liable for the Tax. If under applicable law the Guarantor is unable to pay the Tax and the Company is required to pay the Tax, the amount to be paid to the Company hereunder shall be increased by an amount sufficient so that such payment, net of the Tax, would equal the payment the Company would have received from BPDB or the Fuel Supplier net of any Taxes applicable to payment from BPDB or the Fuel Supplier to the Company.

2.1     Sovereign Immunity

The Guarantor hereby irrevocably and unconditionally agrees that it is subject to suit (including enforcement thereof) in Bangladesh or England as the case may be with respect to its obligations hereunder, and that the execution, delivery, and performance of this Guarantee constitute private and commercial acts of the Guarantor.

## Article 3: UNDERTAKING

October 16, 1997                              60

3.1    Duration

This Guarantee shall remain in full force and effect from and after the date hereof until the termination of the initial term of the Power Purchase Agreement, the Fuel Supply Agreement and the Implementation Agreement and for so long thereafter as any amount owed to the Company by BPDB, the Fuel Supplier or the GOB in connection with such initial term is or may be outstanding.

## Article 4:  TAX AND FISCAL INCENTIVES

GOB undertakes to provide the following tax and fiscal incentives:

4.1    The Company shall be exempted from corporate income tax for a period of 15 years. The period of 15 years shall be counted from the Full Commercial Operations Date of the Plant.

4.2    The Company shall be allowed to import Plant and equipment without payment of Customs Duties and VAT (Value Added Tax) and any other surcharges as well as import permit fee except for indigenously produced equipment manufactured according to international standards.

4.3    Repatriation of equity along with dividends will be allowed freely.

4.4    Exemption from income tax in Bangladesh for foreign lenders to such companies.

4.5    The Company shall be exempted from the requirements of obtaining insurance/ reinsurance only from the National Insurance Company, namely Sadharan Bima Corporation (SBC).

4.6    The Instruments and Deeds(meaning as is commonly understood in Bangladesh) required to be registered under local regulation shall be exempted from stamp duty payments.

4.7    Power generation has been declared as an industry and the Company is eligible for all other concessions which are available to industrial projects.

4.8    The Company may raise local and foreign finance in accordance with regulations applicable for all other concessions which are available to industrial projects, as defined by the Board of Investment.

4.9    Tax exemption on royalties, technical know-how and technical assistance fees and facilities for their repatriation.

4.10    Tax exemption on interest on foreign loans.

4.11    Tax exemption on capital gains from transfer of shares by the investing company.

October 14, 1997                      61

4.12   Avoidance of double taxation in case of foreign investors on the basis of bilateral agreements

4.13   Exemption of income tax for up to three years for the expatriate personnel employed in connection with the Project.

4.14   Remittance of up to 50% of salary of the foreigners employed in Bangladesh and facilities for repatriation of their savings and retirement benefits at the time of their return.

4.15   No restrictions on issuance of work permits to foreign nationals and employees.

4.16   Facilities for repatriation of invested capital, profits and dividends.

4.17   TAKA, the national currency, would be convertible for international payments under current account.

4.18   Re-investment of remittable dividend to be treated as new foreign investment.

4.19   The Company will be on the same footing as locally owned companies with regards to borrowing facilities.

## Article 5: NO WAIVER; REMEDIES CUMULATIVE

5.1   No Waiver

No failure or delay by the Company to exercise any right or remedy under this Guarantee shall constitute a waiver of that right or remedy. No single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver by the Company shall be effective unless it is in writing.

5.2   Remedies Cumulative

The rights and remedies of the Company provided by this Guarantee are cumulative and not exclusive of any rights or remedies provided by law.

5.3   Consents

The Guarantor shall obtain and maintain in full force and effect all consents, licenses, approvals and other authorizations required to enable the Guarantor to perform its obligation hereunder or required for the validity or enforceability hereof.

## Article 6: NOTICES

October 16, 1997                    62

6.1    Address for Notices

All notices or other communications (together "Notices") to be given or made hereunder shall be in writing, shall be addressed for the attention of the person indicated below and shall be delivered personally or sent by registered or certified mail or facsimile. All Notices shall be deemed delivered (a) when presented personally, (b) if received on a Business Day of the receiving Party, when transmitted by facsimile to the receiving Party's facsimile number specified above and, if received on a Day that is not a Business Day of the receiving Party, on the first Business Day of the receiving Party following the date transmitted by facsimile to the receiving Party's facsimile number specified above, (c) three (3) Days after being delivered to a courier for overnight delivery, addressed to the receiving Party, at the address indicated above (or such other address as such Party may have specified by notice delivered to the delivering Party at its address or facsimile number specified above) or (d) five (5) Days after being deposited in a regularly maintained receptacle for the postal service in Bangladesh, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party, at the address indicated above (or such other address as the receiving Party may have specified by written Notice delivered to the delivering Party at its address or facsimile number specified above). Any notice given by facsimile shall be confirmed in writing delivered personally or sent by registered or certified mail, but the failure to so confirm shall not void or invalidate the original notice if it is in fact received by the Party to which it is addressed. The address for service of each Party and its respective facsimile number shall be:

6.1.1    For the Guarantor:

Attention:    _____

Address:    _____
    Dhaka, Bangladesh

Telephone:    _____

Facsimile:    _____


6.1.2    For the Company:

Attention:    _____

Address:    _____
    Dhaka, Bangladesh

Telephone:    _____

Facsimile:    _____

or such other addresses or facsimile numbers as either Party may have notified to the other Party in accordance with this Article 6.1 Notwithstanding the foregoing, if the address of the Lender·

October 16, 1997                 63

or Agent is outside Bangladesh, any notice delivered to the Lender or Agent pursuant to the Article 6.1 shall be sent by international courier or facsimile, and if sent by facsimile confirmed by international courier.

## Article 7: ASSIGNMENT

### 7.1    Assignment by the Guarantor

The Guarantor may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Company.

### 7.2    Assignment by the Company

The Company may not assign or transfer all or any part of its rights or obligations hereunder without the prior written consent of the Guarantor. Notwithstanding the provision of the immediately preceding sentence, for the purpose of construction or permanent financing of the Project, the Company may assign or create a security interest over its rights and interests in and to this Guarantee in favor of the Lenders.

### 7.3    Successors

This Guarantee shall be binding upon and inure to the benefit of the Guarantor and the Company and the respective successors and permitted assigns of each.

## Article 8: GOVERNING LAW

### 8.1    Governing Law

The rights and obligations of the Parties under or pursuant to this Guarantee shall be governed by and construed according to the laws of Bangladesh.

## Article 9: MISCELLANEOUS

### 9.1    Severability

If one or more provisions contained in this Guarantee is held or found to be invalid, illegal, or unenforceable in any respect, the provision(s) shall be given effect to the extent permitted by law and the invalidity, illegality, or unenforceability of any provision shall not affect the validity of the remaining provisions of this Guarantee.

### 9.2    Definitions

The capitalized terms used but not defined in this Guarantee shall have the meanings given to them in the Implementation Agreement. The provisions of Article XV, Articles 18.3, 18.10,

October 16, 1997                                         64

18.13 and 18.14 of the Implementation Agreement shall be deemed to be incorporated herein, mutatis, mutandis, as if references therein to "Agreement" were to this Guarantee, unless in contradiction with any specific provisions of this Guarantee. In case of any conflict between the provisions of this Guarantee and the Implementation Agreement, the provisions of this Guarantee shall prevail, to the extent of such inconsistency.

9.3    Counterparts

This Guarantee may be executed in two counterparts, each of which shall constitute an original but both counterparts shall constitute one and the same instrument.

9.4    General Covenants

The Guarantor shall provide the Company, as soon as practicable, and in any event within thirty (30) Days from the date hereof, with each of the following:

(a) legal opinion from the Ministry of Law stating that this Guarantee is valid and enforceable against the Guarantor. Provided further that such legal opinion shall also include any other provisions reasonably requested by the financing parties.

(b) a copy, certified as a true copy, by a duly authorized officer of the Guarantor, of the Government order issued in connection with the execution, delivery and performance of this Guarantee and authorizing _____ to execute and deliver this Guarantee.

October ____, 1997

65

IN WITNESS WHEREOF, THE PARTIES HAVE ENTERED INTO THIS GUARANTEE AS
OF THE DATE FIRST WRITTEN ABOVE.

**The Peoples' Republic of Bangladesh**

By: _____

Title: _Mirza Tasadduh Hussain_
          Joint Secretary
  M/o: Energy & Mineral Resources
  Govt. of the Peoples' Republic
        of Bangladesh.

Witness: _____

_____

**Smith Cogeneration
(Bangladesh) Pvt. Ltd.**

By: _____  Oct. 16, 1997
    (George B. Jongeling)          5:10 P.M.
    Director

Witness: _____ Oct 16, 1997
                                      5:10 pm
         (Nauman Ahmad)

_____ Oct 16th, 1997
(Mohit Saraf)                5:10 A.M.

October 16, 1997                    66

EXHIBIT 3



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**

# AWARD

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 10372/OL/ESR/MS

### SMITH COGENERATION (BANGLADESH) PVT. LTD.
### (Bangladesh)

### vs/

### 1. BANGLADESH POWER DEVELOPMENT BOARD
### (Bangladesh)

### 2. THE GOVERNMENT OF BANGLADESH
### (Bangladesh)

This document is a certified true copy of the original of the Third Partial Award
rendered in conformity with the Rules of the ICC International Court of Arbitration

IN THE INTERNATIONAL COURT OF ARBITRATION OF THE

INTERNATIONAL CHAMBER OF COMMERCE

IN THE MATTER OF ARBITRATION NO. 10372/OL/ESR/MS

BETWEEN:

SMITH COGENERATION (BANGLADESH) PVT. LTD

**Claimant**

-and-

BANGLADESH POWER DEVELOPMENT BOARD

THE GOVERNMENT OF BANGLADESH

**Respondents**

### THIRD PARTIAL AWARD

### COSTS TO DATE

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS, September 4, 2006

Anne Marie WHITESELL
Secretary General
ICC International Court of Arbitration



INTRODUCTION:

1.  The Tribunal has issued First and Second Partial Awards on the 11 September 2000 and the 8 March 2002 respectively. Those Awards dealt with the issue of the Tribunal's jurisdiction raised by the Board's challenge thereto and with the issues relating to liability raised on Smith's claim. The parties to this Arbitration, the agreements and the early procedural history have already been recorded in the Tribunal's Partial Award of the 11 September 2000.

2.  All issues of costs were reserved by the Tribunal for future decision.

3.  This Partial Award addresses those costs that were the subject of the latest application by Smith. The abbreviations used in the two previous Partial Awards are used in this Award as well.

4.  Following the hearing on the 8th and 9th of May 2001, the Tribunal by its Fourth Order for Directions dated 11/MAY/2001 had directed the parties as follows:

> By or before the 22/JUN/2001 each party may file with the Tribunal a closing brief limited to the issue of liability. The said brief should contain any claim for costs that the delivering party may wish to pursue. Any bill of costs must identify sums paid and sums owing; and must be confirmed on oath by the senior attorney representing the party; failing whom the same must be confirmed on oath by a senior representative, duly authorised, of the party. A brief so filed must be copied to each of the parties.

5.  In purported compliance with this Direction, Smith's lawyers submitted Smith's Bill of Costs under cover of its letter dated 13 August 2001

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

2

together with its post-hearing brief. This Bill of Costs was not "*confirmed on oath*" as was required by the Tribunal's Direction. Therefore, the Tribunal did not deal with the costs to the date of the Partial Award on Liability.

6. Under cover of their letter dated 16 April 2002, Smith's lawyers re-submitted Smith's Bill of Costs together with the required confirmation. This re-submitted Bill of Costs was also served on the Board and the Government.

7. No application for any costs or any representation on Smith's Bill of Costs has been received from either Respondent.

## SMITH'S BILL OF COSTS:

8. Smith's Bill of Costs has been helpfully set out and summarised in a Schedule to the Bill of Costs as follows:

| Description | | Sums Paid | Sums Owing | | Total |
|---|---|---|---|---|---|
| Smith In-House Costs (see tab A for background materials) | | $14,612.20 | $0.00 | | $14,612.20 |
| ICC Fees (see tab B for background materials) | | $340,000.00 | $0.00 | | $340,000.00 |
| Printing, Shipping, Travel and other disbursement costs (see tab C for background materials) | | $14,420.88 | $0.00 | | $14,420.88 |



CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL ... OF COMMERCE

3

| Description | | Sums Paid | Sums Owing | | Total |
|---|---|---|---|---|---|
| Legal Fees and Costs (see tab D for background materials) | | | | | |
| Skadden, Arps, Slate, Meagher & Flom LLP* | | $153,005.00 | $569,217.00 | | $722,222.00 |
| Robert K Simmonds, (Expert Witness) | | $0.00 | $40,611.23 | | $40,611.23 |
| Michael Young of Herbert Smith, London, (Legal Consultant) | | $5,416.05 | $0.00 | | $5,416.05 |
| David C Nickerson, (Consultant) | | $1,050.00 | $0.00 | | $1,050.00 |
| Moudud Ahmed, Moudud, Ahmend & Associates (Legal Consultant) | | $33,490.00 | $54,860.00 | | $88,350.00 |
| Arvind Kaul, (Consultant) | | $1,421.69 | $0.00 | | $1,421.69 |
| Totals | | $548,803.62 | $664,688.23 | | |
| Total Cost to Smith Cogeneration for Arbitration | | | | | $1,228,104.05 |

*The total sum for Legal Fees and Costs for Skadden, Arps, Slate, Meagher & Flom LLP represents the total amount billed through the most recent bill, dated 22 February 2002.

9.   The schedule shows that there are 4 main heads under which costs are being claimed by Smith. They are:

   a.   Smith in-house costs

   b.   ICC Fees

   c.   Printing, Shipping, Travel costs

   d.   Legal fees and Costs

10.   Smith's claims in respect of the Legal Fees and Costs consist of:

   a.   Legal fees of its attorneys

   b.   Costs of Expert Witness, Mr. Simmonds



    c.    Fees of Legal Consultants in the UK and Bangladesh

    d.    Other consultant's fees

11.    The total cost claimed by Smith is the sum of US$1,228,104.05. Smith has not split the costs claimed as being attributable to the jurisdiction or liability issue. It has also not split up the costs in any way as between the issues which have been finally determined and those that remain outstanding.

## THE ISSUES:

12.    The issues that arise for determination are as follows:

    a.    Whether in the light of Article 31(3), the Tribunal can make an award of costs at this stage.

    b.    Whether Smith is entitled to the costs having succeeded on each of the issues on jurisdiction and liability.

    c.    Whether costs under each head in its Schedule are recoverable.

    d.    Which of the parties should bear the costs and in what proportion.

## THE APPLICABLE PRINCIPLES:

13.    Art 31 of the ICC Rules provide as follows:

> *1. The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed*

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

*by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*

*2. The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.*

*3. The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*

14.  The seat of this arbitration is London. The provisions of Part 1 of the Arbitration Act 1996 ("the 1996 Act") apply to this arbitration. The provisions relevant to the issue of costs are set out in Sections 61 and 63 of the 1996 Act.

15.  Section 61 of the 1996 Act states as follows:

*61(1) The tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties.*
*(2) Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs.*

16.  Section 63 of the 1996 Act (in so far as relevant) provides as follows:

*63(1) The parties are free to agree what costs of the arbitration are recoverable.*
*(2) If or to the extent there is no such agreement, the following provisions apply.*
*(3) The tribunal may determine by award the recoverable costs of the arbitration on such basis as it thinks fit. If it does, it shall specify-*
  *1. the basis on which it has acted, and*
  *2. the items of recoverable costs and the amount referable to each.*
*(4)…*
*(5) Unless the tribunal or the court determines otherwise…*

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION  6

1.   *the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and*

2.   *any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party.*

*(6)...*

*(7) Nothing in this section affects any right of the arbitrators, any expert, legal adviser or assessor appointed by the tribunal, or any arbitral institution, to payment of their fees and expenses.*

17.   The applicable principles appear to be:

a.   Costs are within the discretion of the Tribunal save those fixed by the Court.

b.   Costs of the arbitration include the fees and expenses of the arbitrator and the administrative expenses of the ICC, the costs of any experts appointed by the Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

c.   The general principle is that costs should follow the event except where it appears to the Tribunal that in the circumstances that is not appropriate in relation to the whole or part of the costs.

d.   The recoverable costs shall be determined by the Tribunal on such basis as it thinks fit.

e.   The recoverable costs shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and any doubt should be resolved in favour of the paying party.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION 7

## RESOLUTION OF THE ISSUES:

<u>Award on Costs:</u>

18.    Save in respect of decisions concerning the deposit - as to which see below at paragraph 28 - the Tribunal considers that it is competent to make a partial award of costs at this stage. This appears to follow clearly from the last sentence of Article 31 (2):

> *Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.*

19.    The provision in Article 31(3) which refers to the "final" award clearly means the ultimate award to be made by the Tribunal in a case. However, it does not thereby detract from, let alone reverse the discretion given by the last sentence of Article 31 (2). Instead it imposes an obligation on the Tribunal to address costs in so far as they have not been addressed already; and ensures that the final award covers all outstanding matters in issue.

20.    The Tribunal considers that it is appropriate to make this Partial Award at this stage.



Entitlement to Costs:

21.   The Tribunal considers that in all the circumstances, the principle that costs should follow the event should apply in this case. However, for the reasons set out below, Smith should be allowed to recover from the Respondents only so much of its costs as are awarded below.

22.   The Tribunal reminds itself of the following matters arising during the context of the hearing:

   a.   Smith admitted that it had failed to properly make a claim for relief against the Government in the first instance which resulted in the Government not being notified of the proceedings until a late stage.

   b.   Smith's original claim in this arbitration was for the return of the PG. This was later amended to bring in a claim for damages.

   c.   Smith's claim for specific performance was expressly dismissed by the Tribunal.

   d.   Smith failed to produce all relevant documents prior to the hearings in May 2001 which resulted in the second hearing and increased costs.

   e.   There are further issues to be resolved in this arbitration.

23.   Looking at the claim for costs at this stage, the Tribunal considers that in all the circumstances of this case:

   a.   it should only allow such costs as specifically relate to the two issues that have been dealt with in the Partial Awards made by it. The

recoverable costs should not include costs which could have an impact on the final award when issues of damages will be considered and dealt with.

b.    the evidence of Mr. Robert Simmonds was not remarkable at all and did not assist the Tribunal in arriving at its decision.

c.    it would be wrong in principle to allow any costs to Smith in respect of the hearing in November 2001.

d.    a deduction should be made for the failure of Smith to seek any relief against the Government at the outset.


Recoverable costs:

24.    The Tribunal has considered each of the heads of cost claimed by Smith in its Bill of Costs and its decision on each of them is set out below:

25.    Smith in-house costs in the sum of US$14,612.20:  These are claims in respect of Smith's notional cost for its management time in respect of the preparation and conduct of the case and in liaising with its lawyers. The breakdown shows that some of Smith's management time was devoted to the Bangladeshi litigation and corresponding with its Bangladeshi lawyers and in considering various issues raised by the ICC, including, those relating to the payment of the deposit.

26.    The Tribunal does not consider that these amount to recoverable costs as these costs are normally not categorised as recoverable costs.

10

27.  ICC Deposit in the sum of US$340,000: As noted above at paragraph 18, the disposition of the deposit is not within the discretion granted to the Tribunal by Article 31 (2). The Tribunal's role would only be to determine ultimate responsibility for payment thereof; and that role does not arise until the final award.  Accordingly, the Tribunal reserves to itself the final conclusion on that point until the final award in this matter.

28.  Printing, Shipping and Travel Costs in the sum of US$14,420: Part of this sum comprises the travel costs of Mr. Smith to the hearing in November 2001. Those costs total US$3,678.19. Apart from this sum, the Tribunal considers the remaining part of the sum claimed, namely, US$10,740.81 to be recoverable costs.

29.  Legal fees and costs (Skadden Arps) in the sum of US$722,222.00: This is by far the largest part of Smith's Bill of Costs. Out of this sum, the sum of US$153,005 has been paid and the remaining sum of US$569,217 remains unpaid. Except for giving a breakdown of the various bills to which this sum is attributable, no details are provided of how this sum is calculated, who provided the service, in what respect and at what rates. Neither have the bills been exhibited to Smith's Bill of Costs.

30.  The Tribunal is therefore unable to express a final view on the legal costs claimed by Smith Attorneys. Absent the full and detailed breakdown necessary to justify this claim, the Tribunal has considered whether it is able to reach a conclusion as to a sum to which Smith is unquestionably

entitled at this stage. It has reached the decision that the sum of US$250,000 is certain to be recoverable and should be awarded at this present stage.

31. The Tribunal reserves to itself the final determination as to whether Smith is entitled to recover any part of the remainder of the claimed attorneys' fees.

32. Legal fees and costs (Robert K. Simmonds, Expert Witness) in the sum of US$40,611.23: The Tribunal does not consider these costs to be recoverable costs. Smith called this witness in support of its case but his evidence did not assist the Tribunal. It would not be fair or just to order the Respondents to pay these costs.

33. Legal fees and costs (Michael Young of Herbert Smith, London): These costs arose out of the issue of confidentiality which Smith raised with the Tribunal shortly before the start of the hearing in May 2001. The Tribunal was against Smith on the issue of confidentiality and accordingly declines to order the payment of these costs by the Respondents.

34. Legal fees and costs (David C. Nickerson, Consultant) in the sum of US$1,050: The Tribunal has been unable to determine from the submission on costs the nature of Mr. Nickerson's role. The Tribunal holds that these costs are not recoverable costs of the arbitration.

35. Legal fees and costs (Moudud Ahmed & Associates) in the sum of US$88,350: Part of the sum claimed has been paid and US$54,860

remains outstanding. The Tribunal has been provided with invoices which show that all of the work done by Smith's Bangladeshi lawyers relate to the to fees and expenses incurred in bringing the Bangladeshi litigation. The Tribunal holds that these costs are not recoverable costs of the arbitration.

36.  Legal fees and costs (Arvind Kaul, Consultant) in the sum of US$1,421.69: The Tribunal has been unable to determine from the submission on costs the nature of Mr. Kaul's role. The Tribunal holds that these costs are not recoverable costs of the arbitration..

37.  Total: The total recoverable costs at this stage of the proceedings therefore amounts to the sum of US$260,740.81

Party responsible:

38.  The Government did not put forward any challenge to the Tribunal's jurisdiction. Thus, it should not be made liable for any costs arising directly from the challenge to jurisdiction. As stated above, it is unclear from Smith's Bill of Costs as to what proportion of the costs is attributable to the issue of jurisdiction. Doing the best it can, the Tribunal feels that 15% of total the recoverable costs of US$260,740.81 at this stage, namely, $39,111.13 should be attributed to the issue of jurisdiction. This amount should be borne exclusively by the Board and the Tribunal so orders.

39.  As to the remaining 85% of the total recoverable costs of US$260,740.81, namely, $221,629.68, the costs are awarded against both the Board and

the Government and who are jointly and severally responsible for the payment of this sum.

DECISION:

40.    The Tribunal declares and orders

a.    that the Board is liable to Smith in the sum of $39,111.13; and

b.    that the Board and the Government are jointly and severally liable to Smith in the further sum of $221,629.68.

Signed

Ajmalul Hossain Q.C.

Arthur Marriott Q.C.

John Tackaberry Q.C.

2 SEPTEMBER 2002

LONDON ENGLAND

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS, September 4, 2006

Anne Marie WHITESELL
Secretary General
ICC International Court of Arbitration

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

IN THE INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE

IN THE MATTER OF ARBITRATION NO. 10372/OL/ESR/MS

BETWEEN:

SMITH COGENERATION (BANGLADESH) PVT. LTD

**Claimant**

-and-

1. BANGLADESH POWER DEVELOPMENT BOARD

2. THE GOVERNMENT OF BANGLADESH

**Respondents**

---

-----------------------------------------

THIRD PARTIAL AWARD
COSTS TO DATE

-----------------------------------------

Ajmalul Hossain Q.C.
Arthur Marriott Q.C.
John Tackaberry Q.C.

2 SEPTEMBER 2002

EXHIBIT 4



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**



# AWARD

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 10372/OL/ESR/MS

### SMITH COGENERATION (BANGLADESH) PVT. LTD.
(Bangladesh)

**vs/**

### 1. BANGLADESH POWER DEVELOPMENT BOARD
(Bangladesh)

### 2. THE GOVERNMENT OF BANGLADESH
(Bangladesh)

This document is a certified true copy of the original of the Final Award rendered
in conformity with the Rules of the ICC International Court of Arbitration.

IN THE INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL
CHAMBER OF COMMERCE
IN THE MATTER OF ARBITRATION NO. 10372/OL/ESR/MS

BETWEEN:

## SMITH COGENERATION (BANGLADESH) PVT. LTD

**Claimant**

-and-

## BANGLADESH POWER DEVELOPMENT BOARD

## THE GOVERNMENT OF BANGLADESH

**Respondents**

## FINAL AWARD

## DAMAGES AND COSTS

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS, September 4, 2006

*Anne Marie Whitesell*

Anne Marie WHITESELL
Secretary General
ICC International Court of Arbitration

**John Tackaberry Q.C.**

**Ajmalul Hossain Q.C.**

**Arthur Marriott Q.C.**

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

INTRODUCTION:

1.    NAMES AND DESCRIPTIONS OF THE PARTIES AND OTHERS

a.    The Claimant, a Bangladeshi company, is a subsidiary of a United States power company, and is itself involved in the provision of power facilities. It is hereinafter referred to as "Smith".  Its address is:-

c/o Smith Cogeneration, Inc.,

210 West Park Avenue,

Suite 810,

Oklahoma City,

Oklahoma 73102, U.S.A.

b.    The First Respondent is the Bangladeshi authority responsible for the provision of power in Bangladesh. It is hereinafter referred to as "the Board".  Its address is:-

WAPDA Building,

Motijheel Commercial Area,

1000 Dhaka,

Bangladesh.

c.    The Second Respondent is the Government of the People's Republic of Bangladesh and is hereinafter referred to as "the Government".

d.    The Ministry of Energy and Mineral Resources of the People's Republic of Bangladesh is hereinafter referred to as "the Ministry".

2.    THE TRIBUNAL



The Tribunal comprised

a.    Mr Arthur MARRIOTT, QC

DEBEVOISE & PLIMPTON

International Financial Centre

25 Old Broad Street

London, EC2N 1HQ

United Kingdom

On the 28/MAY/1999, Mr. Marriott was confirmed by the Secretary-General of the Court as Coarbitrator upon the proposal of Smith.

b.    Mr Ajmalul HOSSAIN, QC

29 Bedford Row

London WC1R 4HE

United Kingdom

On the 28/MAY/1999, Mr. Hossain was confirmed by the Secretary-General of the Court as Coarbitrator upon the proposal of the Board.

c.    Mr John TACKABERRY Q.C.

22 Willes Road

London NW 5 3DS

United Kingdom

On the 28/MAY/1999, Mr. Tackaberry was confirmed by the Secretary General of the Court as Chairman upon the joint proposal of the Coarbitrators.

3.    APPLICABLE LAW

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

Article 21 of the PPA and Article XIX of the IA provide for the application of the laws of Bangladesh to the PPA and the IA respectively. However, the arbitration clauses in both agreements expressly provide as follows:

a.     The PPA:

> *18.1.7*     *Notwithstanding the provisions of Article 21 of this Agreement, the agreement to arbitrate contained in this Article 18 and the interpretation of this Agreement, shall, in so far as they relate to arbitration under this Article, be governed by and construed in accordance with the Laws of England.   The arbitral tribunal may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Project Agreements. Fuel Supply Agreement, or Financing Agreements that provides for ICC arbitration if the subject matter of the disputes arises out of or related to essentially the same facts or transactions.   Such consolidated arbitration shall be determined by the arbitral tribunal appointed for the arbitration proceeding that was commenced first in time.   Except as otherwise provided in this Article 18.1.7, the rights of the Parties to proceed with dispute resolution under Article 18.1 shall be independent of*



4

*their rights or the rights of related entities to proceed with dispute resolution under any of the other Project Agreements the Fuel Supply Agreements, or the Financing Agreements;* and

b.    The IA

15.1.7    *Notwithstanding the provisions of Article X1X, the agreement to arbitrate contained in this Article XV and the interpretation of this Agreement, the Power Purchase Agreement, the Site Agreement and the Fuel Supply Agreements shall, in so far as they relate to arbitration under this Article, be governed by and construed in accordance with the Laws of England. The arbitral tribunal may consolidate an arbitration arising out of or relating to this Agreement with any arbitration arising out of or relating to one or more of the Project Agreements, Fuel Supply Agreement, or Financing Agreements that provides for ICC arbitration if the subject matter of the disputes arises out of or related to essentially the same facts or transactions. Such consolidated arbitration shall be determined by the arbitral jurisdiction, to the giving of any relief or the issue of any process in connection with such*



*proceedings (including the enforcement or execution*

*against or in respect of any of its assets).*

4.  Extensions of the time limit for the rendering of awards in this matter have been granted from time to time, the last being granted on the 8 August 2003, extending the time to 30 November 2003. During that time thereby allowed the Tribunal issued its First, Second and Third Partial Awards on 11 September 2000, 8 March 2002 and 2 September 2002 and this Final Award. The first three Partial Awards dealt with the issue of the Tribunal's jurisdiction raised by the Board's challenge thereto, the issues relating to liability raised on Smith's claim and some of the issues relating to costs.

5.  The Tribunal reserved the issues relating to damages and remaining issues relating to costs for future decision.

6.  This Final Award deals with all issues on damages and costs that were reserved by the Tribunal. The abbreviations used in the previous Partial Awards are also used in this Award.

7.  By the Sixth Order for Directions,[i] the Tribunal directed the parties, inter alia, as follows:

> *INTRODUCTION*
>
> *6.1    This matter will now proceed to the issue of quantum. The procedure will be as follows.*
>
> *PLEADINGS*
>
> *6.2    The Claimant ("the Serving Party") is to file with the Tribunal and with*

---

[i]    Letter no. 31 dated 2/DEC/2002



6

*each Respondent a detailed statement of its quantum claim by or before 18.00 hours on the 17/FEB/2003.*

*6.3    The detailed statement is to be accompanied by*

*6.3.1    The evidence of fact relied upon in support of the Serving Party's case; and*

*6.3.2    A list of the documents relied upon by the Serving Party and is also to be accompanied by, or (at the option of the Serving Party) is to contain the gist of, the following:*

*6.3.3    Legal submissions;*

*6.3.4    Legal and Technical Authorities.*

*6.4    Leave to either Respondent or to both Respondents to serve a reply to the Claimant's statement of its quantum claim will be given upon receipt in writing of an application or applications for such leave by or before the 13/JAN/2003.*

*6.5    In the event of either or both Respondents seeking leave to serve a reply, the following directions will be amended appropriately.*

*6.6    In the event that neither Respondent seeks leave as aforesaid, the Tribunal will reserve two days for an oral hearing of the quantum claim issues in London. The said dates will be reserved as soon as conveniently possible, as addressed in the covering letter herewith.*

*6.7    Expert evidence may be relied upon. If it is intended to be relied upon, opinions containing the substance of the evidence must be filed along with the Statement of Position.*

*HARD AND SOFT COPIES*

*6.8    ......*

*6.9    DOSSIER*

*6.10    The documents filed in accordance with the above directions shall constitute the dossier for the hearing.*

8.    The Tribunal later confirmed[2] the dates of hearing as 6-8 May 2003.

9.    In compliance with the Sixth Order for Directions, Smith's lawyers submitted[3] the Dossier together with Witness Statements of its witnesses and copies of the documentary evidence of alleged loss and damage suffered by Smith.

10.    Neither Respondent sought to exercise the leave granted by the Tribunal to

---

[2]    Letter no. 35 dated 3/MAR/2003

[3]    Letter from Skaddens dated 28/FEB/2003



7

reply to Smith's claim for damages. Accordingly, the hearing dates were confirmed by the Tribunal[4] and it was anticipated that only Smith would appear and make representations. The hearing commenced on 6 May 2003. The Respondents were each notified of the hearing dates and each was entitled to appear at the hearing and make representations. At the hearing on the issues relating to damages on 6 and 7 May 2003, neither the Board nor the GOB appeared or made representations. Smith appeared through Counsel and called its evidence in support of its claim.

11.    The Tribunal read the witness statements of and heard evidence from Mr. Donald Smith, the Chairman and Chief Executive Officer of Smith; Mr. Philip Smith, the former Director of Treasury at National Power; Mr. Brian Holt, who was the CEO of Thermo Ecotek at the time of the negotiations with Smith; Mr. Robert K. Simmons, retired banker, former consultant to the energy industry and currently an employee of a Texas based energy company; and Mr. Hubert Bereman, the former Manager of Development Engineering at Smith, currently employed by Smith Cogeneration Management, Inc..

12.    Before the conclusion of the hearing, the Tribunal invited Counsel for Smith to place some additional material before it, inter alia, on quantum, namely, an Excel spreadsheet model and directed that copies thereof should be provided to the Respondents. This request was confirmed by the Tribunal's letter[5] to the parties.

---

13.    The documents requested from Smith were provided to the Tribunal and the Respondents.[6]

14.    So far as oral hearings were concerned, the matter was concluded on the 7 May 2003. So far as written submissions were concerned, the matter was concluded (absent any response from the Respondents) on the 28 August 2003 by the receipt by the Tribunal of Smith's final modification of its claim for costs.

SMITH'S CLAIM FOR DAMAGES:

15.    The Tribunal found in its Second Partial Award on Liability issued on 8 March 2002[7] that the Board is liable to Smith for its wrongful breach of the PPA and the LLA.  Further, the Tribunal found[8] that the GOB is liable to Smith for breaching the IA.  In respect of the Performance Bond which Smith provided under the PPA, which was one of the subjects of the Second Partial Award, the Tribunal awarded Smith damages of $1.5 million corresponding to the value of the bond which the Tribunal held was wrongfully drawn down consequent upon the wrongful termination of the PPA. [9]

16.    Smith's claim is put before the Tribunal on three alternative bases: first, the claim at its highest is in the sum of $120,635,000 which is the amount that, as Smith submits, could reasonably have been expected to have been received under a financing arrangement with National Power that would have

---

[6]    Letter no. Smith-27 dated 15/MAY/2003
[7]    Para. 261
[8]    Para. 264
[9]    Para. 294



been put in place in approximately August 1998 but for the failure of the Board and the GOB to honour their contractual obligations to Smith. This sum consists of $110,168,000 in lost profits, a development fee of $5,000,000, a success fee of $2,000,000 and $3,467,000 in development costs.[10]

17.     Secondly, and alternatively to the first claim, Smith claims loss of profits, development fees and lost development costs on the basis of the proposed Thermo Ecotek financing arrangement which was being negotiated after the National Power deal fell through. The sums claimed are $35,021,000, consisting of lost profits of $29,493,000, a development fee of US$1,000,000 and development costs of $4,528,000.[11]

18.     Finally, a further alternative claim is in respect of what has been described as the Thermo Buy-out by which, had the transaction with the Board gone through, Thermo Ecotek would buy-out the project from Smith under an Asset Purchase Agreement dated 26 January 1999 for a token $100 on closing and a lump-sum purchase price of $8.5 million when the project reached FCOD.[12]

19.     The claims are made in US Dollars consistent with Art. 18.1.4 in the PPA which provides that "*any monetary award [resulting from arbitration] shall be made and payable in US Dollars*".

20.     In addition to the sums claimed as damages, Smith claims interest on the

---

[10]     Ex. 309
[11]     Ex. 315
[12]     Ex. 300

F:\CASES\SMITBANG.219\FINAL AWARD - OCT 30.wpd



10

sums awarded by the Tribunal in respect of damages and costs until those sums are paid[13].

THE TRIBUNAL'S PREVIOUS FINDINGS:

21.   The Tribunal made certain findings and certain observations in its Second Partial Award on Liability which are relevant to the issues on damages.

22.   In respect of the GOB, the Tribunal considered[14] the obligations of the GOB under Clause 4.3(a) of the IA which required it to *cause the issuance of consents within thirty (30) days of filing*" and Clause 9.4 of the Schedule 2 of the IA, which required the GOB to cause the Ministry of Law to issue a certain legal opinion within 30 days of the signing of the GOB's guarantee. The Tribunal found,[15] inter alia, that one of the consents, for permission to acquire insurance outside Bangladesh, was issued 302 days late, and another, for an exemption from import fees, was issued 299 days late. The Tribunal also found[16] that the opinion from the Ministry of Law was provided some 252 days late.

23.   The Tribunal also held[17] that under Clause 4.5 of the IA, any delay on the part of the GOB and its constituent agencies in issuing consents resulted in an automatic, day-for-day extension of the FCOD under the PPA. For example, the 302 day delay in issuing permission to obtain insurance outside Bangladesh resulted in an automatic extension of the FCOD in the PPA from

---

13      See page 35 of the Submission of the 28/FEB/2003
14      Para. 263 Second Partial Award
15      Paras. 252-253 *ibid*
16      Para. 181 *ibid*
17      Paras. 248-249 *ibid*



16 August 1998 to 14 June 1999.[18]

24.    The liability of the Board arose out of its failure to recognise that the delays in the giving of consents resulted in automatic extensions of the FCOD and the other milestones in the construction schedule.[19] The Tribunal accepted[20] that when the Board terminated the PPA on 15 February 1999, Smith was unlikely to reach FCOD by 14 June 1999, but nevertheless the Tribunal concluded that completion would have been well within the cure period under Clauses 14.1.1 and 14.4.1 of the PPA. The Tribunal further held[21] that the reason given for termination of the PPA, namely, the failure to sign the Supplementary Agreement by the deadline imposed by the Board, was of no consequence as Smith was under no obligation to sign such an agreement to keep the PPA in force.

25.    The Tribunal made certain observations on the issues relating to damages under the heading of "Delay and Causation" while deciding the issues on liability.  The Tribunal's observations are as follows:

"...there is no evidence before us that unlawful actions of the Respondents caused delay or difficulty to Smith in trying to enter into arrangements firstly, with National Power and secondly, with Thermo Ecotek... it does not appear to the Tribunal that the Respondents were in breach of their obligations to assist by taking the position which they did in those negotiations over the

---

[18]    Para. 254 *ibid*
[19]    Para. 255 *ibid*
[20]    Para. 256 *ibid*
[21]    Para. 259 *ibid*

Supplementary Agreement]; and any such complaint was expressly disavowed by Smith in these proceedings.[22]

Smith's own documentation shows, see for example the letter of the 7 August 1998 [Ex. 160], contemplating Full Commercial Operation by the 28 February 1999, that Smith's whole program for fulfilling the contract envisaged very substantial delays and changes to Schedule 6, and that this was a consequence of Smith's own inability to raise finance and make appropriate arrangements with contractors and investors. Smith had committed itself to perform the PPA, but was unable to do so from its own resources. It took the risk that no investor could be found who was prepared to do so".[23]

"It is unfortunate, but true, that Dr. Smith could not give even as late as 8 February 1999, the assurances (inter alia) as to complete financing being available, and this in respect of a contract which had been entered into on 16 October 1997 and which envisaged the commercial operation of the plant by 15 August 1998."[24]

26.    It was the Tribunal's intention that these matters should be expressed so that the Claimant might have the opportunity to consider them.  Smith has taken

---

[22]    Para. 270 *ibid*
[23]    Para. 271 *ibid*
[24]    Para. 275 *ibid*



that opportunity. To that end, Smith has placed an appreciable body of further oral and documentary evidence before the Tribunal to deal with these specific concerns identified at the hearing on liability. In particular, Smith produced extensive evidence from Mr. Holt, formerly of Thermo Ecotek, as to the negotiations which he had had with Smith and the attitude of Thermo Ecotek at the material time.

THE ISSUES:

27.    The matters that remain to be determined in these proceedings are as follows:

(1)    Did the breaches of the PPA and LLA by the Board and the IA by the GOB as found by the Tribunal in its Second Partial Award cause Smith any loss and damage in addition to the $1.5 million loss on the Performance Bond wrongfully drawn down?

(2)    If so, what loss and damage has been caused by the said breaches by the Board and the GOB and for what proportion of such loss and damage is each liable;

(3)    What further or other costs should be awarded to Smith in respect of the arbitration;

(4)    Whether, and if so, what interest is payable on the sums awarded by way of damages and costs.

28.    In dealing with the issues relating to loss and damage, it must be borne in mind that the Tribunal is dealing with the liability of two separate Respondents,

14

namely, the Board and the GOB under separate agreements, namely, the PPA and the LLA in respect of the Board and the IA in respect of the GOB. The Tribunal reminds itself in this context that the IA has not been terminated.[25]

29.    The Tribunal repeats in this Award what it has stated in its previous Awards, namely, that the absence of the Respondents before it does not automatically entitle Smith to an Award in its favour. Smith must prove its case and, in this context, the loss and damage that it has suffered. Secondly, the absence of the Respondents is most unhelpful and it places the Tribunal in the unsatisfactory position of seeking to ascertain what defences or submissions the Board or the GOB might have placed before it so as to test the validity of the claims being made. Despite the regrettable circumstances giving rise to this task, the Tribunal has sought to take fully into account the possible submissions that either the Board or the GOB might have made.

THE APPLICABLE PRINCIPLES:

30.    In the view of the Tribunal, the legal principles which apply to the present proceedings are as follows:

(1)    The agreements in issue in this arbitration are governed by Bangladeshi law[26] including the Bangladeshi Contract Act 1872 (the "Contract Act");

(2)    Section 73 of the Contract Act deals with the question of damages for breach of contract.[27] To be entitled to damages a claimant must establish (1) that the

---

[25]    Para. 265 *ibid*

[26]    PPA Cl. 18; IA Cl.19.1

[27]    "Compensation for loss and damage caused by breach of contract - When a contract has been broken the party who suffers by such breach is entitled to receive, from the party who has broken the contract, compensation for any loss or damage caused to him thereby, which naturally arose in the usual course of things from such breach, or which the parties knew, when they made the contract, to be likely to

damages claimed were caused by the defendant's breach, and (2) that the loss

claimed is not too remote;

(3)    Where the Contract Act does not apply, the Court is bound to follow the

principles of the common law.[28]

(4)    Section 73 of the Contract Act is based upon[29] and is consonant with the

English common law;[30]

(5)    In applying Section 73 of the Contract Act "the principle is that the plaintiff

ought to be as near as may be in the same position as if the contract had been

performed";[31]

(6)    In order to recover its loss, the claimant must establish a causal connection

between the defendant's breach of contract and the loss claimed. The courts would

normally look at the "effective" cause of the loss.[32]

(7)    Compensation cannot be given for a loss that is too remote.[33]

(8)    In determining the quantum of damages, "the fact that the amount of a loss

cannot be precisely ascertained, as, for example, where it depends on a

---

result from the breach of it.
Such compensation is not to be given for any remote and indirect loss or damage sustained by reason of the breach....
Explanation - In estimating the loss or damage arising from a breach of contract, the means which existed of remedying the inconvenience caused by the non-performance of the contract must be taken into account."
[28]    *Setalwad Keshavlal Harilal and another v Sheth Pratapsing Mohallabhai and another* LVI ILR, Bombay Series, 101, 114-5
[29]    *Mehtab Din v Fazal Hussain* [1953] PLR 704, 705
[30]    *Sadruddin v Mithchell's Fruit Farms Ltd.* [1979] PLD Karachi 694, 700-701
[31]    *Chowdhury v Jagganath Rice Mills* [1951] 3 DLR 23, 33; See also *Mehtab Din v Fazal Hussain, supra*
[32]    Section 73, Contract Act; See also Chitty on Contracts; 28[th] Edn. Vol.1 27.024 and *County Limited v Girozentrale* [1996] 3 All ER 834
[33]    *Pakistan Industrial Development Corp. v Aziz Qureshi* [1965] PLD (WP) Karachi 202 where a distributor for the defendant woollen mill was entitled to foreseeable loss of profits for premature termination of distributorship agreement.

contingency, does not deprive the claimant of a remedy. Where, if the defendant had fully performed his undertaking, there was only a chance that the claimant would acquire a benefit or make profit, the court will discount the damages to reflect the likelihood that the benefit or profit would have been received."[34]

(9)    The claimant need only show that it had a substantial chance rather than a speculative one. Once he has shown the causal connection, *"the evaluation of the chance of success is part of the assessment of the quantum of damage, the range lying somewhere between something that just qualifies as real or substantial on the one hand and near certainty on the other"*.[35]

(10)    The claimant must show that it has taken reasonable steps to mitigate its loss.[36]

(11)    The seat of this arbitration being London, English procedural law applies to the conduct of these proceedings[37].    The burden of proving loss is upon the claimant and must be established on a balance of probabilities.[38]

RESOLUTION OF THE ISSUES:

Have the breaches caused the loss claimed?

31.    In considering this issue, the Tribunal will look at each of the alternative cases advanced by Smith and the quantum claimed under each.

National Power Financing:

---

[34]    See Chitty on Contracts; 28th Edn. Vol.1 27.006; Also see *Amin Jute Mills v A.R.A.G. Ltd.* [1976] DLR (AD) 76
[35]    *Allied Maples Group v Simmons & Simmons* [1995] 4 All ER 907; See also *Pakistan Industrial Development Corp* case, *supra*.
[36]    *Aziz Fatema Begum v Oil & Gas Development Corporation* [1978] PLD Karachi 316
[37]    PPA 18.1.7
[38]    *Biggar v The London Borough of Havering* [2001] EWCA CIV 411



17

32.    As stated above[39], Smith puts its claim on alternative bases. The first of the bases is the failure to obtain the National Power financing. The history of Smith's efforts to obtain finance from National Power starts with an arrangement made by Smith in late 1997 with ABN AMRO Bank ("**AMRO**") under which AMRO agreed to act as financial advisor to the project. AMRO prepared a project description memorandum[40] that was presented to a small number of investors. One of those presented with the opportunity was National Power.

33.    Active negotiations commenced between National Power and Smith in May 1998 to provide finance for the project. The negotiations resulted in a definitive term sheet dated 27 May 1998[41] that set out the terms and conditions under which National Power was willing to provide financing. In summary, the term sheet called for a partnership between National Power and Smith, with National Power providing the construction and permanent financing in return for a share of the partnership profits that varied between 55% and 90%, depending upon the circumstances.

34.    The Tribunal considered the witness statements of Dr. Smith and Mr. Philip Smith of National Power and heard evidence from them. Dr. Smith was informed that the proposal would be submitted on or about 22 June 1998 to National Power's loan approval committee, known as the Leadership Team, for ultimate approval. On 18 June 1998, Dr. Smith met Mr. Smith in London and was told that the Leadership Team had been fully briefed on the project and that the prospects for approval were good. However, Dr. Smith was informed on 22 June that Mr. Max Herbert, the chief

---

[39]    See paragraph 12 above
[40]    Ex. 255 – the AMRO Offering Memorandum
[41]    Ex. 260



18

financial officer of National Power in Singapore had decided not to make the presentation to the Leadership Team and had instead decided to terminate National Power's further involvement in the project.[42]  The Tribunal did not hear evidence from Mr. Herbert.  Dr. Smith was told by Mr. Smith in a letter dated 30 June 1998,[43] that this abrupt reversal of position was due to "*a general level of concern, on further analysis, of the risk profile*".

35.    Smith submits that by far the greatest risk the project faced at that point in time was that the Board would not honour the PPA with regard to the FCOD extension. For several months the Board had taken a rigid position on this issue and the latest letter before National Power withdrew was a letter from the Secretary of the Board dated 16 June 1998[44] which restated the rigid line being taken by the Board. Smith submits that although there is no evidence that this letter was passed on to National Power, there was daily exchange of information between Smith and National Power, and that there is enough evidence to establish the causal link between the Board's position and the decision to withdraw.

36.    Smith, therefore, calculates its loss and damage on the probability that if the Board had not taken its rigid stand on the extension of the FCOD, the project would have been financed and built with National Power funding on the general terms and conditions outlined in the 27 May 1998 term sheet.

37.    Mr. Robert Simmons, supported by Mr. Hugh Bereman, testified as to how the damage calculation is made.  The damage calculation is based on the profits,

---

[42]    Exs. 138-9
[43]    Ex. 146
[44]    Ex. 136



fees and other payments Smith would have received had the National Power financing gone through as expected.  Lost profits are calculated on the assumption that the plant would have been built at a total cost of $185,126,000 and financed with 70% eight year debt at an interest rate of 205 basis points over LIBOR, or 7.75%.[45]  The average plant load factor for these calculations is assumed to be 90%, i.e., it would operate throughout the life of the PPA (15 years) at 90% of its capacity.

38.    Under these assumptions, the net present value of Smith's lost profits would be $110,168,000.[46]  In addition, under the National Power financing, Smith would have received a development fee of $5,000,000 and reimbursement of its development costs of $3,467,000 on construction loan closing, and a success fee of $2,000,000 upon closing of the long term debt financing.  The total of these sums is $120,635,000.[47]

39.    Smith submits that an assumption of a load factor of 90% is reasonable given its experiences with its plant in Oklahoma where the plant and conditions are similar to Bangladesh. Secondly, reliance has been placed upon the demand for electricity in Bangladesh where currently demand far exceeds supply. With a load factor of 80% which is the "best case" according to the AMRO Offering Memorandum[48] the lost profits would be $86,184,000,[49] and with a load factor of 50% which is the AMRO "worst case", Smith's lost profits would be $75,231,000.[50]  Smith also

---

[45]    Ex. 310 p.1
[46]    Ex.310 p.2
[47]    Ex. 309
[48]    Ex. 255 p.83
[49]    Ex. 311
[50]    Ex. 313

supplied to the Tribunal various calculations testing the "sensitivity" of the figures submitted in support of its claim for loss and damage.

40.    Having heard the evidence given by the witnesses, the Tribunal has concluded that the failure of the National Power financing cannot be laid at the door of the Respondents.  The Tribunal bears in mind that the person who was dealing with the proposed financing at National Power was Mr. Max Herbert and it was his decision not to place the project to the Leadership Team.  The Tribunal has not heard any evidence from Mr. Herbert and the evidence of Mr. Philip Smith is insufficient to support a decision that the deal fell through because of the problems with the Respondents in Bangladesh.  Mr. Smith expressly referred to "*the risk profile*" in his letter and not to the risks connected with the project.  He also could not identify a dominant cause for withdrawal of National Power from the project.

41.    The Tribunal notes that it is clear from Mr. Smith's evidence that at the relevant time National Power was involved in a power project in Pakistan, the HUBCO project, which had gone or was going "sour".  The high probability is that this factor would have weighed heavily on National Power and its decision to invest further substantial sums in another similar project in the sub-continent.  These risks were identified by the AMRO Memorandum[51] and must have been of concern to National Power in its assessment of the project as a whole from the start.

42.    The Tribunal therefore concludes that Smith has not been able to show the necessary causal connection between the Respondents' breaches as found by the Tribunal and the loss resulting from the failure of the National Power financing.  In

---

[51]    Ex. 260 p.260 et seq



this view of the case, the Tribunal does not make any observations on the quantum of the loss claimed by Smith in this regard.

Thermo Ecotek Financing:

43.    After the National Power financing fell through, Smith reopened negotiations that it had begun some months earlier with Thermo Ecotek. Smith submits that the evidence was that Thermo Ecotek took a favourable view and was keen to provide the financing. The negotiations eventually resulted in a term sheet that was signed by both parties on 22 October 1998[52] (the "**Term Sheet**"). The Term Sheet expressly stated that it was not legally binding upon the parties.[53]  It further expressly stated some conditions precedent which had to be fulfilled before Thermo Ecotek would be obliged to finance the project.[54]

44.    Smith submits that its claim in respect of the Thermo Ecotek financing is based on a calculation of what Smith could reasonably have been expected to earn under the Thermo Ecotek financing proposal outlined in the Term Sheet. The highest amount claimed is $35,021,000[55] at a plant load factor of 90%, consisting of lost profits to Smith of $29,493,000, a development fee to Smith of $1,000,000, and reimbursement of development costs of $4,528,000. At a plant load factor of 80%, the lost profits would be $25,710,000, and the total with fees and reimbursed costs would be $31,238,000.[56]  Finally, at a plant load factor of 50%, lost profits would be $22,901,000, and the total damages with fees and costs would be

---

[52]    Ex. 280
[53]    Clause 13
[54]    Clause 8
[55]    Exs. 314-315
[56]    Exs. 317-318

$28,429,000.[57]

45.    Smith called evidence from Mr. Brian Holt, who had been the CEO of Thermo Ecotek at the relevant time and with whom Dr. Smith had negotiated, and its calculations of loss and damage were supported by Mr. Simmons and Mr. Beremen. Smith also provided the Tribunal with calculations testing the "sensitivity" of the loss and damage claimed.

46.    Smith's calculation of its loss and damage on this alternative case is based upon the Term Sheet, the full terms of which are at Ex. 280.

47.    A number of points arise out of the Term Sheet. First, the transaction was predicated upon the grant of an extension of the FCOD by an amendment of the PPA[58] by 6 months and 20 days from the date of amendment. Second, there were conditions precedent which had to be fulfilled before the obligations of Thermo Ecotek would become effective.[59] Third, the partnership interests of Smith were dependant upon whether a simple cycle or combined cycle project was developed. Fourth, the reimbursement of expenses paid for the development of the Project was subject to audit, documentation and approval by Thermo Ecotek. Fifth, one of the conditions precedent required approval from the Board for the transfer of ownership interests and the restrictions in the transfer of ownership in the PPA had to be waived.

48.    All of these conditions show that there were many hurdles to be overcome by Smith before it could convert the PPA into profit. Each of these conditions

---

[57]    Exs. 319-320
[58]    Clause 3 and Exhibit 1, Para. 1
[59]    Clauses 3 and 8



represented a risk that could have lessened the chance of earning the sums claimed by Smith.

49.    The structure of the financing with Thermo Ecotek was similar to that proposed by National Power, namely, a partnership in which the financing party would provide funding in return for a specified share of the partnership profits. However, there were significant differences in the benefits for Smith.    The percentage of partnership profits for Smith ranged between 5% and 10% as opposed to between 10% and 45% with National Power, and the development fees were lower, $1 million in contrast with the combination of the $5 million development fee and the $2 million success fee.

50.    Smith's loss calculations are based on a receipt of 10% share in the partnership. It is clear in the light of the evidence that Thermo Ecotek were negotiating Smith's share of the partnership profits down from a 60-40 split to 90-10 split as the time and opportunity to set up the Supplementary Agreement was passing by and the chances of Smith getting the deal together were getting slimmer.

51.    In addition to the financial differences, there is one significant underlying difference between the Thermo Ecotek proposal and the National Power financing proposal. Whereas the National Power proposal was based upon the PPA and its terms, the Thermo Ecotek proposal was predicated upon the signing of the Supplementary Agreement. This is expressly stated in the Term Sheet signed by Thermo Ecotek[60] and is evidenced by the fact that Smith started negotiations on the

---

[60]    Clause 3 reference to Signing Deadline and Clause 8(d) reference to amendments of PPA

24

Supplementary Agreement in about July 1998, which is about the same time that it restarted negotiations with Thermo Ecotek.

52.    It is absolutely clear that the Thermo Ecotek financing would not have gone ahead without the extension required by Thermo Ecotek. That extension could only have come about if the Supplementary Agreement was signed and the milestones in the PPA were extended by the stipulated 6 months and 20 days. Smith knew that the Supplementary Agreement had to be signed by 17 January 1999. Otherwise, the PPA was "*at risk*".[61]

53.    This analysis is supported by the submissions made by Smith.[62]

> "*Rather than attempt at the point to insist upon strict adherence to the PPA and the IA with regard to the FCOD extension issue, which would have required legal action that was sure to further sour relationships going forward, Smith attempted to negotiate a compromise in the form of a "Supplementary Agreement". Under the agreement proposed by Smith, the Board would agree to a reasonable extension of the original FCOD and Smith would make payments to the Board....*

> *On the following day, 18 January 1999, Thermo announced to Smith that it was pulling out of the project[63]....*

> *The only intractable issue, and the one that truly caused Thermo to withdraw,*

---

[61]    Ex. 213
[62]    Page 26 – Prehearing Memorial
[63]    Page 28 - Prehearing Memorial



*as Mr. Holt will testify, was the third – that the 17 January deadline had*

*passed without the Board's signature on a Supplementary Agreement...*[64]

(Exhibit References omitted)

54.    Mr. Holt's evidence,[65] which is reproduced below, indicates that Thermo

Ecotek was seriously interested and in all probability would have proceeded on the

basis of the Term Sheet, had the Board confirmed that it was going to give the

appropriate and contractual extension of time.

> *Mr. Marriott: The real question is that if, in fact, at the time you all signed*
>
> *exhibit 280 on 22nd October 1998, you had already had a clear extension*
>
> *from the government in terms acceptable to you, your position is  that you*
>
> *would have signed on the dotted line and gone ahead.*
>
> *Mr. Holt:      That is exactly right.   The plant would have been up and*
>
> *running.  That would have been our expectation.*

55.    Smith knew from the start that the extension of the original FCOD was crucial

to its obtaining financing from Thermo Ecotek.  It is, therefore, of little surprise that

on the day following the passing of the deadline imposed by the GOB Thermo

Ecotek pulled out of the deal, though there are substantial grounds for believing that

this was more a negotiating tactic by Thermo Ecotek than a final decision to

withdraw and to have nothing further to do with the project.  The parties indeed

---

64      Page 28 - Prehearing Memorial
   65        Transcript, 6 May, 2003, pp.89, 90

F:\CASES\SMITBANG.219\FINAL AWARD - OCT 30.wpd



26

subsequently negotiated the Asset Sale Agreement.

56.    The Tribunal has held that the Board and the GOB's insistence on signing the Supplementary Agreement was contrary to the terms of the PPA and the IA.

57.    In the light of the evidence of Mr. Holt in particular, the Tribunal considers that the second basis of claim, namely, the calculation of damages on the assumption that Thermo Ecotek would have proceeded on the basis of the Term Sheet, is made out.

58.    In coming to this conclusion, it appears to the Tribunal that after the National Power deal fell through, Smith and the GOB/Board were willing to extend the FCOD by 6 months and 20 days.  This was not an issue between the parties. The posting of a $8.5 million bond was also not an issue. The issue was in respect of the liquidated damages that the GOB/Board were seeking from Smith and the time within which the liquidated damages should be paid.  The parties never agreed on when the liquidated damages should be paid. It is clear from the Tribunal's previous findings that the termination of the PPA was unlawful. True it is that Smith was itself incapable of performing the contract from its own resources. Nevertheless, the Government and the Board having broken the terms of the IA and the PPA had no right to put up conditions, namely, the signing of the Supplementary Agreement, as a pre-condition to continuing with the transaction.  This unreasonable behaviour of the GOB/Board destroyed the opportunity for the final deal to go through and destroyed the opportunity for Smith to make money on the Thermo Ecotek financing project.

59.    The Tribunal is of the view that the loss and damage calculation regarding

loss of profits should proceed on the basis of a plant load factor of 80%. This was the percentage that AMRO thought was reasonable to achieve and the Tribunal has no reason to dissent from that view. Further, the Tribunal is of the view that the discount rate, namely, the reflection of the cost of capital to be applied in the calculation should be 15%. On the figures submitted by Mr. Bereman and Mr. Simmons in evidence, the loss of profits on these assumptions would be $19.8 million.[66] However, this is on the basis that the percentage share of the profits to Smith would be 10%. The Tribunal is of the view that this percentage would have reduced further, certainly once the cut off date for the signing of the Supplementary Agreement had passed, and it is more than likely that Smith would have received only a 5% share of the partnership profits from Thermo Ecotek. Therefore, the calculation of the lost profits should be reduced by 50% to $9.9 million to reflect the reduction in the share of the partnership profits.

60.     The Tribunal also considers that the loss and damage claimed by Smith should be subject to a further deduction to take into account the various risks which could have reduced the chance of generating the income anticipated by Smith. The Tribunal has concluded that an additional reduction of the loss of profits by a further 20% is warranted to reflect the additional risks faced by Smith in generating the profits in the venture. This will further reduce the lost profits to $7.92 million.

61.     In addition, Smith would also be entitled to recover its lost investments in the project by way of its wasted costs. These are claimed by Smith in the sum of

---

[66]     Transcript, 7 May 2003, p.73



$4,529,583. The sums claimed as expenses are referred to by Beverley Fenley[67] and a summary and detailed claim is annexed to her affidavit.

62.     The summary at Appendix A[68] shows that the claims for reimbursement are made in respect of Smith's own development in the sum of $3,751,965 and those of Energo Consults Ltd ("**Energo**") in the sum of $531,607 and Source International Inc. ("**Source**") in the sum of $246,010 making a total of $4,529,582.

63.     The evidence does not show that the sums claimed as development costs of Energo and Source have been paid by Smith. Energo and Source, as joint venturers in the project under a Joint Venture Agreement dated 22 January 1997, are not claimants in this arbitration and have no right to claim the sums either directly or through Smith. Further, as Ms. Fenley states in her affidavit, these would have been paid if the project was "*financed and built*".[69] Therefore, the claims in respect of the development costs of Energo and Source are rejected.

64.     As far as Smith's development costs are concerned, these have to be analysed to establish that they were costs properly incurred in the development of the Project. The details of these costs are set out in the 5 volumes of exhibits labelled as Appendix C. An analysis of these costs show that they cover a wide range of heads of expense, ranging from travelling, lodging and meals, consulting and other fees, office expenses, staff costs, overheads and legal costs  It is clear from the Term Sheet that the reimbursement of expenses paid by Smith for development of the Project would be made "*subject to audit, documentation and*

---

67     Ex. 308 – Affidavit of Beverley Fenley and Appendices thereto
68     Ex. 308
69     Para. 4 – Ex. 308



29

*approval by [Thermo Ecotek]*. The Tribunal considers this to be an important qualification. It notes the value of the deal in terms of lost profits for Smith and the approach to the negotiations adopted by Thermo Ecotek. This latter in particular was shrewd, tough and opportunistic. That is not intended as a pejorative evaluation; negotiation is negotiation; and Thermo Ecotek was in a very strong position vis-à-vis Smith. In those circumstances, the Tribunal considers that Thermo Ecotek would have been quick to reject any item of claim that failed any of the three tests outlined above - audit, documentation or approval.

65.    The Tribunal has reviews the material submitted by Smith. Taking these considerations into account, and adopting a broad brush approach, the Tribunal considers that the recoverable development costs would actually have recovered from Thermo Ecotek would not have exceeded $1.5 million.

66.    Adding the US$1 million development fee to the lost profits of $7.92 million and the recoverable development costs of $1.5 million, the Tribunal concludes that the sum of $10.42 million represents the total loss and damage that Smith can properly claim for the Respondents' breaches.

Asset Purchase Agreement

67.    The Asset Purchase Agreement was a last ditch attempt by Smith to recover something from the project. Having regard to the Tribunal's findings that the true measure of Smith's loss falls to be determined by reference to the deal set out in the Term Sheet of 22 October 1998, consideration of the Asset Sale Agreement does not arise. In any event, by the time this agreement was concluded, too much had happened and looking at the contemporaneous correspondence, it appears to

the Tribunal that the chances of Smith ever getting the project back on track were approaching zero.

68.    The Asset Purchase Agreement itself incorporates two hurdles which must be crossed before the transaction can be completed.  The project could not get off the ground because of Smith's lack of finance and it appears that the chance of Smith getting finance to complete the project was by now extremely remote. Therefore, the Tribunal concludes that these losses are too remote and irrecoverable.

<u>Loss and damage recoverable from which Respondent</u>:

69.    The question that next arises for determination is whether the Board or the GOB or both are liable to pay Smith the loss and damage it suffered on the project. The costs were incurred under the PPA and not the IA. Therefore, the loss and damage is certainly recoverable from the Board.

70.    However, the Tribunal found that the GOB has breached the IA in failing to give consents within the time schedule agreed with Smith and in its principal closing submission, Smith understandably was obliged to rely - vis-à-vis the Government - on these breaches of the IA[70]. While it is the case that (at page 20 of the submission of the 28 February 2003) Smith formally argued that "...had the GOB and the Board honored their obligation to provide a day-for-day extension of the PPA, Wmith would have been able to finance and build the Haripur project...." the reality is that hte breach causative of the principal loss suffered by Smith was the failures of the Board to recognise Smith's entitlements under the PPA; and its wrongful

---

[70]    See page 6 of the submission of the 28 February 2003.



determination of that agreement. Furthermore, the development costs were incurred and invested on the basis of the PPA and not the IA. In the premises, the Tribunal has concluded that it would be wrong to make the GOB liable for the loss and damage suffered by Smith.

COSTS:

71.    Smith submitted[71] its final claim for costs in the sum of $1,546,104. This sum is divided into six different heads under which the costs are claimed. The sum includes fees and costs not previously claimed in the 16 April 2002 Revised Bill of Costs, in the amount of $709,898.00[72] together with certain fees and costs upon which the Tribunal reserved judgment in its Third Partial Award on Costs in the sum of $812,222. The sum of costs claimed also includes $23,984 which was not allowed by the Tribunal, but Smith is seeking reconsideration of these costs.

72.    The costs claimed were summarised by Smith as follows:

### BRIEF SUMMARY OF SMITH'S COSTS OF ARBITRATION[1]

| Description | | Sums Paid | Sums Owing | Total |
|---|---|---|---|---|
| ICC Fees (see tab for background materials) | | $625,000 | - | $625,000 |
| Travel, Shipping, Transcription Services and the Like (see tab B for background materials) | | $43,599[2] | - | $43,599 |

---

[71]    Letters dated 25/JUL/03 and 23/AUG/03
[72]    ($686,998 + $22,900)



| Legal Fees and Costs (see tab C for background materials) | | | | |
|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP | | $109,913 | $668,640 | $778,553[3] |
| Brian Holt (Witness) | | $12,106 | - | $12,106 |
| Robert Simmons (Expert Witness) | | $20,306[4] | $64,509 | $84,815 |
| Mr. Philip H. Smith (Witness) | | $2,031 | - | $2,031 |
| Totals | | $812,955 | $733,149 | |

| Total Cost to Smith Cogeneration for Arbitration: | $1,546,104 |
|---|---|

[1]    All figures are rounded to the nearest dollar.
[2]    This amount includes $3,678.19 previously claimed for Dr. Smith's travel expenses for the November 2001 hearing in London. The Tribunal rejected this claim in the Third Partial Award. For the reasons discussed in the section II of this submission, Smith now requests that the Tribunal reconsider that determination.
[3]    This amount includes all of Skadden Arps' legal fees and costs from the initiation of this arbitration, less the $250,000 that the Tribunal awarded to Smith in the Third Partial Award.
[4]    Smith previously claimed $40,611.23 for Mr. Simmons' expert witness fees and expenses for the May 2001 hearing. The Tribunal rejected this claim, and Smith respectfully requests that the Tribunal reconsider that determination and allow half of this amount, or $20,305.62.



73.    Dealing with the last point first, the Tribunal is of the opinion that it is no longer open to it to revisit the orders made in the Third Partial Award for costs. Each of the six heads of cost claimed is discussed below.

74.    <u>ICC Fees in the sum of $625,000:</u> The Tribunal is of the view that the costs of the arbitration as assessed by the ICC Court should be recoverable in full.

75.    <u>Travel, Shipping, and Transcription Services in the sum of $43,599:</u> The Tribunal is of the view that these should be allowed subject to two deductions. First, further to paragraph 67 above, the $3,678 relating to the November 2001 hearing should be removed. Second, the Tribunal does not think that all of the expenses claimed under the heading "Meals, Goods, Services"[73] are reasonable. The Tribunal thinks that a further deduction of $2,000 is in order. The total allowable under this head is $37,921.

76.    <u>Legal Fees and Costs (Skadden Arps) – in the sum of $778,553:</u> Taking into account the costs already awarded on account of the fees of Smith's Attorneys, the Tribunal is of the view that a further sum of $400,000, in addition to the sum of $250,000 awarded in the Third Partial Award, should be allowed. making a total of $650,000 on account of the $1,028,553 claimed.

77.    <u>Legal Fees and Costs (Brian Holt, Robert Simmons, and Philip Smith) – in the sums of $12,106, $84,815, $2,031:</u> In relation to Mr. Holt and Mr P. Smith, the Tribunal is of the view that these are fully recoverable. In relation to Mr. Simmons, and further to paragraph 67 above, the Tribunal is not willing to allow the $20,306

---

[73] Final Bill of Costs of Claimant, Ex 2, page 3.

F:\CASES\SMITBANG 219\FINAL AWARD - OCT 30.wpd



34

claimed in relation to the November 2001 hearing to be recovered.  The total recoverable for Mr. Simmons is $64,509.

78.    Summarising the above, the total costs recoverable under this Final Award are:

| | |
|---|---|
| ICC | $625,000 |
| Travel etc | $37,921 |
| Legal fees | $400,000 |
| Brian Holt | $12,106 |
| Robert Simmons | $64,509 |
| Philip Smith | $2,031 |
| **Total** | **$1,141,567** |

79.    Consistent with the views expressed in paragraphs 69 and 70 above, the Tribunal is of the view that the above costs are recoverable from the Board only, and not the GOB.

INTEREST:

80.    Smith claims interest on the loss and damage and costs awarded in its favour.

81.    The Tribunal notes its power to award interest under section 49 of the English Arbitration Act 1996  and is of the view that Smith should be awarded interest on the damages and costs awarded in its favour. Smith claimed a general



35

rate of 10%[74]. That does not appear to be an appropriate rate for a claim couched in US$ and based upon funding in the USA. After considering current market interest rates and the level of the London Inter Bank Offered Rate (LIBOR) the Tribunal believes interest should be calculated at the rate of 4% and on a simple basis.

82.    In the light of the analysis that the Tribunal has set out above, it is appropriate that interest at that rate should accrue in respect of the substantive elements of the award as follows:

(1)    Lost profits. The opportunity that was lost was that of being involved in a fifteen year project. While Smith suggested[75] a start date for interest in espect of this element of the claim of the 1 July 2001, it seems to the Tribunal that the date of this Final Award should be actual start date for interest to run on the award of this sum.

(2)    The development fee. This would, on the Tribunal's analysis have fallen due at the beginning of 2000. The Tribunal considers that interest, at the rate identified above, should accrue in respect of this item from the 1 March 2000.

(3)    The development costs. $500,000 of these would have been payable at the time the deal was completed. On the above analysis, interest should therefore run on this element from the date that the deal might reasonably have been done had it gone ahead. The Tribunal considers that the 1 March 1999 is the appropriate date. The balance of $1m would have fallen due at the same time as the development fee and accordingly interest should run on that balance from the same

---

[74]        See for example exhibit 309
[75]        See for example Exhibit 317



date, namely the 1 March 2000.

(4)    The Performance Bond Award. The Tribunal considers that Smith is entitled to interest on the principal of $1,500,000 at the above rate from the 15 May 2002.

83.    Smith also claimed interest on the costs; but that is not a usual award under English procedural law; and the Tribunal discerned no special reasons in the present case to depart from the normal rule.

DECISION:

84.    Smith has established its claim against the Board for lost profits, lost development costs and lost fees in the sum of $10.42 million.

85.    The Tribunal orders that the Board shall pay costs of the arbitration assessed by the ICC at $625,000 and the sum of $516,567 towards the legal costs and disbursements incurred by Smith.

86.    The Tribunal further orders that simple interest shall be paid on the damages and costs awarded in favour of Smith. Interest shall run at the rate of 4%, beginning on the dates indicated above at paragraph 82 until such time as the relevant principal sum is paid.



37

87.    The Tribunal orders accordingly.

Signed

**John Tackaberry Q.C.**

**A. Matul Hossain Q.C.**

**Arthur Marriott Q.C.**

This award is made the 30 October 2003 at the seat of this arbitration, namely

London England.

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS, September 4, 2006

**Anne Marie WHITESELL**
Secretary General
ICC International Court of Arbitration



38

# IN THE INTERNATIONAL COURT OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE

## IN THE MATTER OF ARBITRATION NO. 10372/OL/ESR/MS

BETWEEN:

**SMITH COGENERATION (BANGLADESH) PVT. LTD**

**Claimant**

-and-

**1. BANGLADESH POWER DEVELOPMENT BOARD**

**2. THE GOVERNMENT OF BANGLADESH**

**Respondents**

**FINAL AWARD**

**DAMAGES AND COSTS**

John Tackaberry Q.C.
Ajmalul Hossain Q.C.
Arthur Marriott Q.C.

30 October 2003



EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                                      )
NATIONAL UNION FIRE INSURANCE )
COMPANY, et al.,                      )
                                      )
            Petitioners,              )
                                      )
    v.                                )        Civil Action No. 05-0478 (RMC)
                                      )
BANGLADESH POWER                      )
DEVELOPMENT BOARD, et al.,            )
                                      )
            Respondents.              )
                                      )
```

## ORDER

Petitioners National Union Fire Insurance Company and Smith Cogeneration petition this Court to confirm a foreign arbitral award against Respondents Bangladesh Power Development Board and the Government of Bangladesh.

Service of process was effected on Respondents pursuant to the terms of a power purchase agreement between Smith Cogeneration and the Bangladesh Power Development Board. However, Respondents have not filed any responsive pleadings in this matter. Finding that this Court has jurisdiction to consider this petition, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, *reprinted in* 9 U.S.C. § 201 *et seq.*, it is hereby

**ORDERED** that the Petition to Confirm a Foreign Arbitration Award [Dkt. #1] is **GRANTED**. It is

**FURTHER ORDERED** that the arbitral award to Smith Cogeneration, rendered in London, England by the International Court of Arbitration of the International Chamber of

Commerce on March 15, 2005, is **CONFIRMED** pursuant to the Convention on the Enforcement

of Foreign Arbitral Awards of June 10, 1958, *reprinted in* 9 U.S.C. § 201 *et seq.*

**SO ORDERED.**

Date: July 12, 2006                                         _____/s/_____

                                                           ROSEMARY M. COLLYER
                                                           United States District Judge

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SMITH COGENERATION (Bangladesh) PVT. LTD. | BANGLADESH POWER DEVELOPMENT BOARD and THE GOVERNMENT OF BANGLADESH, represented by the Ministry of Energy and Mineral Resources |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)  99999
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Douglas G. Robinson
Donna M. Francescani
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
⊗ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**⊗ E. General Civil (Other)**   **OR**   **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
☒ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Petition for Confirmation of Foreign Arbitration Award, 9 U.S.C.§§ 201, 203

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** [_____]   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒ NO ☐   If yes, please complete related case form.

DATE October 24, 2006   SIGNATURE OF ATTORNEY OF RECORD   *Donna M. Francescani*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.